**DEPARTMENT OF THE NAVY**
BOARD FOR CORRECTION OF NAVAL RECORDS
2 NAVY ANNEX
WASHINGTON DC 20370-5100

JRE
Docket No. 01180-07
26 March 2007

MR HAROLD E SIX SR
C/O WILLIAM J KENNEY ESQ
9915 EMPIRE WOODS COURT
CHARLOTTE NC 28277

Dear Mr. Six:

This is in reference to your application for correction of your naval record pursuant to the provisions of title 10 of the United States Code, section 1552.

A three-member panel of the Board for Correction of Naval Records, sitting in executive session, considered your application on 15 March 2007. Your allegations of error and injustice were reviewed in accordance with administrative regulations and procedures applicable to the proceedings of this Board. Documentary material considered by the Board consisted of your application, together with all material submitted in support thereof, your naval record and applicable statutes, regulations and policies. In addition, the Board considered evidence from cases filed under docket numbers 9117-04 and 7638-05, that pertain to two former members of the crew of the USS Liberty (the Liberty). The petitioner in docket number 7638-05 was represented before the Board by your attorney, Mr. Kenney, who also represents that petitioner in an action filed in the United States Court of Federal Claims. The panel also considered "Acute and Delayed Posttraumatic Stress Disorders: A History and Some Issues", American Journal of Psychiatry, volume 161, pp. 1321-1323, August 2004; "Adverse Outcomes Associated With Personality Disorder Not Otherwise Specified in a Community Sample", American Journal of Psychiatry, volume 162, pp.1926-1932, October 2005; "Stressed Out Vets", The Weekly Standard, 21/28 August 2006; "The Liberty Incident, Gag Orders Debunked", by retired Federal District Court Judge A. Jay Cristol with referenced documents, available on-line at http://thelibertyincident.com/gag-orders-debunked.html,; a statement by Bryce Lockwood dated 8 November

1995; correspondence provided by Rear Admiral Merlin Staring, Judge Advocate General's Corps, US Navy, Retired, in his capacity as an official of the USS Liberty Alliance, an advocacy group which wants the United States government to reopen the investigation of the Liberty attack, with the apparent goal of establishing that military forces of the State of Israel intentionally attacked the Liberty pursuant to the orders of officials of the government of Israel; and "The Assault on the Liberty: The True Story of the Israeli Attack on an American Intelligence Ship", James M. Ennes, Jr., 1979. The Board was unable to obtain an updated copy of your VA claims folder from the VA, despite multiple requests for those records.

For ease of reference, the staff of the Board made photocopies of your Navy service and health records, which are marked as S1-S250 and H1-H130, respectively.

As a preliminary matter, the Board found, contrary to what you led the United States Court of Federal Claims (the Court) to believe, you did not raise the issue of an alleged silencing order in your initial application for correction of your naval record. In this regard, the Board noted that that Mr. Kennedy admitted in paragraph 5 of his letter to the Executive Director, BCNR, dated 17 October 2006, that he did not raise that issue in your initial application, and you made a similar admission in paragraph 13 of your supplemental affidavit dated 2 November 2006.

As you know, Secretary of the Navy Instruction (SECNAVINST) 5420.193, enclosure (1), Procedures of the Board for Correction of Naval Records (32 CFR 723), section 9, Reconsideration, provides, in part, that after final adjudication, further consideration will be granted only upon presentation by the applicant of new and material evidence or other matter not previously considered by the Board. New evidence is defined as evidence not previously considered by the Board and not reasonably available to the applicant at the time of the previous application. As you failed to raise the issue of the silencing order in your first application, evidence concerning that issue is not "new evidence or other matter" as those terms are defined in SECNAVINST 5420.193, and does not provide a basis for reconsidering your request for corrective action. Similarly, the medical evidence and affidavits you submitted in support of your request for further consideration of your application are not new, because such evidence was reasonably available to you when you submitted your initial application.

After careful and conscientious consideration of the entire record the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice in your naval record. Specifically, the panel of the Board that considered your case was not persuaded you were issued the silencing order described in your application, that you suffered from posttraumatic stress disorder while serving on active duty in the Navy, or that you were unfit to reasonably perform the duties of your office, grade, rank or rating by reason of physical disability prior to your separation from the Navy.

The Board made the following additional findings:

Dr. Estrov's findings and opinion do not demonstrate that you suffered from posttraumatic stress disorder at any time during the 1967-1973 period. Although he apparently believes, as you do, that most or all of the problems you encountered during your service in the Navy are related to the effects of undiagnosed and untreated posttraumatic stress disorder, Dr. Estrov's findings do not substantiate those beliefs. As indicated below, Dr. Estrov glossed over, failed to consider, and/or ignored many significant aspects of your personal history that might have caused or contributed to the development of those problems. Particularly, that you were raised by a single mother in economically deprived circumstances. Further, you stated that you saw your father twice during your childhood, once when he gave you "a nickel", and a second time when you saw his body in a casket. It also appears that you did not receive adequate medical or dental care as a child, as you suffered from rheumatic fever, which generally develops from untreated or under-treated strep throat infections. You also had a correctable defect of your mandible which interfered with your ability to close your mouth and chew food, and may have been disfiguring, and at least ten of your teeth were extracted during the first few weeks of your enlistment in the Navy (H54). You dropped out of high school in the 10th grade, and had no significant employment until you entered the Navy in 1964 (S61). You began drinking alcoholic beverages at age 15, and were rejected for enlistment in 1963 because of immaturity and a history of bedwetting that continued beyond your 16th birthday. When you were being evaluated for alcohol abuse by Dr. Cole in August 1972, you admitted that you would drink to intoxication on some evenings in port on sea tours prior to your marriage in 1968 (H2). You contracted gonorrhea on at least two occasions while overseas prior to 8 June 1967, which presumably resulted from contact with prostitutes while your judgment may have been impaired by alcohol. When you married your first wife

on 5 July 1968 (S28) at age 22, you became financially responsible for her and her two children from a previous marriage. In addition, she was about five months pregnant with your son Harold, who was born on 24 October 1968. On 11 June 1968 (S219) you requested accelerated payment of your reenlistment bonus so that you could "pay off" a new car, and pay for dental care your wife needed before her pregnancy had progressed too far.

Additionally, Dr. Estrov did not discuss an electronic message dated 10 July 1972, that is filed in your Navy service record (S125). As the message is difficult to read, the staff of the Board prepared the attached typed copy. The following sentences from the message are particularly significant concerning the loss of your security clearance and your ultimate discharge:

> "DOCUMENTED PROBLEMS AND REPUTATION OF PETTY OFFICER SIX AND HIS SPOUSE INCLUDE $2661.32 INDEBTEDNESS, ACTIVE PARTICIPATION IN DISREPUTABLE INCIDENTS AT EM CLUB AT SAN MIGUEL, EXCESSIVE DRINKING, MUTUAL PHYSICAL ABUSE, HARASSMENT OF MARINE SENTRY AND ALLEDGED ADULTRY [SIC] OF SPOUSE …POTENTIAL FOR SUCCESS IS DEPENDENT UPON ASSIGNMENT WHICH DOES NOT ENSURE PROXIMITY TO SPOUSE. HIS SERVICE REPUTATION IS GOOD AND REFLECTS APPLICATION TO ASSIGNMENT ONLY WHEN PHYSICALLY SEPARATED FROM SPOUSE… MRS. SIX'S PROMISCUOUS REPUTATION IS WELL KNOW AND IS HAVING A DELETERIOUS EFFECT UPON THE MORALE OF MARRIED NEIGHBORS AND BACHELOR ENLISTED ALIKE. HER BEHAVIOR AND HER HUSBAND'S REACTIONS CANNOT BE TOLERATED IN THE SMALL ISOLATED COMMUNITY ENVIRONMENT AT SAN MIGUEL."

Dr. Estrov also failed to note that your performance of duty was slightly better after the attack on Liberty than before the attack, as measured by your Enlisted Performance Record. Prior to the attack, your evaluation mark averages in the trait areas of professional performance, military behavior, leadership and supervisory ability, military appearance, and adaptability were 3.26, 3.40, 3.50, 3.36, 3.46, respectively (S72). After the attack, the averages were 3.43, 3.36, 3.36, 3.48, 3.48, even though you held more responsible positions in higher pay grades (S26). These numerical scores were derived from entries in the "Report[s] of Enlisted Performance Evaluation" covering the periods in question, and those evaluations had a possible numerical range of from 4.0 to 2.2, in increments of .2. For example, ratings in the area of Professional Performance ranged from "Extremely effective and reliable. Works well on his own", left block, 4.0, to "Inadequate. Needs constant supervision",

right blocks, 2.2. Only those ratings that were below 2.6 were per se adverse/unsatisfactory and required additional written comments to justify the ratings.)

Dr. Estrov's discussion of the diagnostic impression recorded by Dr. Cole is misleading, because immature personality disorder is a recognized mental disorder. Such a disorder is listed in the current edition of the International Classification of Diseases (ICD)(World Health Organization) under code F60.8, Other Specific Personality Disorders. It was also listed in the edition of the ICD that was in effect in 1972, as well as in the Diagnostic and Statistical Manual of Mental Disorders, second edition (DSM-II), American Psychiatric Association (1968) that was in effect when you were evaluated by Dr. Cole. DSM-III (1980) includes code 301.89, for "Atypical, Mixed, or Other Personality Disorder". DSM-IV (1994) includes code 301.9, for to "Personality Disorder Not Otherwise Specified". The instructions following those codes in the DSM-III and DSM-IV provide that the codes were applicable in those cases where a clinician judged that a specific personality disorder not included in the DSM was appropriate. Under that guidance, if a clinician were to determine that you suffer from an immature personality disorder, ICD-10 code F60.8, a code of 301.9 would be assigned to that disorder in accordance with DSM-IV.

Dr. Estrov's report that you had been arrested "three times for drunk driving…His last arrest was in 1975" could not be substantiated. A criminal records check disclosed that you were arrested for misdemeanor drunk driving on a highway on 7 April 1976. That charge was ultimately dismissed and you pleaded guilty to a charge of reckless driving. On 29 September 1989, you were arrested for fraud to obtain aid in an amount less than $400.00.

Dr. Estrov did not comment on the fact that you lied to Dr. Cole about your use of alcohol(which you recently admitted), and that Dr. Cole was therefore unable to give you a diagnosis of alcohol abuse or dependence or refer you for treatment. Dr. Estrov's statement that Dr. Cole did not comment on your affect is erroneous, as Dr. Cole wrote that your affect was "happy".

The reports that an unidentified lieutenant commander and/or other officers visited multiple survivors of the Liberty attack at various locations around the world and informed them that they were never to speak of the attack to anyone without first obtaining his permission, or the permission of the former commanding officer of the Liberty, and that failure to follow that order would result in court-martial, are not credible. Two

other survivors of the Liberty attack have applied for correction of their naval records to show that they were retired from the Navy by reason of physical disability because of the effects of posttraumatic stress disorder and other conditions. The first petitioner submitted applications that were assigned docket numbers 8610-98 and 9117-04. He did not raise the issue of the silencing order in the initial application, docket number 8610-98. In that application, he blamed the Department of the Navy for failing to recognize and treat the posttraumatic stress disorder from which he suffered while on active duty in the Marine Corps. In a statement submitted in support of his application, he admitted that he had discussed the Liberty incident with a number of his fellow Marines. His file indicates that his primary focus was his anger over the fact that he had been awarded the Silver Star for his actions on 8 June 1967, rather than the Medal of Honor. He was also angered about what perceived to be the contemptuous attitude of other service members toward him and the other members of the crew of the Liberty. The Board rejected his contentions and denied his application. He raised the issue of the silencing order in his second application, and made claims very similar to those you made in your second application. The Board did not consider him to be a credible historian, and denied his application.

With regard to the issue of decorations awarded to Liberty survivors, it is important to keep in mind that the criteria for combat awards provide that the heroic achievement or wound that justifies the award must have occurred while the recipient was engaged in (1) an action against an enemy of the United States; (2) military operations involving conflict with an opposing foreign force; or (3) while serving with friendly foreign forces engaged in an armed conflict against an opposing armed force in which the United States is not a belligerent party. An additional criteria for the Purple Heart was that the wound was the result of an act of an (1) "enemy" or (2) a "hostile foreign force". The Combat Action Ribbon required that the recipient come under "enemy fire". It does not appear that the Liberty incident met general criteria (1) or (3), or the "enemy fire" requirement for the Combat Action Ribbon, or criterion (1) for the Purple Heart. It is arguable that it met general criterion (2) and Purple Heart criterion (2). Finally, at that time in question, the Purple Heart was not authorized for wounds caused by friendly fire.

The subject of docket number 7638-05 did not raise the issue of the silencing order in his application for corrective action, but there is a references to the silencing order in his VA Claims

folder. On 12 March 1968, the VA awarded him substantial disability ratings for residuals of the physical injuries he sustained in the Liberty attack. He did not request a disability rating for a mental disorder in 1967 or 1968. In 1990, he applied for service connection for posttraumatic stress disorder. He underwent psychiatric evaluation on 22 May 1990. He did not mention the silencing order during the course of the evaluation. He was given a diagnosis of posttraumatic stress disorder, and granted a disability rating for that disorder effective 25 January 1990. In 1994, he applied for an increased rating for posttraumatic stress disorder, and raised the issue of the silencing order during psychological evaluations that he underwent on 6 June and 25 July 1994. The panel of the Board that considered his application did not find him to a reliable historian, and denied his application. The panel noted that his file contained a letter dated 21 August 1968 from an attorney to VA officials, in which the attorney states that he represented the former Liberty crewmember in connection with his claim against the State of Israel "…on account of personal injuries which he sustained in the Israeli attack on the U.S.S. Liberty in the Mediterranean off the coast of Israel on June 8, 1967", which would appear to violate the alleged silencing order. The panel also noted that the petitioner claimed that he had waited more than thirty years to submit his application for correction of his record because he was not aware of the Board's existence. Contrary to that assertion, his Navy record contains a letter dated 24 February 1969 from the Surgeon General of the Navy to the applicant's representative in Congress, in which he advised the congressman that the petitioner had the right to submit an application for correction of his naval record to the Board. A Form 149, Application for Correction of Military of Naval Record, was enclosed in the letter. The petitioner was a member of the USS Liberty Alliance and although he was released from active duty in 1967, and never transferred to the retired list, he is identified as a retired seaman, US Navy, on the USS Liberty Alliance's letterhead.

You recently acknowledged that your record had not been sanitized by the removal of all references to the Liberty incident, as you had previously alleged. There are multiple references to the Liberty attack in your record. Among the more significant are a message dated 9 June 1967 entitled Status Report USS Liberty Casualties (S227-230), and a Presidential Unit Citation which contains details of the attack on the Liberty (S209,copy attached). Your health record also contains a copy of a letter to your commanding officer dated 29 January 1969, in which the Chief, Bureau of Medicine and Surgery, requested, on behalf of

to right leg + rt hand Meditterian [sic]Area. Combat injury. Flesh wound only. 1967. hospitalized USS America 8 days transferred to Naples, Italy - was hospitalized 14 days." It is clear that the entry is based on what you told the physician, rather that his review of your health record. All of the conditions he mentions in the clinical record, beginning with "mumps, measles, rheumatic fever, T+A in childhood, Sinusitis…" and ending with the entry in item 30 concerning your wounds, follow the same sequence as the do the entries you made in the Report of Medical History.

Prior to undergoing surgery on your mandible in 1972, you were interviewed by a surgeon. You disclosed to him that you had undergone a surgical procedure for the repair of lacerations "following shrapnel injury" (H72), and that you had sustained "Shrapnel injury (1967) R middle finger, R elbow and R lower leg" ( H69-73).

Given your disclosures concerning the attack on the Liberty, your participation in combat action, and your wounds, as well as the multiple entries in your record concerning the attack, your contention to the effect that that you did not report alleged symptoms such as insomnia, nightmares, and depression or excessive worry because you feared you might violate the silencing order, is not considered credible.

The statements, declarations and affidavits you submitted in support of your contentions concerning the silencing order are not probative of the existence of material error or injustice in your Navy record. Specifically, the statement by Captain Boston to the effect that he was told by Admiral Kidd that the admiral had been ordered to "put the lid" on everything having to do with the attack on USS Liberty, that they were "never to speak of it", and that they were to "caution everyone else involved that they could never speak of it again", is self-contradictory, and does address the consequences of discussing the attack. Captain Boston's statement is colored by his obvious contempt toward those whom he considers to be "apologists" for Israel, such as Judge Cristol.

Admiral Staring's statement pertains to his abortive attempt to conduct a legal review of the report of the Court of Inquiry. The statement does not address the silencing order.

Captain Kiepfer, whose name is also listed on the letterhead of the USS Liberty Alliance, recently submitted several lengthy statements in your behalf concerning the Liberty attack and the

"Silencing Order". It is clear that he considers the silencing order one of the most important issues for Liberty survivors, to include himself; however, he did not mention the silencing order in two earlier statements he submitted in your behalf, dated 15 February 1996 and 20 August 1997. Those statements, which he made in support of your claim for service connection and disability compensation for residuals of alleged shrapnel wounds to your face, raise a serious concern about his credibility as a witness. Specifically, he stated that he had personally treated you for "multiple mini-fragment facial injuries". Entries in your Navy health record shows that you sustained shrapnel wounds to your right leg, hand and arm. There are no entries concerning mini-fragment facial injuries. The VA accepted Dr. Kiepfer's report as true, and granted your request for service connection for residuals of those alleged facial injuries. It is also significant that in the 15 February 1996 statement, he claimed that he understood that you suffered from "Post Traumatic" neurologist syndrome. You maintain, however, that you learned from him that you suffered from that condition.

LCDR Ennes' description of the nature and effect of the alleged silencing order in the declaration he submitted in support of your application is very similar to your description; however, he did not make similar claims in his book, The Assault on the Liberty. He devoted a chapter of that book to the alleged cover-up of the incident, but he did not use the term "silencing order", or mention the alleged visits from an unidentified officer who conveyed the silencing order, and threatened sanctions for violating its terms. LCDR Ennes contended that although discussing the incident had been officially authorized following the completion of the Court of Inquiry, such discussions were strongly discouraged in private by his superiors at that time and for years thereafter. He related a preposterous anecdote (p184) from an unidentified source that is to the effect that two survivors of the Liberty attack were drugged and questioned by a "therapist" who was not trained in psychology or psychiatry, and threatened with electroshock therapy, and that as a condition of their release from a hospital where they were confined, they were required to promise in writing "never to discuss the Liberty attack or the hospital episode." LCDR Ennes did not disclose why those individuals were singled out, or why other survivors did not have to make similar written promises.

The panel did not accept your contention to the effect that you suffered from untreated posttraumatic stress disorder that caused you to develop a death wish, which in turn led you to volunteer for two tours of duty in Vietnam. Although you served on

the Judge Advocate General, that information be provided regarding the treatment of the injuries you sustained in the Liberty attack, presumably for inclusion in a claim for damages to be submitted to the State of Israel (H7). (See also S8, S 193,S223-230, H41, H42, and H46.)

You apparently misled officials of the Los Angeles Police Department (LAPD) in your application for employment as a jail guard, as it is unlikely that you would have been hired had you disclosed your history of alcohol related problems, or your continuing financial and marital difficulties. Records you obtained from the State of California Department of Corrections at the request of the staff of the Board suggest that when you applied for employment as a prison guard, you were not truthful about the circumstances of your discharge from employment with LAPD.

There are several entries in your Navy service and health records which would have been considered violations of the silencing order had you actually received such an order. For example, on 26 May 1970, you wrote a letter via your commanding officer to the Chief of Naval Personnel, in which you requested that you be issued the Combat Action Ribbon, and stated "[o]n that date, the ship came under heavy attack by Israeli jets and torpedo boats, receiving a torpedo hit on the starboard side which caused considerable damage and the loss of many lives. I have been awarded a Purple Heart for wounds received from torpedo shrapnel"(S194). During the course of the flight physical examination you underwent on 21 October 1971, you completed a Report of Medical History in which you disclosed a history of wounds to your lower right leg and a finger of your right hand. In addition, you falsely reported that you did not have a history of bed wetting, and denied a history of frequent or terrifying nightmares, depression or excessive worry, loss of memory or amnesia, and nervous trouble of any sort. You crossed out questions on the form that pertained to a drug or narcotic habit, excessive drinking and "homosexual tendencies". It appears that you were instructed to do so because answers to those questions were no longer required, and the questions were removed from later editions of the form that superseded the form you completed on 21 Octobr 1971. Your contention to the effect that you crossed out those entries to ensure that you did not violate the silencing order does not appear to have any basis in fact. The physician who conducted the flight physical interviewed you about your disclosures in the Report of Medical History, and prepared a "Clinical Record, Continuation of S.F. 88", which contains, in part, the following entry: "patient received scrapnel [sic]wound

temporary additional duty (TAD) in Vietnam on two occasions, the periods of duty were not lengthy, and there is no indication in available records that you participated directly in offensive combat operations or that you came under enemy fire. During your first period of TAD in Vietnam, you served as an analyst/reporter from 29 December 1970 to 1 April 1971, with responsibility for technical direction of procedures to be followed in processing, analysis, filing, and disseminating data. During your second TAD period, from 19 September to 6 November 1971, you monitored and analyzed communications while aboard an aircraft operating in support of combat operations in the Gulf of Tonkin area. You received highly complementary performance reports during each of those periods, when you were apart from your spouse.

Finally, the silencing order, as you have related it, was not absolute since you could have requested an exception to the order from the officer who gave you the order or from the former commander of the Liberty. You failed to do so, even though you faced the loss of your security clearance and opportunity to remain in your chosen occupational field because of the disabling effects of your service on the Liberty.

In view of the foregoing, your application has been denied. The names and votes of the members of the panel will be furnished upon request. It is regretted that the circumstances of your case are such that favorable action cannot be taken. You are entitled to have the Board reconsider its decision upon submission of new and material evidence or other matter not previously considered by the Board. In this regard, it is important to keep in mind that a presumption of regularity attaches to all official records. Consequently, when applying for a correction of an official naval record, the burden is on the applicant to demonstrate the existence of probable material error or injustice.

Sincerely,

W. Dean Pfeiffer

W. DEAN PFEIFFER
Executive Director

Enclosure

1. REF A ADVISED THAT CTR1 SIX IS NO LONGER ELIG FOR NAVSECGRU DUTIES. HE WAS RENDERED INELIG FOR NAVSECGRU ACCESS ON 7 JUL 1972.
2. DOCUMENTED PROBLEMS AND REPUTATION OF PETTY OFFICER SIX AND HIS SPOUSE INCLUDE $2661.32 INDEBTEDNESS, ACTIVE PARTICIPATION IN DISREPUTABLE INCIDENTS AT EM CLUB AT SAN MIGUEL, EXCESSIVE DRINKING, MUTUAL PHYSICAL ABUSE, HARASSMENT OF MARINE SENTRY AND ALLEGED ADULTRY OF SPOUSE. RELATED INFORMATION PROVIDED BY REFS B THROUGH E (AVAIL FROM COMNAVSECGRU).
3. MOST RECENT INCIDENT OCCURRED AT 23OO H 4 JUL 72 WHEN SUBJ, AFTER EXCESSIVE DRINKING, LOCKED SPOUSE AND CHILDREN OUT OF ASSIGNED PUBLIC QUARTERS AND CREATED GENERAL DISTURBANCE IN HIS QUARTERS. IN VIEW OF 7 JUL DEBRIEFING, ANTICIPATE FURTHER DETERIORATION OF MARITAL RELATIONSHIP AND CONTINUED EXCESSIVE DRINKING BY CTR1 SIX.
4. HIS DEMONSTRATED ABSENCE OF RELIABILITY NEGATES CONSIDERATION OF INDIVIDUAL'S PREFERENCES FOR RATING CONVERSION. THIS COMMAND RECOMMENDS IMMEDIATE CONVERSION TO ANY RATING NOT REQUIRING ACCESS TO CLASSIFIED INFORMATION. **POTENTIAL FOR SUCCESS IS DEPENDENT UPON ASSIGNMENT WHICH DOES NOT ENSURE PROXIMITY TO SPOUSE. HIS SERVICE REPUTATION IS GOOD AND REFLECTS APPLICATION TO ASSIGNMENT ONLY WHEN PHYSICALLY SEPARATED FROM SPOUSE. [EMPHASIS ADDED]**
5, PREVIOUS EXPERIENCE WITHG CASES SUCH AS THESE INDICATES THAT SUBJECT AND DEPENDENTS CAN EXPECT REMAIN AT THIS COMMAND UPWARDS OF SIX MONTHS WHILE CHNAVPERS EFFECTS CHANGE OF RATING AND FOR EPDOPAC TO MAKE ASSIGNMENT TO APPROPRATE NEW DUSTA (RECOMMEND PACFLT SHIP).

6. CTR1 SIX'S CONTINUED PRESENCE AT NAVCOMMSTAPHIL UNQUESTIONABLY JEOPARDIZES THE ABILITY OF THIS COMMAND TO SUPPORT AND MAINTAIN A PRODUCTIVE, WELL-BALANCED COMMUNITY. **MRS. SIX'S PROMISCUOUS REPUTATION IS WELL KNOWN AND IS HAVING A DELETERIOUS EFFECT UPON THE MORALE OF MARRIED NEIGHBORS AND BACHELOR ENLISTED ALIKE. HER BEHAVIOR AND HER HUSBAND'S REACTIONS CANNOT BE TOLERATED IN THE SMALL ISOLATED COMMUNITY ENVIRONMENT AT SAN MIGUEL. [EMPHASIS ADDED]** .STRONGLY REQUEST IMMEDIATE TRANSFER TO NAVSTA SDIEGO OR OTHER LIKELY HOMEPORT AREA TO AWAIT CHNAVPERS AND EPDOPAC DETERMINATIONS.

NOTE: EPDOPAC is believed to be an acronym for Enlisted Personnel Distribution Office Pacific.

Message FROM Commander, Navy Communications Station Philippines to Commander, Naval Security Group, dated 13(/) July 1973. Debt was more than five time his monthly pay.

The President of the United States takes pleasure in presenting the PRESIDENTIAL UNIT CITATION to

USS LIBERTY (AGTR-5)

for service as set forth in the following

CITATION:

For exceptionally meritorious and heroic achievement on 8 June 1967 during an armed attack by foreign aircraft and motor torpedo boats while sailing on an assigned mission in international waters in the Eastern Mediterranean. Very shortly after noon, LIBERTY was attacked without warning by foreign jet fighter aircraft and motor torpedo boats, and suffered major topside damage from strafing aircraft, serious damage amidships from a direct torpedo hit, and heavy casualties to the crew. The ship's radar, most of the external communications capability, all of the life rafts, and most of the ship's boats were lost due to the severity of the damage inflicted, the resulting fires, and exploding gasoline stored topside. Although two-thirds of the crew were killed or wounded, those surviving displayed outstanding professionalism, undaunted spirit, and extraordinary heroism in their efforts to save their ship. Following the directions of their Commanding Officer, they contained and extinguished the various fires caused by the attacks, and fought to control the flooding caused by the torpedo hit. Medical teams cared for the seriously wounded, expeditiously performing a task both great and difficult. Taking a vital part in the wide variety of actions necessary to save their ship and their shipmates, all surviving crew members were instrumental in returning LIBERTY one thousand miles safely to port. Their exceptional courage, perseverance, and devotion to duty reflect the highest credit upon themselves and the United States Naval Service.

Lyndon B. Johnson