# NAVY OCCUPATION AND TRAINING HISTORY

*See Art. B-2305, BuPers Manual

## 1. ADVANCEMENT, REDUCTION OR CHANGE IN RATING

| RATE TO WHICH PERSON WILL BE ADVANCED, REDUCED OR CHANGED | PRACTICAL FACTORS | | TRAINING COURSES COMPLETED | | | DATE ADVANCED, REDUCED OR CHANGED RATING | *OFFICER'S INITIALS |
|---|---|---|---|---|---|---|---|
| | DATE COMPLETED FOR ADVANCEMENT | *OFFICER'S INITIALS | DESCRIPTION OF COURSE OR NAVPERS NUMBER | DATE COMPLETED | *OFFICER'S INITIALS | | |
| | | | PASSED M/L (E-5) [initials] | 15 AUG 67 | | | |
| | | | NEC LTR SER 2 M/L of 10 JUL 67 | | | | |

## 2. NAVY ENLISTED CLASSIFICATION RECORD

| DATE | PRIMARY CODE | SECONDARY CODE | *OFFICER'S INITIALS |
|---|---|---|---|
| 10FEB67 | 0000 | 0000 | [initials] MA |

## 3. RECORD OF OTHER OFF-DUTY STUDY (USAFI Courses, Etc.)

| DATE COMPLETED | NUMBER AND TITLE OF COURSE OR TEST | SCHOOL | GRADE | *OFFICER'S INITIALS |
|---|---|---|---|---|
| | | | | |

## 4. DESIGNATOR RECORD

| DATE | DESIGNATOR | QUALIFICATION OR REVOCATION | *OFFICER'S INITIALS |
|---|---|---|---|
| | | | |

## 5. GENERAL EDUCATIONAL DEVELOPMENT TESTING RECORD

| | PASSED: (In-service equivalent) | FAILED: (Void if passed on retest) |
|---|---|---|
| HIGH SCHOOL LEVEL | HIGH SCHOOL GRADUATION ☐ Date ____ *Off. Initials ____ | ☐ Date ____ *Off. Initials ____ |
| COLLEGE LEVEL | ONE YEAR COLLEGE ☐ Date ____ *Off. Initials ____ | ☐ Date ____ *Off. Initials ____ |

## 6. RECORD OF NAVY SERVICE SCHOOLS ATTENDED

NAME AND LOCATION OF SCHOOL

CLASS NO. | COURSE LENGTH | DATE ENROLLED

DATE COMPLETED | FINAL MARK (0–100) (62.5 passing) | CLASS STANDING ____ in a class of ____

MANNER OF COMPLETION ☐ GRADUATED ☐ DROPPED FOR ____

SIGNATURE*

NAME AND LOCATION OF SCHOOL

CLASS NO. | COURSE LENGTH | DATE ENROLLED

DATE COMPLETED | FINAL MARK (0–100) (62.5 passing) | CLASS STANDING ____ in a class of ____

MANNER OF COMPLETION ☐ GRADUATED ☐ DROPPED FOR ____

SIGNATURE*

| NAME (Last) | (First) | (Middle) | SERVICE NUMBER | BRANCH AND CLASS |
|---|---|---|---|---|
| SIX | HAROLD | EUGENE | 777 58 53 | USN |

Navy Occupation and Training History NAVPERS 601-4 (Rev. 3-58) 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 4 2

AR 76

# NAVY OCCUPATION AND TRAINING HISTORY

*See Art. B-2305, BuPers Manual

## 1. ADVANCEMENT, REDUCTION OR CHANGE IN RATING

| RATE TO WHICH PERSON WILL BE ADVANCED, REDUCED OR CHANGED | PRACTICAL FACTORS: DATE COMPLETED FOR ADVANCEMENT | PRACTICAL FACTORS: *OFFICER'S INITIALS | TRAINING COURSES COMPLETED: DESCRIPTION OF COURSE OR NAVPERS NUMBER | DATE COMPLETED | *OFFICER'S INITIALS | DATE ADVANCED, REDUCED OR CHANGED RATING | *OFFICER'S INITIALS |
|---|---|---|---|---|---|---|---|
| SA | | | SN, NP, 91240-1B, 3.85<br>BMR, NP, 91202-1, 3.83 | 16DEC64<br>16DEC64 | NMB<br>NMB | 14 AUG 1964 | [signature] |
| SN | 22JAN65 | NMB | Military Requirements for PO 3&2 (91206-C) 3.44 | 21MAY65 | BAW | | |
| CTSA | | | NTC for CT T/R/I 3&2 NP91567-1 (3.91) | 28JUN66 | PMA | 5 MAR 65 | NMB |
| CTSN | 28APR65 | BCM | | | | 16MAY65 | BCM |
| CT3 | 25MAY65 | BAW | | | | 16APR66 | [signature] |
| CT2 | 6JUN66 | [signature] | | | | | |

## 2. NAVY ENLISTED CLASSIFICATION RECORD

| DATE | PRIMARY CODE | SECONDARY CODE | *OFFICER'S INITIALS |
|---|---|---|---|
| 14 AUG 1964 | CT-2400 | 0000 | [signature] |
| 05 MAR 65 | 0000 | 0000 | NMB |

## 3. RECORD OF OTHER OFF-DUTY STUDY (USAFI Courses, Etc.)

| DATE COMPLETED | NUMBER AND TITLE OF COURSE OR TEST | SCHOOL | GRADE | *OFFICER'S INITIALS |
|---|---|---|---|---|

## 4. DESIGNATOR RECORD

| DATE | DESIGNATOR | QUALIFICATION OR REVOCATION | *OFFICER'S INITIALS |
|---|---|---|---|

## 5. GENERAL EDUCATIONAL DEVELOPMENT TESTING RECORD

| | PASSED: (In-service equivalent) | FAILED: (Void if passed on retest) |
|---|---|---|
| HIGH SCHOOL LEVEL | HIGH SCHOOL GRADUATION [X] Date 11/65 *Off. Initials LWL | [ ] Date ____ *Off. Initials ____ |
| COLLEGE LEVEL | ONE YEAR COLLEGE [ ] Date ____ *Off. Initials ____ | [ ] Date ____ *Off. Initials ____ |

## 6. RECORD OF NAVY SERVICE SCHOOLS ATTENDED

NAME AND LOCATION OF SCHOOL: U.S. NAVCOMMTRACEN, PENSACOLA, FLORIDA

CLASS NO.: 06A-R | COURSE LENGTH: 22 WKS | DATE ENROLLED: 07 SEPT 1964

DATE COMPLETED: 05 MAR 65 | FINAL MARK (0-100) (62.5 passing): 92.70 | CLASS STANDING: 14 in a class of 19

MANNER OF COMPLETION: [X] GRADUATED [ ] DROPPED FOR Class aver for ~~prev 4 qtrs~~ 94.45

SIGNATURE*: N.M. BRADLEY, LT, USN, PERS. OFF.

NAME AND LOCATION OF SCHOOL:

CLASS NO. | COURSE LENGTH | DATE ENROLLED

DATE COMPLETED | FINAL MARK (0-100) (62.5 passing) | CLASS STANDING ____ in a class of ____

MANNER OF COMPLETION: [ ] GRADUATED [ ] DROPPED FOR

SIGNATURE*

| NAME (Last) (First) (Middle) | SERVICE NUMBER | BRANCH AND CLASS |
|---|---|---|
| SIX, HAROLD EUGENE | 777 58 53 | USN |

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

ENLISTMENT CONTRACT
NAVPERS 601-1 (Rev. 2-63)

[illegible] EXEMPT REPORT

| Field | Entry |
|---|---|
| 1. SERVICE NUMBER (Add suffix "W" if Female.) | 777 58 53 |
| 2. HIGHEST GRADE COMPLETED | 9 |
| 3. RATE ABBREV. | CT3 |
| 4. BRANCH & CLASS OF SERVICE | USN |
| 5. NAME (last, first, middle) | SIX, HAROLD EUGENE |
| 6. DATE OF ENLISTMENT (mo. day yr.) | 02 10 67 |
| 7. TERM OF ENLISTMENT | 06 YEARS ☐ MINORITY |
| 8. DEPENDENCY ABBREV. | 0-0 |
| 9. NAME OF ACTIVITY EFFECTING ENLISTMENT | USS LIBERTY (AGTR-5) |
| 10. AFQT SCORE | 074 |
| 11. | |
| 12. ENLISTED/REENLISTED IN U. S. NAVY | ☐ FIRST ENLISTMENT ☒ REENLISTMENT ☐ INDUCTION |
| 13. ENLISTED AT (City and State or Country) | NORFOLK, VIRGINIA |
| 14. TERM OF ACDU (USNR only) | 00 MONTHS |
| 15. ACTIVE/INACTIVE STATUS (USNR only) | ☐ RETAINED ON ACDU ☐ IMMEDIATE ACDU (Within 24 Hrs.) ☐ INACTIVE DUTY |
| 16. ACCEPTED AT (City and State or Country) | NORFOLK, VIRGINIA |
| 17. NO. OF ENL | 2 |
| 18. DATE MIL. OBL. INCURRED (mo. day yr.) | 05 06 64 |
| 19. M.O.D. | A |
| 20. GCT (Reen. only) | 55 |
| 21. RELIGION | PRESBY |
| 22. PLACE OF BIRTH (City) | TORRINGTON |
| State or Country | WYO |
| 23. DATE OF BIRTH (mo. day yr.) | 04 27 46 |
| 24. PHYSICAL PROFILE | A |
| 25. AREA/STATION/SUBSTA CODE | |
| 26. SOCIAL SECURITY NO. | 520 46 18 48 |
| 27. TRANSFERRED TO (Activity and Location) | RET ON BOARD FOR DUT |
| 28. ACTIVITY CODE | |
| 29. DATE OF TRANSFER (mo. day yr.) | 00 00 00 |
| 30. CITIZENSHIP | ☒ U. S. ☐ NATURALIZED U. S. ☐ OTHER* (Specify) |
| 31. BRANCH OF SERVICE FROM WHICH LAST DISCHARGED | USN |
| 32. | |
| 33. DATE LAST DISCHARGED (mo. day yr.) | 02 09 67 |
| 34. PRIOR NET SERVICE FOR PAY PURPOSES | 02 YEARS 09 MONTHS 05 DAYS |
| 35. TYPE OF LAST DISCHARGE | HONORABLE |
| 36. | |
| 37. DATE OF LAST ENTRY (mo. day yr.) | 05 06 64 |
| 38. ENTITLED TO REENLISTMENT BONUS | ☒ YES ☐ NO. |
| 39. SELECTIVE SERVICE NUMBER | NA |
| 40. SELECTIVE SERVICE LOCAL BOARD (Board Number, City and State) | NA |
| 41. ACTIVE DUTY BASE DATE (mo. day yr.) | 05 06 64 |
| 42. COMPLEXION | FAIR |
| 43. COLOR OF HAIR | BROWN |
| 44. COLOR OF EYES | BROWN |
| 45. HOME ADDRESS AT TIME OF ENLISTMENT (City & County) | COVINA, LOS ANGELES |
| State or Country | CALIF |
| 46. PAY GRADE BASE DATE (mo. day yr.) | NA |
| 47. HEIGHT | 71 |
| 48. WEIGHT | 140 |
| 49. RACE | CAU |
| 50. QUOTA CONTROL CODE | |
| 51. | |
| 52. MARKS AND SCARS | |
| Blood Type | |

I certify that a physical examination has been conducted according to current regulations, and that the above named man has been found by an examining physician to be physically qualified for enlistment.

R. W. PRATT, LT MC, USN, Certifying Officer.

For and in consideration of the pay or wages due to the ratings which may from time to time be assigned me during the continuance of my service, I agree to and with W. L. MCGONAGLE, CDR (*Name of Enlisting Officer*) of the United States Navy, as follows:

First: To enter the service of the Navy of the United States and to report to such station or vessel of the Navy as I may be ordered to join, and to the utmost of my power and ability discharge my several services or duties and be in everything conformable and obedient to the several requirements and lawful commands of the officers who may be placed over me.

Second: I oblige and subject myself to serve SIX Years from 10 FEBRUARY (*Date*) 1967 (*Year*) during minority until ____ (*Date*) ____ (*Year*) unless sooner discharged by proper authority, and on the conditions provided by Section 5540 of Title 10 of the U. S. Code, as printed on the reverse side of this contract.

In the event of a National emergency declared by the President or in the event of war during my term of service in the Regular Navy, or in the event of a National emergency declared by the Congress or in the event of war during my service in the Naval Reserve, I oblige and subject myself to serve until six months after the end of the war or National emergency if so required by the Secretary of the Navy unless I voluntarily reenlist or extend my enlistment. I understand that when so retained the addition of one-quarter pay as specified in Section 5540 of Title 10 of the U. S. Code is not applicable in time of war.

I also oblige myself, during such service, to comply with and be subject to such laws as have been, or may hereafter be enacted by the Congress of the United States, and to regulations issued pursuant thereto, and to submit to treatment for the prevention of smallpox, typhoid (typhoid prophylaxis), and to such other preventive measures as may be considered necessary by naval authorities.

Third: I am of the legal age to enlist; I have never deserted from and I am not a member of the Armed Forces of the United States, the U. S. Coast Guard or any reserve component thereof; I have never been discharged from the United States Service or other service on account of disability or through sentence of either civilian or military court; and I have never been discharged from any service, civil or military, except with good character and for the reasons given by me to the recruiting officer prior to enlistment.

Fourth: I understand that upon enlistment in a Reserve component of the United States Navy, or upon transfer or assignment thereto, in time of war or national emergency declared by the Congress, or when otherwise authorized by law, I may be ordered to active duty for the duration of the war or National emergency and for six months thereafter.

Fifth: I understand that if I become a candidate for the Naval Academy and fail to pass the entrance examination, I will be returned to general service.

Sixth: I have had this contract fully explained to me, I understand it, and certify that no promise of any kind has been made to me concerning assignment to duty, or promotion during my enlistment. EXCEPT AS PROVIDED IN BUPERSINST 1133.13C

Enlistment Oath: I, HAROLD EUGENE SIX, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice. So help me God.

And I do further swear (or affirm) that all statements made by me as now given in this record are correct.

SIGNATURE IN OWN HANDWRITING SURNAME TO RIGHT Harold E. Six

Subscribed and sworn to before me this 10TH day of FEBRUARY A. D. 1967 and contract perfected.

*Citizenship, as shown above, substantiated.

SIGNATURE AND RANK W. L. MCGONAGLE, CDR, USN OFFICIAL TITLE COMMANDING OFFICER ~~USS LIBERTY (AGTR-5)~~

(See Art. 1268, U. S. Navy Regulations)

RETAIN IN SERVICE RECORD

BEFORE THE
BOARD FOR CORRECTION OF NAVAL RECORDS
DEPARTMENT OF THE NAVY
Washington, DC 20370-5100

IN RE: )
HAROLD E. SIX )
Docket NO. 00483-03 )
)

# Applicant's Motion to Reopen for Newly Discovered Evidence And Motion For Reconsideration

William J. Kenney, Esq.
DC Bar No 99267
9915 Empire Woods Court
Charlotte, NC 28277-2279
Tel/Fax: 704-341-4781
E-mail: Kenneyffx@aol.com

JULY 15, 2004

BEFORE THE
BOARD FOR CORRECTION OF NAVAL RECORDS
DEPARTMENT OF THE NAVY
Washington, DC 20370-5100

IN RE: )
HAROLD E. SIX )
Docket NO. 00483-03 )
)

# Applicant's Motion to Reopen for Newly Discovered Evidence
# And
# Motion For Reconsideration

William J. Kenney, Esq.
DC Bar No 99267
9915 Empire Woods Court
Charlotte, NC 28277-2279
Tel/Fax: 704-341-4781
E-mail: Kenneyffx@aol.com

JULY 15, 2004

TABLE OF CONTENTS


| | | |
|---|---|---|
| 1 | Applicants Motion To Reopen | 18 pages |

APPLICANTS EXHIBITS

| | | |
|---|---|---|
| A. | Yuval Estrov, MD's Psychiatric Report Harold Eugen Six, dated April 29, 2004 | 11 pages |
| B. | Six's Supplemental Affidavit | 7 pages |
| C. | Six's Answers to Counsel's Questions in Preparation of Correction Application | 8 pages |
| D. | Six's 12-1-95 Statement | 2 pages |
| E. | Extracts, VA Rating Manual (7-1-1985 Edition.) | 5 pages |
| F. | Extracts, Diagnostic And Statistical Manual ("DSM") (Third Edition) | 6 pages |
| G. | BCNR Ruling JRE, Docket No. 00483-03, Issued 25 August, 2003 | 3 pages |
| H. | NAVMED INST. 5700 Series (To be suppled) | |
| I. | BUMED INST. 5300.8 dated 20 MAR. 92 | 5 pages |
| J. | NAVMED INST. 6400.3 (To be supplied) | |

BEFORE THE
BOARD FOR CORRECTION OF NAVAL RECORDS
DEPARTMENT OF THE NAVY
Washington, DC 20370-5100

IN RE: )
HAROLD E. SIX )
Docket NO. 00483-03 )
)

Applicant's Motion to Reopen for Newly Discovered Evidence
And
Motion For Reconsideration

## THE ISSUES

Applicant here moves to reopen and reconsider the record herein, including the Board's 25 August 2003 action denying Six's application, to receive newly discovered evidence. This evidence establishes that CT 1 Harold E. Six, USN, 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 was suffering from 70% disabling Post Traumatic Stress Syndrome at the time of his discharge from the Navy in February, 1973. Six properly should have been transferred to the Medical Retired List in lieu of being discharged. We here present evidence not previously available to petitioner rebutting the Board's denial of Applicant's petition.

Applicant represented by: William J. Kenney, Esq.
DC Bar No 99267
9915 Empire Woods Court
Charlotte, NC 28277-2279
Tel/Fax: 704-341-4781
E-mail: Kenneyffx@aol.com

## I. STATEMENT OF THE CASE

Former CT 1 Harold Eugene Six, USN moves to reopen his Application For Correction to present newly discovered evidence, to wit: his current VA Medical Records and other pertinent medical records, the Report of Yuval Estrov, MD., Six's supplemental affidavit, and, a copy of Six's answers to questions presented by undersigned counsel in preparation for presenting Six's Application for Correction and Six's original affidavit. This evidence effectively rebuts the Board's conclusions in its action of 25 August, 2003 denying the application for correction. Six's prior submissions to the Board in this record adequately review his personal service and most of the events giving rise to this proceeding. We invite the Board's review of those submissions, and incorporate them herein.

We here tender for the Board's consideration the following newly discovered evidence:

A.
Yuval Estrov, MD's Psychiatric Report : Harold Eugene Six, dated April 29, 2004

B.
Six's Current VA Medical Records

C.
Six's Supplemental Affidavit

D.
Six's Answers to Counsel's Questions In Preparation of Correction Application

## II. THE BOARD'S AUGUST 25, 2003 DECISION

By letter of August 25, 2003, the Board's Executive Director informed Six that on August 21, 2003, the Board in executive session considered and denied Six's application for correction. The Board noted Six was honorably discharged under an early out program, effective February 6, 1973; that despite traumatic events in 1967, Six continued to perform his duties in a satisfactory manner for several years thereafter, with promotions in 1967 and 1973; that it could not find any indication in the available records that Six suffered from the hallmark symptoms of post traumatic stress disorder during the period 1967 to 1973; that Six denied having a history of psychologic complaints on a Report of Medical History he completed on August 21, 1971, denying then having a history of frequent trouble sleeping, frequent or terrifying nightmares, depression or excessive worry, or, nervous trouble of any sort. The Board further noted that in a psychiatric evaluation on August 4, 1972 Six was diagnosed as having "immature personality;" that in a psychiatric opinion entered August 8, 1972, his records show the psychiatrist opined that "claims of alcoholism are unfounded;" and, that Six's physical exam of February 6, 1973 concluded that Six's psychiatric state was "normal," and the report's "Summary of Defects and Diagnosis" makes no reference to any psychiatric conditions or complaints. The letter reports "The

Board rejected your unsubstantiated contentions that the Navy treated you with indifference, that your use of alcohol was related to the effects [of] undiagnosed and untreated post traumatic stress disorder, and that your discharge was improper." The Board stated "The fact the ... (VA) granted you service connection .... for post traumatic stress disorder on July 21, 1999 was not considered probative ....", noting the different criteria applied by the VA from those of the military departments.

## III DELAY IN TENDERING REBUTTAL EVIDENCE

Applicant acknowledges this rebuttal is presented out of the time prescribed by the Board's Rules. The delay is the result of the applicant's severe financial circumstances, difficulties in obtaining a qualified psychiatrist to evaluate Six at rates and payment conditions Six could afford; and, his continuing uneasiness in dealing with issues arising from his experiences on the USS Liberty and the difficulties he experienced in the ensuing years as a consequence of those experiences.

On receipt of the Board's decision, applicant was advised he needed to retain a competent psychiatrist to review, and if professionally appropriate, rebut the Decision. Six could not pay for such a consultation. In November, 2003, Six determined he could assemble limited funds for such a consultation provided we could identify a competent psychiatrist willing to accept such responsibilities on a basis Six could afford. The doctor first contacted was not then available and recommended a colleague on the west coast. That doctor was too ill to accept the responsibilities, but provided recommendations that ultimately led to Dr. Estrov's participation. Applicant proceeded as rapidly as his limited finances allowed.

Equity and justice requires the Board accept and consider this compelling new evidence despite the delay in its submission, which was in fact beyond the applicant's control.

## IV DR. ESTROV'S REPORT

Dr. Estrov is a practicing psychiatrist, a member of the Psychiatry Consultation Associates, with offices at suite 1130, 4225 Executive Square, La Jolla, CA. He was recommended to counsel by the Chief of Psychiatry, University of California, San Diego, Medical School. He has served as a psychiatrist with the Veterans Administration Hospital, San Diego. He has meaningful experience in the diagnosis and treatment of individuals suffering from Post Traumatic Stress Syndrome.

Prior to his consultation with Mr. Six, Dr. Estrov reviewed Six's application for correction, including Six's affidavit, the statements from his children, Six's Naval Service and Medical Records (to the extent those records have been provided counsel,)[1] the Cain mental health evaluation conducted on August 4, 1972, Six's VA medical records, and, Six's medical records from his private health care provider, Kaiser Permanente. In addition, Dr. Estrov conducted a 3 hour interview with Mr. Six and his wife.[2]

1. POST TRAUMATIC STRESS DISORDER

In his report, Dr. Estrov carefully evaluated the record evidence for symptoms of post traumatic stress syndrome using the DSM-IV criteria for PTSD. These criteria include:

A. Experience of a traumatic event, and an emotional response of fear or horror to this event. Dr. Estrov concludes Six's experiences aboard the Liberty meet this criteria.

B. Traumatic recollections of the event. Dr. Estrov reports Six describes daily intrusive and distressing recollections of the event; nightly nightmares of the event; flashbacks that were most prominent in 1968 but occur even currently; and, intense psychological responses at events that remind him of the attack on the Liberty. Dr, Estrov concludes that Six fulfills now and did fulfill Criterion B in [the] winter of 1967.

C. Avoidance of stimuli associated with the trauma. Dr. Estrov reports Six avoids thoughts and conversations regarding the Liberty; that he seeks to avoid meetings with the Liberty veterans, starting in 1968; that he avoids going to the beach or having water touch his head in any way; that he is unable to recall the names of two victims of the Liberty attack, despite frequent reminders; that he experiences prominent detachment from others, including family members; and, that Six has a significant feeling of foreshortened future, that starting in 1967, Six began feeling as if he was "already dead", and volunteered for two tours in Vietnam "because of wanting to die." Dr Estrov reports that Six's avoidance of discussing the

---

[1] We note that Six spent several weeks hospitalized at Naval Hospital, San Diego in 1967 following his injuries aboard the USS Liberty. The medical records provided counsel by both the Navy and the VA do not contain any records from this hospitalization.

[2] We refer to his current wife. Mr. Six and his former wife were divorced in 1977; he married his current wife in 1978.

traumatic event aboard the Liberty during his Mental Status exam is representative of this criteria. Dr. Estrov concludes that Six fulfills now and did fulfill criterion C in 1968

D. Increased arousal. Estrov reports Six has experienced nightly insomnia since 1967; and, since 1968 has experienced significant irritability with angry outbursts, a decreased ability to concentrate, and, is hyper-vigilant, sensing he is "always on guard" and ducks in response to loud noises. Dr. Estrov reports that Six displayed hyper-vigilance during his mental status examination Dr. Estrov determined that Six fulfills now and did fulfill criterion D in1968.

E. Affect. Dr. Estrov reports that in the course of his Mental Status Examination, Six's tendency to discuss the events on the Liberty as though it were occurring in present time with blunted emotion is suggestive of re-experiencing and numbing, both diagnostic criteria.

Dr. Estrov concludes "It is my professional belief that Harold Six suffers from post traumatic stress disorder. Based on my assessment Mr. Six met criteria for this disorder in 1968 and has not had the disorder remit to this very day.

2. ALCOHOL DEPENDENCE

Dr. Estrov notes Six reports drinking on weekends while in port with neither social nor occupational consequences until the attack on the Liberty. In the months following the attack he began drinking more heavily, and, by 1969, Six had escalated to full alcohol dependence. In 1969 Six reported for duty drunk and was reprimanded. From 1969 on, Six spent much of his off duty time consuming alcohol; and, experienced markedly diminished effect of consumption of similar amounts of alcohol. Six attributes marital difficulties and difficulties in fulfilling his parental obligations in part to his alcohol use. Incidences of violence while under the influence increased, causing arrests for DWI. Dr. Estrov reports Six remained in a state of active alcohol dependence from 1969 to 1978. Six experienced a year long relapse in 1984 with significant alcohol consumption and depressive symptoms. He has been in remission since, with a 2 week relapse in 1994, and is currently in full remission.

3. DEPRESSION

Six suffered an episode of depression in 1984, precipitated by the loss of his job. In the ensuing nearly one year of unemployment, Six spent the year at home, drinking and in severe depression. Symptoms included: dysphoria, anhedonia, thoughts of

death, significant guilt regarding his unemployment, worsened insomnia, decreased appetite with weight loss, feelings of hopelessness and of worthlessness.

4. CO-MORBIDITY

Dr. Estrov reports that PTSD is commonly associated with other psychiatric conditions and that it is often the rule in combat related cases. He notes that the prevalence of an alcohol dependence diagnosis in combat related PTSD has been estimated as high as 75% , and 40% in civilian PTSD cases. He also notes that the prevalence of major depressive disorder in all patients with PTSD is estimated at 49%. Dr. Estrov concludes :"The time course of psychiatric diagnosis: PTSD in 1968 and alcohol dependence in 1969 leads me to conclude that PTSD symptoms were more probably than not etiological in the subsequent development of alcohol dependence.

5. DISABILITY

Dr. Estrov notes Six was released from the Navy due to his inability to manage his finances; that at that time both he and his then wife were drinking heavily, and, that while Six blames his then wife, it is likely that Six's ongoing alcohol dependence contributed to his marital difficulties and to his failure to manage his monetary affairs. The doctor then notes that after his release, Six's employment was at positions below the level of his technical training and experience, and, that he lost several jobs at these lower levels of achievement. Both Six and his children report that he was isolative and largely inebriated during this time; that alcohol abuse was the stated reason for his release from these employment opportunities. Six's marriage was failing and he was unable to provide for the emotional needs of his children. Dr. Estrov concludes that: "There is no question in my mind that at the time Mr. Six was functioning at a very low level." In his Multiaxial diagnosis in keeping with the DSM criteria for evaluation of Six's current mental health status, Dr. Estrov choses a 55 rating for Axis V.

6. CONCLUSIONS

Dr. Estrov's "professional opinion [is] that Mr. Six currently suffers from post traumatic stress disorder. I also believe that criteria for the diagnosis were met during active duty from 1968 and contributed to disability at the time of discharge in February, 1973. He concludes: " Based on the VA Rating Manual , 38 CFR, Ch. 1, Part 4 (7-1-85 Edition), sections 4.125, et seq., evidence cited, and evaluation conducted above, I concluded that at the time of his discharge from the navy in February, 1973 Mr. Six was suffering from PTSD and alcohol dependence. These conditions were more likely than not the cause of severe impairment in both employment and interpersonal relationships. It is my opinion that at the time of his discharge Mr. Six's disability rating

was 70% under criterion established at section 4.132 of the Rating Manual, applying the standards for Psychoneurotic disorders, 9400, et seq."

## VI. RESPONSE TO BOARD OPINION

### 1. ATTORNEY'S ERROR

At the outset, with embarrassment, Counsel acknowledges an egregious error in the facts alleged in the Application and stated in the applicant's affidavit. As the Board correctly notes, Six was not actually discharged for cause. Rather, he was initially offered the opportunity to apply for change of job classification, and on declining , was transferred to San Diego for discharge under the regulations providing for discharge for alcohol abuse and for failure to manage his finances. However, sympathetic personnel at San Diego noted he was close to being eligible for the "early out program," held him there until February, 1973, and he was honorably discharged under the "early out" program. It is important that the Board recognize that the wording of the application and the accompanying affidavit was solely that of Counsel. The applicant relied on Counsel. Unfortunately, counsel did not fully elaborate the sequence of Six's processing. To reinforce this fact, we submit Mr. Six's answers to a series of questions counsel presented to him incident to preparation of the application and accompanying affidavit. Mr. Six clearly set out the true facts of the circumstances of his discharge.

We submit, the Navy improperly handled this discharge, deprived Six of substantial rights incident to processing what was in fact, if not procedure, a "for cause" discharge, and caused him great harm. Counsel's error should not distract the Board from the injustices and inequities the Navy has inflicted on Mr. Six.

### 2. SIX IN FACT DISCHARGED FOR CAUSE

It is evident that termination of Six's security clearance by reason of his debt management failures, his family difficulties, and, his alcoholism, had the same practical effect, and was intended to have the effect, of terminating Six for cause. It is also clear from this record that the Navy did nothing practical or appropriate to help Six salvage his career. The proffered a change of rating was not practical. Six well recognized that any such change would simply postpone his ultimate discharge before establishing his retirement entitlement. Transferring into another rating as a First Class Petty Officer ensured he would fail of selection to Chief, and face attrition as the Navy "downsized" after Vietnam. It seems that the Navy offered the change of rating to avoid triggering their responsibility to inform him of his rights to counsel. It is both strange, improper, and, sad, that no effort was made to counsel Six as to how to get control of his finances. He never was informed that he could discharge his debts by filing for

bankruptcy; that such would be deemed appropriate under the Navy's governing Instructions. He was never informed of his right to challenge the revocation of his security clearance. He was challenged about his alcohol dependency but never advised of his opportunity to enroll in the Navy's Alcohol treatment program. He was informed he would be discharged, but never informed of his right to challenge that determination. Six's injuries aboard the Liberty, his two tours in Vietnam counted for nothing. He was hung out to dry, but offered no guidance as to how, or where, to dry out. Indeed, if it were not for a sympathetic personnel mate, he would have been discharged for cause. That he was being processed under "for cause" instructions is clear from the exams he underwent on August 4 and August 8, 1972. Such exams were not called for as a component of regular release from active duty processing.

3. NAVY FAILED IN DUTIES OWED SIX

The Navy well knew that sailors who had experienced the extreme trauma and terror that Six underwent were highly likely to evidence signs of psychiatric stress. Six's loss of financial control, his evolving alcoholism, the evident deterioration of his family life, and, his growing uncontrolled anger, surely were such signs. The misguided effort to get him to change his rating seems to be a Command effort to ship Six out of the command instead of providing him the care and counseling he needed and deserved.

The critical fact is the Navy well knew of the trauma and terror Six experienced aboard the Liberty. It had a duty to monitor his subsequent life and to intervene and carefully evaluate Six when the combined tell tale signs of loss of control began evidencing themselves. This duty to carefully evaluate Six was heightened by the highly security sensitive responsibilities involved in Six's job assignments. The Navy's action in sterilizing Six's record so as to avoid disclosure of the true facts of Liberty attack, and, their orders prohibiting him from discussing events aboard the Liberty, had the unfortunate, if likely unintended result of concealing these horrifically stressful events from medical personnel who might otherwise perceived their duty to intervene. Whether ignorant of, or indifferent to Six's background, his command's reaction was to ship Six out to another command. When Six frustrated that effort, the Commands action was to initiate for cause discharge action by reason of his alcoholism and his debts.

LCDR. Cain's report recognized the reality this was a "for cause" processing in specifically noting he could not determine alcoholism on the information then available to him. LCDR. Cain also cautioned the processing commands that more was needed than the pro-forma evaluation he was able to conduct on the basis of the limited record presented him. Commander Cain's concern as to the adequacy of the records presented him for his evaluation is fully understandable. Those records were almost

totally silent as to Six's real service history. The sole reference to his Liberty experiences was the notations of the injuries to his leg and his hand, and the fact that he was transferred from the Liberty to the USS America on the 8th or 9th of June, 1967, and, thereafter medevaced to U.S. Naval Hospital, San Diego, via the Army Medical Command, Germany. Person's reviewing the record would have no knowledge of how the leg was injured, and, what else transpired that day.

The Commander obviously recognized something that required further evaluation. He was obviously frustrated by his inability to gain any info as to what had gone on, either from Six, or the available records. Six was prohibited from discussing what went on. Despite the truly heroic efforts of the Liberty crew in withstanding the Israeli attack, and their subsequent efforts to keep the vessel afloat, no unit citation was awarded the crew. Six's Purple Heart award merely identified the fact he was wounded in enemy action. Nowhere in the medical and service records is their any recitation of the facts concerning the attack on the Liberty, or the extreme trauma and terror experienced by Six and other sailors aboard the Liberty. The Navy had made certain of that. In so doing it denied Six the care he needed and was entitled to. Instead, the Navy allowed Six to stumble into a life that almost destroyed him and his family.

## VI. BOARD RULING IN ERROR

### 1. BASIS OF BOARD'S RULING

The Board relies on four factual determinations of its record: 1) Six's successful Navy promotional history following the Liberty attack; 2) Six's October, 1971 flight physical; 3) The "psychiatric evaluations" of August 4, and August 8, 1972, and, the "clinical evaluation" of February 6, 1973; and, 4) presumably, the presumption of regularity that attach to official records. The Board dismisses as "unsupported", Six's assertions in his affidavit, and declares the VA finding that Six suffered from service incurred Post Traumatic Stress Disorder as "not dispositive" that his discharge was a correctable injustice. We respectfully submit that this data is insufficient to support the Board's rejection of Six's application. At a minimum, the facts alleged in the affidavits and statements supporting the application, coupled with the VA finding , coupled with the fact that immediately prior to his discharge the Navy had revoked his security clearances, should have prompted the Board to direct NAVMED to allow Six to submit to evaluation by Navy Psychiatrists and should have assisted the applicant by ordering the production of the additional records requested by the applicant.

2. BOARD ERRS IN DISMISSING VA RULING

We do not assert that the VA finding that Six presently suffers from service incurred Post Traumatic Stress Disorder was "dispositive" of the issue or determinative that he was disabled from the disorder at the time of his discharge. We do assert that the VA finding, coupled with the affidavits and statements of record, are evidence that an injustice may have incurred sufficient to invoke the Board's duty of inquiry. We further assert that, in the circumstances here involved, the Board did not satisfy that duty by blind acceptance of entries in Medical History Reports. Here, the member was under orders prohibiting him from discussing the June 6, 1967 events aboard the Liberty. Had he answered those questions accurately, inevitably this would have required discussion of the attack on the Liberty.

3. REGULARITY OF RECORDS

The Board's opinion does not identify precisely how it applied the presumption to the records involved. However, the Board accepts the accuracy of Six's checked responses to the Reports of Medical History he prepared incident to the examinations of February 21, 1971, the exams of August, 1972 and of February, 1973. Six's claims of PTSD symptoms are rejected as "unsubstantiated." The Board rejects his claims that prior to, at the time of his discharge, and, in the ensuing years, he was experiencing PTSD symptoms. We suggest the fact Six was issued orders by competent superiors prohibiting him from answering those questions accurately must be considered in evaluating those histories.

Six's February, 1971 History shows clearly he was evading answering those questions. Thus, the presumption is overcome as to those reports because of the conflicting duties that confronted Six in completing those reports.

As to the mental health evaluations themselves, not only did the applicant point out the incompleteness of records herein, the Mental Health Evaluation of August 4, 1972 expressly notes that the evaluator required examination of additional records before his evaluation could be considered complete, and, relied on as a competent, professional psychiatric evaluation. Further, applicant has requested the Board to require the Naval Medical Command to provide data establishing the credentials and privileges of the doctors conducting the evaluations of CT-1 Six on August 4, and August 8, 1972, and, February 6, 1973. The Board failed to act on this request; yet, as discussed below, that information is critical to the issue of whether such records qualify for the presumption of regularity of official records.

As Dr. Estrov notes in his Psychiatric Report on Six, LCDR. Cain's Report does not prove helpful in assessing Six's illness. First, the apparent purpose of the

evaluation was to determine alcohol abuse, but no clear conclusion was reached. Second, the Evaluation did not document a full mental status examination. For example, the report does not document questions regarding hallucinations, relying instead on the report of medical history provided by Six; nor does it contain analysis of many of the DSM criterion observed during the examination, focusing instead on the "immaturity" diagnosis established when Six first sought to enlist. It does not appear the doctor was aware that diagnosis related to a physical "immaturity" problem. LCDR. Cain specifically caveated his report with the notation that he needed to review Six's Medical and Service Records, which records obviously were not made available to the doctor. The record fails to explain why those records were not made available to the doctor. Finally, the diagnosis offered is not a DSM diagnosis and is not related to a DSM diagnosis. As discussed below, the Department of Defense and the Navy have adopted the DSM criteria and diagnosis terminology in matters relating to mental health evaluations. Thus, at best, this report is incomplete as to the critical issues raised by the application, and does not qualify for the presumption of regularity. The evaluation does not appear to have arisen in the normal course of conduct of Six's separation physical, is facially incomplete, and, fails to comply with governing regulations.

A fair inference can be drawn from the report in support of the application. If, as the Board concluded, Six was not being processed under for cause discharge instructions, It is clear Six's superiors were concerned with his conduct and requested he be specifically examined for alcohol dependency. In that era, the Navy members, officer and enlisted, had a limited, unsympathetic understanding of mental health issues, including, in particular, the problem of PTSD. They felt they could identify alcohol problems. It is clear that issues concerning Six's mental health status were raised. LCDR Cain obviously detected evidence of mental health issues that required more in depth analysis following review of the requested records. Such in depth evaluation was never conducted.

Regarding the report of August 8, 1972, there is simply no basis to evaluate the report. This report seemingly was directed to the sole issue of determining the validity of "claims of alcoholism." The record shows this was a concern specifically identified by his command in forwarding him for discharge processing. It is unusual that Six would be directed to submit to a second psychiatric evaluation in 4 days. A legitimate inference can be drawn that LCDR. Cain's supervisors found his report deficient and incomplete, and directed further evaluation. Alternatively, LCDR Cain may have recognized signs of alcoholism or other signs of stress that were inconsistent with Six's pro forma denial of alcohol abuse and other indicia of mental health problems, did not

record those signs, but reported them to his supervisors, and, his need for additional records (information) before he could complete his evaluation. Presumably, this prompted the second evaluation. There is no suggestion that those records were evaluated incident to this evaluation. An inference can be drawn that the Command had no intention of conducting a professional evaluation. It can be inferred the Command viewed the exams as a pro forma process required before Six's discharge, and cut off further evaluation or investigation.

Even had those records been available, other than LCDR. Cain's notation that Six's "orders requested medical opinion regarding alcohol abuse " there is nothing in Six's medical records that have been made available to Counsel that infers any issue of alcoholism. Only an understanding of the subtle references in Six's service record commonly used to suggest alcohol abuse, coupled with the circumstances of his discharge, infers such a problem, (for example, references to dirty uniforms.) But, the Navy clearly knew of Six's alcohol abuse. Presumably that knowledge arose from Six's personal conduct, including the events of family abuse in his family's quarters. The Board does not challenge Six's claims of alcoholism, merely that such was related to his experiences aboard the Liberty. We ask, however, that the Board direct the Navy to locate and produce the incident reports from the Shore Patrol units involved in responding to situations at then CT-2 Six's quarters in the Married Enlisted Quarters assigned the NAVSECGRU PHILLIPPINES personnel. Six's daughter Tammy describes that those interventions were required because Six was then experiencing outbursts of uncontrollable rage, not merely acting as a mean drunk. In short, much more than mere alcohol abuse was involved.

Regarding the application of the presumption of regularity to this report, we note the report does not appear to be a full mental status examination. The report notes Six's complaints of the "unfairness of his present life situation", but limits the discussion to Six's concern with his then wife's infidelity. It does not suggest the doctor was aware of the trauma Six experienced aboard the Liberty, or addressed in any way how that event might be affecting Six. It does not document questions to evaluate possible hallucinations, flashbacks, nightmares, insomnia, survivors guilt, difficulty in concentration, aggressive behavior, feelings of estrangement or detachment or other symptoms of mental health problems. As the Board notes, the sole issue evaluated seems to be "claims of alcoholism." We note the Board accepts Six's report of his alcohol abuse in this period, despite his then denial of that fact in his reports of medical history, and, yet, rejects as unsubstantiated, his claims of then experiencing disabling

symptoms of PTSD. We suggest the Board is inappropriately selective in its use of the presumption as it relates to those reports.

Six relates he simply lied about his alcohol use, and no further evaluation of the issue was made. We have no information as to the credentials or privileges of the doctor, and, the report does not comply with the DSM recommended standards as adopted by DOD, SECNAV, and, NAVMED. We suggest that the presumption of regularity does not apply, except to the extent they establish that some quality of an evaluation was conducted on the date and at the place identified. They are simply not competent to rebut Six's claims in his application.

Again, regarding the February 6, 1973 physical examination, like the Board, we are forced to speculate as to the manner in which the "clinical evaluation" was conducted on that date. Six has no recollection of any psychologic test being performed incident to any of these exams. The Board notes the report made no reference to any psychiatric conditions or complaints. Six, in his answers to counsel's questionnaire, his affidavits, in his interview with Dr. Estrov, and, in his consultations with the VA psychiatrists and psychologists, reports he was then depressed, angry, and, anxious to remove himself from the humiliating circumstances that were ending his naval career. Thus he carefully avoided any comments or actions that might prolong his embarrassment.

We respectfully submit that these reports , while entitled to consideration by the Board, are not entitled to such weight under the presumption of regularity as to be dispositive of the issue of Six's mental health status at the time of his discharge. It seems evident LCDR. Cain attempted to caution that in fact he detected signs of stress or other mental health issues that required further evaluation. Neither the August 8, 1972 or the February 6, 1973 evaluations complied with that caution.

4. REPORTS DO NOT COMPLY WITH REGULATIONS

In the 1972-1973 era, the Navy was then beginning to recognize that alcoholism is a treatable disease. The Navy adopted the diagnosis criterion established in the Diagnostic and Statistical Manual ("DSM") promulgated by the American Psychiatric Association. (See, for example: NAVMEDINST 5700 series.) It was then establishing programs for treatment and rehabilitation of members diagnosed as alcohol dependent or alcohol abusers. ( See: SECNAV INST 5300 series and the implementing regulations and instructions of OPNAV and MAVMED.) For a medical examination or psychiatric evaluation to qualify for use in a waiver petition relating to flight status, the evaluation had to be conducted by a privileged psychiatrist or clinical psychologist.

There is no evidence that any of the medical personnel involved in the 1971, 1972, or, 1973 evaluations were so qualified.

The Navy recognizes that such evaluations require special care and training. For example, the Navy restricts evaluation of psychologic test results. Only doctorally qualified psychologists are to be privileged as psychological test users as part of their core privileges. (See: NAVMED INST. 6400.3 and 6320.66B) DOD has promulgated regulations governing the conduct of mental health evaluations for members of the armed services.(DOD INST 6490 series.) Adopting APA recommended procedures, DOD directs that mental status exams shall include evaluation of the individual on the basis of the following criteria: Appearance; Behavior, to include the presence or absence of psychomotor agitation or retardation; Speech, noting the rate and rhythm; Mood, as stated by the member; Affect; Examiner's evaluation of observed mood, whether conduct is within the member's stated mood, and, if not, why not; Thought Process, whether psychotic or paranoid, etc.; Thought Content, whether spontaneous, responsive to questions, irrational, reflecting anger, rage, jealousy, etc.; and, Cognition, whether the member is oriented as to time, place, understanding of purpose, reason for evaluation, and, members ability to answer simple informational questions, do simple calculations, etc. As noted, supra, these reports simply do not comply with these requirements.

5. CHILLING EFFECT OF SILENCING ORDER

The Board fails to address the chilling effect the Navy's silencing order had on Six, and, for that matter, on other Liberty crew members. Indeed, it totally ignores Six's statement concerning the silencing order. Unfortunately, Six's records were peculiarly sterile as to the facts of the Liberty attack, or Six's extreme trauma and terror incident to that attack. The Navy was responsible for the absence of this critical information. Not the examining doctors, and, not Six. Six was prohibited from discussing anything relating to the attack with anyone other than the former Commanding Officer of the USS Liberty, or an unidentified officer who conveyed those instructions[3]. Thus, Six denied any of the symptoms he was then experiencing since admission to those symptoms would violate that order.

This is evident from a review of the Report of Medical History in each examination. The Report of Medical History accompanying the February 21, 1971 flight

[3] Every member of the Liberty crew I have interviewed relates having received the silencing orders. This includes crew members who were retained with the Ship at Malta during the Court of Inquiry and those medevaced to hospitals in Europe or the US. Those who were medevaced seem to describe the same officer delivered these orders, wherever the crew members were hospitalized. These were NAVSECGRU members well used to silencing orders. Such were taken to heart.