physical well illustrates this fact. There, Six, while denying several symptoms of stress and PTSD, simply struck out or left blank other questions relating to his mental health. Not only was Six seeking to avoid violation of the silencing order, in 1971 he sought duty in Vietnam, under the influence of "survivors guilt," hoping he would be killed in action there. It is to be noted, the attending physician does not seem to have challenged those omissions.

The silencing order not only forced Six to conceal the truth as to symptoms he was experiencing, it had the effect of denying him access to the care he so desperately needed and grossly exacerbated those symptoms. Dr. Cain's report clearly shows that fact: "This patient does not give sufficient history ... to indicate that he requires further medical psychiatric management." The doctor carefully avoids declaring Six presents no symptoms suggesting a need for psychiatric management. Merely that the patient is not forthcoming. Absent competent medical care, Six turned to self medication and became alcohol dependent.

We acknowledge , with respect, the very real change the Navy, indeed all military departments, have adopted in responding to similar tragedies today. Today, members exposed to such trauma are promptly interviewed by special teams of psychiatrists and psychologists. They are encouraged to talk candidly about their experiences with family and trained personnel. They and their family members are carefully briefed as to what consequences they might experience as a result of the trauma, how to deal with such problems, and what things they should avoid that might trigger such symptoms. They are cautioned to be observant of signs of such evolving problems. Special resources are assembled to help deal with or avoid such symptoms. Those needing special care are provided that care. All involved are carefully monitored on a continuing basis to detect any evolving problems.

In sharp contrast, Six and the other Liberty Crew were silenced and ostracized. His record seemingly has been sterilized of anything but the most cursory references to the fact he had served aboard the Liberty. The crew were labeled as liars by the Navy and the US Government. Israel mounted an aggressive campaign to label the Liberty Crew as liars and suffering from post traumatic stress disorder when crew members disclosed the murderous, deliberative, prolonged, nature of the attack. That campaign continues to this day! The Navy and the government adopted and supported Israel's description of the event, well knowing that the Israeli's were lying. And, the silencing order effectively blocked Six and the other crew members from defending themselves against claims they were lying, or exaggerating about the details of the attack. Even when first discussing presenting this application, Six struggled with the question of

whether he would be violating that order in presenting the application. The Navy's attitude greatly aggravated the stress Six was experiencing, blocked him from seeking competent help, forced him to suppress and lie about the symptoms he in fact was experiencing, and further contributed to his alcohol abuse.

6. NAVY'S INDIFFERENCE

The Board's letter opinion reports :"The Board rejected your unsubstantiated contentions that ... the Navy treated you with indifference ... ." Counsel understands that claims of the Navy's indifference may seem harsh and unfair. Still, it is difficult to select a more apt term to describe the Navy's overall conduct in Six's case.

We do not challenge the authenticity of the documents relied on by the Board. We do not challenge the good faith of the medical personnel who prepared these reports, although, the August 8th report seems pro forma, as if the evaluator was "just following orders." We do challenge that they were not conducted with the thoroughness that Six's history of extreme trauma should have prompted and the governing regulations required. It is most probable that had those personnel been on notice of Six's experiences aboard the Liberty, and aware of the silencing order, they would have conducted the type of in depth psychiatric evaluation that LCDR. Cain apparently felt was required. Unfortunately, the Navy dismissed the doctors caution with indifference.

We acknowledge the care the Navy provided in treating the wounds to his leg and finger. But, the Navy was totally indifferent to the possibility that Six would experience psychiatric stress from the severe physical and emotional trauma he had been exposed to on the Liberty. As witness the Navy's treatment of the USS COLE crew, the Navy now recognizes its treatment of the Liberty crew was/is grossly unprofessional and inappropriate and did not and does not comply with the duty to provide necessary medical care and treatment to members of the Navy. Good Lord, In the 1968-1970 era, the Israeli government seized on the probability the crew members would experience PTSD problem when contesting the factual accuracy of the crew's statements as to the time, duration and circumstances of the attack. Six's growing history of family abuse, outburst of anger and violence, dysfunctional family life, loss of financial control, and alcohol abuse , all of which were known to the Navy at the time of his discharge, should have prompted psychiatric intervention and treatment.

We also acknowledge the fact that Six was promoted both shortly after the Liberty attack and again, apparently just prior to his discharge. I have no doubt that the promotion to Second Class was fully merit justified, and , in addition, reflected the fact Six had performed his duties in an exemplary way during the Israeli attack, staying at his assigned duty station, carefully destroying sensitive cryptographic material, even when on notice that a torpedo was about to hit his side of the ship. I suggest the

promotion to First Class reflected Six's two tours in Vietnam and the Command's guilt complex. Instead of providing the care Six needed and deserved, they gave him a small farewell bonus. This promotion has minimal value in evaluating Six's ability to perform his duties at the time of his discharge. The fact is he was prohibited from performing his duties because he was then incompetent to serve in that rating. That incompetence was a direct result of the symptoms of PTSD then incapacitating him.

7. SIX SEVERELY DISABLED AT DISCHARGE

The Navy adopts the DSM Manual in evaluating psychiatric disability, and, the VA Rating Manual in determining the member's degree of disability. Dr. Estrov notes that at the time of, and following his discharge, Six was functioning at "a very low level," an APA, DSM term. Applying the VA Rating Manual standards he concludes Six was then severely impaired in both employment and interpersonal relationships and ratable as 70% disabled under the VA standards. Applying the DSM Axis V criteria, he rates him as "very poor." The record establishes that Six's ability to maintain effective relationships was severely impaired, and resulted in severe industrial impairment. This is well established by the fact Six's security clearances were revoked because of his alcohol abuse, loss of personal control, and, loss of control of his finances. The records establishes that in addition to his debt burden, his family life, his only non work related social involvement, was in shambles. Burdened with survivors guilt complex, Six twice volunteered and served tours in Vietnam in the hope he would be killed in action. His children's affidavits and statements well document and support Six's self acknowledged heavy drinking ,violent outbursts and angry rages during this period. These reached such extremes that the neighbors, fellow NAVSECGRU personnel, felt compelled to call the MP's to Six's quarters to control Six and protect the family members. Throughout this period from 1968 through 1973, Six was experiencing debilitating bouts of insomnia, nightmares and flashbacks.

We recognize that the affidavits and statements of Six and his children may be viewed with skepticism, as self serving. Counsel informs the Board that these statements were very difficult to obtain. Six himself was very reluctant, concerned that by giving the statement he would be violating the silencing order, and, candidly, having great difficulty acknowledging the magnitude of abuse his conduct inflicted on his then wife and the children. He repeatedly complained that going into this history was simply too painful for him. The interviews of the children were conducted individually, out of the presence of each other and of Six. They were not shown to Six until we were ready to file the application. He neither asked,. Nor would he have been allowed to edit their statements. The children each complained that it was too painful for them to reflect on all the abuse and difficulties Harold inflicted on them and their mother. One of the

daughters stated that Harold had "screwed up her life" and it had taken her a long time, and lots of therapy, and she did not want to revisit those horrors and risk reopening those wounds. She reluctantly made a statement on recognizing that Harold's conduct was most likely the result of then undiagnosed mental health issues. "I always thought he simply hated me." Counsel is thoroughly convinced these affidavits and statements present an accurate image of Harold's conduct during this period.

CONCLUSION

The record herein establishes that Six was in fact suffering from Post Traumatic Stress Disorder and alcohol dependence at the time of his discharge, that the alcohol dependence was caused or aggravated by his PTSD, and, that he was 70% disabled when discharged in February 1973. (See: Dr. Estrov's report, Six's affidavits, the affidavits and statements of his children, and the VA reports.)

Respectfully, Submitted,

William J. Kenney

William J. Kenney, Esq.
D.C. Bar No. 99267
Attorney For the Applicant
Harold Eugene Six, Sr.

9915 Empire Woods Court
Charlotte, NC 28277-2479
Tel/Fax: 704-341-4781
Email: kenneyffx@aol.com

PCA Psychiatry Consultation Associates

Yuval Estrov, MD
4225 Executive Square, Suite 1130, La Jolla, California 92037
Phone: (858) 455-9716 • Fax: (858) 455-9713
e-mail: estrov@psychiatryca.com

**Psychiatric Report: Harold Eugene Six**

**April 29, 2004**

**Sources**

- Interview with Mr. Six and his wife (3 hours).
- Follow-up phone call with Mr. Six for clarification.
- Affidavit of Harold Six in support of application for correction of records.
- Letters of Richard Kiepfer MD.
- Health records of acute treatment of Mr. Six in 6/67.
- Medical records of ongoing treatment of Mr. Six in the Navy until 12/72.
- Affidavit of Cindy Six Valles in support of the application.
- Affidavit of Tammy Six Rievley in support of the application.
- Affidavit of Harold E. Six Jr in support of the application.
- Mental health evaluation conducted by R M Cain on 8-4-72.
- VAMC Loma Linda medical records dated: 9/5/02 – 10/25/02.
- Service Record for Mr. Six.
- Private health care records from Kaiser Permanente providers dating 1994 – 1999.

**Purpose**

- Assess for the presence of post traumatic stress disorder (PTSD) and determine the date of onset of PTSD symptoms where possible.

**Post Traumatic Stress Disorder Diagnosis**

Criterion A: For the diagnosis of PTSD the DSM-IV requires the experience of a traumatic event (threat of death or serious injury) and an emotional response of fear or horror to this event.

On June 8, 1967 Mr. Six was aboard the USS Liberty when it was attacked by Israeli forces. He had been knocked unconscious transiently in a torpedo blast. Mr. Six

regained consciousness under water. He found himself drowning and was unable to get to the top of the water. Mr. Six reports extreme fear for his life. He reports feeling as though the experience lasted for minutes with his sense of desperation growing. As a rescue attempt was ongoing Mr. Six was initially pulled up only to be dropped, drowning again. Eventually he was rescued and pulled out of the water. Mr. Six did suffer injury in the explosion. Nonetheless, he had helped in the removal of fallen navy men and had witnessed: "one guy was cut in half," and another "had a hole in him from his head to his legs."

Mr. Six did fulfill criterion A for PTSD diagnosis in June of 1967.

Criterion B: Traumatic recollections of the event.

Mr. Six describes daily intrusive and distressing recollections of the event. He reports that these intrusive thoughts began in 1967 in the hospital while recuperating from injuries sustained in the Liberty attack.

Mr. Six describes nightly nightmares of the events described above: "I dream of being down in the compartment. All I see is bodies with no faces." He reports waking up from sleep in cold sweat and reports not desiring to return to sleep. Mr. Six has been prescribed numerous sleep aids and sedating medications but to this day his sleep remains disturbed. Mr. Six reports three hours sleep a night on average.

Mr. Six experiences flashbacks of the attack on the liberty. These were most prominent in 1968 with daily reliving of the traumatic event. To this day Mr. Six reports that when he is "not careful in the shower" and water gets over his head he begins to relive the events of the liberty: "I'm back in that hole." He begins to feel as though he is drowning; his chest tightens as thought he is getting short of breath; he is paralyzed by fear as though he is about to die.

Mr. Six describes intense psychological responses at events that remind him of the attack on the Liberty. An intense response had occurred when watching the movie "Pearl Harbor." He reports having to interrupt the viewing and withdrawing from his family for days following the movie.

Mr. Six fulfills now and did fulfill criterion B for PTSD in winter of 1967.

Criterion C: Avoidance of stimuli associated with the trauma.

Mr. Six reports avoiding thoughts and conversations regarding the Liberty. He reports distant relationships with veterans of the Liberty "because I don't like talking about it." During infrequent meeting with veterans of the Liberty he uses alcohol to allow him to converse with them. This distancing of the veterans began in 1968.

Mr. Six avoids going to the beach or having water touch his head in any way. This symptom began in winter of 1967.

Mr. Six is unable to recall the names of two victims of the Liberty attacks. He has had reminders of the names several times but remains unable to recall their names. He reports guilt that they died and he survives: "I wish it was me instead of them." He reports no insight into the reason that he is unable to recall these names. This symptom has been ongoing since 1967.

Mr. Six describes prominent detachment from others. He reports that starting in 1967 he was unable to be close to loved ones. He reports feeling that emotional intimacy will only lead to grief: "You get close and then they're gone." He reports that this has led to his inability to tell family members that he loved them and his inability to hug his children: "I didn't love anybody because it causes pain."

Mr. Six reports a significant feeling of foreshortened future. Starting in 1967 Mr. Six had been feeling as though he were in some way "already dead." He reports volunteering for two tours of duty in Vietnam because of "wanting to die."

Mr. Six fulfills now and did fulfill criterion C for PTSD in 1968.

<u>Criterion D</u>: Increased arousal.

Mr. Six reports nightly insomnia since 1967.

Mr. Six reports significant irritability "I'm mad all the time," and angry outbursts particularly when symptoms are at a significant ascent "I get short with my wife." This symptom was present in 1968.

Mr. Six endorses decreased concentration.

Mr. Six reports hypervigilance "I'm always of guard," and increased startle response reporting he ducks in response to loud noises.

Mr. Six fulfills now and did fulfill criterion D for PTSD in 1968.

**Past Psychiatric History**

In addition to the above mentioned PTSD symptoms Mr. Six has had significant symptoms of alcohol dependence and depression.

Alcohol Dependence: Mr. Six had been using alcohol casually since age 15. He had been drinking on the weekends when in port with neither social nor occupational consequences until the attack on the Liberty. The months that followed the attack were accompanied by increasing alcohol consumption. By 1969 Mr. Six's alcohol consumption had escalated to full dependence.

In 1969 Mr. Six manifested tolerance to alcohol reporting markedly diminished effect of consumption of similar amounts of alcohol. Also in 1969 Mr. Six had appeared for duty drunk and was reprimanded. He had spent much time consuming alcohol. Mr. Six currently attributes marital difficulty at the time and difficulty in fulfilling parental obligations in part to his alcohol use. With time Mr. Six engaged in alcohol related violence and was later arrested three times for drunk driving with one night spent in jail. His last arrest was in 1975.

Mr. Six remained in a state of active alcohol dependence from 1969 to 1978. He reports one year long relapse in 1984 with significant alcohol consumption and depressive symptoms. He had been in remission since with one 2 week relapse in 1994. Per history obtained he is currently in a sustained full remission.

Depression: Mr. Six suffered a single episode of depression in 1984. The episode was precipitated by the termination of Mr. Six's position in Caltex. During the ensuing period of unemployment Mr. Six had spent nearly one year at home with severe depression. Symptoms endorsed include: dysphoria, anhedonia, thoughts of death, significant guilt regarding his unemployment, worsened insomnia, decreased appetite with unspecified weight loss, feelings of hopelessness and of worthlessness. Mr. Six had relapsed with respect to his alcohol consumption during that time. This episode resolved spontaneously with both sobriety and gainful employment resuming. No other episodes of depression were reported.

Psychiatric Treatment: Mr. Six has had neither suicide attempts nor psychiatric hospitalizations. His treatment for PTSD began in 1995 with Fluoxetine being the mainstay of treatment. Benzodiazepines and Trazodone were added for treatment as well.

**Past Medical History**

- Lower back pain with past surgery.
- Atypical pain syndrome – left face.
- Gastro-esophageal reflux disease.
- Restless leg syndrome diagnosis.
- Urinary frequency

**Medications**

- Fluoxetine 60 mg a day
- Ranitidine 150mg twice a day.
- Imipramine 50mg nightly.
- Pramipexole 0.25mg twice a day.
- Temazepam 30mg nightly.

**Allergies**

Mr. Six reported that he has had a seizure with loss of consciousness on taking Gabapentin.

**Family History of Mental Illness**

Mr. Six's son Harold Six Jr. suffers from methamphetamine dependence.

Mr. Six denies all other family history of mental illness.

**Personal History**

Childhood and Family of Origin: Mr. Six was born on April 27, 1946 in Torrington, Wyoming. His father left the family shortly after his birth. He was raised by his mother with the aid of two older siblings and many uncles. During his early childhood his uncles served as father figures. Harold excelled in musical education with emphasis on wind instruments. He had difficulty with his mathematics classes. Mr. Six dropped out of high school in 10th grade. He cites a poor band in his high school as the reason for dropping out but did appear to have some conflicts with authority figures surrounding his

drop out. He proceeded to have two of short term employments: dishwasher and short order cook.

Mr. Six's relationship with his family of origin had been somewhat distant in his adult years. His older brother Charles was a minister. He is dead of a Pulmonary Embolism. He is survived by two daughters. Mr. Six is in distant touch with them. Mr. Six older sister Betty is a retired convenience store teller. She lives with their mother and has two boys. Mr. Six's mother is 78 years old.

Military Service: Mr. Six entered government service in 1964. He joined the drum and bugle corps. He completed his GED. Mr. Six had later learned Morse code communication and served as a communication technician in Germany for 4 months. In 1966 Mr. Six was assigned to the Liberty. After suffering injury in the attack he was sent to the NATO hospital in Naples and from there to the naval hospital in San Diego. He was hospitalized for 4 months. After his hospitalization he was stationed for 2 years in a radio station. He had later entered training in cryptogenic studies in Maryland and in 1970 went to the Philippine Islands. In 1971 Mr. Six volunteered for a tour of duty in Vietnam. He volunteered for a 2nd tour in 1972. In 1972 because of rising financial debts (unpaid bills) Mr. Six lost his security clearance. Mr. Six ended his military service in 1973. Mr. Six holds the Purple Heart, the Combat Action Ribbon, the Presidential Unit Citation, the Vietnam Service Medal, the Vietnam Campaign Medal, and the Good Conduct Medal.

Employment and Education: Mr. Six entered college in 1973 with plans to study music. He performed poorly with significant absenteeism and dropped out of college after 18 months because of financial difficulty. Mr. Six had a series of short lived jobs including: janitor for Kaiser, security guard, work with LAPD as a jail guard. He had lost these jobs. Mr. Six reports that he had been drinking heavily throughout this time and that the stated reason for termination from these jobs had been either alcohol use or absenteeism. Between 1975 and 1978 Mr. Six had maintained employment as a truck driver though with different contracts at different times. In 1979 he had taken one semester of college with focus on business. He had taken employ in sales for a valve company. In 1981 Mr. Six took a position in a small company called Caltex. He had maintained this position for three years. After his termination Mr. Six was unemployed

for one year. In 1985 Mr. Six began working for the county of Riverside as a truck driver and remained in this employ until his retirement in 2002.

First Marriage: Mr. Six married his first wife Lucy in San Diego in 1968. His son, Harold was born in 1968. Mr. Six never adopted Lucy's daughters Tammy and Cindy. He was concerned regarding Lucy's fidelity to him and believes she had extramarital affairs. Both Lucy and Harold drank heavily and the marriage was marred by domestic violence with two police visits. 2nd daughter Elizabeth was born in 1974. Mr. Six separated from Lucy in 1974. The children were with Lucy from 1974 to 1980. From 1980 the children lived with Mr. Six.

Second Marriage and Current Life: Mr. Six had met his current wife Margaret in 1977 and had married her in 1978. This marriage has been supportive and therapeutic throughout the years. Today Mr. Six enjoys camping. He is a motorcycle enthusiast.

**Mental Status examination**

When approached Mr. Six was seated in my waiting room. He had selected a chair from which he could view both the entrance to my office and my receptionist's desk. He was accompanied by his wife.

Mr. Six was alert and oriented to person, place, and time.

Mr. Six arrived to my evaluation casually dressed and well groomed.

He was largely cooperative with the examination. On occasion he was noted to be somewhat evasive with his replies with respect to specific elements of the events of June 8, 1967. When confronted with this Mr. Six replied that he has chosen not to cry during this evaluation and was avoiding answers that would make him cry.

When discussing the events of the Liberty Mr. Six did exhibit some psychomotor retardation. Otherwise there was no psychomotor anomaly.

Speech was fluent. It was characterized by normal volume, rate, and quality.

Mood was slightly anxious.

Affect was full throughout much of the examination. The sole exception was when describing the events on the Liberty. During this description Mr. Six had a markedly blunted affect.

Thought process was linear and goal directed throughout. The sole exception again is the description of the attack on the liberty. He did not describe these events factually but rather began to explain the layout of the compartment by demonstrating where different pieces of furniture from the Liberty's compartment would exist in my office. He proceeded to describe the events as though they were occurring in my office at the present time.

With the exception of flashbacks (above) Mr. Six denied all hallucinations.

Mr. Six denied suicidal and homicidal ideation. There was no identified delusional content.

Insight and judgment were rated fair.

**Impression**

It is my professional opinion that Mr. Six currently suffers from post traumatic stress disorder. I also believe that criteria for the diagnosis were met during active duty from 1968 and contributed to disability at the time of discharge in February, 1973.

Multiaxial diagnosis:

I PTSD, chronic.
  Alcohol dependence, sustained full remission.
  Depression not otherwise specified:
    Major depressive disorder, single episode in remission vs.
    Alcohol induced mood disorder with depressive features.
II No pathology identified.
III Lower back pain with past surgery.
  Atypical pain syndrome – left face.
  Gastro-esophageal reflux disease.
  Restless leg syndrome diagnosis.
  Urinary frequency.
IV Mild – access to healthcare.
V 55

**Comments**

Mental Status Examination – the mental status evaluation presented above provides some objective evidence for a primary diagnosis of PTSD. The choice of seating in my waiting room is suggestive of hypervigilance. The avoidance of discussing the traumatic event is common and may represent a diagnostic criterion for PTSD. The description of the event as though it were occurring in present time with blunted emotion is suggestive of re-experiencing and numbing (both diagnostic categories).

Co-Morbidity – PTSD is commonly associated with other psychiatric conditions. In combat related cases of PTSD co-morbidity, far from an exception, is often the rule. Specifically, the prevalence of an alcohol dependence diagnosis in combat related PTSD has been estimated as high as 75% (with civilian PTSD alcohol co-morbidity estimated at 20% - 40%).[1] Similarly, the prevalence of major depressive disorder in all patients with PTSD has been estimated at 49%[2]. Both of these rates are significantly higher than rates for these disorders in the general population. The time course of psychiatric diagnoses: PTSD in 1968 and alcohol dependence in 1969 leads me to conclude that PTSD symptoms were more probably than not etiological in the subsequent development alcohol dependence.

Cain Evaluation – This is a mental health evaluation conducted in 1972. Its purpose appeared to be the determination of the presence of an alcohol use disorder. No clear conclusion appears to have been reached. This evaluation fails to diagnose PTSD. This omission may have been caused by the lack of diagnostic criteria for the disorder at that time. Diagnostic criteria for PTSD were first published in1980. The examination did not document a full mental status examination. Specifically, documentation of direct questioning regarding hallucinations may have given clues as to the presence of flashbacks. Also a documentation of Mr. Six's affect during the examination may have given further objective evidence of the presence of PTSD. The documentation does indicate a desire to review more records to arrive at a diagnostic conclusion. There is no evidence that this was done. The sole diagnosis offered is not a DSM-IV diagnosis and does not seem to directly correlate to any DSM-IV diagnosis. I have not found this examination useful in assessing Mr. Six's illness.

Conditions of Military Release – Mr. Six was released from military duty because of mounting debts (a consequence of unpaid bills). Per Mr. Six's report both he and his wife were drinking heavily at the time. They were experiencing significant marital difficulty. He reports that he had entrusted Lucy with the task of paying the bills and that she failed to perform this task. Given reports of Mr. Six's alcohol consumption at this time I suspect his ongoing alcohol dependence contributed to his marital difficulty and to his failure to manage his monetary affairs.

Disability – After Mr. Six's release from the military he sought employment below the level of his technical training and experience. He had lost multiple such opportunities. Per his account and accounts of his children he had been isolative and largely inebriated during this time. He reports that excessive alcohol use was the stated reason for release from some employment opportunities. At the same time Mr. Six's marriage was failing and he was unable to provide for the emotional needs of his children. There is no question in my mind that at the time Mr. Six was functioning at a very low level.

Based on the VA Rating Manual, 38 CFR, CH.1, Part 4, (7-1-85 Edition), sections 4.125, et seq., evidence cited, and evaluation conducted above, I conclude that at the time of his discharge from the navy in February, 1973 Mr. Six was suffering from PTSD and alcohol dependence. These conditions were more likely than not the cause of severe impairment in both employment and interpersonal relationships. It is my opinion that at the time of his discharge Mr. Six's disability rating was 70% under criterion established at section 4.132 of the Rating Manual, applying the standards for Psychoneurotic disorders, 9400, et seq.

**References**

1. Jacobsen LK, Southwick SM, Kosten TR. Substance use disorders in patients with posttraumatic stress disorder: a review of the literature. Am J Psychiatry. 2001 Aug;158(8):1184-90.

2. Breslau N. Epidemiologic studies of trauma, posttraumatic stress disorder, and other psychiatric disorders. Can J Psychiatry. 2002 Dec;47(10):923-9.

**Summary**

It is my professional belief that Mr. Harold Six suffers from post traumatic stress disorder. Based on my assessment Mr. Six met criteria for this disorder in 1968 and has not had the disorder remit to this very day.

Yuval Estrov MD

Supplemental Affidavit of Harold E. Six

SS: Town of Riverside
County of Riverside
State of California

1. I, Harold Eugene Six, being duly sworn make this supplemental affidavit in support of my Motion To Reopen and Reconsider my Application for Correction of Naval Records.

2. I am Harold Eugene Six, social security number 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. I was born April 27, 1946 at Torrington, Wyoming. I first enlisted in the United States Navy on May 6, 1964. My service number is 777-58-53. I was discharged from the Navy effective Feb 6, 1973, at Naval Station, Treasure Island, San Francisco, California

3. I was discharged by reason of my loss of control of our family finances and by reason of alcohol abuse, that caused the Navy to revoke the security clearances essential to my rating as a NAV- SECGRU Cryptographer. I was suffering from undiagnosed, untreated, Post Traumatic Stress Disorder arising from the injuries and psychological terror suffered aboard the U.S.S. Liberty on June 7, 1967.

4. I have reviewed my affidavit tendered herein by my attorney, and the recently completed Report of Dr. Estrov. My attorney suggests that I submit this supplemental affidavit to address issues that I did not address in my initial affidavit. These relate to events arising at and following my discharge. Some of these facts are addressed by my children. Other pertinent information arose in the course of Dr. Estrov's examination. In the interest of a complete record, my attorney and I have prepared this supplemental affidavit.

5. As stated in my Initial Affidavit, since the events on the Liberty, I have experienced numbing nightmares and flashbacks. Even while I was hospitalized at Naval Hospital, San Diego, I felt traumatized by these nightmares and flashbacks. Perhaps that was a partial explanation for the problem they had in getting my leg wound to heal properly. To this day, I am hypersensitive to sudden loud noises. In my nightmares I become terrorized with memories of the horrific blast as the torpedo smashed through the ship's side and exploded in our space, setting the space on fire. I sense first the roar of the explosion. Then, the rush of the water flooding the space and pushing everything before it. It is as if the blast were reoccurring. I still smell the dust and smoke of the explosion. I see the blood and bodies of my shipmates spattered through the air. I hear my and their terrifying

screams and cries for help. I even must watch myself, even today, when taking a shower to avoid letting the shower water run over my face. It traumatizes me.

6. I experience a mixture of terror at the event and guilt at my inability to respond and help. I have frequent memories, daydreams, and nightmares, of the utter fear of dying. One very troubling aspect of it all is that I can't remember the names of the two lower rated men on watch with me that da. Shipmates have given me their names on several occasions, but I can't keep their names in my memory. We were in the crypto space that day. We heard sounds like someone dragging a chain across the deck above us. Then, a guy came down the ladder, screaming "those damned Israeli's are shooting at us. What the hell is the matter with them." as he passed through our space. Then, after a very long time, and perhaps two or there additional staffing attacks, the Bridge called down and told us to destroy all crytographic material. I ordered our guys to get all the stuff and give it to me for the burn bags and started inventorying the material to be certain we had it all. As we were finishing destroying the crypto stuff, the bridge called again ordering us to brace and secure ourselves torpedo was heading for our side of the ship. My two mates and I crouched together against the inner bulkhead, with a file cabinet in front of us. Then the torpedo struck; with a horrendous blast, followed by the rush of sea water. The next thing I remember was being dropped down the ladder by a guy who had pulled me from under the file cabinets and was pulling me to safety up the ladders. I remember him screaming at the hatch because someone had dogged it shut on us. Then, I remember his coming back down, again pulling me out of the flooded compartment, up the ladder to safety. He asked if anyone else was still alive down there. I said my two rated men were down there. He passed me to guys on the deck and dove back down into the space. I learned latter that both those guys were dead. I feel very guilty at the fact that I lived and they died. I was their superior officer. I should have been the one to die.

7. Since that time, I have had great difficulty concentrating, controlling my anger, and maintaining a focused life. I began drinking heavily to try to ignore these nightmares and flashbacks. This simply added to my paranoia and loss of self-esteem. For awhile, the respect I earned as a Liberty Survivor carried me through. However, the Navy's "official" explanation of the Liberty event quickly eroded that respect. The fact our government endorsed the Israeli lie that this was a brief, mistaken incident, terminated as soon as they recognized our status as a US Navy vessel, resulted in we, the survivors of the Liberty attack, being labeled as, essentially, liars and Anti-Semites.

8. I don't mean to say the average sailor reacted that way. It was more a situation of our watching in frustrated silence while the governments spread this lie. When any

of us described what really happened, people reacted as though they felt we were exaggerating the attack for our personal advantage. Adding to that sense of frustration was the fact that the Navy and our government undertook an operation to silence the Liberty crew. Indeed, reviewing those portions of my Navy Records I have retained, there is nothing in those records other than the recordation that I served on the Liberty; that on or about June 8 or 9 1967, I was transferred to the USS America for treatment of wounds to my right leg and right hand, then medevaced, ultimately to US Navy Hospital, San Diego for treatment and recuperation. No one reviewing that record would have any notice of the horrific, terrifying events we on the Liberty experienced that fateful day. And, no one would have knowledge of my personal experiences of being knocked unconscious in the flooded compartment, etc.

9. This was not by accident. It was part and parcel of the Navy's intent to conceal the true facts that occurred aboard the Liberty. Not only was my record "sterilized," care was taken to insure that this information did not get out. We Liberty veterans acted with uncommon valor and devotion to duty that day to keep our ship afloat in the face of the Israeli attack. Our skipper was awarded the Congressional Medal of Honor for his efforts in staying on the bridge until Navy ships arrived, to assist. This was presented several years later in an essentially private ceremony at the Washington Navy Yard by the Secretary of the Navy. No unit citation was awarded the crew for its identical efforts.. Instead, the crew members were silenced under penalty of prosecution. An officer was dispatched to each survivor to warn the crew members that they were not to discuss the attack with anyone, without permission of either the CO of the Liberty, or that officer. When that Lieutenant Commander visited me in the San Diego Naval Hospital, I had never seen him before in my life. I have never seen him since. He was not a member of the Liberty crew. I cannot remember his name. I surely remember his threatening message. This merely added to the turmoil I was experiencing. The heavy inference from all this was that we on the Liberty had been engaged in some unlawful, unauthorized activities. And yet, all we were doing was performing our duties.

10. All of these stressors gradually destroyed my self-confidence and self-respect. I began drinking even more heavily. Without recognizing or understanding it, I was becoming extremely self centered. I was angry at how we Liberty survivors were being treated; angry at the lies the Navy and the Government spread about the Liberty incident. I took my anger and frustration out on my family. My family life was in turmoil. I developed an uncontrollable rage like anger directed at my wife. There were justifying circumstances, but it never occurred to me that my problems might well be causing her problems. My drinking was draining the family's

finances, but I blamed her and her alone for her failure to control our family finances. The more paranoid I became, the more uncontrollable my rage became. The more enraged I became, the more I drank.

11. I have read, with sorrow and embarrassment, the statements of my children regarding their memories of these events. It is painful to recognize how damaging that has been on their lives. With the help of my current wife, I have tried to repair some of the damage, but, it is truly impossible to correct the past.

12. My memory of the years following my discharge are blurred. I spent most of the first year unemployed and drinking. I was angry and embarrassed by the circumstances of my discharge. The Navy had suggested I apply for change of rating. I declined. I well understood this would merely result in my being shifted to a different station and, then, being discharged in the future when I could not compete in that rating as a First Class Petty Officer, against others of my rate and grade who had spent their entire career in that rating. I well recognized that while the stated reason for my discharge was "inability to manage financial affairs," the real reason was that my drinking, my moodiness, and my deep seated anger had reduced my family life to shambles, and destroyed my ability to perform my duties.

13. I had planned to make the Navy my career. I was proud of my achievements, my rating and my career pattern. Then, came the discharge. The circumstances of my discharge meant that I was thrown out on the street, without any separation pay, other than my unused accumulated leave. I was completely unprepared for this. As angry as I was at my wife, I accepted the reality that I had to care for her, our child, and her children by her previous marriage.

14. I now understand that the entire process of my discharge was handled improperly. My superiors at NAVSECGRU PHILIPPINES confronted me regarding my failure to pay my debts and my drunkenness, and, informed me they were revoking my security clearances. I was never informed of my right to contest this action or given the opportunity to consult with an attorney. I was offered the chance to apply for a change of job ratings , which I declined. Their was no suggestion that I participate in a the Navy's Alcohol Treatment program, and, I was not advised that I could resolve my debt problems in a manner the Navy deemed honorable by filing for bankruptcy. No one suggested that by filing for bankruptcy I might retain my security clearances. It was merely made clear that I was no longer allowed to serve as a NAVSECGRU Cryptographer, and I was not allowed to remain in the PHILIPPINES. I was shipped back to San Francisco for discharge processing.

15. At Frisco, I was initially being processed "for cause" for drunkenness and for failure to pay my debts. Thus, my physical exam on August 4, 1972 was conducted under the regs requiring a psychiatric exam. I wanted out of the highly embarrassing and frustrating circumstance I found myself in. The doctor pressed me for more information as to what was causing this disastrous end to me career. I did not cooperate with him. I lied to the psychiatrist concerning my drinking habits. I denied the multiple questions in the Report of Medical History that might have given him a clue as to what I was actually experiencing He relied on the Report of Medical History. I have no recollection of his asking specific questions as to any stress I might be experiencing, or regarding any events in my service experience that might explain my then current circumstance. I did the same in any prior or subsequent evaluations, until some time in the 90's. How could I answer those questions? A truthful answer would inevitably lead to discussion of the Liberty attack. I was prohibited from discussing anything about that incident. I did discuss with him the problems I was having with my wife. I blamed her for failing to pay our bills. Then, the guys processing my discharge told me that if I hung around until February, they could process me under the 'early out" program, rather than the for cause action that was then pending. So, I stayed until February.

16.. Somewhere I learned that despite the circumstances of my discharge, I still qualified for VA "GI Bill" benefits. The VA told me I could get $600.00 a month, plus my tuition and books paid for if I was enrolled as a full time student. I enrolled in the L.A. Community College, as a music major. Because I had not completed high school, I was required to take 2 "bonehead" courses; one in English, the other in Math. They were ridiculously simple. The English course was basically the courses I took in 4th through 7th grade. The Math was equally basic. My other courses included courses in Music Appreciation, Music Theory, and, a course on playing the Piano, and, one on playing the Saxophone. I actually enjoyed the music courses and did reasonably well, when I bothered to attend class. After the first few classes, I began my habit of dropping by a bar close to the College, before class. Then, I recognized that the Profs didn't really care whether I attended or not. So long as the College got the tuition payments from, they were content.

17. During this same time period, 1973-1974, I also tried working nights. We needed the money, I couldn't sleep anyway, and, if I spent any time in the house, I was fighting with my wife and kids. I went through three jobs. I was fired from each because of my drinking. I was drinking to conceal or blot out the nightmares and flashbacks, my deep depression, my anger at my wife, my very real sense of embarrassment for my being thrown out of the Navy, and, for being a failure in life. After a year, I dropped out of college. I had learned of a Heavy Rig Drivers School that also qualified for the GI Bill, and, promised a job on completion of the

course. I took and completed the course and got a job as a truck driver. This lasted for about 3 or 4 months before I was fired for drinking on the job and reporting for duty drunk.

18. I kept blaming myself and my wife, mostly my wife, for my circumstances. I heard through the grapevine of how the other guys on the Liberty were doing. All reports I heard were that they were all doing very well. This merely added to my sense of failure. As a result, I avoided contact with the Liberty Survivors Group. It wasn't just the idea they were doing well and I had screwed up my life so completely. It was also the fact that whenever I thought about the Liberty, the flashbacks, nightmares, insomnia, and, depression intensified. I have since learned that a significant number of them in fact suffer from PTSD, many with the same problem of alcohol dependency that I experienced. But, for 20 or more years, I avoided contact because the memories of the events on the Liberty were so traumatic, and, because I saw my post Liberty experiences as a sign of personal weakness.

19. When I think back on the horrendous pain I have experienced, and, the terrible pain I inflicted on my family, and, realize that with competent care this very likely could have been avoided, I get a new sense of anger. I served my country with honor and distinction. My country responded by lying about the circumstances of the Liberty attack, and, engaged in a studied program to silence me and the rest of the Liberty crew so as to keep the true facts of that attack from the American public . There was ample evidence in 1967 that individuals subject to the brutal terror of an attack like that endured by the Liberty are highly likely to experience severe psychiatric injury from that trauma. This is most especially likely for those crew members like myself who were in the compartment hit by the torpedo, felt the trauma of the exploding torpedo, were engulfed in the fire and the flooded compartment, saw their shipmates blown to pieces, and, were drenched with their shipmates blood and shattered body parts. And yet, the Navy's sole response to this trauma was to caution the survivors that they were not to reveal the events of that attack without prior approval of the former Commanding Officer and participation in any such discussion by either the former CO or a now unidentified Navy Lieutenant Commander.

20. My medical and "psychologic" evaluation at the time of my discharge was performed without review of my medical records or my personnel records. I now recognize that even had such a review been conducted, my records were strangely silent as to horror I experienced aboard the Liberty. The Navy was intent on silencing the true facts concerning that incident, and simply did not care what was happening to me. I was a drunken sailor; an embarrassment to the Command in an

From : HAROLD SIX SR PHONE No. : 909 685 3324 Jul.14 2004 4:39PM P01

Jul 15 04 11:59a William JKenney Esq 7035914947 p.2

era for the Navy that was adopting a new policy towards alcoholism. Therefore, I was thrown ot on the street, without any advice as to what was happening to me, or why. It is cause for being angry.

Harold E. Six, PMR CTI USN 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

State of CA
County of Riverside
SUBSCRIBED AND SWORN TO BEFORE ME
THIS 14th DAY OF July, 2004
Monna M. Lowe
NOTARY PUBLIC

MONNA M. LOWE
Commission # 1287093
Notary Public - California
Riverside County
My Comm Expires Jan 10, 2005

era for the Navy that was adopting a new policy towards alcoholism. Therefore, I was thrown of on the street, without any advice as to what was happening to me, or why. It is cause for being angry.

Harold E. Six, FMR CT1 USN 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

/

Harold E. Six, Sr.
4080 Pedley Rd. Sp. 185
Riverside, Ca. 92509

Dear Mr. Kenney,

Here goes.

1). Difficult Childhood: I wouldn't say I had a difficult childhood. Grew up in a one parent home (my mother) had one older brother and one older sister. Was born and lived in Torrington Wyoming until 1962. Saw my father twice. Once he gave me a nickel and then at his funeral. Was held back in the second grade because I was sick with rheumatic fever for most of the year. Grades in school were average. My mother lost her job with the Telephone Company in 1962 and we (mother, sister, and me. Brother was already in the Navy by then.) moved to California. Moved to Fortuna Calif. Went to high school there. Grades average. Moved to Southern Calif. Attended school for less than a year. Didn't like the school or their idea of teaching (if you were failing a subject rather than helping you they suggested you drop it) also see #3 below.
2). Physical/psychological problems as a child: None other than Rheumatic fever as a child. Bed-wetting appears to be genetic. Older sister had the same problem as I did and my oldest son had the same problem. Seems to disappear at around age 16 or 17.
3). You had difficulty interacting with your schoolmates and ultimately failed to complete high school: Didn't really have any problems in high school. Quit because the music department wasn't up to the standards I was use to. And music was the main reason I stayed in school and kept my grades up.
4). You were identified as a slow learner?: No. I never failed a subject until we moved to So. Calif. I was failing algebra and they suggested I drop it rather than offering me any help with it. I suggested I just quit school and I did. My main interest in school every since the 5th grade had been music. To participate in the music program at most schools you have to maintain a good grade average in you other classes. This was the reason I kept my grades up.
5). You had difficulties enlisting, initially: The main reason I was turned down for enlistment the first time was because of my bed-wetting. I was told to come back in a year if I had quit. The bed-wetting stopped shortly after that and I was allowed to enlist at the age of 18. I remember there was something about immaturity, but don't' know if that was because of the bed-wetting or what.
6). Discuss your boot camp experience: I had no problem in boot camp. After the first few week I joined the Drum and Bugle Corp company and really enjoyed boot camp.
7). You were selected for radio-cryptographic training, how did you don in any of the schools to which you were assigned: Went to Naval Communication School Pensacola Fla., Sept. 1964 Graduated March 1965 GPA 92.70 14 of 19 class standing. After school was transferred to Bremerhaven Germany. Manual

2

morse intercept operator. Enjoyed tour of duty although it was short. Was there until June of 1965. In Aug. 1969 was assigned to National Cryptologic school at Ft. George G. Meade, Md. Graduated around April 1970. Unable to find anything as to GPA or class standings. I do remember that my grades were above average. From Ft. Meade I was assigned to Navcomsta Philippines as a cryptoanalyst. Enjoyed my work and the challenges it presented.

8). You were assigned to NAVSEC GROUP. Upon completion of Naval communications school at Pensacola Fla. My clearance for top secret material had been finalized and from then on I was part of the NAVSEC GROUP. My first duty station was NAVSECGRU Activity, Bremerhaven, Germany. From March 1965-June 1965. I was transferred to NAVCOMSTA Washington, at Cheltenham, MD. Was assigned there from June 1965 till May 1966. Was then assigned to the USS Liberty (AGTR-5) Reported aboard May 1966 was air evacuated off June 9 1967.

9). Within the group assigned to the Liberty, how long had you been with the group: All of the men assigned to the Liberty were new to me. I hadn't been assigned with any of them prior to the Liberty. I was with most of them for over a year while on the Liberty. I don't believe I was considered a "naïve kid" when I reported to the Liberty. Perhaps naïve about sea duty. And with a name like Six good-natured ribbing is normal. The guys attached to NAVSECGRU aboard the Liberty were a close knit group of men. We berthed together, ate together, worked together, shared our care packages from home and sometimes our letters from home with each other, and for the most part went on liberty together. It just went with the fact that we all had top secret and above security clearances and did the same kind of work. Not to say, that on a whole, the crew of the Liberty wasn't a close knit ship. We were. I don't recall any tension between the different divisions aboard the Liberty until Rota Spain. ??

10). Your growing success in the Navy Schools: I don't remember ever having any lack of self-confidence. By the time I went aboard the Liberty I had been to one of the best communications schools the navy had to offer and had been a manual morse operator for over a year. Self-respect wasn't something I was lacking in either. I was a Communications Technician, one of the more elite rates in the navy and a member of the US Navy the finest branch of the armed forces.

11). I met my first wife (Lucy) while we were in port in VA. For the last time. We dated and then the Liberty left for what was to be her last deployment. I knew at the time that she was married to a sailor that was out to sea. We wrote to each other while I was at sea and the she wrote she was leaving her husband and moving to Texas. The Liberty was attacked and I finally ended up in the hospital in San Diego. She wrote that she had family in the L.A. Calif. area and her and her two daughters were moving there. After I got out of the hospital we started dating and then got married. (You mention something about my returning to Germany after the Liberty was attacked. I never went back to Germany. After I got out of the hospital I was assigned to NavRadSta San Diego. From there I went to Cryptologic School at Ft. Meade and then to the Philippines). When we first got married we lived in an apartment off base because NavRadSta didn't have housing. By this time my drinking was already getting out of hand. Our