marriage didn't really start down hill until I was sent to the Philippines. There was a six-month waiting period before my family could join me there. The drinking got worse. I volunteered during this period to go TAD to Viet Nam. (I don't see anything in the stuff I have or what you have that mentions this tour. I was with VQ1 in Da Nang for 90 days). I felt at the time that perhaps I could get myself killed over there. I was really having trouble by then about being alive after so many of my friends had died on the Liberty. Drinking was a way of pushing the guilt and depression aside. Any way after I got back from Nam my wife and family were able to join me in the Philippines. Our marriage seemed to really fall apart there. I was drinking more and also had become physically abusive to her and the children. By then we had had a son. He was born in San Diego in 1968. Thinking back on it I think our best time together was when we were stationed at Ft. Meade and I was going to school. I pretty much quit drinking then. Maybe it was the challenge of the school and wanting to do well in it that made me quit. Our marriage really ended the second time I went to Nam. Again I volunteered to go. This time to Phu Bai. While I was gone I learned that she was cheating on me and not taking care of the bills we had. If I remember rightly it was a letter from the base in the Philippines that alerted me to the problem. As I remember it a sailor from the base listed her as a contact when he tested positive for VD. After I got back from Phu Bai I was told to ship my family back to the States. Then I got my orders for Permanent Change of Station (to Guam) I turned the orders down since I only had about six months left on my enlistment. I lost my security clearance about the same time, because of the drinking, and was sent to San Francisco to see a Psychiatrist about my drinking.

12) You began drinking at some point in your career? The heavy drinking started after I got out of the Hospital in San Diego in 1967. This is the same time that I stopped remembering any dreams I had. I would know that I had a bad dream because my pillow would be soaking wet and my wife at the time said that I did a lot of tossing and turning and mumbling in my sleep. What started you drinking? I'm not really sure. Perhaps it was the guilt that I was the only person to make it out or the room that the torpedo entered. Perhaps it was that and the fact that I couldn't remember any of the names of the guys that were there with me. Even the two that were sitting on either side of me. Perhaps it was all of that and not being able to talk to any one about it. What would set you off? I don't think anything did. It was just easier to stay drunk than deal with the guilt. I wasn't a nice drunk. I was pretty mean to my wife and the children.

13) You were assigned to the Philippines. This is answered in number 12 above.

14) In the Philippines, what, if anything did you Navy superiors do to help with the problem? Nothing. Disciplinary action. None really. I think they were glad to see me volunteer for Viet Nam the second time. It was a way for them to get me out of their hair for awhile. There wasn't any refusal to allow me to reenlist to my knowledge. When my clearance was revoked I was told I had to pick another ratting. This is when I asked for an early out and that is when they sent me to San Francisco. This is also when they sent me to a Psychiatrist about my drinking. I believe if you look at my DD214 it says, under reenlistment code, RE-4 that I understand to means "recommended for reenlistment".

15) My first wife and I had bought a lot of stuff on credit when we first got married because we really didn't have anything to set up a home with. She also had two children at the time and money was pretty tight. Then in 1968 we had another child. I was an E-5 by then I believe, but money was still tight. When I was transferred to the Philippines I was an E-6 and money was still tight and we did have to maintain two homes. Realistically I believe the drinking had a lot to do with the problems we had with money but mostly I think it was just two people not knowing how to manage money. We got ourselves so deep in dept and we just didn't know how to get out.
16) You ultimately divorced. Was this while you were still in the service? No we separated around 1974 after I caught her in bed with another man. We were living in Long Beach Calif. at the time. I didn't divorce her until 1978. I figured as long as I was still married to her I couldn't make the mistake of getting married again.

Review of Navy records.
Item 12 states that recommendation for advancement to CT1 withdrawn. I don't remember this. My advancement to CT1 was guaranteed upon my completion of the Naval Cryptologic School at Ft. Meade. Part of my reenlistment package.

Performance ratings. Explain lower grades
To tell the truth I can't really say much about the lower marks except perhaps the last two, January and July of 72. By then the drinking and the depression had pretty much taken over my life. I didn't give a shit about anything then.

We need to discuss the real issues.
Nightmares: I have had nightmares ever since the attack on the Liberty. Up until 1997 I was always unable to remember what they were about. I would know I had had a nightmare because I would wake up in the middle of the night and my pillows and my hair would be soaking wet. And, it wasn't caused because the room was to warm. Both my wives have told me that on those nights I would thrash around in bed and talk in my sleep. After the USS Liberty reunion in 1997 my bouts with depression became more frequent and started lasting longer and my urge to drink became stronger. After Capt. McGonagle's death in March of 1999 I started remembering a nightmare, more often than not, it would wake me up. The nightmare would be me in a dark room filled with water and faceless bodies floating all around me. It is so real it wakes me up and it takes me an hour or two to get back to sleep. This dream happens once or twice a week. The depression has become extremely bad the last few months. Started seeing a psychiatric social worker in July 1999.
1) Special assignments prior to the Liberty. None.
2. Describe your relationship with you colleagues aboard the Liberty: The Liberty was a close nit group. Especially the people with NavSecGru. Like I said above. We ate together, berthed together, worked together, and went on liberty together. As a whole the Liberty crew was a very close crew. It was a small ship and everybody knew everybody. My duties when I first reported aboard the

Liberty were as a manual morse intercept operator. Around Feb. of 1967 I was assigned to the Processing and Reporting Dept. We analyzed and reported to NSA on the traffic that was intercepted by the manual morse operators and the voice intercept operators. My battle station was in the Processing and Reporting room. My duties were to destroy any and all classified documents if need be. Shipboard discipline was to my knowledge usually handled at the division level. I don't remember there being many guys that went to Captains Mast. The civilians didn't come aboard the USS Liberty until we left Rota Spain just before the attack and none of us really got to know them. I have since found out that some of the guys knew one or two of them from previous duty stations.

3) How did those relationships change following the attack: I was transferred off the USS Liberty the day after the attack and didn't see anyone I was stationed with aboard the Liberty again until June 1992 when I went to my first Liberty Veterans Assoc. reunion. Our governments refusal to come to our aid during the attack. And then the fact that it took 17 hours for help to get to us had me and most of the crew of the Liberty scared to death as we set out there all by our selves wondering if we would be attacked again that night. I didn't trust the government or the Navy to really fulfill any of their obligations they had to me or anyone else in the service. They had stood by and let 34 guys get murdered and did nothing. And to this day they still do nothing. I don't believe that it had any impact on my family life. Job assignment. I think the Navy and the government did it's best to keep the Liberty survivors that were still in the Navy apart as long as they were still in the Navy. I spent 5 more years in the Navy before I got out and I was never assigned anywhere where there was another Liberty survivor. How it affected my personal outlook on life and duty? Personal outlook on life: don't trust anyone. Personal outlook on duty? I am proud of my service to this country. Would I do it again? Yes in a heartbeat. I my not like the government as a whole but I do love my country and would defend it with no reservations. The Navy. I guess all I can say is that they were following orders. Just like I did when they told me not to talk about it. My performance. I guess if I had cared as much about my performance after the attack as I did before the attack I wouldn't have become an alcoholic.

4) Discuss in detail your recollection of the Liberty attack. June 8th 1967 started out like any other day. Got up had breakfast and then went to work. Around noon I went to lunch and then went topside for some fresh air. I remember looking up and seeing the flag flying in the breeze. Then I went back to work. At 1300 we had a General Quarters drill that lasted until 1330 or so. Soon after that I heard the weirdest noise. It sounded like someone was dropping chains on the decks above us. Then a guy came into the spaces with a bullet wound and said we were under attack by jet aircraft. At about the same time the General Quarters alarm went off and we were informed that we were under attack and it was no drill. Since my G.Q. stations was in Processing and Reporting I just stayed where I was and awaited further orders. Our division officer came in right after the alarm and told us to start bagging up all the classified material into special weighted bags. We could still hear the noise above decks. This went on for what seemed like hours. Then it was announced to stand by for torpedo

attack on the starboard side. The Processing and Reporting room was on the starboard side so we got as far away from the starboard bulkhead as possible which was about 10 to 15 feet. Two other guys and I found a corner between two desks and huddled as close to each other as possible. To this day I still can't remember who those two guys were. They were among the 25 men killed in that room. To my knowledge I am the only one that made it out of their alive. Then all I remember is that the room was filled with water and more was coming in and it was dark. I was having trouble keeping my head above the water. The next thing I remember is that I was somewhere on the ship and they were patching my hand and putting my arm in a sling because it felt like it was broken. Then someone told me to go on down to the chow hall because that is where they had set up the emergency hospital. I have no recollection of time at this point. I went down to the chow hall and someone looked at my wounds and said they were out of morphine and gave me a bottle of alcohol to help with the pain. I remember someone saying they needed help topside so I went up to see what I could do. What I did I don't remember. I do remember later, someone telling me that my uniform was all bloody and I should change it. ( Talking to other crewmen at one of the reunions they believed that the only way I could have gotten that bloody is if I was topside helping to remove the dead crewmen that were up there.) The NavSecGru. berthing compartment was right next to the chow hall so I went in and changed my clothes. It was then that I found out I had a big hole in my right leg. The strange thing is that my leg didn't hurt until I saw that big whole in it. So I finished getting changed and went out and had someone look at it. I believe they put a big bandage on it to stop the bleeding. I don't remember much more about the rest of the day or the night except the fear of us being attacked again before help arrived. During and after the attack I don't think you could have asked for a better crew than what was on the Liberty that day. The damage control teams saved the ship ( from all accounts a ship that should have sunk) from sinking. The medical people and many volunteers help save many lives. Most of the officers were wounded or dead if I remember rightly. We all knew that the Capt. was wounded but had refused to leave the bridge. I think that lifted all our spirits and gave us someone to look up to as we fought with our fears that night. We were treated extremely well at all the facilities we were in except the USAG Hosp. at Frankfurt Germany. If I remember it right we got there on the weekend and there were no Doctors around and the nurses seemed reluctant to treat us without Dr. orders. I do remember some of us that could walk went around and helped change bandages and tried to make some of the guys that were in bad shape as comfortable as possible. It was in Frankfurt that I tore open the wound in my leg because I did so much walking around on it. When we got back on the medical flight again the nurses aboard it were really mad about the treatment we had received at Frankfurt. When I got to the hospital in San Diego my leg wound was so bad again that they had to sew it back together with wire stitches. It never did heal right and I have a large scar on my right leg. After I had been in the hospital in San Diego a couple of days a Lt.Cmdr. came into my room. Drew the curtain around my bed and told me who he was (I don't remember now) and said "you are not to discuss the incident

aboard the USS Liberty with anyone, that includes your family, ever. If you do charges will be brought against you and you could go to prison." Until 1992 I didn't discuss the attack on the Liberty with anyone. In 1992 I saw in a VFW magazine that the USS Liberty was having a reunion in South Dakota. I told my wife (Margaret) that I would like to go. She asked about the Liberty. I just told her it was a ship I was on that got attacked by the Israelis. It wasn't until I got to the reunion and started talking with the other survivors that I really talked about the attack. It was at this reunion that I found out that it was Bryce Lockwood who had pulled my unconscious body out of the water and taken me out of the flooded compartment. The majority of the conversation wasn't about the attack but what had or had not been going on since the attack. The cover-up, the fact that congress had never investigated it, and what some of the survivors were doing and had been doing to try and get congress to investigate it. I guess my most overwhelming feeling at that time was anger. And I'm still angry that our government is still trying to cover up the attack and congress still refuses to do a congressional investigation. These last few paragraphs and my last two sessions with the psychiatrist are the most I have ever talked about the actual attack and what happened to me and how it affected me, since the attack. Doing both has been an emotional roller coaster.

5) Following the attack, did you experience any particular feeling about you reaction and experience during the attack?: No not really. Except for the guilt of being alive. Being mad at God. And the ever present question Why Me, why am I still alive?

6) What, if any other reactions did you experience: After I got out of the Navy in 1973 I was unable to hold a job for more than a couple of years, and then I would move on to another job. I can only remember one that I lost because of my drinking and that was when I was working for the Los Angeles Police Dept. To this day I don't get close to people or let them get to close to me. My wife is the only person that I can honestly say is close to me today. I can't really say that I am close to my children. Because of the Liberty I have found life is less painful if you don't get to close to people.

7) Did you seek medical help?: No. Not until June 1999. Why not? : Thought I could handle it on my own. Did you discuss it with your Liberty colleagues?: Yes. Talked about it with Rocky Struman and Bryce Lockwood. Both said I should seek professional help. Were you cautioned/advised ?: Only the one time back in 1967 while in the hospital in San Diego. What did you do?: I kept my mouth shut like I was told. That is until 1992.

8) How have these nightmares and other problems affected your military career etc ?: I can't really say. Perhaps the nightmares were a cause of my drinking but I really think that the drinking problem was because of the guilt. The drinking was a way of escaping the guilt. The nightmare I am having now is effecting my sleep. It has gotten to the point that I put off going to bed as long as I can, if you aren't asleep you can't dream, and the nightmare wakes me up during the night and I find it hard to get back to sleep. This has made me extremely sleepy at work. More than once I have fallen asleep while operating my roadgrader.

You received the Meritorious Unit Citation for service at NAVCOMS Diego: I don't know anything about that one. The only MUC I know about is the one I received while stationed in the Philippines for the period 28 March 1972 to 28 Jan. 1973

You were awarded proficiency pay: I don't remember what Pro Pay was for unless it had something to do with being a petty officer.

You were in Nam from 12-29-70 through 01-04-71; thereafter a dispute arose: I don't remember any dispute. I was at Phu Bai from Dec. 29 1970 till April 1, 1971 that would have been real close to 90 days which is the normal TAD duty time. But before that I was in Da Nang for 90 days sometime around May or June of 1970.

The 2.8 in Military appearance: A little difficult to remember back that far. The Good Conduct Medal? I don't know what the criteria for the Good Conduct Medal was. Perhaps quarterly evaluations didn't have that much to do with whether or not you received one. That was all so long ago.

Hope I have got everything that you needed. Let me know if there is anything else you need.

Respectfully

Harold E. Six, Sr.

Harold E. Six, Sr.
4080 Pedley Rd. Space# 185
Riverside, CA. 92509
Home Phone# 909-685-4707
FAX # 909-685-3324

December 1, 1995

To Whom it may Concern:

Trying to explain this condition and the course it has taken over the last 30 odd years has proven to be more difficult than I thought it would be. I hope I have put it down so that it is understandable.

1970-1972: Treated in sick bay at Naval Radio Station, San Meguel, Philippine Islands. This is the first incident of the facial pains that I remember. They treated me for sinusitis. None of the medication did any good. Was then sent to a dentist, they thought it might be my teeth. Dentist couldn't find anything except that my lower jaw wasn't right. Was sent to an oral surgeon at Naval Hospital Subic Bay, he did a bi-lateral, vertical osteotomy. Discharged from Navy in early 1973.

1973-1978: Didn't have a Dr. during this period. Treated pain when it did occur with over the counter pain medication.

1978-1986: Pain became worse. Started going to Dr. Horace Stevens a G.P. His diagnosis was sinusitis. Nothing he was giving me did any good. He sent me to an E.N.T. Dr. (don't remember his name). This Dr. decided that I had a deviated septum and that was what was causing the pain. He suggested surgery. I didn't have any medical coverage at that time and couldn't afford the surgery.

1986-1988: Went to and E.N.T. Dr.(don't remember his name either) at Kaiser Medical Group, I now had medical coverage. After first treating me for sinusitis to no avail, he to decided that it was because of my deviated septum and did surgery. I didn't have any pain the next year so I thought we had finally found the problem and solved it. No such luck.

1986-present: Pain continued every year or so. E.N.T. Dr. Tadwaker, at Kaiser continued to treat me for sinusitis which did no good. 1992 Dr. Tadwaker sent me to see a neuroligest Dr. Lipiz. Dr. Lipiz diagnosis was nerve damage. In 1993 I found out from Bryce Lockwood that when he found me floating in the research spaces after the attack I was unconscious. My battle station was in the processing and reporting room. That is the room the torpedo exploded in. I was less than 30 feet away from its impact site.

The pain has until this year been only on the right side of my face and neck. The pain feels like a hot poker is stuck up my nose and then over under my eye then travels down in front of my ear and into my neck. Most years these incidents only happen once a year and lasts about a week or two. The pain can last 15 min. or hours, usually occurring every night. but not very often during the day. The last couple of years the pain has become more intense. This year it also

start [illegible] left side. The pain would usually be on one side or the other. Only once do I remember it being on both sides at the same time. At times it would start on one side then switch to the other side.

In 1993 Dr. Lipiz started me on 30 mg of Elvil a day and I believe 800 mg of Motren as needed. The Elvil stopped the pain from occurring every night and did seem to lessen the pain when it did occure. That year the episode lasted about a month.

1994 when 30mg of Elvil didn't work that year Dr. Lipiz up my dosage to 60 mg of Elvil. The 60mg had the same results as the 30mg had the year before. During those two years Dr. Lipiz had me taking 10mg doses throughout the day.

1995 Dr. Lipiz had to up my dosage to 75mg a day at bedtime. He also elevated my pain pills to Vicodin 1 tablet every 6 hr as needed for pain. (I've taken as many as 3 in a 2 hour period and like other pain medication they don't help.) The only thing I am able to do during an attack is pace the house until the pain goes away. This year the pains started in August. In October Dr. Lipiz added Baclofin 10mg at bed time to my regular medication, this and the Elvil stopped me from having any pain at all. Around the second week of November I started taking less Elvil every night for two weeks. I am now off the Elvil and Baclofin and am having no pain. It appears it is over for another year.

Respectfully

Harold E. Six, Sr.

UTHORITY: 72 Stat. 1125; 38 U.S.C. 355.

OURCE: 29 FR 6718, May 22, 1964, unless herwise noted.

## ubpart A—General Policy in Rating

**.1 Essentials of evaluative rating.**

This rating schedule is primarily a uide in the evaluation of disability reilting from all types of diseases and juries encountered as a result of or cident to military service. The perntage ratings represent as far as can racticably be determined the average npairment in earning capacity resultg from such diseases and injuries nd their residual conditions in civil ccupations. Generally, the degrees of isability specified are considered adeuate to compensate for considerable ss of working time from exacerbaions or illnesses proportionate to the everity of the several grades of disbility. For the application of this chedule, accurate and fully descripive medical examinations are reuired, with emphasis upon the limitaion of activity imposed by the disbling condition. Over a period of nany years, a veteran's disability laim may require reratings in accordnce with changes in laws, medical nowledge and his or her physical or nental condition. It is thus essential, oth in the examination and in the valuation of disability, that each disbility be viewed in relation to its hisory.

[41 FR 11292, Mar. 18, 1976]

**4.2 Interpretation of examination reports.**

Different examiners, at different times, will not describe the same disability in the same language. Features of the disability which must have persisted unchanged may be overlooked or a change for the better or worse may not be accurately appreciated or described. It is the responsibility of the rating specialist to interpret reports of examination in the light of the whole recorded history, reconciling the various reports into a consistent picture so that the current rating may accurately reflect the elements of disability present. Each disability view of the veteran working or seeking work. If a diagnosis is not supported by the findings on the examination report or if the report does not contain sufficient detail, it is incumbent upon the rating board to return the report as inadequate for evaluation purposes.

[41 FR 11292, Mar. 18, 1976]

**§ 4.3 Resolution of reasonable doubt.**

It is the defined and consistently applied policy of the Veterans Administration to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. When after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability such doubt will be resolved in favor of the claimant. See § 3.102 of this chapter.

[40 FR 42535, Sept. 15, 1975]

**§ 4.6 Evaluation of evidence.**

The element of the weight to be accorded the character of the veteran's service is but one factor entering into the considerations of the rating boards in arriving at determinations of the evaluation of disability. Every element in any way affecting the probative value to be assigned to the evidence in each individual claim must be thoroughly and conscientiously studied by each member of the rating board in the light of the established policies of the Veterans Administration to the end that decisions will be equitable and just as contemplated by the requirements of the law.

**§ 4.7 Higher of two evaluations.**

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned.

**§ 4.9 Congenital or developmental defects.**

Mere congenital or developmental defects, absent, displaced or supernumerary parts, refractive error of the eye, personality disorder and mental [illegible]

ria and are unemployable, will be referred by the rating board to the Adjudication Officer under § 3.321(b)(2) of this chapter.

[43 FR 45348, Oct. 2, 1978]

**§ 4.17a Misconduct etiology.**

A permanent and total disability rating under the provisions of §§ 4.15, 4.16 and 4.17 will not be precluded by reason of the coexistence of misconduct disability when:

(a) A veteran, regardless of employment status, also has innocently acquired 100 percent disability, or

(b) Where unemployable, the veteran has other disabilities innocently acquired which meet the percentage requirements of §§ 4.16 and 4.17 and would render, in the judgment of the rating agency, the average person unable to secure or follow a substantially gainful occupation.

[40 FR 42536, Sept. 15, 1975, as amended at 43 FR 45349, Oct. 2, 1978]

**§ 4.18 Unemployability.**

A veteran may be considered as unemployable upon termination of employment which was provided on account of disability, or in which special consideration was given on account of the same, when it is satisfactorily shown that he or she is unable to secure further employment. With amputations, sequelae of fractures and other residuals of traumatism shown to be of static character, a showing of continuous unemployability from date of incurrence, or the date the condition reached the stabilized level, is a general requirement in order to establish the fact that present unemployability is the result of the disability. However, consideration is to be given to the circumstances of employment in individual claims, and, if the employment was only occasional, intermittent, tryout or unsuccessful, or eventually terminated on account of the disability, present unemployability may be attributed to the static disability. Where unemployability for pension previously has been established on the basis of combined service-connected and non-service-connected disabilities and the service-connected disability or § 4.16 is for consideration.

[40 FR 42536, Sept. 15, 1975, as amended at 43 FR 45349, Oct. 2, 1978]

**§ 4.19 Age in service-connected claims.**

Age may not be considered as a factor in evaluating service-connected disability; and unemployability, in service-connected claims, associated with advancing age or intercurrent disability, may not be used as a basis for a total disability rating. Age, as such, is a factor only in evaluations of disability not resulting from service, i.e., for the purposes of pension.

[29 FR 6718, May 22, 1964, as amended at 43 FR 45349, Oct. 2, 1978]

**§ 4.20 Analogous ratings.**

When an unlisted condition is encountered it will be permissible to rate under a closely related disease or injury in which not only the functions affected, but the anatomical localization and symptomatology are closely analogous. Conjectural analogies will be avoided, as will the use of analogous ratings for conditions of doubtful diagnosis, or for those not fully supported by clinical and laboratory findings. Nor will ratings assigned to organic diseases and injuries be assigned by analogy to conditions of functional origin.

**§ 4.21 Application of rating schedule.**

In view of the number of atypical instances it is not expected, especially with the more fully described grades of disabilities, that all cases will show all the findings specified. Findings sufficiently characteristic to identify the disease and the disability therefrom, and above all, coordination of rating with impairment of function will, however, be expected in all instances.

[41 FR 11293, Mar. 18, 1976]

**§ 4.22 Rating of disabilities aggravated by active service.**

In cases involving aggravation by active service, the rating will reflect only the degree of disability over and above the degree existing at the time of entrance into the active service, whether the particular condition was

DISEASES OF THE PERIPHERAL NERVES—Continued

| | Rating Major | Rating Minor |
|---|---|---|
| 8620 Neuritis. | | |
| 8720 Neuralgia. | | |
| External popliteal nerve (common peroneal). | | |
| 8521 Paralysis of: | | |
| Complete; foot drop and slight droop of first phalanges of all toes, cannot dorsiflex the foot, extension (dorsal flexion) of proximal phalanges of toes lost; abduction of foot lost, adduction weakened; anesthesia covers entire dorsum of foot and toes | | 40 |
| Incomplete: | | |
| Severe | | 30 |
| Moderate | | 20 |
| Mild | | 10 |
| 8621 Neuritis. | | |
| 8721 Neuralgia. | | |
| Musculocutaneous nerve (superficial peroneal). | | |
| 8522 Paralysis of: | | |
| Complete; eversion of foot weakened | | 30 |
| Incomplete: | | |
| Severe | | 20 |
| Moderate | | 10 |
| Mild | | 0 |
| 8622 Neuritis. | | |
| 8722 Neuralgia. | | |
| Anterior tibial nerve (deep peroneal). | | |
| 8523 Paralysis of: | | |
| Complete; dorsal flexion of foot lost | | 30 |
| Incomplete: | | |
| Severe | | 20 |
| Moderate | | 10 |
| Mild | | 0 |
| 8623 Neuritis. | | |
| 8723 Neuralgia. | | |
| Internal popliteal nerve (tibial). | | |
| 8524 Paralysis of: | | |
| Complete; plantar flexion lost, frank adduction of foot impossible, flexion and separation of toes abolished; no muscle in sole can move; in lesions of the nerve high in popliteal fossa | | 40 |
| Incomplete: | | |
| Severe | | 30 |
| Moderate | | 20 |
| Mild | | 10 |
| 8624 Neuritis. | | |
| 8724 Neuralgia. | | |
| Posterior tibial nerve. | | |
| 8525 Paralysis of: | | |
| Complete; paralysis of all muscles of sole of foot, frequently with painful paralysis of a causalgic nature; toes cannot be flexed; adduction is weakened; plantar flexion is impaired | | 30 |
| Incomplete: | | |
| Severe | | 20 |
| Moderate | | 10 |
| Mild | | 10 |
| 8625 Neuritis. | | |
| 8725 Neuralgia. | | |
| Anterior crural nerve (femoral). | | |
| 8526 Paralysis of: | | |
| Complete; paralysis of quadriceps extensor muscles | | 40 |

DISEASES OF THE PERIPHERAL NERVES—Continued

| | Rating Major | Rating Minor |
|---|---|---|
| Incomplete: | | |
| Severe | | 30 |
| Moderate | | 20 |
| Mild | | 10 |
| 8626 Neuritis. | | |
| 8726 Neuralgia. | | |
| Internal saphenous nerve. | | |
| 8527 Paralysis of: | | |
| Severe to complete | | [illegible] |
| Mild or Moderate | | [illegible] |
| 8627 Neuritis. | | |
| 8727 Neuralgia. | | |
| Obturator nerve. | | |
| 8528 Paralysis of: | | |
| Severe to complete | | [illegible] |
| Mild or Moderate | | [illegible] |
| 8628 Neuritis. | | |
| 8728 Neuralgia. | | |
| External cutaneous nerve of thigh. | | |
| 8529 Paralysis of: | | |
| Severe to complete | | [illegible] |
| Mild or Moderate | | [illegible] |
| 8629 Neuritis. | | |
| 8729 Neuralgia. | | |
| Ilio-inguinal nerve. | | |
| 8530 Paralysis of: | | |
| Severe to complete | | [illegible] |
| Mild or Moderate | | [illegible] |
| 8630 Neuritis. | | |
| 8730 Neuralgia. | | |

THE EPILEPSIES

| | Rating |
|---|---|
| A thorough study of all material in §§ 4.121 and 4.122 of the preface and under the ratings for epilepsy is necessary prior to any rating action. | |
| 8910 Epilepsy, grand mal. | |
| Rate under the general rating formula for major seizures. | |
| 8911 Epilepsy, petit mal. | |
| Rate under the general rating formula for minor seizures. | |
| NOTE (1): A major seizure is characterized by the generalized tonic-clonic convulsion with unconsciousness. | |
| NOTE (2): A minor seizure consists of a brief interruption in consciousness or conscious control associated with staring or rhythmic blinking of the eyes or nodding of the head ("pure" petit mal), or sudden jerking movements of the arms, trunk, or head (myoclonic type) or sudden loss of postural control (akinetic type). | |
| General Rating Formula for Major and Minor Epileptic Seizures: | |
| Averaging at least 1 major seizure per month over the last year | [illegible] |
| Averaging at least 1 major seizure in 3 months over the last year; or more than 10 minor seizures weekly | [illegible] |

THE EPILEPSIES—Continued

| | Rating |
|---|---|
| Averaging at least 1 major seizure in 4 months over the last year; or 9–10 minor seizures per week | 60 |
| At least 1 major seizure in the last 6 months or 2 in the last year; or averaging at least 5 to 8 minor seizures weekly | 40 |
| At least 1 major seizure in the last 2 years; or at least 2 minor seizures in the last 6 months | 20 |
| A confirmed diagnosis of epilepsy with a history of seizures | 10 |
| [illegible] NOTE (1): When continuous medication is shown necessary for the control of epilepsy, the minimum evaluation will be 10 percent. This rating will not be combined with any other rating for epilepsy. | |
| NOTE (2): In the presence of major and minor seizures, rate the predominating type. | |
| NOTE (3): There will be no distinction between diurnal and nocturnal major seizures. | |
| [illegible]2 Epilepsy, Jacksonian and focal motor or sensory. | |
| [illegible]3 Epilepsy, diencephalic. | |
| Rate as minor seizures, except in the presence of major and minor seizures, rate the predominating type. | |
| [illegible] Epilepsy, psychomotor. | |
| Major seizures: | |
| Psychomotor seizures will be rated as major seizures under the general rating formula when characterized by automatic states and/or generalized convulsions with unconsciousness. | |
| Minor seizures: | |
| Psychomotor seizures will be rated as minor seizures under the general rating formula when characterized by brief transient episodes of random motor movements, hallucinations, perceptual illusions, abnormalities of thinking, memory or mood, or autonomic disturbances. | |

[illegible] Disorders in Epilepsies: A nonpsychotic organic [illegible] syndrome will be rated separately under the appropri[illegible] diagnostic code (e.g., 9304 or 9307). In the absence of a [illegible] of non-psychotic organic psychiatric disturbance [illegible], psychoneurotic or personality disorder) if diag[illegible] and shown to be secondary to or directly associated [illegible] epilepsy will be rated separately. The psychotic or [illegible]choneurotic disorder will be rated under the appropriate [illegible] code. The personality disorder will be rated as a [illegible]psychotic organic brain syndrome (e.g., diagnostic code [illegible] or 9307).

[illegible] Epilepsy and Unemployability: (1) Rating specialists must [illegible] in mind that the epileptic, although his or her seizures [illegible] controlled, may find employment and rehabilitation diffi[illegible] attainment due to employer reluctance to the hiring of [illegible] epileptic.

[illegible] Where a case is encountered with a definite history of [illegible]ployment, full and complete development should be [illegible]taken to ascertain whether the epilepsy is the determin[illegible] factor in his or her inability to obtain employment. [illegible] The assent of the claimant should first be obtained for [illegible] to conduct this economic and social survey. The [illegible] of this survey is to secure all the relevant facts and [illegible] necessary to permit of a true judgment as to the reason [illegible] or her unemployment and should include information [illegible]:

[illegible] Education;
[illegible] Occupations prior and subsequent to service;
[illegible] Places of employment and reasons for termination;
[illegible] Wages received;
[illegible] Number of seizures.

(4) Upon completion of this survey and current examination, the case should have rating board consideration. Where in the judgment of the rating board the veteran's unemployability is due to epilepsy and jurisdiction is not vested in that body by reason of schedular evaluations, the case should be submitted to the Director, Compensation and Pension Service.

[29 FR 6718, May 22, 1964, as amended at 40 FR 42540, Sept. 15, 1975; 41 FR 11302, Mar. 18, 1976; 43 FR 45362, Oct. 2, 1978]

MENTAL DISORDERS

**§ 4.125 General considerations.**

The field of mental disorders represents the greatest possible variety of etiology, chronicity and disabling effects, and requires differential consideration in these respects. These sections under mental disorders are concerned with the rating of psychiatric conditions and specifically psychotic, psychoneurotic and psychophysiologic disorders, as well as mental disorders accompanying organic brain disease. Advances in modern psychiatry during and since World War II have been rapid and profound and have extended to the entire medical profession a better understanding of and deeper insight into the etiological factors, psychodynamics, and psychopathological changes which occur in mental disease and emotional disturbances. The psychiatric nomenclature employed is based upon the Diagnostic and Statistical Manual of Mental Disorders, 1968 Edition, American Psychiatric Association. It limits itself to the classification of disturbances of mental functioning. To comply with the fundamental requirements for rating psychiatric conditions, it is imperative that rating personnel familiarize themselves thoroughly with this manual (American Psychiatric Association Manual, 1968 Edition) which will be hereinafter referred to as the APA manual.

[41 FR 34258, Aug. 13, 1976]

**§ 4.126 Substantiation of diagnosis.**

It must be established first that a true mental disorder exists. The disorder will be diagnosed in accordance with the APA manual. A diagnosis not in accord with this manual is not acceptable for rating purposes and will be returned through channels to the examiner. Normal reactions of discour-

AR 130