should be considered. The highest levels of adaptive functioning should be used only when high occupational productivity is not associated with a high level of subjective discomfort.

*Use of leisure time* includes recreational activities or hobbies. The range and depth of involvement and the pleasure derived should be considered.

The level noted should be descriptive of the individual's functioning regardless of whether or not special circumstances, such as concurrent treatment, may have been necessary to sustain that level.

| Levels | Adult examples | Child or adolescent examples |
| --- | --- | --- |
| **1 SUPERIOR**—Unusually effective functioning in social relations, occupational functioning, and use of leisure time. | Single parent living in deteriorating neighborhood takes excellent care of children and home, has warm relations with friends, and finds time for pursuit of hobby. | A 12-year-old girl gets superior grades in school, is extremely popular among her peers, and excels in many sports. She does all of this with apparent ease and comfort. |
| **2 VERY GOOD**—Better than average functioning in social relations, occupational functioning, and use of leisure time. | A 65-year-old retired widower does some volunteer work, often sees old friends, and pursues hobbies. | An adolescent boy gets excellent grades, works part-time, has several close friends, and plays banjo in a jazz band. He admits to some distress in "keeping up with everything." |
| **3 GOOD**—No more than slight impairment in either social or occupational functioning. | A woman with many friends functions extremely well at a difficult job, but says "the strain is too much." | An 8-year-old boy does well in school, has several friends, but bullies younger children. |
| **4 FAIR**—Moderate impairment in either social relations or occupational functioning, or some impairment in both. | A lawyer has trouble carrying through assignments; has several acquaintances, but hardly any close friends. | A 10-year-old girl does poorly in school, but has adequate peer and family relations. |
| **5 POOR**—Marked impairment in either social relations or occupational functioning, or moderate impairment in both. | A man with one or two friends has trouble keeping a job for more than a few weeks. | A 14-year-old boy almost fails in school and has trouble getting along with his peers. |

| Levels | Adult examples | Child or adolescent examples |
|---|---|---|
| **6 VERY POOR**—Marked impairment in both social relations and occupational functioning. | A woman is unable to do any of her housework and has violent outbursts toward family and neighbors. | A 6-year-old girls needs special help in all subjects and has virtually no peer relationships. |
| **7 GROSSLY IMPAIRED**—Gross impairment in virtually all areas of functioning | An elderly man needs supervision to maintain minimal personal hygiene and is usually incoherent. | A 4-year-old boy needs constant restraint to avoid hurting himself and is almost totally lacking in skills. |
| **0 UNSPECIFIED** | No information. | No information. |

**Examples of How To Record the Results of a DSM-III Multiaxial Evaluation**

Example 1

| | | |
|---|---|---|
| Axis I: | 296.23 | Major Depression, Single Episode, with Melancholia |
| | 303.93 | Alcohol Dependence, In Remission |
| Axis II: | 301.60 | Dependent Personality Disorder (Provisional, rule out Borderline Personality Disorder) |
| Axis III: | | Alcoholic cirrhosis of liver |
| Axis IV: | | Psychosocial stressors: anticipated retirement and change in residence with loss of contact with friends<br>Severity: 4—Moderate |
| Axis V: | | Highest level of adaptive functioning past year: 3—Good |

Example 2

| | | |
|---|---|---|
| Axis I: | 304.03 | Heroin Dependence, In Remission |
| Axis II: | 301.70 | Antisocial Personality Disorder (Principal diagnosis); prominent paranoid traits |
| Axis III: | | None |
| Axis IV: | | Psychosocial stressors: No information<br>Severity: 0—Unspecified |
| Axis V: | | Highest level of adaptive functioning past year: 5—Poor |

Example 3

| | | |
|---|---|---|
| Axis I: | 295.92 | Schizophrenia, Undifferentiated Type, Chronic |
| | V62.89 | Borderline Intellectual Functioning (Provisional) |
| Axis II: | V71.09 | No diagnosis on Axis II |

**308.30 Post-traumatic Stress Disorder, Acute**

**309.81 Post-traumatic Stress Disorder, Chronic or Delayed**

The essential feature is the development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experience.

The characteristic symptoms involve reexperiencing the traumatic event; numbing of responsiveness to, or reduced involvement with, the external world; and a variety of autonomic, dysphoric, or cognitive symptoms.

The stressor producing this syndrome would evoke significant symptoms of distress in most people, and is generally outside the range of such common experiences as simple bereavement, chronic illness, business losses, or marital conflict. The trauma may be experienced alone (rape or assault) or in the company of groups of people (military combat). Stressors producing this disorder include natural disasters (floods, earthquakes), accidental man-made disasters (car accidents with serious physical injury, airplane crashes, large fires), or deliberate man-made disasters (bombing, torture, death camps). Some stressors frequently produce the disorder (e.g., torture) and others produce it only occasionally (e.g., car accidents). Frequently there is a concomitant physical component to the trauma which may even involve direct damage to the central nervous system (e.g., malnutrition, head trauma). The disorder is apparently more severe and longer lasting when the stressor is of human design. The severity of the stressor should be recorded and the specific stressor may be noted on Axis IV (p. 26).

The traumatic event can be reexperienced in a variety of ways. Commonly the individual has recurrent painful, intrusive recollections of the event or recurrent dreams or nightmares during which the event is reexperienced. In rare instances there are dissociativelike states, lasting from a few minutes to several hours or even days, during which components of the event are relived and the individual behaves as though experiencing the event at that moment. Such states have been reported in combat veterans. Diminished responsiveness to the external world, referred to as "psychic numbing" or "emotional anesthesia," usually begins soon after the traumatic event. A person may complain of feeling detached or estranged from other people, that he or she has lost the ability to become interested in previously enjoyed significant activities, or that the ability to feel emotions of any type, especially those associated with intimacy, tenderness, and sexuality, is markedly decreased.

After experiencing the stressor, many develop symptoms of excessive autonomic arousal, such as hyperalertness, exaggerated startle response, and difficulty falling asleep. Recurrent nightmares during which the traumatic event is relived and which are sometimes accompanied by middle or terminal sleep disturbance may be present. Some complain of impaired memory or difficulty in concentrating or completing tasks. In the case of a life-threatening trauma shared with others, survivors often describe painful guilt feelings about surviving when many did not, or about the things they had to do in order to survive. Activities or situations that may arouse recollections of the traumatic event are

often avoided. Symptoms characteristic of Post-traumatic Stress Disorder are often intensified when the individual is exposed to situations or activities that resemble or symbolize the original trauma (e.g., cold snowy weather or uniformed guards for death-camp survivors, hot, humid weather for veterans of the South Pacific).

**Associated features.** Symptoms of depression and anxiety are common, and in some instances may be sufficiently severe to be diagnosed as an Anxiety or Depressive Disorder. Increased irritability may be associated with sporadic and unpredictable explosions of aggressive behavior, upon even minimal or no provocation. The latter symptom has been reported to be particularly characteristic of war veterans with this disorder. Impulsive behavior can occur, such as sudden trips, unexplained absences, or changes in life-style or residence. Survivors of death camps sometimes have symptoms of an Organic Mental Disorder, such as failing memory, difficulty in concentrating, emotional lability, autonomic lability, headache, and vertigo.

**Age at onset.** The disorder can occur at any age, including during childhood.

**Course and subtypes.** Symptoms may begin immediately or soon after the trauma. It is not unusual, however, for the symptoms to emerge after a latency period of months or years following the trauma.

When the symptoms begin within six months of the trauma and have not lasted more than six months, the acute subtype is diagnosed, and the prognosis for remission is good. If the symptoms either develop more than six months after the trauma or last six months or more, the chronic or delayed subtype is diagnosed.

**Impairment and complications.** Impairment may either be mild or affect nearly every aspect of life. Phobic avoidance of situations or activities resembling or symbolizing the original trauma may result in occupational or recreational impairment. "Psychic numbing" may interfere with interpersonal relationships, such as marriage or family life. Emotional lability, depression, and guilt may result in self-defeating behavior or suicidal actions. Substance Use Disorders may develop.

**Predisposing factors.** Preexisting psychopathology apparently predisposes to the development of the disorder.

**Prevalence.** No information.

**Sex ratio and familial pattern.** No information.

**Differential diagnosis.** If an **Anxiety, Depressive,** or **Organic Mental Disorder** develops following the trauma, these diagnoses should also be made.

In **Adjustment Disorder,** the stressor is usually less severe and within the range of common experience; and the characteristic symptoms of Post-traumatic Stress Disorder, such as reexperiencing the trauma, are absent.

**Diagnostic criteria for Post-traumatic Stress Disorder**

A. Existence of a recognizable stressor that would evoke significant symptoms of distress in almost everyone.

B. Reexperiencing of the trauma as evidenced by at least one of the following:

(1) recurrent and intrusive recollections of the event
(2) recurrent dreams of the event
(3) sudden acting or feeling as if the traumatic event were reoccurring, because of an association with an environmental or ideational stimulus

C. Numbing of responsiveness to or reduced involvement with the external world, beginning some time after the trauma, as shown by at least one of the following:

(1) markedly diminished interest in one or more significant activities
(2) feeling of detachment or estrangement from others
(3) constricted affect

D. At least two of the following symptoms that were not present before the trauma:

(1) hyperalertness or exaggerated startle response
(2) sleep disturbance
(3) guilt about surviving when others have not, or about behavior required for survival
(4) memory impairment or trouble concentrating
(5) avoidance of activities that arouse recollection of the traumatic event
(6) intensification of symptoms by exposure to events that symbolize or resemble the traumatic event

## SUBTYPES

**Post-traumatic Stress Disorder, Acute**

A. Onset of symptoms within six months of the trauma.

B. Duration of symptoms less than six months.

**Post-traumatic Stress Disorder, Chronic or Delayed**

Either of the following, or both:

(1) duration of symptoms six months or more (chronic)
(2) onset of symptoms at least six months after the trauma (delayed)

300.00
This ca
Anxiety
conditic

From : HAROLD SIX SR PHONE No. : 909 685 3324 Sep. 08 2003 4:46PM P01

DEPARTMENT OF THE NAVY
BOARD FOR CORRECTION OF NAVAL RECORDS
2 NAVY ANNEX
WASHINGTON DC 20370-5100

JRE
Docket No. 00483-03
25 August 2003

MR HAROLD E SIX
4080 PEDLEY ROAD
SPACE 185
RIVERSIDE CA 92509

Dear Mr. Six:

This is in reference to your application for correction of your naval record pursuant to the provisions of title 10 of the United States Code, section 1552.

A three-member panel of the Board for Correction of Naval Records, sitting in executive session, considered your application on 21 August 2003. Your allegations of error and injustice were reviewed in accordance with administrative regulations and procedures applicable to the proceedings of this Board. Documentary material considered by the Board consisted of your application, together with all material submitted in support thereof, your naval record and applicable statutes, regulations and policies.

After careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice.

The Board found that you were honorably discharged from the Navy on 6 February 1983, under an early out program for Sailors within three months of expiration of term of service.

The Board noted that despite the traumatic events you experienced in 1967, you continued to perform your duties in a satisfactory manner for several years thereafter, and were promoted to CT2 in 1967, and to CT1 in 1973. It could not find any indication in the available records that you suffered from the hallmark symptoms of posttraumatic stress disorder during the period from 1967 to 1973. The Board noted, however, that you denied having a history of psychological complaints on 21

October 1971, when you completed a Report of Medical History, and stated that you did not have a history of frequent trouble sleeping, frequent or troubling nightmares, depression or excessive worry, or nervous trouble of any sort. You underwent psychiatric evaluation on 4 August 1972, and were given a diagnosis of an immature personality. The majority of your complaints apparently related to your wife's behavior and the perceived unfairness of your life situation. You indicated that you did not regret your time in the Navy, but that you did not want to remain in the Navy. On 8 August 1972, you spoke to another psychiatrist, who was of the opinion that "claims of alcoholism are unfounded", and that you had "no detectable psychiatric difficulties." The Report of Medical History you presumably completed in connection with your pre-separation physical examination on 6 February 1973 was not available to the Board; however, the results of a clinical evaluation of your psychiatric state conducted on that date were classified as normal, and item 74 of the report of examination, entitled Summary of Defects and Diagnoses, makes no reference to any psychiatric conditions or complaints.

The Board rejected your unsubstantiated contentions to the effect that the Navy treated you with indifference, that your use of alcohol was related to the effects undiagnosed and untreated posttraumatic stress disorder, and that your discharge was improper. The fact that the Department of Veterans Affairs (VA) granted you service connection and a 10% rating for posttraumatic stress disorder on 21 July 1999 was not considered probative of your contentions of error and injustice. In this regard, the Board noted that the military departments assign disability ratings only in those cases where a service member has been found unfit for duty by reason of physical disability, whereas the VA rates all conditions it classifies as "service connected", without regard to the issue of fitness for military duty. As you have not demonstrated that you were suffering from posttraumatic stress disorder at the time of your discharge, and that you were unfit for duty because of that or other conditions that were ratable at or above 30% disabling, the Board was unable to recommend that your request for corrective action be granted. Accordingly, your application has been denied. The names and votes of the members of the panel will be furnished upon request.

It is regretted that the circumstances of your case are such that favorable action cannot be taken. You are entitled to have the Board reconsider its decision upon submission of new and material evidence or other matter not previously considered by

the Board. In this regard, it is important to keep in mind that a presumption of regularity attaches to all official records. Consequently, when applying for a correction of an official naval record, the burden is on the applicant to demonstrate the existence of probable material error or injustice.

Sincerely,

W. DEAN PFEIFFER
Executive Director

TO BE SUPPLIED

DEPARTMENT OF THE NAVY
BUREAU OF MEDICINE AND SURGERY
WASHINGTON, D.C. 20372-5120

IN REPLY REFER TO

BUMEDINST 5300.8
BUMED-23
20 Mar 92

BUMED INSTRUCTION 5300.8

From: Chief, Bureau of Medicine and Surgery
To: All Ships and Stations

Subj: DISPOSITION OF REHABILITATED ALCOHOL DEPENDENT OR ABUSER AIRCREW, AIR CONTROLLERS, HYPOBARIC CHAMBER INSIDE OBSERVERS AND INSTRUCTORS

Ref: (a) SECNAVINST 5300.28B
(b) OPNAVINST 5350.4B

1. Purpose. To provide guidance for the uniform disposition of aviators, aircrew, air traffic controllers, and hypobaric chamber inside observers and instructors who have been diagnosed as alcohol dependent or alcohol abusers.

2. Cancellation. NAVMEDCOMINST 5300.2.

3. Scope. Applies to all commands and activities having aircrew personnel, air controllers, and hypobaric chamber inside observers or instructors within their administrative control.

4. Background. The Navy recognizes that alcoholism is treatable and has established programs emphasizing individual participation in treatment and rehabilitation. Within the constraints imposed by flight safety regulations, appropriate Federal Aviation Administration (FAA) regulations, and all pertinent Chief of Naval Operations (CNO) and Bureau of Medicine and Surgery (BUMED) directives, these individuals should be returned, as expeditiously as possible, to their special duty assignments, per reference (a). The uniform disposition of rehabilitated aviation personnel throughout the naval aviation communities should be commensurate with operational requirements.

5. Applicability. Applies to all aeronautically designated personnel or students (Navy and Marine Corps), active and Reserve, serving in a flying status involving operational or training flights (DIFOT), duty in a flying status not involving flying (DIFDEN) orders, those personnel serving as hypobaric chamber inside observers or instructors under hazardous duty incentive pay (HDIP) orders, and to all civilian employees of the Department of the Navy, including nonappropriated fund employees and contract employees involved with frequent aerial flights or air traffic control duties.

0510-LD-055-8470

6. Action

a. Personnel diagnosed as alcohol dependent or alcohol abusers using current Diagnostic and Statistic Manual (DSM) criteria must be grounded immediately and found not physically qualified (NPQ) for all aviation duty. The diagnostic criteria should conform to the most current DSM of the American Psychiatric Association.

b. Disposition:

(1) Personnel diagnosed as alcohol dependent by a flight surgeon, other medical officer, or clinical psychologist must be immediately referred to a Level III inpatient program for treatment.

(2) Personnel diagnosed as alcohol abusers and judged by a flight surgeon, other medical officer, or clinical psychologist not to be dependent must be immediately referred to a command alcohol counseling center Level II program for treatment per reference (b).

c. Upon satisfactory completion of the appropriate treatment program, personnel must be evaluated by a flight surgeon. (Aviation medical examiners under competent orders are used synonymously under the collective title flight surgeon throughout this instruction.) Those diagnosed as alcohol dependent and alcohol abusers are to be considered NPQ for aviation duties. Return to flight status requires a waiver for such duty from the Chief, Bureau of Naval Personnel or Commandant of the Marine Corps.

d. A recommendation for return to flight status, air controller duties, or hypobaric inside observer or instructor duties rests on a positive assessment by the flight surgeon. The flight surgeon must consider the following areas when making a recommendation:

(1) Member's positive attitude and unqualified acknowledgement of his or her alcohol disorder.

(2) Successful completion of the appropriate treatment program with favorable prognostic statement by the treatment facility.

(3) Abstinence from alcohol.

(4) Satisfactory participation in an ongoing program of recovery. The flight surgeon and squadron drug and alcohol

program advisor (DAPA) must document required visits. The member must provide proof of attendance at Alcoholics Anonymous (AA) or other organized outpatient alcohol recovery program.

e. Aftercare Intervals. The member must visit the following professionals and organizations at the intervals specified:

(1) Flight Surgeon. Monthly for the first 12 months, then every 3 months for the remaining 2 years.

(2) DAPA. Monthly for the entire 3 years with documentation of AA attendance.

(3) AA. Attended at least 3 times per week for the first 12 months out of treatment, then no less than 4 times per month for the remainder of the documented recovery program. Exceptions to this recovery program schedule for operational necessity must receive command endorsement.

f. All personnel must be given a series of physical examinations specified to provide additional monitoring of the recovery process. Forward all physicals to BUMED (MED-236) located at the Naval Aerospace Medical Institute (NAVAEROSP MEDINST), Naval Air Station, Pensacola, FL 32508-5600. These examinations must include a complete flight physical (SF 88 and SF 93 or NAVMED 6120/2 as appropriate) as well as the following information:

(1) Flight surgeon's narrative assessment of the member's recovery specifically addressing: work performance, peer relationships, family and marital relationships, psychosocial stressors and attitude toward recovery, abstinence, and AA attendance. A mental status examination should be performed with referral to NAVAEROSPMEDINST for specialized neuropsychological testing if there are any questions of cognitive impairment.

(2) Copy of Level II or Level III treatment summary (first time only).

(3) Flight surgeon's and DAPA's statements to document aftercare, including AA attendance. (AA attendance is usually verified by signature card and recorded by command DAPA.)

(4) Psychiatric evaluation by a privileged psychiatrist or clinical psychologist at initial waiver request, then annually while in aftercare).

(5) Internal medicine evaluation at initial waiver request as indicated.

g. Intervals for performance of flight physicals:

(1) Immediately upon completion of appropriate treatment program.

(2) Every 3 months thereafter during the first 12 months of recovery, then at 6-month intervals for the remaining 2 years, and annually thereafter for the duration of the member's aviation career.

(3) Recommendation of return to service group I, service group II, or service group III (class I personnel).

(4) Upon recommendation of return to naval flight officer, aircrew, air traffic controller, or hypobaric inside observer or instructor duties (class II personnel).

(5) Upon subsequent restriction of special duty assignment for any reason.

h. Return to flight status or aviation related duties:

(1) No sooner than 30 days after satisfactory completion of the appropriate treatment program.

(2) Those diagnosed as alcohol abusers, providing the criteria in paragraphs 6(d) and (e) are met, may request a waiver to return to class II duties normally after 90 days of demonstrated recovery.

(3) Those diagnosed as alcohol dependent and all class I aviation personnel will normally be returned to aviation duties after at least 3 months of demonstrated recovery and meeting the criteria in paragraphs 6(d) and (e). In cases of continued personal turmoil, emotional instability, or poor adherence to recovery program, the flight surgeon may wish to extend the observation time as long as 12 months. The 30-day option should only be used in those cases with minimum risk factors, minimal family or personal turmoil, and unqualified participation in treatment and recovery.

i. Submit initial waiver requests and flight physical with commanding officer's endorsements and specified consultations and documentation to MED-236 for review.

j. In line with current FAA and Navy and Marine Corps policy, Antabuse therapy is considered to be disqualifying for duty involving flight operations for all personnel who are involved in the conduct and safety of flight. A minimum of 14 days should lapse after cessation of Antabuse before resuming flying duties.

7. Noncompliance. Continued denial of an alcohol problem and refusal to abstain from alcohol following treatment is unacceptable for continued aviation status in any capacity and requires submission of SF 88 and SF 93 to MED-236. The disease concept of alcoholism, plus potential safety considerations, does not permit a trial of social drinking for an individual with a diagnosis of alcohol dependence or abuse. Refusal to abstain from alcohol requires a recommendation of permanent removal from flight status. Full documentation for such a recommendation must be provided with endorsement by the individual's commanding officer.

8. Forms

a. SF 88 (10-75), Report of Medical Examination, NSN 7540-00-634-4038, and SF 93 (10-74), Report of Medical History, NSN 7540-00-181-8368, are available from the Federal Supply System through normal supply procurement procedures.

b. NAVMED 6120/2 (11-79), Officer Physical Examination Questionnaire, S/N 0105-LF-208-3071, is available from the Navy Supply System and may be requisitioned per NAVSUP P-2002D.

D. F. HAGEN

Distribution:
SNDL, Parts 1 and 2
MARCORPS PCN Codes 71000000000 and 71000000100
(BUMED-250 copies)

Stocked:
Navy Aviation Supply Office
Physical Distribution Division Code 103
5801 Tabor Ave.
Phila., PA 19120-5099

TO BE SUPPLIED

DEPARTMENT OF THE NAVY
BOARD FOR CORRECTION OF NAVAL RECORDS
2 NAVY ANNEX
WASHINGTON DC 20370-5100

JRE
Docket No. 01180-07
26 March 2007

MR HAROLD E SIX SR
C/O WILLIAM J KENNEY ESQ
9915 EMPIRE WOODS COURT
CHARLOTTE NC 28277

Dear Mr. Six:

This is in reference to your application for correction of your naval record pursuant to the provisions of title 10 of the United States Code, section 1552.

A three-member panel of the Board for Correction of Naval Records, sitting in executive session, considered your application on 15 March 2007. Your allegations of error and injustice were reviewed in accordance with administrative regulations and procedures applicable to the proceedings of this Board. Documentary material considered by the Board consisted of your application, together with all material submitted in support thereof, your naval record and applicable statutes, regulations and policies. In addition, the Board considered evidence from cases filed under docket numbers 9117-04 and 7638-05, that pertain to two former members of the crew of the USS Liberty (the Liberty). The petitioner in docket number 7638-05 was represented before the Board by your attorney, Mr. Kenney, who also represents that petitioner in an action filed in the United States Court of Federal Claims. The panel also considered "Acute and Delayed Posttraumatic Stress Disorders: A History and Some Issues", American Journal of Psychiatry, volume 161, pp. 1321-1323, August 2004; "Adverse Outcomes Associated With Personality Disorder Not Otherwise Specified in a Community Sample", American Journal of Psychiatry, volume 162, pp.1926-1932, October 2005; "Stressed Out Vets", The Weekly Standard, 21/28 August 2006; "The Liberty Incident, Gag Orders Debunked", by retired Federal District Court Judge A. Jay Cristol with referenced documents, available on-line at http://thelibertyincident.com/gag-orders-debunked.html,; a statement by Bryce Lockwood dated 8 November

1995; correspondence provided by Rear Admiral Merlin Staring, Judge Advocate General's Corps, US Navy, Retired, in his capacity as an official of the USS Liberty Alliance, an advocacy group which wants the United States government to reopen the investigation of the Liberty attack, with the apparent goal of establishing that military forces of the State of Israel intentionally attacked the Liberty pursuant to the orders of officials of the government of Israel; and "The Assault on the Liberty: The True Story of the Israeli Attack on an American Intelligence Ship", James M. Ennes, Jr., 1979. The Board was unable to obtain an updated copy of your VA claims folder from the VA, despite multiple requests for those records.

For ease of reference, the staff of the Board made photocopies of your Navy service and health records, which are marked as S1-S250 and H1-H130, respectively.

As a preliminary matter, the Board found, contrary to what you led the United States Court of Federal Claims (the Court) to believe, you did not raise the issue of an alleged silencing order in your initial application for correction of your naval record. In this regard, the Board noted that that Mr. Kennedy admitted in paragraph 5 of his letter to the Executive Director, BCNR, dated 17 October 2006, that he did not raise that issue in your initial application, and you made a similar admission in paragraph 13 of your supplemental affidavit dated 2 November 2006.

As you know, Secretary of the Navy Instruction (SECNAVINST) 5420.193, enclosure (1), Procedures of the Board for Correction of Naval Records (32 CFR 723), section 9, Reconsideration, provides, in part, that after final adjudication, further consideration will be granted only upon presentation by the applicant of new and material evidence or other matter not previously considered by the Board. New evidence is defined as evidence not previously considered by the Board and not reasonably available to the applicant at the time of the previous application. As you failed to raise the issue of the silencing order in your first application, evidence concerning that issue is not "new evidence or other matter" as those terms are defined in SECNAVINST 5420.193, and does not provide a basis for reconsidering your request for corrective action. Similarly, the medical evidence and affidavits you submitted in support of your request for further consideration of your application are not new, because such evidence was reasonably available to you when you submitted your initial application.