perceive how the Board can fulfill its duty of correcting error while it declines to access records essential to establish the existence of error adversely affecting the accuracy of the member's records and his rights. The issue here is not some irrelevant, collateral matter. The documents we sought the Board's assistance on were matters directly involving official records of the Navy Department, and, the direct involvement of other agencies of government directly affecting the issue of the accuracy of official Navy Department records. In turn the requested records bear directly on Mr. Six's assertion that Navy Department officials, acting under improper pressure from other agencies of the government, willfully published a knowingly false report of a Court of Inquiry, issued Silencing Orders to conceal the falsity of that Report, and, those actions materially contributed to the Navy's failure to provide the applicant the care and benefits that he was entitled to under law. We respectfully submit that the Board's refusal is in error.

Respectfully submitted,

William J. Kenney
D.C. BAR No. 99267
Attorney for the Applicant,
Harold E. Six, Sr.

% HART/HTC
600 Pennsylvania Avenue, SE, Suite 105
Washington, DC 20003
Tel: 202-547-5129
Fax: 202 547- 8311

9915 Empire Woods Court
Charlotte, NC 28277
Tel/Fax: 704-341-4781

cc: Harold E. Six, Sr.

**Before The**
**Board For Correction of Naval Records**

| | | | |
|---|---|---|---|
| **In Re:** | **HAROLD E. Six, Sr.** | ) | **On Remand From** |
| | **Former CT-1, USN** | ) | **U.S. Court of Federal Claims** |
| | | ) | **BCNR Docket 483-03** |

---

Supplemental Declaration of CAPT Richard F. Kiepfer, MC, USN, Retired

---

I, Richard F. Kiepfer, CAPT., MC, USN Retired, on my oath make the following additional statement in support of the Application for Correction of Naval Records presented by Harold E. Six, Sr., former CT 1, USN.

I am Captain Richard F. Kiepfer, MC, U.S. Navy, Retired, having been medically retired following injuries incurred in the crash of a naval aircraft. I have more than 13 years active duty experience as a Navy Doctor, including my service as the Medical Officer aboard the U.S.S. Liberty, AGTR 5 in June, 1967 during the sneak attack on the ship by Israeli Air and Naval forces. I reside at 208 Wollschlager Drive, Bourne, TX 78006. I make this statement in support of the Application for Correction of Naval Records presented by my former Liberty shipmate, Harold Eugene Six, Sr., former CT 1, U.S. Navy. I have been assisted in the preparation of this statement by Mr. Six's attorney, Mr. Kenney.

Mr. Six and I served together on the U.S.S. Liberty, AGTR-5, in 1967. I was the Medical Officer of the ship. It is my memory that then CT 3 Six was a member of the Liberty's regular ship compliment, and, that his duty station and battle station was in the Liberty's Communication Space. Mr. Six and I were crew members when we received orders to take up station off the Gaza Strip in the Eastern Mediterranean in June 1967 during the Israeli-United Arab Republic conflict.

I have discussed the attack in my initial declaration in this proceeding .Suffice to say it was a brutal, murderous, sneak attack designed to sink the ship and kill all its crew. I feel it is highly important that the true facts of the assault on the Liberty be put forth because of the attack against the crew's credibility committed

by the members of the Court of Inquiry in their willfully false and misleading report of the attack. Brave men gave their lives that day; brave survivors have had their lives ruined as a consequence of the attack, because of the false report of the Court of Inquiry, and, the resultant attack on their credibility and reputation. We must take all steps necessary to set the record straight; report the true facts of that attack. We must force the Navy to acknowledge its shameful activities to silence the survivors; and, to acknowledge how those silencing orders, and the Navy's efforts to conceal the fact it had deliberately published a false report of the attack, have denied our survivors access to medical benefits and treatment they sorely needed and rightfully deserved. Justice to the living and the dead demands that the truth of this attack be published and the lies promulgated by elements of the Government of Israel and its supporters here in the U.S. and throughout the Western World, aided by the actions of the U.S. Government, must be exposed.

I have been asked my professional opinion as to what affect the Silencing Orders issued by the Navy to the surviving crew members likely had on the ability of those survivors to access the professional medical care they needed to treat the wounds suffered from the attack. As I stated in my initial declaration, I personally received , and witnessed other crew members receiving those silencing orders. At the outset, let me emphasize that we Navy doctors did an outstanding job in treating their observable and x-ray-able injuries. The failure of the Navy to respond immediately to the attack and come to our rescue did greatly aggravate our ability to give timely treatment, initially, But, once the doctors from the destroyers arrived to assist, and we were able to evacuate the most seriously wounded to the USS America, our medical system worked well in diagnosing and treating their physical injuries. Where we failed was in the diagnosis and treatment of the psychiatric and psychologic injuries.

It is my professional opinion as a matter of medical certainty that the Silencing Orders definitely impeded the ability of the survivors to seek professional help for their evolving symptoms of mental health disorders, including, especially, symptoms of Post Traumatic Stress Disorder. To understand the gravity of this problem, one must appreciate the fact that, based on my contacts with various crew members over the years, (including telephone contacts with Mr. Six) and my observation of the survivors at meetings of the USS Liberty Veterans Association over the years, I am medically certain that the vast majority of the survivors, if not

in fact all survivors, myself included, suffer from some degree of PTSD as a consequence of our experiences during that attack.

As I stated in my initial declaration in this proceeding, I personally received the orders that we surviving crew members were not to discuss the attack with anyone, "not even your wife or your mother." To understand how such an order would block a person from seeking medical help as he began experiencing severe mental stress symptoms following the attack, one must appreciate how intimidating those orders were to our crew.

We were a "Spy Ship", a one of a kind, important, sophisticated intelligence gathering platform, equipped with the most technically advanced equipment designed to intercept communications then available. Every member of our crew had drilled into them the special National Security interest the ship served, and their personal responsibility not to discuss or disclose the mission of the ship or its special equipment and staff. And, that special responsibility to guard the classified duties, equipment, mission, and communications of the ship was even more ingrained into the members of the ship's Naval Security Activities Group aboard ship, like Mr. Six, and Mr. Lockwood, the operators of that equipment and analysts of the communications intercepted thereby. Thus, when a special group of officers including an Admiral, came aboard and issue new, special orders, warning them not disclose what they had observed in that attack, it had a deep impact on everyone. When the word began to circulate that the Navy was sending officers out to the crew that had been transferred off for medical treatment and conveying that message to them, personally, it had a very chilling effect.

Let me give two examples of how intimidating those orders were to all of the survivors, officer and enlisted. I understand extracts from LCDR Ennes' book "Attack on the Liberty" have been entered in this record. That book tells the true facts of that sneak attack. It is to be noted that Commander Ennes did not publish his book until he had retired from active duty some 7 years after the attack. He feared disciplinary retaliation if he published the truth while on active duty. He sent me a copy with a note stating he had framed all references to me in the book in a manner to protect me from any allegation that I had violated that order! I was still on active duty at that time. He knew I was fearful that the Navy would retaliate against me if they suspected me of violating that order. Recognize that the

book simply told the truth. And, understand, we were officers. If those orders instilled fear in us seven years after the event, imagine how they affected our enlisted shipmates.

Another example comes sorrowfully to mind. I attended a meeting of the USS Liberty Veterans Association at some point in the 1990's. Energized by Mr. Ennes book, this group has been actively engaged in trying to get our government to acknowledge the Court of Inquiry's Report was a deliberate lie intended to conceal from the American public the fact this attack was a carefully planned and executed attack intentionally designed to sink a U.S. Navy vessel and to kill all of its crew. At this meeting, one of our shipmates came in a wheel chair. He was in the final stages of his struggle with Lou Gehrig's Disease. It was painfully evident he had but a few months to live. At one point we were asked to assemble for a group picture. This poor man refused to join in the picture. He stated he was afraid the government would use his presence in the picture as proof he had violated the Silencing Order, and deny him and his family the VA and Social Security benefits he and they were entitled to. This some 30 years latter!

In my initial declaration in this proceeding, I cited medical journal articles on PTSD, and the psychiatric injuries induced by exposure to combat, that I relied on in formulating my opinion that Mr. Six was suffering from and disabled by PTSD at the time of his discharge from the Navy in 1973. One of those articles, "Combat Duty in Iraq and Afghanistan, Mental Health Problems, and Barriers to Care", The New England Journal of Medicine, Vol. 351:13-22, July 1, 2004, reports on the results of research conducted by Charles W. Hoge, M.D., and his colleagues conducted asa part of the research program by the Department of Psychiatry and Behavioral Sciences, Walter Reed Army Institute of Research, U.S. Army Medical Research and Material Command. They reported on their study of selected U.S. combat infantry units, both Army and Marine Corps. The study concluded that there was a significant risk of mental health problems among veterans of combat operations and the study group identified important barriers to receiving mental health services.

It reported that today, screening for mental health problems is a routine both before and after combat deployment. Such was not the case in 1967, and, in truth, we did not perceive the Liberty as a "Combat Ship." Our gun mounts had no

offense capability and minimal defensive capability. The study concluded that, even with the pre- and post combat screening, there are unique factors in the military that constrain the combat veteran from seeking help when they begin evidencing symptoms of mental health disorders. Of particular significant concern is the issue of how the soldier "will be perceived by peers and leadership," and "the concern about stigma was disproportionately greatest among those most in need of help from mental health services." The Report concludes "Efforts to address the problem of stigma and other barriers ...should take into consideration outreach, education,.....and in the provision of confidential counseling..."

That research reinforces my confidence that the "Silencing Orders" affirmatively interfered with Mr. Six's ability to obtain the care he needed for his evolving symptoms of PTSD when they first evidenced following the attack. No effort was made to educate the survivors or their families as to the possible effects they might experience as a result of their experiences in the attack. Dr. Hoge's research identifies the fact that combat vets are fearful of how their fellow soldiers will view them if they report symptoms of mental health disorders. That fear is greatly compounded when the individual is threatened with Courts Martial if he discusses the events experienced with anyone. The Order exaggerated the constraints of this so-called "natural" reluctance to acknowledge symptoms of mental health disorders.

The significance of the exaggerated constraint can be understood more clearly by reviewing another NEJM Article I relied on in my initial statement here. In the NEJM Article: "Post -Traumatic Stress Disorder" by Rachel Yehuda, Ph.D., NEJM Vol. 346:108-114, January 10, 2002. After discussing the definition and symptoms of PTSD, Dr. Yehuda notes that "The symptoms of PTSD are readily identifiable by a primary care physician." She observes that "the diagnosis is easily missed unless specific inquiries are made about the occurrence of a traumatic event. Often practitioners are reluctant to ask their patients about events that might be distressing, or that might involve shame or secrecy, and patients will not usually mention such topics without prompting." Dr. Yehuda further notes that "By providing patients with an opportunity to disclose such events, practitioners break down an important barrier to treatment.."

When that reluctance is reinforced with threats of Courts Martial if the event is

discussed "with anyone", the barrier to care is dramatically increased. In Mr. Six's case, and in the case of all Liberty survivors, that barrier was increased to unscalable heights by the false report of the Court of Inquiry. The order was intended to conceal the lies published in the report. Those lies claimed the attack was brief, inferring it was an insignificant event. Thus, individuals experiencing PTSD symptoms were denied the opportunity to disclose the event; their symptoms could not be understood for what they were without such disclosure, and, the individual presents, in military circumstances, as a malingerer. This is evident in Mr. Six's records when he presents himself for medical attention following a knife wound, and it is treated as a cut, without further inquiry. And, again, he presented for medical care following a drunken street brawl, and, no inquiry is made. The affidavits from his step children also attest to this. They relate the SP's being called to the home to deal with drunken fights between Mr. Six and his then wife; even his being taken into custody while assaulting his then Wife at the base PX, all without inquiry. And, of course, throughout all these incidents. Even when faced with discharge, Mr. Six maintained silence as to his evolving PTSD, for fear of violating the Silencing Order.

I have also given an affidavit in the case of another Liberty shipmate, Bryce Lockwood. (BCNR Docket 8610-98, renumbered 09330-02; Lockwood v. US, Fed Claims Docket No. 1:06-cv-543). I have reviewed the affidavits of Mr. Lockwood and his wife in that proceeding, as well as Mr. Lockwood's declaration in this proceeding, and, Mr. Six's and his current wife's affidavit and declaration in this matter. All these statements testify to both Mr. Six and Mr. Lockwood evidencing classic symptoms of PTSD over a prolonged period of time, both in service and post service. Both attest to their inability to seek care for these symptoms because of their fear of violating the silencing orders. Further, both Mr. Six and Mr. Lockwood attest to how their inability to explain what was going on to their families, because of the silencing order, greatly exacerbated their illness.

As noted above, I have attended numerous meetings of the USS Liberty Veterans Association over the years since the attack and my retirement from active duty. Based on my observations, my discussions with most of the members at those meetings, and, the comments of their family members, it is obvious that the vast majority of the survivors, if, indeed, not most, suffer from PTSD, myself included. I have heard over and over again the survivors and their family members complain

how difficult it has been for them finally to seek help. They repeatedly report they resisted seeking help despite being frightened by the symptoms they were experiencing for fear of violating those orders. And, there access to care was also frustrated by the practices of the VA and the Social Security Administration, routinely deny applications for benefits based on mental health disorders.

In conclusion, It is my professional opinion, to a medical certainty, that the silencing orders blocked Mr. Six, and numerous other Liberty survivors from getting timely treatment for their evolving symptoms of PTSD . I restate my opinion that Mr. Six was disabled from his PTSD at the time of his discharge in 1967. Based on my understanding of the VA Rating Manual then utilized, I am of the opinion that he was properly ratable as 70% disabled at the time of his discharge in February, 1973.

CAPT Richard F. Kiepfer, MC, USN Retired

**Before The**
**Board For Correction of Naval Records**

| | | | |
|---|---|---|---|
| **In Re:** | **HAROLD E. Six, Sr.** | ) | **On Remand From** |
| | **Former CT-1, USN** | ) | **U.S. Court of Federal Claims** |
| | | ) | **BCNR Docket 483-03** |

Declaration of LCDR James M. Ennes, Jr., USN, Retired

I, James M. Ennes, Jr. LCDR, USN Retired, on my oath make the following statement in support of the Application for Correction of Naval Records presented by Harold E. Six, Sr., former CT 1, USN.

I am LCDR James M. Ennes, Jr., U.S. Navy, Retired, having retired with more than 20 years of active service. I reside at 19009 194th Avenue, N.E., Woodinville, WA 98077. I make this statement in support of the Application for Correction of Naval Records presented by my former Liberty shipmate, Harold Eugene Six, Sr., former CT 1, U.S. Navy.

Mr. Six and I served together on the U.S.S. Liberty, AGTR-5, in 1967. I was the Electronic Material Officer of the ship. It is my memory that then CT 3 Six was a member of the Liberty's regular ship compliment, and, that his duty station and battle station was in the Liberty's Communication Space. Mr. Six was a crew member when we received orders to take up station off the Gaza Strip in the Eastern Mediterranean in June 1967 during the Israeli-United Arab Republic conflict.

I have detailed the events that actually happened aboard the Liberty in my book, "Assault On The Liberty." I understand portions of that book have been entered into the record of this proceeding. I feel it is highly important that the true facts of the assault on the Liberty be put forth because of the attack against the crew committed by the members of the Court of Inquiry in their spurious report of the attack. Brave men gave their lives that day; brave survivors have had their lives ruined as a consequence of the attack, because of the false report of the Court of Inquiry, and, because of the attacks on the credibility and reputation of crew



JE

members seeking to set the record straight by elements of the Government of Israel and its supporters here in the U.S. and throughout the Western World, aided by the actions of the U.S. Government to perpetuate the lies of the Court of Inquiry's Report.

I here intend to state my personal knowledge of the actions of the U.S. Navy to silence the crew by prohibiting the surviving crew members from discussing the true events of the unprovoked sneak attack by units of the Israeli Air Force and Navy. I also intend to state my personal knowledge of how the "Silencing Orders" issued to the survivors denied them and their loved ones the opportunity to recognize and seek timely care and treatment of the mental health disorders induced by that attack and the subsequent actions of both the US and Israeli governments.

I am truly surprised that the Navy now seeks to deny the fact of that Silencing Order. I have learned that an entry in the USS Liberty's Plan of the Day for June 30, 1967 directs the crew's attention to a DOD message announcing that DOD was releasing the Preliminary Report of The Court of Inquiry into the attack on the Liberty. That entry relays the DOD orders that no one was to discuss any aspect of the attack, except as is reported in the Court's Preliminary Report. Since I had been transferred to the USS America for treatment of the wounds I sustained in that attack late in the day of the attack (June 8, 1967), and was ultimately transferred for further treatment to U.S. Naval Hospital, Portsmouth, VA, I did not receive that plan of the day order.

However, at about that same time, in late June or early July, 1967, I was visited by a Navy Captain at my bedside in the hospital. I did not know this officer and cannot presently recall his name. After the normal pleasantries, this officer proceeded to caution me that I was not to discuss the events aboard the USS Liberty with anyone, "not even your wife," without his permission or the permission of my Commanding Officer from the Liberty. I was warned that if I violated that Order I could face disciplinary action, including Courts Martial. I responded to the effect that as a member of the Naval Security Group Activity, I did not need such an Order. I well understood my duties in handling National Security information. His response was to the effect, this was recognized, but these orders came from the top and were very serious.



JE

I have been asked if I interpreted this order as prohibiting me from discussing aspects of the attack with my health care providers. I certainly did. Why else would the Navy feel it necessary to convey that order to me in the hospital, and why have a superior officer convey both the Order and the threat to me personally.

I recognize that the Navy did not then have our current level of understanding of how the trauma of an event like the sneak attack on the ship can cause individuals sever mental trauma and induce mental health disorders. That may be true, but the Navy surely understood the anger we surviving crew members would experience when it promulgated a knowingly false report of that attack, and, necessarily labeled any of us who tried to correct the public record as liars. The profound anger and sense of betrayal this provokes is compounded by our recognition that the Navy's assault on its own crew members was done to serve the interests of a Foreign government, and serve the political interests of the then administration. Surely, even given the relatively limited understanding of mental health injuries extant in 1967, all understood you can only twist an individual a limited number of ways before deep permanent damage is done. That surely has been the consequence to the Liberty survivors.

I speak from personal experience and from my observations of the adverse impact this has had on the vast majority of my fellow Liberty survivors. There is hardly a single survivor who has not evidenced some symptom of mental health stress or disorder. We have struggled with alcohol or substance abuse, family discord, divorce, estrangement from our families, gravitated to employment in positions far below those one would expect from these highly intelligent individuals, and, even then, difficulties in keeping gainful employment. As their family members have become informed of the symptoms of Post Traumatic Stress Disorder, the family members each conclude their loved one suffers from the disorder. And. I believe they are correct, some more than others.

To fully understand the stress and anger we surviving crew members experience, one has to understand the facts of the attack, how patent the lies concerning the attacks were that were promulgated by Israel, and, how these survivors view the subsequent actions of the Navy and the U.S. Government as compounded acts of utter betrayal. First, it must be recognized that the Navy and the Johnson



JE

administration not only did not respond and defend the Liberty during these attacks; to the contrary, they ordered Navy units to stand down when they began to come to the defense of the Liberty. Seemingly to conceal this abandonment of our ship, the Johnson administration ordered the members of the Court of Inquiry to accept as true the patent lies published by Israel concerning the attack.

Israel claims the "Attack" was a case of mistaken identity; that "it" was short lived, and terminated as soon as it was recognized this was a U.S. Navy Vessel. These are all lies; lies that are transparent to any reasonably intelligent person given an opportunity to view the ship following the attack; readily contradicted by message traffic from both US and Israeli sources, and, most likely, Soviet sources. Our ship was flying the US Ensign, our hull markings clearly identified us as a U.S. Naval vessel; our hull characteristics and antennae clearly distinguished our vessel from the "Egyptian Horse Carrier" Israel claimed was the intended target; the "Attack" was in fact at least 4 carefully coordinated waves of attack by both Israeli Air Force and Israeli units, extending over more than an hour. Finally, following the attack there was scarcely a foot of our superstructure and deck that was not punched with holes from the Israeli air cannons, missiles, and machine gun bullets; our hull was penetrated by an Israeli torpedo, 34 of our brave crew were dead, and more than ~~180~~ 170 of the survivors were injured. Despite all this clear evidence, our Navy convened a Court of Inquiry to investigate the attack, and promulgated its report endorsing Israel's claim it was all a big mistake.

We have now seen proof that the Report of the Court of Inquiry was knowingly, intentionally false; that the Court members, and, indeed the highest levels of the Johnson administration well knew its public conclusions were false. Be assured, we crew members knew it was a shocking lie, and, we were incensed by that action when we discovered what they were reporting. Unfortunately, the Navy was not through abusing our crew. As stated, the Navy promulgated Silencing Orders prohibiting the crew from discussing the true events of the attack with anyone, without the Navy's consent. And, throughout the ensuing years, the Navy continues to lie regarding the attacks and the report, continuing to assert the incident was thoroughly investigated by the Court of Inquiry and to defend its report.

I don't mean to minimize the impact of the Silencing Orders on the normal ship's



JE

compliment, the engineers, deck department, etc. I will address the peculiar impact that had on those of us who were members of the Naval Security Group Activity unit aboard the ship. Our personnel are specially trained in handling documents, equipment and communications, and engaging in operations that are highly sensitive from a national security perspective. We are drilled in and live with that special responsibility each day of our military service. We well understand that if we compromise that aspect of our duties, our membership in the Naval Security Group will be summarily terminated. And, we are proud of our membership in that group; we work hard to achieve and maintain that status. Thus, when a special order of secrecy is issued, members of our group take it to heart. When that order is reinforced with threats of Courts Martial, it is scrupulously complied with. You don't ask questions; you don't seek clarification; when in doubt, you comply.

I had the occasion to observe, first hand, the problems the Silencing Order was creating among the surviving crew members, especially during my post Liberty tour of duty in Bremerhaven. Several NAVSECGRU Liberty survivors were assigned to my division at Bremerhaven in the two years following the attack. Recognizing that these men had no other ability to vent their anger at the way we Liberty survivors had been betrayed, I sought out occasions to gather the Liberty crew members and capture their memories. These discussions were highly emotional. The men would become highly agitated and tearful when discussing the attack, the Court of Inquiry, the Israeli and Johnson administration cover up, the failure of the Navy to come to our rescue, or, the failure to launch a retaliatory attack against the Israeli forces. They expressed their anger at the silencing order. Particularly aggravating was their inability to tell their wives about what happened, so the family could understand what they had experienced, and, thereby understand some of the changes in their lives they were undergoing as a result of those experiences.

Several described how they were experiencing nightmares and difficulty sleeping. The men who had been in the compartment where the torpedo struck (I was not) described waking up feeling trapped in the compartment; others described waking up seeing faces of buddies blown away by the blast; and/or, of feeling guilty for having survived when so many had been killed. It was having an affect on their ability to concentrate and focus on the traffic they were analyzing.



JE

I look back on this, especially in the light of knowledge I have since obtained that these men were drinking heavily and experiencing serious family discord. I wonder what I should have done with this information as their division officer. Normally, in those days, if one of your crew was having recurrent nightmares and difficulty sleeping and it was affecting his job performance, you would most likely suggest he go talk to the chaplain, or, talk to a doctor. The one thing I well understood, as did they, this they could not do. There is no way you could discuss your symptoms without going into the true facts of the attacks and the conspiracy to cover it up. That was clearly prohibited by the Silencing Order.

I did not have any contact with Mr. Six for several years following the attack. At some point, I learned Gene had been discharged from the Navy, and, that his life went seriously down hill for several years. Gene has told me that he never again served with any other Liberty survivor, that he was drinking heavily practically from the day he got out of the San Diego Hospital, that he volunteered for two tours in Vietnam in the hope he would be killed in action there, and, that he struggles with, flashbacks, nightmares, difficulty sleeping, rage and alcoholism to this day. This doesn't surprise me. His experiences aboard the Liberty had to be especially terrifying. To have been denied any opportunity of venting his experiences and his anger and frustration with the way the Navy and our government has treated us must necessarily exacerbate any mental injuries he suffered incident to the attack.

I make this statement of my free will, without promise of reward or threat of any nature, with the knowledge and intent that it be submitted to an agency of the U.S. Government, and with full knowledge and understanding of the potential criminal consequences of making a false statement to the government. The information set forth in this statement is true and correct to the best of my understanding and belief. I have been assisted in the preparation of this affidavit by Mr. Kenney, Gene's attorney in this proceeding.

James M. Ennes, Jr.

James M. Ennes, Jr, LCDR, USN Retired



JE

**Before The**
**Board For Correction of Naval Records**

| | | | |
|---|---|---|---|
| **In Re:** | **HAROLD E. Six, Sr.** | ) | **On Remand From** |
| | **Former CT-1, USN** | ) | **U.S. Court of Federal Claims** |
| | | ) | **BCNR Docket 483-03** |

---

Declaration of Phil Tourney
Former Shipfitter-Pipe Fitter Third Class, U.S. Navy

---

I, Phil Tourney, on my oath, make this statement in support of the Application For Correction Of Naval Records presented by my former shipmate, Harold E. Six, Sr. to attest to my knowledge of the "Silencing Order" issued by the Navy to surviving members of the crew of the USS Liberty prohibiting them from discussing the sneak attack on the Liberty by Israel, and, the affect that Order had on my ability to seek treatment for the mental health injuries I suffered as a consequence of that attack. I present this statement of my free will, without promise of reward or threat of any nature, with knowledge it will be presented to an agency of the Federal government in connection with claims presented against the federal government, and, full understanding of the potential criminal penalties that would result from a false statement in that circumstance. I have been assisted in drafting this statement by Mr. Six's attorney, William J. Kenney.

I am Phil Tourney, P.O. Box 582, Cedaredge, Colorado 81413. On and prior to June 8, 1967, I was a member of the U.S. Navy, assigned as a Shipfitter-Pipefitter Third Class (Damage Controlman) aboard the U.S.S. Liberty, AGTR-5. I am a 100% totally disabled USN Vietnam Veteran. I have served my country proudly during two tours in the Navy. I hold the Bronze Star, with combat insignia, the Purple Heart, the Vietnam Service Medal with bronze star, the Combat Action Ribbon, the Presidential Unit Commendation Ribbon, and the Armed Forces Expeditionary Medal.

On June 8, 1967, our ship was sailing in international waters in the Eastern

Mediterranean off the coast of the Gaza Strip. Israel and the United Arab Republic were then engaged in active warfare. It is my understanding we were stationed there to monitor transmissions of the United Arab Republic aircraft to verify that. the Soviet Union had not assigned Soviet Pilots to man aircraft of the United Arab Republic. Thus, we of the Liberty felt our mission was in support of and protective of the interests of Israel in that conflict.

We were reinforced in that pro-Israel belief because our lookouts were reporting multiple sightings and fly overs by units of the Israeli Air Force. In each instance it was our understanding they clearly recognized that we were a U.S. Navy vessel and did not view us as hostile to Israel's interests. We understood that Israel had achieved great success against the United Arab Republic forces, and, the transmissions our "research group" were monitoring indicated that Israel had driven the Arab forces out of the Gaza strip and that Israeli aircraft were now operating from the former United Arab Air Force airbase in the Gaza Strip.

At around 11:00 AM, the Captain ordered a General Quarters Drill. We had been conducting such drills repeatedly over the past several days. We crew members were grousing about that. We secured from the drill about 20 minutes later and resumed our normal watch stations. Shortly after that, without warning, the ship came under attack by unmarked aircraft. Over the next approximately 2 hours, our ship was subjected to repeated waves of attack by the unmarked planes. We were shocked, but rapidly concluded these were units of the Israeli Air Force! Then, we came under attack by three torpedo boats; these were clearly identified as units of the Israeli Navy. Our ship was hit by one torpedo that exploded into our "Research Compartment" below decks.

These attacks were brutal and clearly intended to sink the ship and kill all of the crew. Some 25 men were killed in the "Research Compartment," a total of 34 crew members were killed. More than 170 of the crew, including myself, were injured. They used armor piercing cannon shells,, missiles, machine guns, napalm and, of course, bombs. Only the heroic actions of our Skipper, and all the crew, kept that ship afloat. I received shrapnel wounds and burns from the napalm attacks. But, the horror of that attack, and, the recognition that we had been abandoned by our government throughout the attack, has been burned deep in my mind, and, has haunted me throughout the rest of my life.

Fourteen hours after the attack, we met two Navy Destroyers, and their medical staff came aboard to assist our ship's doctor, Dr. Kiepfer, in treating the wounded. Then, the most serious of the wounded were coptered to the USS America for treatment. I remained aboard the Liberty, directing and assisting in Damage Control as needed as we steamed back to Malta..

While we were steaming to Malta, we were informed that the Navy had ordered a Court of Inquiry into the facts of the attack, and that members of the Court would come aboard. At one point, I was visited in sick bay by Vice Admiral Kidd, the President of the Court. There were some three or four of us in the sick bay compartment when he came in. He introduced himself , took his stars off his collars, and said something to the effect he wanted to talk with us, "Sailor to Sailor," and wanted us to tell him what we had observed. We related what each of us had observed. When we were finished, Admiral Kidd put his stars back on his collars, and stated: "Now, I want you each to understand. You are never again to discuss anything you observed during the attack, or our discussion here today, with anyone. Not your mother, not your wife, Anyone. If you do, you will be Courts Martialed and put in jail or worse." (We all knew what that meant!) When he left, we were shocked and frightened.

When we reached Malta, we began to hear that the government of Israel was now claiming this was a brief attack, a case of mistaken identity, that they had not seen our flag, and, stopped the attack as soon as they recognized this was a U.S. Navy Ship. We were enraged by the report. Then, as I began to hear that the Admiral's Report supported Israel's lies, like all the crew, I was profoundly angered. It was bad enough the Navy had abandoned us during the attack, but it was obvious Admiral Kidd knew his report was an outright lie, as were the Israeli explanations. Admiral Kidd's report was calling the crew a bunch of liars. And, worse, he has threatened us with Courts Martial if we dared to tell the truth about the attack.

I attempted to bury the attack deep in my memory. I certainly did not want to be Courts Martialed. I lived in fear of Courts Martial while I began experiencing flashbacks and nightmares about the attack. But, for fifteen years, I did not dare discuss what I was experiencing with anyone.

I have no doubt that Admiral Kidd's order prevented me from getting the medical

care I needed. The Navy, and, latter, the VA, provided competent care for the observable, x-ray-able injuries I incurred. But, no effort was made to help me understand how the terror of that attack would affect me mentally. There was, and is, no way that I can explain the various symptoms I have experienced from that attack without discussing the facts of the attack itself. I'm told that the Navy is suggesting that we were free to discuss the fact the ship was attacked. That may have been the intent, but it sure wasn't the way it was conveyed. I doubt I had ever met any Admiral prior to Adm. Kidd's visit to us in sick bay. I readily acknowledge that when he told me I couldn't discuss this with anyone, I took it to heart. He didn't offer any exceptions, and I didn't dare ask any questions. He meant to intimidate us, and he surely intimidated me.

It was fifteen years after the attack before I could bring myself to acknowledge the adverse mental effects I was suffering as a result of the attack. That is a direct result of the Silencing Order. I know from my contacts with other Liberty survivors that they have had the same experience. Once I established my VA benefits, (after a prolonged struggle with the VA) I began reaching out to other Liberty survivors urging them to seek out their rightful benefits. Without exception, they stall because of fear of violating that order. If the Navy truly felt the Order was misunderstood, it would have tried to convey that fact to the Liberty survivors. Instead, it apparently seeks to deny such orders were issued and to ignore the duty it owes to our crew. The Navy abandoned us during the attack and continues to abandon us even to this day. It is long past due to set this entire record straight, tell the truth, acknowledge the benefits the crew should have received and lay this sorry part of history to rest.

On my oath, this 11th day of December, 2006 at Cedaridge Colorado.

Phil Tourney 12-11-06

Phil Tourney
Former DamageControlman,

U.S.S. Liberty

Six v.U.S. BCNR Docket 483-03
Tourney Declaration
~~Page 4 of 4 page Declaration~~

* USS LIBERTY (AGTR 5) *
FPO New York 09501
PLAN OF THE DAY
Friday, 30 June 1967

| | | | |
|---|---|---|---|
| CDO ENS LUCAS | | | DUTY DEPT |
| DUTY OFFICER ENS O'MALLEY | | | DUTY SECT |
| | UNIFORM OF THE DAY | | |
| Sunrise 0449 | OFFICERS & CPO'S | TROPICAL WASH KHAKI | |
| Sunset 1918 | ENLISTED | CLEAN DUNGAREES | |

| LIBERTY UNIFORM | | WORKING UNIFORM |
|---|---|---|
| OFFICERS & CPO'S | TROPICAL WHITE LONG | TROPICAL WASH KHA |
| ENLISTED | TROPICAL WHITE LONG | DUNGAREES |

ALL INFORMATION APPEARING IN THE PLAN OF THE DAY CONSTITUTES AN OFFICIAL ORDER IN ACCORDANCE WITH USS LIBERTY REGULATION 4236.

CARRY OUT THE ROUTINE PLAN OF THE DAY IN ACCORDANCE WITH USS LIBERTY INSTRUCTION P EXCEPT AS MODIFIED HEREIN

1145 - All personnel going to Naples on leave muster on the quarterdeck for transp to the airport.

1530 LIBERTY COMMENCES for sections I & III.

NOTES

1. The following letter addressed to officers and crew of USS LIBERTY, was recei from Mrs. Armstrong.

Dear Men,

Thank you so much for the beautiful floral wreath you sent. It went wi all the way to Arlington.

You lost your XO and I lost my husband but we were fortunate to have l part of his life. I know all of you prayed and did what you could for him i last hours and for this I thank you. I don't understand why God chose to ta Philip but I accept God's will. This was His plan for Philip.

My children and I are fine. Of course our future looks a bit dim but G give us the strength to take life a day at a time.

I expect to stay in the Norfolk area for a while. I'm not going to mak definate plans until I have some time to think In any case please feel fre call on me and my children when you are home again.

May God bless and keep all of you safe. My prayers are with you. Than for so many happy memories

Sincerely,

/s/ Weetie Armstrong

2. The ship expects to return to Norfolk about 01 August 1967.

3. The Secretary of Defense has released to the press portions of the unclassifie information obtained by the Court of Inquiry. Ships members are authorized to di with others only what is contained in the news release and no more. In other worc can say no more than exactly what the news release says. To avoid any possibility disclosing classified information it is highly recommended that all hands refrain discussing the incident with others particularly news media representatives. The release has not yet been received but will be promulgated to all hands when receiv Any discussions with news media representatives are to be reported to the Executiv Officer right away giving the name of the individual you talked with, who he work and what information was given to him.

J. D. SCOTT, ENS, USNR
Command Duty Officer

**HUMAN RESOURCES**
**P.O. Box 942883**
**Sacramento, CA 94283-0001**

January 10, 2007

William J. Kenney
9915 Empire Woods Court
Charlotte, NC 27277

Dear Mr. Kenney:

This is in response to your letter dated December 4, 2006, in which you requested the following: "The release of all records, including all medical, psychological, and/or psychiatric records and all personnel records maintained by the Department of Corrections and Rehabilitation relating to or arising out of the application for employment for Harold Eugene Six, in or about November 25, 1985, December 6, 1985, June 13, 1986, or any other date," pertaining to Harold Eugene Six, Sr.

Unfortunately, the Department is unable to provide any records relating to Mr. Six, due to the fact that we no longer retain those records. At the time of Mr. Six' application, the Department retained records for a period of seven to ten years after the background investigation was completed for applicants who were withheld from the selection process. Files dated during the time period referenced above have been purged.

If you have any questions, please feel free to contact Judy Gelein, Associate Director, Human Resources, at (916) 227-2030.

Sincerely,

Nancy E. Bither

NANCY E. BITHER
Deputy Director
Human Resources

cc: James E. Tilton, Secretary, California Department of Corrections
and Rehabilitation

**William J. Kenney, Esq.**

9915 Empire Woods Court
Charlotte, NC 28277 *
Tel: 704-341-4781
Fax: 704-341-4781
email: kenneyffx@aol.com
* Not admitted in North Carolina or California

% HART/HTC-CA
Wilshire Boulevard, Suite 420
Los Angeles, CA 90010 *
Tel :213-251-5737

% HART/HTC
600 Penn. Ave, SE, Ste 105
Washington, DC 20003
Tel: 202-547-5129

December 5, 2006

W. Dean Pfeiffer, Executive Director
Board For Correction Of Naval Records
Department of the Navy
2 Navy Annex
Washington, DC 20370 - 5100

Re: Harold E. Six, Sr., Docket No. 483-03

Dear Mr. Pfeiffer:

This in further response to your letter of 24 August 2006 in the above remanded proceeding. Attached please find the following documents. We move their admission in this proceeding:

1. Supplemental Affidavit of Harold E. Six, Sr. dated November 2, 2006.
2. Six Affidavit Directing Release of VA Records.
3. Six Affidavit Directing Release of LAPD Records.
4. Six Affidavit Directing Release of CA Department of Corrections Records.
5. Supplemental Declaration of Mrs. Margaret Six.
6. Declaration of Bryce F. Lockwood.
7. Declaration of William J. Kenney, Esq.
8. Mr. Kenney's letter to the Board dated October 17, 2006

Also, please find Six's Request For Production or Subpoena of identified records from the Navy Department, and various other government departments and offices.

Be advised that, in response to the Court's inquiry as to how the Silencing Order affected Mr. Six's ability to access health care providers for his emerging disabling PTSD symptoms, I am soliciting additional statements from other recipients of those orders, examining how those orders obstructed their ability to seek timely care for their disabling psychiatric symptoms. And, I will tender declarations from medical professionals addressing this issue. These will be submitted as soon as the parties forward their statements to me.

Respectfully submitted,

William J. Kenney
D.C. BAR No. 99267
Attorney for the Applicant,
Harold E. Six, Sr.

% HART/HTC
600 Pennsylvania Avenue, SE, Suite 105
Washington, DC 20003
Tel: 202-547-5129
Fax: 202 547- 8311

9915 Empire Woods Court
Charlotte, NC 28277
Tel/Fax: 704-341-4781

cc: Harold E. Six, Sr.

**Before The**
**Board For Correction of Naval Records**

| | | | |
|---|---|---|---|
| **In Re:** | **HAROLD E. Six, Sr.** | ) | **On Remand From** |
| | **Former CT-1, USN** | ) | **U.S. Court of Federal Claims** |

Supplemental Affidavit of Harold Eugene Six, Sr.

I, Harold Eugene Six, Sr, SSN # 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, being duly sworn, depose and state as follows:

1. I am Harold Eugene Six, Sr. former CT1, U.S. Navy. I make this supplemental affidavit to attest to various facts and events in my life to better assist the Board and other officials of the Navy Department, and the Court to understand the disabling affects inflicted on me by the events I experienced on June 8, 1967 aboard the U.S.S. Liberty, the subsequent efforts of the Navy and the U.S. Government to conceal and misrepresent those events, and, the resultant failure of the Navy to provide me with the medical and psychiatric care I required as a result of those events.

2. The evidence submitted by my attorney on my behalf amply establishes the true events of June 8, 1967, and the shameful activities of senior Naval Officers and other officials of the U.S. Government to conceal the true facts of those events, therefore I will not repeat those facts here.

3. The Board has requested copies of all medical, psychological, and/or psychiatric consultations, etc. I underwent during the period 7 February 1973-6 February, 1978, including reports of psychiatric or psychological evaluation(s) I may have underwent as an applicant for employment as a police officer in 1973 or 1974, and any such evaluation I may have completed when applying for a position as a peace officer with the California State Police. I enclose a signed and notarized copies of affidavits I have presented to both the Veterans Administration and the Los Angeles Police Department requesting that those agencies release to the Board any such records they may have in their possession relating to me. Through my

attorney, I will forward any response I receive to the Board, promptly.

4. I also enclose a copy of documents I received from the State of California, Department of Corrections, dated August 21, 1986, with an enclosed, undated report of that Department's Background Investigation Unit documenting the basis for the Department's rejection of my December 6, 1985 and June 13, 1986 applications for employment with the Department. You will note the report of the Background Investigation Unit establishes that I reported having been employed by LAPD , as a Jailer, from 12-74 through 3-75. You will also note that LAPD informed the Department that I had been rejected from probation as an LAPD employee on March 17, 1975 for failing to meet the standards for the LAPD position. LAPD reported among their reasons for dismissing me from the force, the following "delinquencies":

   Established a pattern of tardiness.
   Formal complaint filed - excessive consumption of alcohol.
   Failure to report to duty as a result of consuming alcoholic beverages.
   Marital problems.
   Indebtedness.

5. The Background Report quotes excerpts from my LAPD personnel file further explaining LAPD's actions, quoting a Probation Report dated March 22, 1974 (id) concluding "The lack of maturity for job. Required above average supervision." Also quoted was a probation report dated November 22, 1974 determining that I had "an attitude problem.....that [I was] aggressive at times which was uncalled for" and noting counseling failed to produce improvement. The Report further cites my involvement in a bar-room fight on February 13, 1975; that I called my supervisor and reported the incident but failed to obtain the police report of the incident, that a LAPD Supervisor was sent to my home regarding this incident and found me "in uniform displaying objective signs of intoxication" and concluded I was unfit for duty. The report further notes that on February 14, 1975, at 0100 hours, one hour after my starting time, I was found to have a blood