alcohol level of 0.19 by a Breathalyzer test. Finally, the report notes that I was carried by LAPD as AWOL on December 19, December 30, and, December 31, 1974.

6. I have no present recollection of having exercised any appeal rights from my dismissal from the LAPD. As the Correction's Department Background report notes, I did participate in a "discrepancy interview"before the Corrections Department on June 13, 1986. I cannot presently verify that date but do recall that interview. I was trying to convince the Corrections Department that my drunken past was history and that I should be given a chance with the Department. They declined.

7. I have no present memory of having sought, or being subjected to medical, psychiatric or psychologic evaluation, care or treatment at any time or place from my discharge through 1978, or for some time thereafter. I do my best to shut out that period of my life from my memory. Whenever I am forced to try to recall events and circumstance during those years, I develop a feeling of deep anger and become very depressed and embarrassed. For many years, my anger was directed at both myself and at the Navy for having thrown me and my family out. Knowing what I know now, I cannot understand how the Navy could have released me without treatment and caution that my constant fighting with my family and my neighbors, my pattern of family and Spousal abuse, and especially my physical and verbal abuse of my children, my alcoholism, my inability to-keep a job, my inability to manage family resources, the list goes on, were all predictable symptoms of the Post Traumatic Stress I suffered due to my experiences aboard the U.S.S. Liberty. It is angering, embarrassing and depressing to look back on that era, recognizing the terrible harm I inflicted on myself and my family, recognizing that with proper treatment it likely could have been avoided.

8. The Board has asked for a "detailed statement" of the basis for the belief that I am entitled to a disability rating of 70 percent on 7 February 1973 and 7 February 1978 when the VA established a rating of 10 per cent in its rating decision in . First, I respectfully submit that the VA rating is in error. Unfortunately, it is the common experience of we vets suffering from

mental health disabilities that we are forced to constantly appeal VA ratings before we succeed in establishing the disability ratings accurately reflecting our disabilities. I am advised that the fact that at the time of the VA rating decision I was then working daily at my job as a Grader Operator for the County of Riverside, California was undoubtedly a significant factor relied on by the VA in limiting my rating to 10 per cent rating for my disabilities.

9. Perhaps the rating decision was also influenced by my inability to openly and honestly discuss what was ( and is) truly going on in my life and in my head, and by the fact that the VA personnel I have dealt with seem more interested in the clock than in helping me open up and truly and honestly talk with them as to what is really going on. I have dealt with my attorney, Mr. Kenney, for now better than 7 years. Yet, not infrequently, I mention a situation and realize that was the first time I had mention that fact to him, although, on one level, I recognize that fact is of import in my case. I frequently respond to his questions as to what is going on and how I am doing, with a general answer, "Fine", or "O.K." Mr. Kenney than asks to speak to my wife and questions her as to what is going on in my life. She then relates the truth as to what really is happening, and I somehow feel more at ease discussing those facts. I don't truly understand why I do that, but it is a pattern that has evolved dating back to my injuries aboard the Liberty.

10. I guess it represents my means of dealing with the "Silencing Order," my training as a member of the Naval Security Group, and, the circumstances when I first joined the Navy. The record will show that I was a high school drop out when I joined the Navy, and, that I suffered from an "immature bladder," causing me to wet the bed late into my teen age years. That was a situation I did my utmost to keep private. Thus, from an early age I learned to avoid talking about my personal health so as to avoid any chance that the bed wetting would become known outside my immediate family. I was greatly encouraged when the doctor at Navy Recruiting informed me that this was a result of my bladder not fully developing at the same rate as most children, and, that it would very likely resolve itself within the next year. He told me that while I was then physically unfit, I could and should reapply the next year and would likely be found fit for enlistment at that time. I did,

and I was. But, I well understood that was piece of my personal history that was best kept to myself.

11. When I was selected for CT training, I was exposed to the Navy's security requirements perhaps more quickly than the average recruit. To me, being intrusted with classified materials was a source of great pride. And, given my status as a high school drop out, I may have had a greater fear of being thrown out of the Navy, which I understood to be one of the results if you violated your security duties. Of course, I well understood that as a CT, I had one of the better (I felt the best) jobs in the Navy. I sure did not want to get tossed out as a CT striker and wind up either as deck hand or an engineer. I very much took to heart any instruction or order that prohibited me from talking about my duties or experiences as a CT. Thus, when that Lieutenant Commander visited my berth in Naval Hospital San Diego, and personally ordered me not to discuss my experiences aboard the Liberty with anyone "Not even your mother,“ I was deeply impacted by that order.

12. First, I had few, if any visitors, and, no visitor associated with the Liberty throughout my stay at the Hospital. Second, as a Third Class Petty Officer, I was not accustomed to being visited by an officer. Finally, the order itself was frightening. It left me with the impression that we of the Liberty crew were somehow guilty of some terrible act the Navy wanted to keep concealed. Whatever was involved, the threat of discharge and court martial hit me right in my deepest insecurities. I knew what life was like for me outside the Navy. I didn't want to go there. I wanted to make the Navy a career; I wanted to be a 20 year man; maybe longer. And, I wanted to serve my career in the Naval Security Group, not anywhere else. I took that order at its fullest threat. I understood it to prohibit me from discussing anything about my experiences aboard the Liberty with anyone, at any time, unless this officer, or my former Co expressly authorized me to do so. That obviously meant the doctors and nurses, why else did he come to me in the hospital. And, it meant my family. I didn't realize then that the order would turn me into a walking time bomb. But, it surely did.

13. The Board asks why I failed to mention the "Silencing Order" in my initial application for correction. There are several explanations. First, I had not

then mentioned to Mr. Kenney the fact of the unidentified officer's visit and his personal order to me. I was still having great difficulty opening up to Mr. Kenney. Second, Mr. Kenney was trying to get me to focus on the circumstances causing my transfer and discharge, and, my experiences in the years immediately following my discharge. Finally, I assumed that the Navy well understood what it had done to the Liberty crew; that the Board would do its duty, access the Navy's records concerning the Liberty affair, and, correct my record without my having to discuss that Order. I was mistaken. When, well after filing the initial application, Mr. Kenney asked if I had been visited by this unidentified officer who had visited other hospitalized Liberty survivors, I acknowledged that he had visited me and given me the same warnings and order.

14. The Board has asked if me application for the award of a Combat Action Ribbon in May , 1970 violated the Silencing Order; why I requested the award, if I wore that award and my Liberty - related Purple Heart and Presidential Unit Citation ribbons on my uniform, and, if so, how did I avoid violating the silencing order when responding to questions concerning how I earned those awards. Let me be candid. It is difficult for me to respond to such a demeaning series of questions from a representative of the Navy Department. Such disrespectful and defensive attitudes by Navy representatives and other groups seek to demean my service, and the service of all the Liberty crew, the dead and the survivors. I can see such serves no purpose other than an attempt to intimidate me from pursuing my rightful benefits, in fear that If I persevere, the truth of the attack on the Liberty will be disclosed. It seems to be a continuing effort to suppress the true facts of the attack on the Liberty and the disgraceful conduct of the Navy and other government officials in lying to the public concerning the truth of that attack. In so doing they did not, and the author of these questions does not serve a legitimate interest of the Navy or the U.S. Government.

15. Ignoring the ignorance of these questions, I will try to answer. First, note this is taking place some 3 years after the attack. We now know that the Navy was locked in a debate about awarding such awards to the Liberty crew less such cause new inquiries as to what really went on. I did not apply for these awards until directed by Navy Officials that such was appropriate,

and then only when encouraged by my command to do so. I did in fact wear the cited awards with honor and pride, and would welcome the opportunity to do so again. I do not recall anyone at NAVCOM STA Phillippines questioning how those awards were earned. Indeed, I was wearing them on my uniform when I presented for physical exams and psychiatric evaluations at Naval Station San Francisco incident to processing my discharge. Strangely, no one questioned me regarding those awards. Had they done so, it might have thrown some light on my conduct.

16. The Board asks if my promotions following the attack on the Liberty were earned on the basis of satisfactory service, and if a record entry (not contained in records previously provided my attorney by the Department) accurately assesses my service. The entry relates that my military record "reflects eight years eight months exceptionally meritorious service. While attached to this command he has served in professional manner consistently demonstrating high sense of personal responsibility for quality of his work".

17. I am flattered at this assessment. Do I feel I earned my promotions. I certainly do; as much, if not more so than most others promoted in that rating in that time frame. Do I feel the 12 January 1973 entry is an accurate assessment of my service? That is complex. First, obviously, neither my skipper, or the Navy felt so. They threw me out of the Naval Security Group and discharged me within the month. This hardly an action appropriate for a sailor with exceptionally meritorious service, nor is t an appropriate reward for a sailor who has served in a professional manner demonstrating high sense of personal responsibility. I guess this was a well intentioned effort tp distinguish my "Work" from my general demeanor. The Command well knew that I was by then a drunk. T is obvious they felt I was safe for cannon fodder assignments in Vietnam, but not acceptable at NAVCOM STA Phillippines. The Command well knew my conduct in my family life was an embarrassment to the command, and, that I was a positive danger to my wife and children. And, they well knew that I was no longer able to manage my personal finances. I guess the answer is more a question of the standards of the Navy. Is a sailor, known to drunk during all off duty hours, (and during duty hours as well) known to be physically and verbally abusing his wife and children, known to be engaged in bar room brawls, and known to be

unable to manage his family finances, an individual performing his duty in a professional manner and demonstrating a high sense of personal responsibility for quality of his work. In my drunken gaze of 1970-1973, I would have said yes. More responsible Navy officials ultimately said no. It was one of the few calls they got right.

18. I believe that entry reflects an effort of my command to "go to bat" for me; perhaps out of respect for my surviving the Liberty attack, perhaps because I was foolish enough to volunteer for Vietnam duty. Unfortunately, the Command failed to do its duty to me and the Navy. Both the Navy and I would have been better served by an honest report that my conduct established I had deteriorated mentally and physically and needed immediate care and counseling. The Navy might have salvaged its investment in my training and experience; I might have salvaged my family and my life.

19. The Board cites a Standard Form 507, Clinical Record entry associated with a Standard Form 88 I reportedly completed in 1971. The Clinical Record entry summarizes the wounds I received in the Liberty attack and the history of my subsequent care and treatment. In addition, the Board cites an entry of October, 1967 when I sought care for decreased range of motion in my finger as a result of "an injury in June, 1967." The Board asks if my disclosure of the facts reflected in the Standard Form 507 violated the Silencing Order. I have no present recollection of having completed the SF 507; it is my understanding that the clinical record entries are prepared by the attending medical personnel. It is more likely that information was obtained from my medical records that accompanied me for that evaluation. It is to be noted, however, that while the entry identifies my care aboard the USS America, it apparently does not mention the USS Liberty. It is also to be noted that no mention is made in the entry of my having been trapped, unconscious in the flooded compartment aboard the Liberty, does not mention the fact that my wounds were the result of the sneak attack by Israeli Defense Forces, that some 23 fellow sailors were blown apart in that compartment by the Israeli torpedo, does not mention the other efforts of the Israeli forces to sink my ship and kill me and my shipmates, and, does not mention the subsequent actions by my Naval Superiors and other

officials of my government to prepare and distribute a false report of that attack, thereby labeling me and my fellow survivors liars when we tell the truth of the attack. Basically, I don't believe I prepared that document nor do I believe I was the source of the details summarized therein. Do I believe I violated the Silencing Order if I disclosed the data identified? Emphatically no. My injuries were evident to any competent medical examiner. Identification that the injuries were incurred in combat in the Mediterranean certainly is not a violation; it is the cover story created by the Navy to put the lid on the truth of that attack.

20. Again the entry of 24 October 1967 disclosed nothing of the circumstances of the attack. I have no doubt I did not violate the Silencing Order in seeking treatment for my finger. There is no suggestion in either entry that the critical elements of the sneak attack the Navy sought to misrepresent and conceal were revealed.

21. The Board asks how many times have I participated in reunions of the Liberty crew. To the best of my present recollection, following the attack, I never again served with any other Liberty survivors. I think the first reunion of the survivors group I attended was in 97, held in SD. I found attending that meeting very disturbing. It stimulated my flashbacks and nightmares, revived my deep survivors guilt feelings, and, I started drinking again. I avoided contacts with the survivors group, and, most of the crew. Then, in 2000, I attended a Liberty Survivors meeting in San Diego, CA. Again, while I enjoyed seeing the old crew members, I found the meetings very uncomfortable, again stimulating my flashbacks, nightmares, and survivors guilt sensations. I do not recall attending any other such meetings.

22. As to the discussions of the Silencing Order, it certainly has been discussed, in one manner or another at the meetings I attended. As a group, we all are deeply angered by the multiple efforts of the Navy, the U.S. Government, the Israeli Government, and certain of the supporters of Israel, to suppress efforts of the crew to get the true facts of the sneak attack by Israel revealed and published to the American public. In the confidence of our comrades, we discuss each of our frustrations as to how the Silencing Order has

adversely affected each of us, individually and collectively. I am not a very talkative person, and I protect my privacy. I listen to the others; I think I have only shared my personal pain and embarrassment with LCDR Ennes , CAPT Keipfer, Gunner Lockwood, my attorney, and, only recently, with my wife. But, I have surely heard the stories of my shipmates as to how their inability to tell their wives and children what had happened on the Liberty wrecked their marriages and their lives. I might not join in, but I surely understand. I have been there, and, perhaps, worse.

23. The Board questions why the VA gave me a 10 percent rating, yet I claim a 70 per cent rating, dating back to my discharge. My children have presented affidavits and statements concerning my conduct after the attack on the Liberty, how bad it was during my active service, and, how horribly that worsened after my discharge. It hurts to face the fact of how my conduct injured these kids. I'd like to claim that all that has changed now that I have gained a better control of my drinking and my anger. Unfortunately, that simply is not true. The slightest problem can put me into depression, my anger can gain control, I start drinking, and lose my self control.

24. In an effort to regain my self respect, I have become a volunteer in the local Sea Scout's program. I have gained the rank of Lieutenant in that group. I enjoy that service. It has become an important part of my life. And, yet, I find myself struggling to retain control of my anger when one of the scouts elects to ignore my orders. Intellectually I know it is wrong, they are just being kids, but, I just can't control myself. Recently, this last Dec, I was on an over the week end camp out with our unit in the hills of Calif . As we gathered for a training session, I ordered my unit to gather around, sit down, and pay attention to the next training lesson. One of the group, a kid of 15 years, kept talking and horsing around, and ignored my order. Before I realized it, I had grabbed the kid and order him to sit down and shut up. When he protested, I pushed him to the ground. Almost immediately, our unit Commander came over, took control of the situation, and ordered me to step over to the Command Center. I was livid and tried to justify my conduct. The Commander told me to take a walk, calm down, and, to stay away from the unit for the rest of the day. He warned me if there was any repeat of that conduct, I would be expelled from the Sea Scout organization.

While I complied, my anger remained just below the surface for the remainder of the camp out. When I got back home, I complained to my wife as to how I had been treated. She told me I was being stupid; the Commander was absolutely right, and, that, if I didn't understand it, I should. She told me she had been fearful of my loss of control for several weeks prior to the camping trip, and, That I really needed to tell this to my VA counselors and get their help. I ignored her.

25. A few weeks latter, my step grandchildren were visiting us for several weeks. I love these kids and enjoy having them visit. But, the extended stay made me feel trapped in my own home. I felt my anger getting more and more out of control, and I felt guilty for having those feelings. In turn, I began having thoughts of suicide, and the flashbacks and nightmares of being trapped in that bloody compartment came back with a vengeance. Those memories are always close and vivid, but, at times, they make me feel as if I am actually back in the compartment, trapped under debris, with the sea water rapidly rising. And, I begin again feeling guilty for being alive, while my two non rated men were killed in the blast, one on each side of me. Those memories are frightening , and, I find myself drinking again to try and shake those thoughts.

26. I don't know what caused me to tell my wife Margaret what I was experiencing; maybe I was trying to make her feel guilty for letting the kids stay so long. At any extent, when I left to get some more booze, she called Mr. Kenney and related to him what was going on and how scared this made her, for my safety, for her safety, and, the safety of the kids. When I came back, she told me Mr. Kenney had called and wanted me to call him right away. In our subsequent discussion, Mr. Kenney told me that I was really out of control and should get to the VA right away and check myself into the psych ward for treatment. He told me to have Margaret drive me to the Hospital because he did not feel I should be driving, and because he wanted Margaret to go in to the Hospital with me so as to be certain the medics knew exactly what was going on. After some argument I agreed. But, I then left the house and drove to the hospital without Margaret. I did seek admission to the psych ward, and told the staff some of what was going on, especially the fact I was having thoughts of suicide. They admitted me, but,

the next morning, when I realized they had me on a locked ward, I signed myself out against the doctors advice. My wife was shocked and angry when I returned home the next day. I know I need treatment and I don't understand why I avoid it.

27. I surely understand my attitude toward the locked ward. Having been trapped in the flooded compartment and dropped back into the bloody mess as Gunner Lockwood tried to get the hatch open, I have an absolute paranoia about being trapped in locked or even crowded spaces. I even have difficulty participating in group therapy sessions at the VA clinic. The close proximity of others in the group session gives me a sense of being trapped.

28. I have requested a report of my Social Security earnings from 1973 through 1994. I will forward that report to the Board through my attorney. Attached is the requested affidavit requesting the VA forward my service records to the Board. I have also requested copies of my LAPD personnel records. I have reviewed Mr. Kenney's and Mr. Lockwood's declarations explaining the "missing" Lockwood affidavit. As Mr. Kenney states, I have searched my files an can find no copy of an affidavit or statement from Mr. Lockwood relating t my initial application for correction.

[signature]
Harold Eugene Six, Sr.

Subscribed and sworn to before me, a notary public in and for the County of Riverside State of California, this 2 day of ~~October~~ Nov., 2006 in Riverside California, by Harold Eugene Six, Sr., identified to me by his pictured California Driver's License, # MO628838 , copy attached.

[signature: Monna M. Lowe]
,Notary Public

My license expires: 01-10-09

MONNA M. LOWE
Commission # 1536948
Notary Public - California
Riverside County
My Comm. Expires Jan 10, 2009

**Before The**
**Board For Correction of Naval Records**

**In Re:** **HAROLD E. Six, Sr.** ) **On Remand From**
**Former CT-1, USN** ) **U.S. Court of Federal Claims**

---

Affidavit of Harold Eugene Six, Sr.
Authorizing And Directing
Forwarding of Original Service Medical Records
to
Board For Correction Of Naval Records

---

Harold Eugene Six, Sr, SSN # 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, being duly sworn, herewith requests, authorizes and directs the U.S. Department of Veterans Affairs to forward my original service medical records to the Department of Navy, Board For Correction of Naval Records, 2 Navy Annex, Washington, DC 20370-5100, for the Board's review and consideration in its review and reconsideration of my Application For Correction of Naval Records in that Board's pending docket No. 483-03.

Harold Eugene Six, Sr.

Subscribed and sworn to before me, a notary public in and for the County of Riverside, State of California, this 14 day of October, 2006 in Riverside California, by Harold Eugene Six, Sr., identified to me by his pictured California Driver's License, # M0682838.

Monna M. Lowe

My license expires: 01-10-09

MONNA M. LOWE
Commission # 1536948
Notary Public - California
Riverside County
My Comm. Expires Jan 10, 2009

**William J. Kenney, Esq.**

9915 Empire Woods Court
Charlotte, NC 28277 *
Tel: 704-341-4781
Fax: 704-341-4781
email: kenneyffx@aol.com
* Not admitted in North Carolina or California

% HART/HTC-CA
Wilshire Boulevard, Suite 420
Los Angeles, CA 90010 *
Tel :213-251-5737

% HART/HTC
600 Penn. Ave, SE, Ste 105
Washington, DC 20003
Tel: 202-547-5129

December 4, 2006

Personnel Division
Los Angeles Police Department
P.O. Box 30158
150 N. Los Angeles Street
Los Angeles, CA 90012

Re: Harold Eugene Six, Sr.; Former Station Officer

Dear Sir or Madam:
Attached please find an affidavit duly executed by my client, Harold Eugene Six, Sr., requesting and authorizing the release of all records maintained by the Department relating to or arising out of his employment by the Department in or about 1973 through 1976.

I note the Division's letter to Mr. Six dated September 11, 2006, stating Mr. Six was employed as a Station Officer from September 23, 1974 through March 18, 1975, and, the Department's policy not to provide information regarding rehire eligibility, complaint history or reason for employment separation. We specifically request you waive that policy and provide a complete copy of Mr. Six's personnel folder and all related files.

I am representing Mr. Six in his request that his Naval Record be corrected to show he was suffering from a psychiatric disorder at the time of his discharge from the Navy in February, 1973. We have a copy of a California Department of Corrections Background Investigation Unit Report on Mr. Six, their file number 2420-1S85 reporting on that Department's reasons for withholding certification of Mr. Six's eligibility for employment.(Copy attached) We invite your attention to references to reports dated March 22, 1974, November 22, 1974, February 13, 1975, February 14, 1985, December 19, December 30, and, December 31, 1974. I presume the reference to 1985 is merely a typo, but this information could be of meaningful assistance to Mr. Six in his proceeding before the Navy Department. Your cooperation will be greatly appreciated.

Sincerely, WJK 12/05/06

William J. Kenney, Esq.

Cc: Harold E. Six, Sr.

**Before The**
**Board For Correction of Naval Records**

| | | | |
|---|---|---|---|
| **In Re:** | **HAROLD E. Six, Sr.** | ) | **On Remand From** |
| | **Former CT-1, USN** | ) | **U.S. Court of Federal Claims** |

---

Affidavit of Harold Eugene Six, Sr.
Authorizing And Directing
Los Angeles, CA. Police Department To Provide
Copies of My Employment Records
To
Board For Correction Of Naval Records
To
My Attorney, William J. Kenney

---

I, Harold Eugene Six, Sr, SSN # 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, being duly sworn, herewith request, authorize and direct the Los Angeles CA. Police Department to forward copies of all records maintained by the Department relating to or arising out of my employment by the Department, in or about 1973-1976, to :

U.S. Department of the Navy
Board For Correction Of Naval Records
2 Navy Annex
Washington, D.C. 20370-5100

and, to my attorney:

William J. Kenney, Esq.
D.C. Bar No 99267
9915 Empire Woods Court
Charlotte, NC 28277

For the Board's and Mr. Kenney's review and consideration in connection with the Board's review and reconsideration of my Application For Correction of Naval Records in that Board's pending docket No. 483-03, on remand pursuant to the order of the U.S. Court of Federal Claims, in that court's docket .

In submitting this request, I hereby waive any and all rights I may have under federal, state, or local laws or ordinances protecting my privacy rights in such records and save the State of California, the County of Los Angeles, the City of Los Angeles, the Los Angeles, CA. Police Department, and its and their officers and agents harmless from any and all claims that might arise from the release of said records. It is my intent to release all records, including, but not limited to my personnel records, reports of background checks, disciplinary records, and medical records.

Harold Eugene Six, Sr.

Subscribed and sworn to before me, a notary public in and for the County of Riverside, State of California, this 2 day of ~~October~~ Nov, 2006 in Riverside, California, by Harold Eugene Six, Sr., identified to me by his pictured California Driver's License, #

Monna M. Lowe

My license expires: 01-10-09

MONNA M. LOWE
Commission # 1536948
Notary Public - California
Riverside County
My Comm. Expires Jan 10, 2009

**William J. Kenney, Esq.**

9915 Empire Woods Court
Charlotte, NC 28277 *
Tel: 704-341-4781
Fax: 704-341-4781
email: kenneyffx@aol.com
* Not admitted in North Carolina or California

% HART/HTC-CA
Wilshire Boulevard, Suite 420
Los Angeles, CA 90010 *
Tel :213-251-5737

% HART/HTC
600 Penn. Ave, SE, Ste 105
Washington, DC 20003
Tel: 202-547-5129

December 4, 2006

Mr. James E. Tilton, Secretary
California Department of Corrections and Rehabilitation
P.O. Box 942883
Sacremento, CA 94283

Re: Harold Eugene Six, Sr.; SSN: 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

Dear Mr. Secretary :
Attached please find an affidavit duly executed by my client, Harold Eugene Six, Sr., requesting and authorizing the release of all records, including all medical, psychological, and/or psychiatric records, and all personnel records maintained by the Department relating to or arising out of his application for employment by the Department in or about November 25, 1985, December 6, 1985, June 13, 1986, or, at any other date.

I am representing Mr. Six in his request that his Naval Record be corrected to show he was suffering from a psychiatric disorder at the time of his discharge from the Navy in February, 1973. We have a copy of a California Department of Corrections Background Investigation Unit Report on Mr. Six, their file number 2420-1S85 reporting on that Department's reasons for withholding certification of Mr. Six's eligibility for employment.(Copy attached) Verification of this information could be of meaningful assistance to Mr. Six in his proceeding before the Navy Department. Your cooperation will be greatly appreciated.

Sincerely, WJK 12/5/06

William J. Kenney, Esq.

Cc: Harold E. Six, Sr.

**Before The**
**Board For Correction of Naval Records**

| | | | |
|---|---|---|---|
| **In Re:** | **HAROLD E. Six, Sr.** | ) | **On Remand From** |
| | **Former CT-1, USN** | ) | **U.S. Court of Federal Claims** |

---

Affidavit of Harold Eugene Six, Sr.
Authorizing And Directing
Forwarding of All Medical and Personnel Records
Retained on Harold Eugene Six, Sr
to
Board For Correction Of Naval Records
and, to
Attorney William J. Kenney, Esq.

---

Harold Eugene Six, Sr, SSN # 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, being duly sworn, herewith requests, authorizes and directs the State of California, Department of Corrections to forward copies of my all medical, pyschological, and/or psychiatric records, and all personnel records they may maintain relating to me, Harold Eugene Six, Sr. , arising in connection with my application for employment as a Correctional Officer in or about November 25, 1985, December 6, 1985, June 13, 1986, or, at any other date or dates, to the U.S. Department of Navy, Board For Correction of Naval Records, 2 Navy Annex, Washington, DC 20370-5100, for the Board's review and consideration in its review and reconsideration of my Application For Correction of Naval Records in that Board's pending docket No. 483-03., and, to my attorney: William J. Kenney, Esq., D.C. Bar No 99267, 9915 Empire Woods Court,

Charlotte, NC 28277.

I make this request to further consideration of my pending application for correction of my naval records pending before that Board. In doing so, I waive all rights of privacy, and all other rights that may exist under Federal Law, or California law, protecting my privacy rights in those records, or otherwise restricting the release of such records.

Harold Eugene Six, Sr.

Subscribed and sworn to before me, a notary public in and for the County of Riverside, State of California, this 2nd day of October, 2006 in Riverside California, by Harold Eugene Six, Sr., identified to me by his pictured California Driver's License, #

My license expires: 01-10-09

MONNA M. LOWE
Commission # 1536948
Notary Public - California
Riverside County
My Comm. Expires Jan 10, 2009


CALIFORNIA
COMMERCIAL DRIVER LICENSE
M0682838
CLASS:A M1
ENDORS:N
HAROLD EUGENE SIX SR.
RIVERSIDE CA 92509
SEX:M HAIR:BRN
HT:6-01 WT:170 DOB:04-27-46
RSTR: CORR LENS
05/01/2006

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY GEORGE DEUKMEJIAN, *Governor*

**DEPARTMENT OF CORRECTIONS**
BACKGROUND INVESTIGATION UNIT
2201 Broadway
Sacramento, CA 95818
(916) 739-3050

AUG 21 1986

Mr. Harold Six
3661 Fleming St.
Riverside, CA 92509

Dear Mr. Six:

This is in regard to your eligibility on the employment list for Correctional Officer. As part of the selection procedure, the Department of Corrections conducts a background investigation on each candidate certified for employment. Based upon information developed during your background investigation, State Personnel Board Rule 172, and Government Code Section 18935, it is the Department's decision to withhold your name from certification under the authority delegated to us by the State Personnel Board.

The decision to withhold your name from certification is based upon the information shown on the attached.

Should you have any questions regarding this action or additional information you believe the Department may have overlooked in its investigation of your background, please contact the Background Investigation Unit at the address and phone number shown above.

If you believe the withhold action is improper and you do not wish to provide the Department with additional information, you may appeal the action to the State Personnel Board by contacting the Appeals Division, 801 Capitol Mall, Sacramento, California, 95814. An appeal must state in writing the facts, information, or circumstances upon which it is based and must be received by the State Personnel Board within 30 days after the postmark of this letter. To ensure prompt response, please include a copy of this letter with your request for appeal. You may phone the Appeals Division at (916) 445-8762 for additional information.

Sincerely,

Carlos M. Sanchez

CARLOS M. SANCHEZ, Chief
Selection and Standards

Attachment

cc: State Personnel Board, Investigation Unit

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
BACKGROUND INVESTIGATION UNIT

WITHHOLD BASIS NOTIFICATION
IU-209 TEMP

| | |
|---|---|
| NAME: Six, Harold | CLASS: CORRECTIONAL OFFICER |
| FILE: 2420-1S85 | SSN: 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 |

o HAS BEEN DISMISSED FROM ANY POSITION FOR ANY CAUSE WHICH WOULD BE CAUSE FOR DISMISSAL FROM THE STATE SERVICE.

o IS, IN ACCORDANCE WITH BOARD RULE, FOUND TO BE UNSUITED OR NOT QUALIFIED FOR EMPLOYMENT.

On December 6, 1985 and again on June 13, 1986, you signed and dated your application for employment certifying that all statements in your application were true and complete.

Under Section 2E of this document, you stated by answering, "No", that you had never been discharged, rejected during probation, been requested to resign or resigned under unfavorable circumstances from any employment.

On December 6, 1985, during your Qualifications Appraisal Panel interview, you were asked what you had done to prepare yourself for a position as a Correctional Officer. You told the panel that your experience with the Los Angeles Police Department as a Jailer had prepared you for employment. You also told the panel that you didn't pass your probationary period. When the panel asked you why you were rejected from probation, you responded, "It was more of my personal life that interfered with this, than how I performed on the job. It didn't affect my work on the job. It affected my whole personal life."

On November 25, 1985 and again on June 13, 1986, you certified on your Personal History Statement that there were no misrepresentations, omissions or falsifications on this document and that all statements and answers to questions were true and correct.

Under the Employment and Experience Section of this document you listed, "LAPD Jailer, 12-74 through 3-75 Los Angeles, California, 77th St. Jail."

During the conduct of your background investigation, it was revealed that you were rejected from probation from the Los Angeles Police Department on March 17, 1975, for failing to meet the standards for this position. Specifically noted were the following delinquencies:

1. Established a pattern of tardiness.
2. Formal complaint filed - excessive consumption of alcohol.
3. Failure to report to duty as a result of consuming alcoholic beverages.
4. Marital problems.
5. Indebtedness

The following statements are quoted excerpts from your personnel file at the Los Angeles Police Department. Your probation report dated March 22, 1974, indicated, "The lack of maturity for job. Required above average supervision." Your probation report dated November 22, 1974, indicated that you had, "An attitude problem portraying that you know all the jail functions. You were aggressive at times which was uncalled for. You were counseled regarding faults (attendance). Shown little improvement."

It was also noted that on February 13, 1975, you consumed 6-8 glasses of beer and accepted a challenge to a fight in a bar in the Wilmington area. You called in to your supervisor and you were instructed to obtain a police report from the Wilmington Precinct Station. You failed to do so. A supervisor from the Los Angeles Police Department was dispatched to your home and found you in uniform displaying objective signs of intoxication. You were not fit for duty. On February 14, 1985, at 0400 hours, one hour after your scheduled starting time, you were found to have a blood alcohol level of .19 by a breathalizer test. In addition to this, on December 19, 1974, December 30, 1974 and December 31, 1974, you were carried as Absent Without Leave from Duty.

On June 13, 1986, during your discrepancy interview, you were asked about the circumstances surrounding your employment as a Jailer with the Los Angeles Police Department. You said you were having marital problems, you were indebted and you were having a drinking problem back then. You remembered being in a fight but couldn't recall any of the other incidents surrounding your employment with the Los Angeles Police Department.

Your rejection from probation was upheld by the Los Angeles Police Commission and your employment was unquestionably unfavorable. Your inappropriate conduct in a position similar to the one for which you have applied demonstrates you lack the general qualifications for this peace officer position. Additionally, your dismissal from the Los Angeles Police Department would be cause for dismissal from the Department of Corrections. After considering your behavior, a determination has been made that you are unsuitable for consideration as a Correctional Officer candidate.

# LOS ANGELES POLICE DEPARTMENT

WILLIAM J. BRATTON
Chief of Police

ANTONIO R. VILLARAIGOSA
Mayor

P. O. Box 30158
Los Angeles, Calif. 90030
Telephone: (213) 485-3243
TDD: (877) 275-5273
Ref #: 10.4.1

September 11, 2006

RECEIVED
SEP 0 8 2006
PERS. DIV.

Harold E. Six, Sr.
4080 Pedley Rd., Sp #185
Riverside, CA 92509

Dear Mr. Six:

Re: **Harold Eugene Six** **SSN: xxx-xx-1848**
Last Position held: **Station Officer**
Employment Dates: **September 23, 1974 through March 18, 1975**
Remarks: **No longer employed with our Department.**

In response to your letter to verify past employment, **Harold E. Six** was employed with our Department as indicated above. It is the policy of this Department not to provide information regarding rehire employment eligibility, complaint history or reason for employment separation.

An employee's personnel folder is available for viewing during our normal business hours with the proper release authorization. It is recommended that you notify our office in advance to review former employees' folders that have been gone five years or longer. Their personnel folders are normally available within 2 to 3 days of the request.

If you have questions, please contact Sr. Clerk Typist Bernette Johnson, Employment Verification Coordinator, Personnel Records Section, Personnel Division at (213) 485-5245. Our office is open Monday through Friday, 7:30 a.m. to 11:00 p.m., except holidays.

Very truly yours,

WILLIAM J. BRATTON
Chief of Police

Sue W. Gordon

SUE W. GORDON, Police Administrator
Commanding Officer
Personnel Division



AN EQUAL EMPLOYMENT OPPORTUNITY — AFFIRMATIVE ACTION EMPLOYER
www.LAPDOnline.org

**Before The**
**Board For Correction of Naval Records**

**In Re:** **HAROLD E. Six, Sr.** ) **On Remand From**
**Former CT-1, USN** ) **U.S. Court of Federal Claims**

Supplemental Declaration of
Mrs. Margaret Six

I am Mrs. Margaret Six, wife of the applicant, Harold E. Six, Sr. I live with the applicant at 4080 Pedley Road, Space 185, Riverside California 92509. I make this Supplemental Declaration in further support of Harold's Application For Correction, to bring to the Board's attention aspects of Mr. Six's mental health and his resultant conduct so that the Board can recognize he is a very sick individual, suffering from what has been diagnosed as PTSD incurred during his active duty in the Navy in the late 60's and early 70's.

I have no medical training or experience, but I am a caring, God fearing person. I married Harold in 1978. I knew at the time that he had a history of alcohol abuse, and, that he had served in the Navy. He had 3 children by a prior marriage. I understood there had been difficulties in that marriage, and that Harold and his former wife were both heavy drinkers. I knew Harold had been sober for several years and admired the fact that he kept the children with him, although the 2 oldest were his former wife's children by a previous marriage. When we married, the children continued to live with us. I knew he had served in Vietnam, but knew nothing of his service aboard the USS Liberty. I don't think I had ever heard of the fact that the Israeli's, our allies, had attack our ship.

Over time, I began to recognize that Harold had some problem or problems he was holding deep in his mind, and, that he would not share it. He had great trouble sleeping at night; and, when he slept, he frequently woke up screaming about being trapped. Also, he would become very moody, very withdrawn, very upset, and, have bouts of wild anger. He would explode at me, or at the children. Frequently, he would then start drinking. When he came out of his mood, he was embarrassed and apologetic, but, it took it's toll. This pattern continues to this day.

He still stays up all night, falling to sleep in the early morning, and then sleeping until 11:00 or so.
He still cannot talk with me as to what is going on. He holds it all in. When asked, his answer is always:"I'm fine," even though he is in pain and greatly upset and depressed. At times, it is very frightening.

What truly hurt was that he would not discuss what was causing these nightmares, and, his very sudden changes in his personality. And, he would not seek help for hor his troubles. I recall talking to his oldest step daughter about it. She said, in effect, Harold has been that way as long as she has known him, and it was best just to stay out of his way when he got that way. I tried repeatedly to get him to talk about it, or, to go talk to a doctor. All he would say was , "I Can't."

I first learned some of the facts of Harold's experiences in the Navy, perhaps in the late 1980's or early 1990's. I overheard Harold talking with his son, Harold, Junior. ( We always called him, simply, "Junior".) Junior was, is, a very troubled individual, very lacking in self esteem, and given to drug abuse. He and Harold, Sr. have a very difficult personal relationship. Harold told Junior that he volunteered for duty in Vietnam because he hoped he would be killed there. I was shocked and told Harold that wasn't funny. Hoping to get yourself killed is nothing to joke about. I was concerned with Junior's habits. I had heard of how young people lacking in self esteem, are very susceptible to suicidal thoughts.

Later, when Junior was out, I brought up my concerns with Harold. He scoffed at my concerns for Junior, but told me that he wasn't joking; that he really did volunteer for Vietnam duty because he wanted to be killed fighting in Vietnam. He explained that he was trapped in a flooded compartment on board the U.S.S. Liberty, that the two men in his charge were killed, along with some 20 others in that compartment when a torpedo exploded in the compartment, that there were so many good men killed then, that he feels guilty because he survived that attack, that he has been haunted by thoughts of that event ever since, and felt he could make up for his having survived by getting killed in Vietnam. I told him that was crazy, and he shouldn't give Junior any thoughts that suicide is a solution to anything. Harold's response was, "You know, maybe I am crazy." After that talk, I did not bring it up again, and followed his step daughter's advice. When he got into one of his all too frequent moods, I avoided him.

At some point in the mid 1990's Harold went to a reunion of the Liberty Survivors in Washington, D.C. He came back in a strange mood. He was happy to have seen the old crew, and, he began talking about the attack on the Liberty, how the Israeli's attacked the ship without warning, how vicious the attack was, how one of the guys at the reunion had rescued him, puling him out of the flooded compartment, how the Israeli's are still lying about the attack, and so is both the U.S. Navy and our government, even still. Then, surprisingly, he said he would never go back to another reunion. He told me that the memories of that attack are what puts him into his moods; that his anger and rage is not at me, or the kids, but at "those G... D.... Israeli's and their supporters and that G.. D..... Johnson and McNamara." And, he told me that is what made him a Drunk, and when he goes off drinking, he is simply trying to blot out those thoughts.

Following that reunion, Harold began getting occasional phone calls from Bryce Lockwood, who was the guy who had rescued him on that ship. Gene explained that Lockwood had asked him to talk to Lockwood's attorney and give the attorney a statement for use in Lockwood's efforts to get disability benefits from the Navy and the VA because of what happened to him on the Liberty. Gene said Lockwood began explaining the nightmares, flashbacks, uncontrollable rage, family difficulties, bouts of drinking, his sense of guilt for having survived the attack, his employment difficulties, and other problems he had been experiencing ever since the attack on the Liberty., and, that he had been told these were symptoms of an illness, "Post Traumatic Stress Disorder."

I remember after one of his phone calls from Mr. Lockwood, Harold told me some of what Lockwood had told him he had been going through. Harold told me that he had been experiencing the very same problems, right from shortly after the attack, but he was always afraid to admit what he was experiencing. Harold explained he was afraid he would lose his status in the Naval Security Group if he told anybody in authority what was going on.

At some point in 1998, Harold received a telephone call from Mr. Lockwood's attorney, Mr. Kenney. Mr. Kenney interviewed Harold and latter sent him a document to sign. Harold did not get the document signed right away, and Mr. Kenney called asking if there was a problem with the statement. Harold then asked Mr. Kenney if he was entitled to benefits. I recall that phone call was