**William J. Kenney, Esq.**

9915 Empire Woods Court
Charlotte, NC 28277 *
Tel: 704-341-4781
Fax: 704-341-4781
email: kenneyffx@aol.com
* Not admitted in North Carolina or California

% HART/HTC-CA
Wilshire Boulevard, Suite 420
Los Angeles, CA 90010 *
Tel :213-251-5737

% HART/HTC
600 Penn. Ave, SE, Ste 105
Washington, DC 20003
Tel: 202-547-5129

October 17, 2006

W. Dean Pfeiffer, Executive Director
Board For Correction Of Naval Records
Department of the Navy
2 Navy Annex
Washington, DC 20370 - 5100

Re: Harold E. Six, Sr., Docket No. 483-03

Dear Mr. Pfeiffer:

This will respond, on an interim basis, to the Board's letter of 24 August 2006 in the above proceeding. Please accept my apologies for the delay in responding. Your letter arrived during my absence on vacation. Thereafter difficulties in contacting my client, Mr. Six, and certain personal family matters distracted me from a more timely response.

I appreciate that this delay will adversely impact the Board's ability to comply with the procedural dates directed by the Court. With the government's concurrence, I will move for an extension of those dates to a date mutually acceptable to both my client and the government.

Responding to the issues presented by the Board's letter, please be advised as follows:

1. I have prepared and forwarded to Mr. Six affidavits directing the VA to release his service record to the Board. In addition, I have prepared affidavits directing release of all records from the LAPD and the California Department of Corrections. As soon as I receive those documents, I will forward them to the Board, and, personally present them to the respective agencies.

2. I enclose my declaration regarding the " missing" Lockwood affidavit. I have also reviewed this with Mr. Lockwood and prepared a declaration for his

review and approval. Mr. Lockwood requested various changes to the draft presented him. Those have been made. As soon as I receive Mr. Lockwood's signed declaration, I will forward it to the Board.

3. Regarding records of Mr. Six's medical, psychological, and/or psychiatric consultations, etc. during the period 7 February 1973-6 February 1978, Mr. Six advises that to the best of his present recollection there were no such consultations, etc. during that period. He also informs me he has no recollection of undergoing any psychological evaluation incident to his application for employment with the California Department of Corrections. I have prepared an affidavit for Mr. Six's review, editing and approval regarding these issues ( and other pertinent matters). As soon as Mr. Six is comfortable with the wording of that affidavit, I will submit it to the Board.

4. The Board asks that I provide a detailed statement of the basis of ***my*** belief that Mr. Six was entitled to a disability rating of 70 per cent, together with an explanation of the discrepancy between that rating and the 10 per cent awarded by the VA. I will address that issue in an attachment.

5. The Board requests an explanation for Mr. Six's failure to mention the Silencing Order in his initial application. Candidly, the failure to mention the Silencing Order in the initial application is my responsibility, not Mr. Six's. In preparing the initial application, I was flooded with multiple facts, some of which seemed of obscure relevance. I construed the discussions of the Silencing Order that occurred in my interviewing other crew members as a part of their anger and frustration at the Navy for promulgating the false report of the attack. And, these facts were often presented in a haze of profound anger and frustration, coupled with explanations of how badly these individual's lives, and the lives of their families had been affected by their experiences in the attack on the Liberty, and the subsequent lies by our government concerning the facts of that sneak attack. Mr. Six himself had great difficulty in discussing the events of the attack. I attributed this to the understandable confusion aboard the Liberty at the time of the attack, and the fact he had obviously sustained a severe concussion when the torpedo exploded into his work station in the compartment. In preparing the initial application, I attempted to focus on the fact of Six's injuries and the unique circumstances of those injuries. Naively, I felt confident the Board would well recognize the enormous injustice the Navy and our government inflicted on Six and his fellow Liberty survivors. It was not until sometime latte[illegible] began to perceive the affect that Order had on Mr. Six (and [illegible] members), and undertook additional inquiries to ve[illegible]

Silencing Order had in fact been issued, and, the scope of the crew's understanding of its reach.

6. The Board has asked for response as to questions relating to the various medals awarded to Mr. Six as a result of his service aboard the Liberty; questions relating to comments by Six's Commanding Officer concerning Six's service, and questions relating to Six's participation in reunions of the Liberty crew. Mr. Six will respond to these issues in his supplemental affidavit.

7. The Board asks which of the numerous affidavits and declarations presented in support of Six's application were prepared by the affiants or declarents, and which were prepared by me. I respectfully submit that the affidavits and declarations speak for themselves. To the extent the Board challenges the authenticity of any of these documents, or challenges any fact presented in any of the aforesaid affidavits and declarations, the Board owes a duty to Mr. Six to identify, with specificity, each such fact or section of any challenged document. Mr. Six requested a personal hearing before the Board. The Board chose to ignore that request. It still has the power to conduct such a personal hearing, and, to subpoena, at its expense, any witness whose testimony has been presented, if the Board wishes to challenge the authenticity or credibility of the facts presented in any such affidavit or declaration.

8. Notwithstanding the foregoing, and, without waiving any attorney client privilidges that may otherwise be involved. The Board is informed that I, personally prepared the affidavits and declarations presented by the following witnesses:

A. Mr. Six
B. Mrs. Margaret Six
C. The Six Children, Cindy Valles, Tammy Rievley, and Harold Six, Jr.
D. Bryce Lockwood. As noted, I represent Mr. Lockwood in a related application presented to the Board
E. CAPT Richard Keipfer, MC USN, Ret. Dr. Keipfer has presented a similar affidavit to that presented in this proceeding in the Lockwood proceeding.
F. Joe Binkert

In addition. I reviewed and suggested certain language changes in the Psychiatric Report prepared and presented by Dr. Estrov. Dr. Estrov adopted some of my recommendations, and rejected others.

9. In each instance, prior to preparing a draft affidavit or declaration, I interviewed the witness, by phone, exploring the witness's personal knowledge of the facts I sought to establish. In the case of the Six children, I asked each to confirm that Mr. Six Senior, the applicant, was neither present in the room, or in the house when they spoke with me. I spoke with Cindy on at least 3 occasions, first for the interview, then to confirm she was comfortable with the language used in the draft presented The Board will note Harold, Jr. left the area before signing his statement. I talked to Junior at least 3 times, first to interview him, and, thereafter to confirm that he was comfortable with the draft presented for his consideration, and, finally, to ask him to take it to a notary and mail it to me. In Tammy's case, I spoke with her on at least 3 occasions. First at Harold's home, then on two other occasions at her home in Arizona. She was very angry at the applicant and very reluctant to open up old wounds from her childhood.

I have followed the same standard with respect to each affidavit or declaration, interviewing the witness, by phone, first, then drafting a proposed statement for the witness' consideration, then revising and editing the final statement to conform to the witness' directions. And, finally, to confirm that the final statement has been received and accurately reflects their thoughts and knowledge of the facts at issue. In each discussion, I identify myself, explain the purpose of the call, and the intention to take a statement for use in this proceeding. Each is reminded of the need to be truthful, and, the consequences of false statements in federal government matters, and each urged to use their own discretion, and to make any and all changes, corrections, deletions or additions they feel necessary. The determination to use a declaration in lieu of an affidavit was dictated by the convenience of the witness and his convenient access to a notary. It is our intention to file at least two additional declarations form other Liberty survivors, one from LCDR Ennes, USN, Ret.; the other from MCPO White, USN, Ret., each of whom have made statements regarding Six's rescue in the related Lockwood proceeding.

10. Regarding the Statement of RADM Staring, and the Declaration of CAPT. Boston, as stated in our pleading to the Court, these documents have been extracted from a Report submitted to the Secretary of the Army as Executive Agent for the Secretary of Defense, asserting war crimes were committed against the Liberty crew by Israeli air and naval forces. I have personally verified the authenticity of the Staring statement in discussions with RADM Staring. I have had no discussion with CAPT Boston, but the authenticity of his declaration was confirmed to me by RADM Staring, and, in addition. I have

personally seen news clips of CAPT. Boston acknowledging his role in the preparation of the false report, and, the fact that the Silencing Order was issued by RADM Kidd, and their seniors.

Respectfully submitted,

William J. Kenney
D.C. BAR No. 99267
Attorney for the Applicant,
Harold E. Six, Sr.

% HART/HTC
600 Pennsylvania Avenue, SE, Suite 105
Washington, DC 20003
Tel: 202-547-5129
Fax: 202 547- 8311

9915 Empire Woods Court
Charlotte, NC 28277
Tel/Fax: 704-341-4781

**Before The**
**Board For Correction of Naval Records**

| | | | |
|---|---|---|---|
| **In Re:** | **HAROLD E. Six, Sr.** | ) | **On Remand From** |
| | **Former CT-1, USN** | ) | **U.S. Court of Federal Claims** |
| | | ) | **BCNR Docket # 483-03** |

Applicant Six's Request Board Produce or Subpoena
Records of Navy Department, Defense Department
State Department, The White House, The National Security Agency
The Lyndon B. Johnson Presidential Library, Relating to the Attack on the Liberty

Applicant, Harold E. Six, Sr, respectfully requests that the Board For Correction of Naval Record,s exercise its powers pursuant to SECNAVINST 5420.193, and, pursuant to its inherent powers under its enabling Act, 10 U.S.C. , Chapter 79, Sections 1551- 1557, and take all necessary steps to compel production of the below listed files and documents which are deemed necessary to a complete and impartial determination of the facts and issues here involved.

1. From the Navy Department, to include, but not limited to, the Office of the Secretary of the Navy; the Chief of Naval Operations; Chief, Bureau of Medicine and Surgery; Commander in Chief, Atlantic Fleet; Commander, U.S. Naval Forces, Europe; Commander, Sixth Fleet; the Judge Advocate General, and all Commands and Units under their respective jurisdiction, supervision and control, and, Commanding Officer, U.S.S. America, and any other elements of the U.S. Navy operating in the Eastern Mediterranean on June 6, 7, 8, or 9, 1967, and their subordinates, staff members and delegates the production of all files, documents, correspondence, memoranda, messages, including radio, verbal and/or teletype, notes of meetings and/or telephone conferences or conversations, and, transcripts thereof, relating to:
   a.) The dispatch of the U.S.S. Liberty to conduct operations and/or relocate to patrol stations in the Eastern Mediterranean in or about April, May or June, 1967.
   b.) The transfer of members or units of the NavSecGru Activity from its base in Germany to stations in Iceland or Greenland in April or May, 1967, and, the subsequent transfer of some of said personnel or units to NAVSTA, Rota, Spain, for further duty aboard the U.S.S. Liberty, in or about May or June, 1967.
   c.) The request of the Israeli Government or its Defense Forces or other Israeli authority to representatives of the U.S. to move the U.S.S. Liberty from its then steaming position off the Gaza Strip on or about June 5, 6, 7, or 8, 1967, to include the response thereto by the Navy, or other elements of the U.S. Government, and all actions taken in response thereto.
   d.) The attack by Israeli Defense Forces, including elements of the Israeli Air Force

and the Israeli Navy (or similarly titled Israeli Military or Defense units) on the U.S.S. Liberty on or about June 8, 1967, to include the response thereto by the Navy and /or other elements of the U.S. Government, and any and all actions taken in response thereto.

e.) Any and all reports of death and injuries of Liberty crew members and other U.S. Government personnel, and/ or personnel of government contractors suffered in that attack, by any and all Commands, to include prognosis and proposed care and treatment of the injured, and method and contents of notification of the next of kin of the dead, it being agreed that the names, and all other personal identifying data, and the units or organizations associated with any such persons, shall be redacted.

f.) The determination to conduct a Court of Naval Inquiry into the facts of that attack, the deaths and injuries of the survivors, and, the damage to the ship itself; and, the selection and appointment of the President, members, and Legal Advisor or Counsel of said Court of Inquiry.

g.) The conduct of that Inquiry, the determination to limit the scope of witness testimony before the Court; any and all advice, instruction or guidance as to the findings and conclusions to be established by the Court; the refusal to authorize the Court to seek testimony of Israeli military personnel involved in the attack; the review of the Report of the Court by the convening authority and any and all senior reviewing commands; including the determination to take responsibility for legal review of the report from the Convening Authority's Legal Officer, and approve said report without such review, and, the determination to allow and accept editing and revisions to the report following the conclusion of the sessions of the court.

h.) Any and all discussions, memoranda, notes of meetings or telephone conversations, messages, etc, by, to, from, or between Civilian or Uniformed Officials of the Department of the Navy, the Department of Defense, the State Department, The National Security Agency, the White House National Security Staff and/or other members of the President's Staff relating in any way to the convening of the Court of Inquiry, the appointment or selection of its members, the conduct of the Inquiry, the preparation of the Report of the Court of Inquiry; the Convening Authority's legal review of the conduct of the Court and the content of its Report, the subsequent review of the Report by Navy, DOD, and White House representatives, and any "corrections", deletions, "modifications", or amendments to the report by any such individuals, and, like information concerning any press releases or statements to the press issued or made by U.S. Government officials.

i.) Any and all notes and memoranda of meetings, discussions, or telephone conversations, messages, correspondence, etc, by, to, from, or between Civilian or Uniformed officials of the Navy Department, the Defense Department, the State Department, the National Security Agency, the White House National Security Staff and/or other members of the President's Staff relating in any way to grant of medals and awards to the crew members of the Liberty for their conduct during or as a consequence of the attack.

j.) The "'Ship's Log", the Engine Room Log, and, the logs of each Division of the U.S.S. Liberty for June 6, 7, 8, and, 9, 1967.

k.) Harold E. Six, Sr.'s Navy Personnel Files, Medical Files, Security Clearance Files, Discipline Files, and any and all files relating to Six's indebtedness, the revocation of his security clearance (s), the termination of his status as a member of the Naval Security Group Activity organization, and, all files, correspondence and/or communications relating to Six's transfer from NAV COM STA Philippines, his transfer to NAV STA San Francisco, and, his discharge.

l.) Any and all memoranda, briefing summaries, or other analysis or summaries of Six's application for correction, his supporting evidence, his service and/or his medical records and other records of the Navy, prepared by the BCNR staff, or any other person or persons, presented to or considered by the Board or the Executive Director in their respective actions on Six's application and his Motion For Reconsideration, and any such document prepared by the BCNR staff, or other Navy offices in recommending factual issues for consideration by the Department of Justice in its opposition to Six complaint before the Court of Federal Claims.

m.) Any and all responses to inquiries by various members of congress, the press and other communications media, family members of the USS Liberty crew, and other members of the public, from June, 1967 to date, prepared by any representative of the Navy Department, to include any and all memoranda, file summaries, or other analysis prepared by various staff of the department in responding to such inquiries.

n.) Any and all orders, memoranda, reports, or other communications of all nature whatsoever regarding: i.) Operations in or about March, April, May, or June 1967, identified as "FRONTLET", and or "CYANIDE" involving the use of U.S. Navy submarines and

other elements of the U.S. Navy and other elements of the U.S. Defense Department or other elements of the U.S. Government in operations off the coast of, or within the waters of the United Arab Republic, including, without limitation the participation of the USS Amberjack, SS 522; USS Truta, SS 421; USS Requin, SS 481; and, possibly including units of other NATO forces.

2. From the Defense Department, to include, but not limited to the Secretary of Defense, the DOD General Counsel, the DOD Duty Officer and Watch Communications Officers, the Secretary of the Air Force, the Defense Intelligence Agency, the Chairman of the Joint Chiefs of Staff, the Chief of Staff, U.S. Air Force, the Chief of Staff, U.S. Army, and , all Commands and Units under their respective Command, jurisdiction, supervision, and control, , including all elements of the DOD, The Joint Chiefs, the U.S. Army, and/or the U.S. Air Force engaged in operations in the Eastern Mediterranean on June 6, 7, 8 or 9, 1967, and, respecting all of the foregoing, their Deputies and subordinates, staff and delegates: the production of all files, documents, correspondence, memoranda, messages, including radio, verbal and/or teletype, notes of meetings and/or telephone conferences or conversations, and transcripts thereof, relating to:

a.) The dispatch of the U.S.S. Liberty to conduct operations and/or relocate to patrol stations in the Eastern Mediterranean in or about April, May or June, 1967.

b.) The transfer of members or units of the NavSecGru Activity from its base in Germany to stations in Iceland or Greenland in April or May, 1967, and, the subsequent transfer of some of said personnel or units to NAVSTA, Rota, Spain, for further duty aboard the U.S.S. Liberty, in or about May or June, 1967.

c.) The request of the Israeli Government or its Defense Forces or other Israeli authority to representatives of the U.S. to move the U.S.S. Liberty from its then steaming position off the Gaza Strip on or about June 5, 6, 7, or 8, 1967, to include the response thereto by the Navy, or other elements of the U.S. Government, and all actions taken in response thereto.

d.) The attack by Israeli Defense Forces, including elements of the Israeli Air Force and the Israeli Navy (or similarly titled Israeli

Military or Defense units) on the U.S.S. Liberty on or about June 8, 1967, to include the response thereto by the Navy and /or other elements of the U.S. Government, and any and all actions taken in response thereto.

e.) Any and all reports of death and injuries of Liberty crew members and other U.S.
Government personnel, and/ or personnel of government contractors suffered in that attack, by any and all Commands, to include prognosis and proposed care and treatment of the injured, and method and contents of notification of the next of kin of the dead, it being agreed that the names, and all other personal identifying data, and the units or organizations associated with any such persons, shall be redacted.

f.) The determination to conduct a Court of Naval Inquiry into the facts of that attack, the deaths and injuries of the survivors, and, the damage to the ship itself, and, the selection and appointment of the President, members, and Legal Advisor or Counsel of said Court of Inquiry.

g.) The conduct of that Inquiry, the determination to limit the scope of witness testimony before the Court; any and all advice, instruction or guidance as to the findings and conclusions to be established by the Court; the refusal to authorize the Court to seek testimony of Israeli military personnel involved in the attack; the review of the Report of the Court by the convening authority; and, the determination to take responsibility for legal review of the report from the Convening Authority's Legal Officer, and approve said report without such review.

h.) Any and all discussions, memoranda, notes of meetings or telephone conversations, messages, etc, by, to, from, or between Civilian or Uniformed Officials of the Department of the Navy, the Department of Defense, the State Department, The National Security Agency, the White House National Security Staff and/or other members of the President's Staff relating in any way to the convening of the Court of Inquiry, the appointment or selection of its members, the conduct of the Inquiry, the preparation of the Report of the Court of Inquiry; the Convening Authority's legal

review of the conduct of the Court and the content of its Report, the subsequent review of the Report by Navy, DOD, and White House representatives, and any "corrections", deletions, "modifications", or amendments to the report by any such individuals, and, like information concerning any press releases or statements to the press issued or made by U.S. Government officials.

i.) Any and all notes and memoranda of meetings, discussions, or telephone conversations, messages, correspondence, etc, by, to, from, or between Civilian or Uniformed officials of the Navy Department, the Defense Department, the State Department, the National Security Agency, the White House Staff and/or other members of the President's Staff relating in any way to grant of medals and awards to the crew members of the Liberty for their conduct during or as a consequence of the attack.

j.) Any and all responses to inquiries by various members of congress, the press and other communications media, family members of the USS Liberty crew, and other members of the public, from June, 1967 to date, prepared by any representative of the Navy Department, to include any and all memoranda, file summaries, or other analysis prepared by various staff of the department in responding to such inquiries.

k.) Any and all orders, memoranda, reports, or other communications of all nature whatsoever regarding: i.) Operations in or about March, April, May, or June 1967, identified as "FRONTLET", and or "CYANIDE" involving the use of U.S. Navy submarines and other elements of the U.S. Navy and other elements of the U.S. Defense Department or other elements of the U.S. Government in operations off the coast of, or within the waters of the United Arab Republic, including, without limitation the participation of the USS Amberjack, SS 522; USS Truta, SS 421; USS Requin, SS 481; other elements of the U.S. Navy, and, possibly including units of other U.S. Military, or other elements of the U.S. Government, and, possibly other NATO forces.

3. From the Lyndon B. Johnson Presidential Library, and, the depositories of the papers of former Secretary of State Dean Rusk, former Secretary of Defense Robert McNamara, the National Security Advisors serving from April through September, 1967, and, the former Presidential Counselors serving then President Johnson on military, foreign policy an domestic political issues from April through September, 1967: the production of all files, documents, correspondence, memoranda, messages, including radio, verbal and/or teletype, notes of meetings and/or telephone conferences or conversations, and, transcripts thereof, relating to:

a.) The dispatch of units of the US Navy, including the U.S.S. Liberty to conduct operations and/or relocate to patrol stations in the Eastern Mediterranean in or about April, May or June, 1967.

b.) The transfer of members or units of the NAVSECGRU Activity, or other intelligence gathering and analytical units of the U.S. Military from their normal assignments to stations in Iceland or Greenland in April or May, 1967, and, the subsequent transfer of some of said personnel or units to NAVSTA, Rota, Spain, for further duty aboard the U.S.S. Liberty, in or about May or June, 1967.

c.) The request of the Israeli Government or its Defense Forces or other Israeli authority to representatives of the U.S. to move the U.S.S. Liberty from its then steaming position off the Gaza Strip on or about June 5, 6, 7, or 8, 1967, to include the response thereto by the Navy, or other elements of the U.S. Government, and all actions taken in response thereto.

d.) The attack by Israeli Defense Forces, including elements of the Israeli Air Force and the Israeli Navy (or similarly titled Israeli Military or Defense units) on the U.S.S. Liberty on or about June 8, 1967, to include the response thereto by the Navy and /or other elements of the U.S. Government, and any and all actions taken in response thereto.

e.) Any and all reports of death and injuries of Liberty crew members and other U.S.

Government personnel, and/ or personnel of government contractors suffered in that attack, by any and all Commands, to include prognosis and proposed care and treatment of the injured, and method and contents of notification of the next of kin of the dead, it being agreed that the names, and all other personal identifying data, and the units or organizations associated with any such persons, shall be redacted.

f.) The determination to conduct a Court of Naval Inquiry into the facts of that attack, the deaths and injuries of the survivors, and, the damage to the ship itself, and, the selection and appointment of the President, members, and Legal Advisor or Counsel of said Court of Inquiry.

g.) The conduct of that Inquiry, the determination to limit the scope of witness testimony before the Court; any and all advice, instruction or guidance as to the findings and conclusions to be established by the Court; the refusal to authorize the Court to seek testimony of Israeli military personnel involved in the attack; the review of the Report of the Court by the convening authority; and, the determination to take responsibility for legal review of the report from the Convening Authority's Legal Officer, and approve said report without such review.

h.) Any and all discussions, memoranda, notes of meetings or telephone conversations, messages, etc, by, to, from, or between Civilian or Uniformed Officials of the Department of the Navy, the Department of Defense, the State Department, The National Security Agency, the White House Staff and/or other members of the President's Staff relating in any way to the convening of the Court of Inquiry, the appointment or selection of its members, the conduct of the Inquiry, the preparation of the Report of the Court of Inquiry; the Convening Authority's legal review of the conduct of the Court and the content of its Report, the subsequent review of the Report by Navy, DOD, NSA, CIA, State, and/or, White House representatives, and any "corrections", deletions, "modifications", or amendments to the report by any such individuals, and, like

information concerning any press releases or statements to the press issued or made by U.S. Government officials.

i.) Any and all notes and memoranda of meetings, discussions, or telephone conversations, messages, correspondence, etc, by, to, from, or between Civilian or Uniformed officials of the Navy Department, the Defense Department, the State Department, the National Security Agency, the White House Staff and/or the presidential staff relating in any way to grant of medals and awards to the crew members of the Liberty for their conduct during or as a consequence of the attack.

Respectfully submitted,

William J. Kenney, Esq.
D.C. Bar No. 99267

Attorney for the Applicant
Harold E. Six, Sr.

9915 Empire Woods Court
Charlotte, NC 28277
Tel/Fax: 704-341-4781

% HART/HTC
600 Pennsylvania Avenue, SE, Suite 105
Washington, DC 20003
Tel: 202-547-5129
Fax: 202-547-8311

DEPARTMENT OF THE NAVY
BOARD FOR CORRECTION OF NAVAL RECORDS
2 NAVY ANNEX
WASHINGTON DC 20370-5100

JRE
Docket No. 07638-05
17 November 2006

[redacted]

Dear Mr. [redacted]

This is in reference to your application for correction of your naval record pursuant to the provisions of title 10 of the United States Code, section 1552.

A three-member panel of the Board for Correction of Naval Records, sitting in executive session, considered your application on 16 November 2006. After careful consideration of your application, the Board concluded that your application was not timely filed, and that it would not be in the interest of justice to excuse your failure to submit your application in a timely manner.

The Board rejected your contentions to the effect that you were unaware of retirement or disability benefits available from the Department of Veterans Affairs (VA) or the Department of the Navy until June 2002. In this regard, the Board noted that you submitted a claim for disability compensation to the VA within a few months of being released from active duty in 1967. During January or February 1969, you contacted Congressman Edward D. Eshleman and related that you had been told by a VA official that you should have been retired from the Navy by reason of physical disability. On 24 February 1969, the Surgeon General of the Navy advised Congressman Eshleman, in response to his inquiry in your behalf, that you had not been retired by reason of physical disability because you were fit for duty at the time of your separation from the Navy. He indicated that physical fitness for military duty should not be equated with the assignment of a disability rating by the VA, because the VA may award ratings