DEPARTMENT OF THE ARMY
OFFICE OF THE JUDGE ADVOCATE GENERAL
INTERNATIONAL AND OPERATIONAL LAW DIVISION
1777 N. KENT STREET
ROSSLYN, VIRGINIA 22209-2194

May 15, 2006

Rear Admiral Clarence A. Hill, Jr.
Rear Admiral Merlin H. Staring
U.S.S. Liberty Alliance
P.O. Box 663
Front Royal, Virginia 22630

Gentlemen,

Thank you for your letter of April 20th, regarding the Secretary of the Army's responsibility in investigating the tragic U.S.S. Liberty incident. I am responding on behalf of the Secretary.

The circumstances of the investigation conducted by the U.S. Navy into the attack on the LIBERTY, and the subsequent action taken by our government, are all too familiar to your organization. Admiral John S. McCain, Jr., Commander-in-Chief, U.S. Naval Forces, Europe, convened a Court of Inquiry with a wide mandate to investigate "all pertinent facts and circumstances leading to and connected with the armed attack" on USS LIBERTY. In his endorsement of the investigation report, Admiral McCain affirmed that "USS LIBERTY suffered an unprovoked attack by Israeli air and naval forces in international waters off the coast of the United Arab Republic." The Secretary of State communicated to the Government of Israel that "the attack must be condemned as an act of military irresponsibility reflecting reckless disregard for human life." Israel apologized and fully paid United States claims for the deaths and injuries as well as damage to USS LIBERTY caused by the attack.

The Secretary of the Army's responsibility with respect to alleged war crimes committed against U.S. personnel requires the Army to ensure there is a system for reporting and investigation of those allegations. Service Secretaries and Combatant Commanders, even under the latest regulations (Department of Defense Directive 2311.01E, published May 9, 2006), are charged with prompt reporting and investigation of alleged war crimes.

It is clear from the records maintained by the Department of the Navy that a prompt investigation was conducted by the Navy and the responsible Combatant Commander. The Court of Inquiry, which heard testimony from several officers and enlisted men from LIBERTY, including the commanding officer, produced an exhaustive record of proceedings over 650 pages in length. The military chain of command made appropriate findings and recommendations that resulted in the cable quoted above. In fact, the U.S. Government concluded that the Israeli government was culpable for the attack; the Government of Israel formally communicated its sincere expression of deep regret and subsequently paid U.S. claims in full for the deaths, injuries, and damages caused in the attack, thus closing the matter between the two governments. Therefore, further investigation by the U.S. military is unwarranted.

The Army recognizes and honors the sacrifice and uncommon bravery demonstrated by the officers and crew from our sister service on the U.S.S. LIBERTY on that fateful day. But no purpose would be served in re-opening an investigation into this tragic event.

If there is any further information I can provide on this matter, you can contact me at the above address. My email address is Richard.Jackson@hqda.army.mil.

Sincerely,

Richard B. Jackson
Special Assistant to the Judge Advocate General
for Law of War Matters

# *U. S. S. Liberty Alliance, Inc.*

1819 Horseback Trail
Vienna, VA 22182
(703) 938-4670

Merlin –
78537 Autumn Lan
Palm Desert, CA
92211
760-772-6174

September 30, 2006

Dear, ~~Dear Colleagues, and Their Families and Friends,~~

As a fellow member of the Navy - Marine Corps Retired Judge Advocates Association, I am directing this rather-imposing document package to each other member, plus a few of their friends – a total list of about 400 for the moment. As a preliminary, I address you on an interim letterhead of the U. S. S. Liberty Alliance, an organization which I presently serve as Treasurer. (That relationship will terminate shortly due to a relocation in store for me in the near future.) I was brought into the USS LIBERTY matter, in its present posture, chiefly by and through Admiral Thomas Moorer, our long-esteemed Chief of Naval Operations and later Chairman of the Joint Chiefs of Staff who most unfortunately passed away in early 2004. Admiral Moorer was succeeded in the letterhead organization by RADM Clarence A. (Mark) Hill, Jr., USN (Ret), with whom I now closely work.

So – what is this all about? It's about this: Back in June 1967 the USS LIBERTY, a U. S. Navy intelligence ship, was operating in the Mediterranean during the Israeli "Six Day War." A neutral ship in international waters, essentially unarmed, she was suddenly placed under concerted attack, over a period of several hours, by Israeli air and naval forces. Of a complement of 294 officers and men, she suffered 34 Americans killed and 173 wounded in action. The ship was badly damaged and never again sailed on an operational mission.

Admiral Moorer, who became CNO shortly after that attack, was personally convinced, based on information even then available, that the attack was a deliberate and knowing attack by Israel on our ship, despite the claim by Israel that it was a case of mistaken identity. He held that view through the rest of his active-duty career and through his retirement, to the time of his death. At his initiative, the U. S. S. Liberty Alliance was ultimately formed in support of the much-delayed public efforts of the survivors of the attack to determine, and to have accurately recorded in our nation's history, the true facts and nature of the event.

I, personally, had at the time only brief and glancing contact with the Navy's resulting investigation – a Court of Inquiry convened by Admiral John Sidney McCain, Jr., then Commander in Chief, U. S. Naval Forces Europe. My sole formal contact was to receive the record of that Inquiry when it was submitted to the Convening Authority for his action. As Admiral McCain's senior staff legal officer, I was asked to review that record of about 650 pages. I immediately undertook that

review. I had the record for a total of about 18 hours, during 15 of which I concentrated solely upon it. At the end of that time Admiral McCain, learning that I was having problems finding evidence in the record to support some of the Court's findings (though only about a third of the way through it), withdrew the record from me. I had no input into his action upon it, and I had no further official contact with the matter during the rest of my active-duty career which concluded in 1975.

Not until many years later did I learn some of the facts related to the Navy's 1967 investigation and the experiences of the survivors both during and after the attack. I will mention here only these basic facts concerning that inquiry – though there are many others of significance: When the Court convened on 10 June 1967 in London, it was ordered to conduct and to complete its investigation within one week. It did so, meeting for portions of only five calendar days and having in the process requested of the Convening Authority additional time, which request was denied. In its report the Court cited, as an "unusual difficulty" it had experienced in conducting its proceedings, "the necessity of investigating such a major naval disaster of international significance in an extremely abbreviated time frame." During its three days with the ship in drydock in Malta, the Court heard from only 14 of the 260 surviving members of LIBERTY's complement – many of her 172 wounded crewmen, including many who had been at the heart of the action, having been evacuated to other U. S. Navy vessels and shoreside facilities for medical attention. Never thereafter were those critically important eyewitnesses officially questioned concerning their observations of or experiences during the attack.

With that background of the matter – highly condensed for these present purposes – Admiral Hill and I wrote to the Secretary of the Navy on 27 July 2005, setting forth those and many other telltale facts. We respectfully asked the Secretary to examine and appraise the records of his Department to which we thus referred, and to consent to and support the efforts of the LIBERTY survivors to generate a full, fair, and objective U. S. Government investigation into the facts and records of the attack upon their ship. On 22 September 2005 a subordinate in the Office of the Judge Advocate General of the Navy, speaking on behalf of the Secretary, answered, stating that there was "no purpose to further investigation," thus refusing to examine the facts of record which clearly revealed that investigation to have been grossly and blatantly inadequate to its stated purposes

On 8 June 2005 the survivors' Liberty Veterans Association had filed with the Secretary of the Army, as Executive Agent for the Department of Defense in War Crimes matters, an extensive, documented report of War Crimes alleged to have been committed against LIBERTY and her crew during the 1967 attack. The Secretary of the Army, under his charter, is responsible for ensuring that all such War Crimes allegations are "thoroughly investigated," so we in turn wrote to him on 20 April 2006, asking that he consider and appraise the Navy's 1967 Court of Inquiry, in all of its utter inadequacy, and that he institute a proper investigation now to supplant that inquiry and remedy its deficiencies. On 15 May 2006 a Special Assistant to the Judge Advocate General of the Army responded — again on behalf of his Departmental Secretary – taking no note of our demonstration of the superficiality and inadequacy of the Navy's hasty 1967 Inquiry and concluding that "further investigation by the U. S. military is unwarranted."

It's being then apparent that no cognizant Defense authority in the Executive Branch of the Government would consent or attempt to reopen the matter that had been so hastily swept under the rug back in 1967, and remained officially there, Admiral Hill and I have on 22 July 2006 written formally to Senator John Warner, Chairman of the Senate Committee on Armed Services, enclosing a complete file of the relevant documents I have described above. (I had earlier, myself, written informally to the Senator about the prior stages of the process, in light of his past service as our Navy Secretary and his known interest and fairness in related matters.) The package below this cover memo is the full file that we thus presented to Senator Warner and to each member of his Committee. We ask there that the Legislative Branch of our Government now step in to conduct or to order a full and proper official U. S. Government investigation of the 1967 assault on the LIBERTY while many participants and eyewitnesses remain still available to testify.

Our communication to the Congress was the subject of a personal meeting in late July between Liberty Alliance representatives, including Admiral Hill, and a designated member of Senator Warner's staff. At this writing we have an appointment for a further meeting with a cognizant member of his Committee staff. In our letter to the Senator we assured him of our keen awareness of the delicacy of the matter from a diplomatic standpoint – an earnest concern in which we yield to noone. In light of that very concern, when we next meet we will suggest – as we have long espoused – that Congress, rather than institute its own hearings, might direct instead that the Department of the Navy now conduct, for the record, the full, fair, and objective investigation that it should have conducted back in 1967.

I tell you all of ths because, as "alumni" of the organization, I think you have a right to know, and should know, how the legal affairs of the Navy have been and are being conducted, both during our mutual service years and since. I submit that not a single Navy or Marine Corps Judge Advocate addressed by this letter would or could conscientiously spring to the defense of the validity or the reliability of that farcical 1967 Court of Inquiry and its sequelae. I cannot bring myself to think that any of our present or past Judge Advocate successors have allowed themselves to be coopted into ignoring the points we have thus repeatedly made, and I can only believe that they have either been denied the opportunity to apply their professional qualifications or directly ordered to ignore their clear professional duties.

I shall not report further, to this address list, on future developments in the matter. We have had recent changes in the management, organization, and administration of the Liberty Alliance, however -- explaining my use here of the temporary, interim letterhead rather than the one seen below in the document file. We shall in the very near future have a new letterhead reflecting those changes. I will then address a further, <u>and far shorter</u>, communication to each of you, explaining briefly who we are, where we may be reached, and what we are about.

Sincerely, and most cordially, to all,

Merlin

Merlin Staring

# U.S.S. Liberty Alliance

☆☆☆☆
Adm. Thomas H. Moorer, USN
Chairman, Joint Chiefs of Staff
*Founding Chairman*

☆☆☆☆
General Ray Davis, USMC
Medal of Honor
General of Marines
*Founding Vice Chairman*

☆☆
RADM Clarence A. Hill, Jr.
USN (Ret.)
*Chairman pro tem*

☆☆
RADM Merlin Staring
JAGC, USN (Ret.)
Former Judge Advocate General
*Treasurer*

Ambassador James Akins
*Director*

B.GEN Max G. Halliday
USMC (Ret.) Director
Former Asst. JAG, USN

Captain Richard Kiepfer, MD
USN (Ret.), Director
*U.S.S. Liberty Survivor*

Richard Larry Weaver, SN.
USN (Ret.), Director
*U.S.S. Liberty Survivor*

M. I. Hakki
*Director*

Jack Tillar
*Director*

Tito Howard
Director
*Executive Director*

The Honorable Francis J. Harvey
Secretary of the Army
101 Army Pentagon
Room 3E 560
Washington, DC 20310

April 20, 2006

Subject: Report of War Crimes submitted to the Secretary of the Army by the USS Liberty Veterans Association, Inc., on 8 June 2005

Dear Mr. Secretary:

On 8 June 2005 the USS Liberty Veterans Association, Inc., submitted to you a documented Report of War Crimes Committed Against U. S. Military Personnel on June 8, 1967. That report was submitted to you in your capacity as Executive Agent for the Secretary of Defense under Department of Defense Directive No. 5810.01B of 29 March 2004. It was based upon, and contained a detailed description of, the sudden, savage, unjustified, and prolonged attack made on 8 June 1967, by air and naval forces of the state of Israel, upon the USS LIBERTY (AGTR-5), a U. S. Navy technical research ship then operating peacefully in international waters in the Eastern Mediterranean Sea. The LIBERTY was at that time the most sophisticated and best-equipped intelligence ship in the world. Of a crew of 294 officers and men, including three American civilian government employees, she suffered 34 Americans killed in action and 173 wounded in action. The ship itself was so badly damaged that it never again sailed on an operational mission.

Our organization, the Liberty Alliance, was founded in 2002 by Admiral Thomas H. Moorer, retired Chairman of the Joint Chiefs of Staff, in support of the survivors of that 8 June 1967 attack on the LIBERTY. We – Rear Admiral Clarence A. (Mark) Hill, Jr., USN (Ret.), and Rear Admiral Merlin H. Staring, JAGC, USN (Ret.), Chairman and Treasurer, respectively, of the Liberty Alliance – now write jointly in furtherance of the efforts that Admiral Moorer had



P.O. Box 663, Front Royal, VA 22630 ☆ Tel: (540) 631-9339 ☆ Fax: (540) 636-6912 ☆ E-mail: Lataiyo@gmail.com

pursued for many years after his retirement, and right up to the time of his death in 2004.

Our Liberty Alliance, on 27 July 2005, sent a detailed letter to the Secretary of the Navy in support of the efforts of the Liberty Veterans Association (the LVA) to obtain a full, fair, and objective U. S. Government investigation of that 1967 Israeli attack on the LIBERTY. When we thus wrote to the Secretary of the Navy, we had only recently learned of a 16 March 2005 admission by the Department of the Navy, in an official letter reply to a Congressional inquiry, that the only investigation that the United States Government had ever made into that attack was a Navy Court of Inquiry which was conducted – <u>and concluded – within ten days after the attack had occurred</u>. In our letter to the Secretary we presented facts of official record which demonstrated that the investigation conducted by that Navy Court of Inquiry, to put it most charitably, was a hasty, a superficial, an incomplete, and a totally inadequate inquiry into the extremely complex and important matter that had prompted it. In addition, we have within the past two years developed additional evidence, in the form of testimony and an affidavit by the Navy judge advocate counsel to that Court of Inquiry, that the conclusions recorded by the Court were ordered by the President of the United States and his Secretary of Defense and were inconsistent with and were contrary to any evidence the Court of Inquiry had adduced.

On the basis of the foregoing, Mr. Secretary, it was and is our position that reliance by the Department of the Navy and by the United States Government upon that inquiry – for <u>any</u> purpose – is misplaced and unfounded. With its glaring defects and inadequacies, it would not constitute a reliable basis even for decisions by the Navy concerning operational or material matters, for example – the context in which that inquiry, and most inquiries of that sort, are ordered and conducted within the naval service. Far less reliable – or even relevant – would it be with respect to reports of War Crimes – the issues presented by the Liberty Veterans Association in its formal Report of War Crimes submitted to you on 8 June 2005. The War Crimes issues now raised by the LVA had not even been formulated or substantially articulated at the time of the hasty Navy Court of Inquiry in 1967. In fact, among the very few of the LIBERTY survivors who were actually called and permitted to testify before that Court, some were silenced when they attempted to describe events which in retrospect

would have fallen clearly within the War Crimes category; and the testimony of at least one who did enter that area – having witnessed the firing by the Israelis upon life rafts launched or launching to accommodate wounded members of LIBERTY's company – has been found to have been deleted from the Court's original report of its proceedings.

In short, Mr. Secretary, the matters that have been officially submitted to your attention by the Liberty Veterans Association as War Crimes have never been "thoroughly investigated" – to use the terms of your charter under Department of Defense Directives Numbers 5810.01B of March 29, 2004, and 5100,77 of December 9, 1998. They have never been addressed or investigated at all. The fact that the state of Israel may have admitted to the attack upon the LIBERTY after the fact, claiming it to have resulted from a mistaken identification of the ship – or that it ultimately paid some damage claims – is in no way responsive, or even relevant, to the Report of War Crimes – War Crimes which, quite simply, have never been investigated. Those War Crimes have been properly reported now, and they should now be investigated, at long last, with appropriate corrective action to follow in accordance with the system implemented by the DoD Directives cited above.

In July 2005, when we delivered our letter to the Secretary of the Navy, we simultaneously submitted an information copy of it to your office, Mr. Secretary, because we knew that the existence and the adequacy of any prior investigation of the attack on the LIBERTY were matters that had been officially raised to you by the Liberty Veterans Association in their 8 June 2005 Report of War Crimes. As nearly as we have been able to determine, you have not yet responded to or taken any official action with respect to that LVA Report. The matter thus apparently still lies before you for action.

Since the adequacy of the Navy's 1967 Court of Inquiry, as "the only United States Government investigation" into the LIBERTY attack, is an inescapable concern under the responsibilities placed upon you by the Secretary of Defense, we now address and submit our position in the matter directly to you, rather than relying upon our previous indirect submission as an information copy of our 27 July 2005 letter to the Secretary of the Navy. Our position, however, remains exactly as stated in our letter to the

Secretary of the Navy -- a full copy of which is accordingly appended to and incorporated in this letter as Enclosure (1).

To place the matter in its full current context, however, we must advise you that a dismissive reply was made to us, on behalf of the Secretary of the Navy, by a letter dated 22 September 2005 from a subordinate in the Office of the Judge Advocate General of the Navy. We attach a copy of that one-page reply as Enclosure (2). In essence, that reply on behalf of the Secretary of the Navy "renew[s] the conclusions of previous Navy correspondents, to wit: there is no purpose to further investigation." (Emphasis supplied.)

The Department of the Navy, having previously assured the Congress of the United States that the Navy's 1967 Court of Inquiry "was the only United States Government investigation into the attack" on the USS LIBERTY, has thus refused to examine the facts of record which we have laid before them and which reveal that that investigation was grossly and blatantly inadequate to its stated purposes. Not a word of that misdirecting and dismissive "response" attempts to support or to justify or to defend the 1967 Court of Inquiry as the adequate or thorough investigation required by the Department of Defense -- and by the United States Government and the American people -- to be conducted in an important matter of the nature and consequence of the Israeli 1967 attack on the USS LIBERTY. The reason there is no such attempted justification or defense, Mr. Secretary, is clear: No conscientious lawyer -- no naval or military officer of the United States -- and no objective Government official of any profession or qualification -- could seriously spring to the defense of an investigative proceeding so seriously flawed, and so patently inadequate, as the hasty (and dishonest) inquiry into the unprovoked and unlawful attack on the USS LIBERTY.

Rear Admiral Staring, in his position as a signer to this letter, speaks to the latter point from a career background as a Navy Judge Advocate and as a former Judge Advocate General of the Navy. While neither he personally -- nor perhaps any naval officer -- can speak to the investigative standards maintained within your Department of the Army, Mr. Secretary, we are confident that those standards are no less exacting than are those of the Navy. By no stretch of the imagination can that single official investigation into the 1967 Israeli attack on the USS LIBERTY be honestly

characterized, maintained, or defended as a "thorough investigation" meeting the standards of the Secretary's charter as Executive Agent for the Secretary of Defense in War Crimes matters. The position thus currently taken by the Department of the Navy and by (or on behalf of) its Secretary is not and cannot be the final word in this important matter. The Secretary of the Army, in his capacity as Executive Agent for the Secretary of Defense, has had the matter properly and officially presented to him -- and it is now he, and not the Secretary of the Navy, who is charged with ensuring that the matter placed before him has been or is thoroughly investigated, and that appropriate corrective action is taken. America has a right to expect that the Secretary of the Army will not take his responsibilities as lightly as the authorities of our Department of the Navy have taken theirs.

Soon after the Liberty Veterans Association's Report of War Crimes was initially submitted to the Secretary of the Army in June 2005, its receipt was formally acknowledged to the LVA by a letter of 27 June 2005 from the U.S. Army Criminal Investigation Command. That acknowledgment designated a point of contact within the Army Criminal Investigation Command for future communications in the matter. It also stated that the Report of War Crimes had been forwarded by the Army to the Naval Criminal Investigative Service for appropriate action "because the incident described in the report involved a Navy vessel and its personnel." That reference of the matter to the Department of the Navy is understandable from the standpoint of learning, from the Department initially and primarily involved, what investigative measures had been taken, and with what results -- but it did not relieve the Secretary of the Army of his separately assigned responsibilities as Executive Agent for the Secretary of Defense in War Crimes matters. It is still thus the responsibility of the Secretary of the Army to ensure that any report of War Crimes has been or is "thoroughly investigated" by some appropriate and competent authority of the United States Government.

In due course, starting in late August 2005 and authorized by the LVA to do so on its behalf, Rear Admiral Staring personally sought to determine the location of the LVA's Report of War Crimes and the status of its consideration by the Secretary of the Army. Our attempted inquiries to the Army and to the Naval Criminal Investigative Service (NCIS), following the contact chain initiated by the Army's June 2005 acknowledgment letter,

have to this date been unable to establish that the LVA Report of War Crimes has in fact ever been received and accepted by NCIS for action of any sort, as had been professed in the Army's acknowledgment letter of 27 June 2005.

Mr. Secretary, the survivors of the unjustified Israeli attack on the USS LIBERTY had lived with the thoughts, the memories, and the tragic results of that attack for exactly 38 years when they finally made their collective and formal report and petition to you in your capacity as Executive Agent for the Secretary of Defense in war crimes matters. They have now waited for ten additional months with nothing but an initial, pro forma acknowledgment of the receipt of their Report, and with no substantive response or disposition. Although many of the heroic survivors of the initial attack upon the LIBERTY have not survived the nearly four decades since, as recounted at pages 7-8 of Enclosure (1) a substantial number of the attack survivors are still available and competent as witnesses, were they but to have the opportunity to testify – most, for the first time – concerning their observations and tragic experiences of that 1967 date.

We respectfully ask you, Sir, to consider this shameful matter objectively – to examine for yourself, independently, the official record of the Navy's 1967 Court of Inquiry, with its review and disposition, and to consider whether that hasty, superficial, incomplete – even farcical – investigative proceeding would have satisfied you had the event occurred within your Department of the Army. We are confident that it would not – and on that basis we respectfully ask that you institute, now, an investigative proceeding which will extract the true facts of this tragic episode from the large body of competent sources now still available. The survivors of the attack who are still available in substantial and significant numbers, and the survivors of those who died in the attack or have since passed on, deserve and are entitled to an opportunity to record the truth of the matter; and the citizenry of the United States is entitled to know that truth and to have it authoritatively recorded in the annals of our history.

Because of his obvious interest and necessary involvement in this matter, we are simultaneously delivering a copy of this letter to the current Secretary of the Navy. Also, because of his ultimate responsibility in the premises – and because he has been a party to correspondence on the subject

from and to survivors of the LIBERTY attack (see Enclosure (3)) – we are likewise simultaneously delivering a copy of this letter to the Secretary of Defense.

Finally, due both to the importance of his present position and responsibilities and the perspective he can bring personally to the matter by virtue of his prior experience in the naval service, both in uniform and as Secretary of the Navy, a complete copy of this presentation is being delivered to Senator John Warner, Chairman of the United States Senate Committee on Armed Services. Rear Admiral Staring had earlier brought our letter of 27 July 2005 to the Secretary of the Navy to Senator Warner's attention. The Senator has replied that he is aware of the action of the Liberty Veterans Association in filing their formal Report of War Crimes with you, Mr. Secretary, as the Executive Agent for the Department of Defense – and that he views that action by the LVA as an appropriate course of action. We attach a complete copy of that exchange with Senator Warner as Enclosure (4).

Most sincerely, and very respectfully,

Merlin H. Staring
Rear Admiral, JAGC, USN (Ret.)

Clarence A. (Mark) Hill, Jr.
Rear Admiral, USN (Ret.)

Copies to:

Senator John Warner
Chairman, United States Senate
Committee on Armed Services

The Secretary of Defense

The Secretary of the Navy

# Liberty Alliance

July 27, 2005

The Honorable Gordon England
Secretary of the Navy
1000 Navy Pentagon
Washington, DC 20350-1000

☆☆☆☆☆
Admiral Thomas H. Moorer, USN
Chairman, Joint Chiefs of Staff
Retired
*Founding Chairman*

☆☆☆☆☆
General Ray Davis, USMC
Medal of Honor
General of Marines, Retired
*Founding Vice Chairman*

☆☆
RADM Clarence A. (Mark) Hill, Jr.
USN (Ret.)
*Chairman pro tem*

☆☆
RADM Merlin Staring
JAGC, USN (Ret.)
Former Judge Advocate General
*Treasurer*

☆
BGen Max G. Halliday
USMC (Ret.)
*Director*

Ambassador James Akins
*Director*

Captain Richard Kiepfer, MD
USN (Ret.), *Director*
*U.S.S. Liberty Survivor*

Richard Larry Weaver, DAV
*Director*
*U.S.S. Liberty Survivor*

M. I. Hakki
*Director*

Jack Tillar
*Director*

Tito Howard
Director
*Executive Director*

Subject: United States Government Investigation of the 8 June 1967 Israeli attack on the USS LIBERTY (AGTR-5)

Dear Mr. Secretary:

I am RADM Clarence A. (Mark) Hill, Jr., USN (Ret.), and I write to you in my capacity as Chairman pro tem of the U.S.S. Liberty Alliance, Inc. I assumed that position after the death in February 2004 of Admiral Thomas H. Moorer, USN, the retired chairman of the Joint Chiefs of Staff. Admiral Moorer was the Founding Chairman of our Liberty Alliance which he had been instrumental in forming in May 2002 as an organization devoted solely to the support of the survivors of the 8 June 1967 Israeli attack on the USS LIBERTY (AGTR-5) and of their organization, The USS LIBERTY Veterans Association. Right up to the time of his death Admiral Moorer had for over 36 years been outspoken in his support of the USS LIBERTY survivors and their efforts to rectify the injustices to which both they and the American public had been subjected through a deliberate manipulation and warping of the recorded history of the event.

For reasons which will become apparent, I have asked RADM Merlin H. Staring, JAGC, USN (Ret.), a former Judge Advocate General of the Navy and the Treasurer of our Liberty Alliance, to join me in preparing this letter and in submitting it for your consideration.

AR 398

As we are sure you are well aware, the U.S.Navy technical research ship USS LIBERTY (AGTR-5) was on 8 June 1967 attacked by Israeli air and naval forces in the Eastern Mediterranean Sea. Thirty-four Americans assigned to the vessel -- 33 U.S. Navy personnel and one civilian U.S. Government employee -- were killed in the attack; 172 Navy personnel were wounded; and the ship was damaged beyond any further use and was accordingly scrapped. On 10 June 1967 Admiral John S. McCain, Jr., USN, Commander in Chief, United States Naval Forces, Europe (CINCUSNAVEUR), headquartered in London, England, appointed a formal Court of Inquiry "to inquire into all the pertinent facts and circumstances leading to and connected with [that] armed attack; damage resulting therefrom; and deaths of and injuries to naval personnel."

We address you now in this matter, Mr. Secretary, for two important reasons, both springing from an official letter that your Department recently addressed to an inquiring Member of Congress under date of 16 March 2005. We attach at TAB A, for your ready reference, a letter of that date which the Office of the Judge Advocate General sent to Congressman Rob Simmons of Connecticut.

Our first reason for addressing you with respect to that letter is in the nature of a fervent thank you. In the Department's letter to the Congressman is the statement, for the record, that "[the] Court of Inquiry [ordered by Admiral John S. McCain, Jr., Commander-in-Chief, U.S. Naval Forces, Europe] <u>was the only United States Government investigation into the attack.</u>" (Emphasis supplied.) We are most grateful to the Department of the Navy for this official confirmation of a fact that the USS LIBERTY survivors, and others in their support, have maintained over all of these 38 years since the attack. During those years there have been many published assertions and claims that the attack had already been "investigated" a dozen or more times, by various Congressional or other U.S. Government officials or authorities. We deeply appreciate having that matter laid authoritatively to rest.

Following immediately upon that helpful clarification, however, the letter at TAB A states: "<u>The Navy plans no further investigations into the incident.</u>" (Emphasis supplied.) We most respectfully submit, Mr. Secretary, that such a position by the Department of the Navy -- if it is to be construed as a firm and considered determination -- can only be adopted by ignoring a complex of evidence and circumstances that demonstrate the utter inadequacy and unreliability of the investigative proceedings conducted by the Navy Court of Inquiry of June 1967 -- to put the kindest face on the record of those proceedings. If, on the other hand, the statement is intended to indicate only that the Navy has no <u>present</u> plans to reopen the matter -- perhaps leaving open the possibility of further investigative proceedings, by the Navy or Congress or other duly constituted authority -- we most respectfully submit that the Navy, in

consideration of the facts that we shall now enumerate, should not oppose such further investigative proceedings should they be conducted or ordered by the Congress, for example -- or by the Secretary of the Army, who now has just such a request under consideration in his capacity as Executive Agent for the Secretary of Defense pursuant to Department of Defense Directive Number 5810-01B of 29 March 2004.

The Court of Inquiry appointed by Admiral McCain on 10 June 1967 was directed to take the sworn testimony of witnesses and to submit a verbatim record of its proceedings, including its findings of fact. It first convened at the London headquarters of the Convening Authority late on 10 June 1967, then proceeded to the Mediterranean Sea where it conducted its proceedings, first aboard USS LIBERTY as she limped under escort toward Malta, then at Malta where the ship was drydocked.

Upon the initial convening of the Court at London Admiral McCain had orally directed that it conduct and complete its proceedings within one week. In its record of proceedings, as a preface to its Findings of Fact, the Court cited, as an "unusual difficulty" that it had experienced in conducting its proceedings, "the necessity [thus imposed] of investigating such a major naval disaster of international significance in an extremely abbreviated time frame." Pursuant to that patently unusual and unreasonable directive and requirement, however, the Court, after meeting during the three calendar days of 13 to 15 June at Malta [its record presents those Malta sessions as constituting its "Second" and "Third" days], returned to London on 16 June 1967 and on that day there conducted its final "Fourth Day" proceedings. At London, on 16 and 17 June, the Court's Findings of Fact were formulated and its tape-recorded proceedings were rendered into a written record which, with its documentary exhibits and appendages, constituted a document of over 650 pages.

The official Navy record of the proceedings of that 1967 Court of Inquiry thus reveals that the Court, pursuant to the <u>one-week</u> time limit imposed upon it, actually met during portions of <u>five calendar days</u> -- two days of its allotted time having been consumed in its travel between London and the Mediterranean. It is small wonder that the Court fell far short of fulfilling its directed mission of inquiring into "all the pertinent facts and circumstances leading to and connected with" that attack.

The failure of the Court to inquire into, and to record, "all the pertinent facts and circumstances" is both apparent and clear from multiple circumstances of record. We will flag here, preliminarily and briefly, some of the most significant and blatant of those tell-tale indicators:

(1) The arbitrary imposition of a 7-day time limit within which the Court was required to complete its inquiry into a massively complex event;

(2) The fact that, in its three days in Malta, it had access to and took testimony from only 14 of the 260 surviving members of LIBERTY'S complement – many of her 172 wounded crewmen, obviously including many who had been at the heart of the action, having already been medevaced to other U.S. Navy vessels and shoreside facilities for medical attention. (Never thereafter were these critically important eyewitnesses officially questioned concerning their observations of or experiences during the attack.)

(3) Some of the few crewmen whose testimony was in fact recorded included in their sworn testimony factual observations concerning the attack which were eliminated by the Court from its written record or were otherwise subsequently redacted from the Court's record as it is now officially held and acknowledged by the Government;

(4) Some of the LIBERTY crewmen who did have an opportunity to testify before the Court attempted to respond in full, or to include in or add to their accounts factual observations which would have been clearly relevant to the "pertinent facts and circumstances . . . connected with the armed attack" that the Court had been charged with eliciting – but were stopped and expressly forbidden by the Court to testify further in those areas;

(5) The President of the Court and the Court's appointed Counsel, toward the conclusion of the last day of their proceedings at Malta on 15 June 1967, discussed the perceived advisability of the Court's proceeding to Israel in an attempt to get relevant evidence from Israeli sources; the President of the Court telephoned Admiral McCain, the Convening Authority, seeking an extension of the Court's deadline to permit such an investigative effort; but any such extension was denied by the Convening Authority and the President was told to "come home with what you have."

Some, or perhaps all, of these investigative deficiencies are directly attributable to the "unusual difficulty" that the Court itself acknowledged at the time that it had experienced in conducting its proceedings – "the necessity of investigating such a major naval disaster of international significance in an extremely abbreviated time frame."

Moving from the hasty proceedings of the Court of Inquiry to the submission and processing of its results – on the afternoon of 17 June 1967 the record of the Court's proceedings was delivered by the Court's appointed Counsel to the senior Navy Judge Advocate General's Corps officer then on the CINCUSNAVEUR staff – then-Captain Merlin H. Staring, JAGC, USN. In

delivering the record the Court's Counsel simply told the CINCUSNAVEUR Staff Judge Advocate that Admiral McCain was sending it to him for his review. The Staff Judge Advocate thus charged with that review -- a normal and anticipated procedure whereby the Convening Authority would have available a legal opinion and recommendations concerning the Inquiry proceeding and its results -- turned immediately to his detailed examination and consideration of the record. He continued that process steadily into the early morning hours of 18 June 1967, then after a four-hour rest break resumed his review at 6:00 AM on 18 June 1967.

Early in the forenoon of 18 June the Court's Counsel, again as an emissary from the Convening Authority, reappeared and inquired of the Staff Judge Advocate concerning the status of his review and when it might be expected to be completed. The Staff Judge Advocate advised that he had by then read only about a third of the record -- that there were many clerical and typographical flaws in the physical record that should be remedied before it was formally forwarded to the high governmental authorities who undoubtedly awaited it -- that, more importantly, the reviewer had not yet been able to find, in the parts of the record that he had so far reviewed, testimony or other evidence to support some of the Court's stated findings -- and that he could not yet estimate when he could complete his review and recommendations but was continuing to devote himself solely to that task.

The Court's Counsel departed with that information, reported it to Admiral McCain and the President of the Court, Rear Admiral Kidd, then returned to the Staff Judge Advocate about 20 minutes later with the message that CINCUSNAVEUR, the Convening Authority, had directed him to come and get the Court's record from the Staff Judge Advocate and bring it back to the Convening Authority. The Staff Judge Advocate accordingly surrendered the record to the emissary exactly as he had received it; he was neither then nor later asked for any of his work or any opinions that he might have formed to that point; and he had no further contact with the Court of Inquiry or its results at any time during the remaining eight years of his active Navy career.

The records ultimately declassified and released by your Department, Mr. Secretary, show that the record of proceedings of the Court of Inquiry, as thus produced, was formally submitted by the President of the Court to Admiral McCain, the Convening Authority, by letter dated 18 June 1967. Your records also show that, on that same 18 June 1967 date, Admiral McCain endorsed the record forward, addressed to the Judge Advocate General of the Navy as required by the Navy's investigative procedures -- the Judge Advocate General being then charged with the responsibility of circulating the investigative record to all cognizant or interested Navy officials and commands and, ultimately, with the permanent custody and safekeeping of the official record. Admiral McCain's endorsement consisted of five typewritten pages of substantive or procedural

comments, concluding with his unqualified approval of the proceedings and findings of the Court of Inquiry "based upon knowledge available as of 191425Z" (emphasis supplied). [Since we will have occasion to refer to a number of provisions of that endorsement, a full copy of it is attached for your convenient reference as TAB B.]

Rear Admiral Kidd, the President of the Court, departed the London CINCUSNAVEUR headquarters on the afternoon or evening of 18 June 1967 en route to Washington, DC, with the thus-endorsed record of the Court of Inquiry for delivery to the Department of the Navy. Whether he did so on 18 June as thus understood, or on 19 June as might be indicated by the "191425Z" date time group which rather illogically concludes Admiral McCain's 18 June endorsement, it is certain that the drafting of that endorsement, and such consideration of the content of the 650-plus-page record as may have underlain it, was all accomplished – presumably by Admiral McCain with or without the assistance of his nonlegal staff (or perhaps Rear Admiral Kidd) – within either about five hours [up to 181425Z June 1967] or about 29 hours [up to 191425Z June 1967].

We would first note that the U.S. Navy commander who appointed the Court of Inquiry directed it "to inquire into all the pertinent facts and circumstances leading to and connected with the armed attack[, the] damage resulting therefrom[, and the] deaths of and injuries to naval personnel." In contrast to the fully warranted and completely justified breadth of that investigative assignment, the recent letter from your Department to the Congress purports to restate – and, in the process, seeks to narrow – both the scope and significance of that Court of Inquiry investigation. Noting simply that the Court had been ordered "to investigate the circumstances surrounding the attack," it told the Congress that the investigation had "focused primarily on U.S. military communications problems prior to the attack" and upon "the heroic efforts of LIBERTY'S crew in damage control during the aftermath of the attack." To the extent that these latter representations may be true, they constitute in themselves an acknowledgment that the 1967 Court of Inquiry fell far short of inquiring into "all the pertinent facts and circumstances leading to and connected with the armed attack," as had been clearly directed by the Convening Authority.

The Court's very first recorded Finding of Fact was to the effect that the attack by Israeli forces upon USS LIBERTY resulted from a mistaken identification of that ship, (thus was not an intentional assault on the part of the Israelis). The Convening Authority, in paragraph 15 of his endorsement, addressed that vital aspect of the matter only briefly, attributing his conclusion that "the attack was in fact a mistake" to his series of preceding "comments," most of which did indeed relate to "U.S. military communications problems prior to the attack." (One exception: His almost-admiring comments in his paragraph 11 concerning the "remarkable efficiency of the coordinated Israeli air and surface attack" and the "particularly noteworthy . . . efficacy of [the Israelis'] air-

delivered rockets" with respect to "their penetrating capabilities and devastating accuracy.")

Only one of the prior comments upon which the Convening Authority thus relied in support of his conclusion that the attack "was in fact a mistake" bore even tangentially upon the possibility of "mistake," versus "intentional attack" -- his paragraph 14, seemingly bemoaning a deterioration of the competence of both the United States and the Israelis in visual identification procedures. In connection with that rather pious observation he professed that the LIBERTY'S national colors had been "shot down in the opening stages of [the] action," taking no account whatsoever of the testimony, in the Court's record, that those colors had been promptly replaced by the ship's larger and even more visible "holiday colors." In addition, he expressly noted that both "intense fires on the ship," ignited in the early stages of the attack – "coupled with herculean efforts by [LIBERTY'S] engineer department to increase speed . . . produced heavy black smoke which compounded the recognition problem facing the attacking forces." It is far from clear in what manner the USS LIBERTY, or any other United States force, displayed in this event any apparent deficiency "in our recognization (sic) competence" which would prompt such a gratuitous <u>and misleading</u> attempt to assume for our nation a shared responsibility.

Beyond these observations concerning the incomplete, the shallow, and the contrived comments by the Convening Authority in his endorsement on the Court's record, Mr. Secretary – an endorsement as demonstrably hasty and ill-considered as the Court's proceedings themselves -- there is yet more to demonstrate more specifically that the 1967 Navy Court of Inquiry into the unprovoked attack upon the USS LIBERTY was and is totally inadequate as a basis for an accurate historical record of that tragic event – and a totally inadequate record of the actions, the merits, and the entitlements of the survivors of that event and of the families and survivors of the 34 Americans who were killed in that event.

At the very outset, in orally ordering that the Court of Inquiry complete and submit its work within one week, the Convening Authority imposed a condition that was totally and blatantly unreasonable in the circumstances. A basically unarmed United States Navy ship had been subjected to a sudden, concerted, and unprovoked attack by unmarked forces of a foreign nation. Thirty-four Americans had been killed in the assault; 172 others had been wounded - - many of them disabled in varying degrees for life; and the ship devastated beyond further use. To require the official investigation of an event of such magnitude and complexity to be completed in one week was not only to <u>invite</u> a superficial, incomplete, and unreliable result - - but to <u>ensure</u> it.

There is still now available, Mr. Secretary, a very substantial volume of live and fully competent testimony – officially unheard testimony – to the events of 8

June 1967 and to the widespread aftermath of those events. Over 30 of the Navy and Marine Corps survivors of the Israeli attack are still available -- many of them having overcome or tolerated grievous wounds and having carried (and suffered), for 35 years, graphic memories of the events of 8 June 1967. Those survivors, once they ultimately overcame the fear of threatened consequences that had been drilled into them by the 1967 Court of Inquiry, have now for years sought to be heard -- and they both stand ready and seek now to state their observed truths about the assault on the LIBERTY and its aftermaths.

In addition, there are still available a substantial number of other competent witnesses who, while not among the heroic victims and survivors of the attack, were privy in various ways to relevant June 1967 events. Such additional testimony includes, but is not limited to, the following:

(1) Eye witness accounts of aircraft surveillance, well prior to the Israeli attack on the LIBERTY, with the Israeli Star of David identification on one of those surveillance aircraft plainly visible to members of LIBERTY'S crew.

(2) Evidence that the LIBERTY herself was, except for her special antennas, nothing more than a Victory ship converted for U. S. Navy purposes -- a type which dominated the U. S. Navy's Service and Transport Forces at the time. Her profile, paint, and bow designation were identical to those of a plethora of U.S. Navy ships that had plied the Mediterranean during the 1960's, every day of the year. Based on those characteristics alone, no military pilot of a Mediterranean littoral country could have failed to identify her, prior to the attack, as an American ship -- without even considering all of the other forms of identification she displayed at the time, including particularly, of course, her U.S flag.

(3) Evidence that the communication foul-ups which resulted in LIBERTY'S being some one-hundred miles from where the JCS had ultimately intended her to be -- a major focus of the cursory endorsement placed on the investigative report by the Commander-in-Chief, U S. Naval Forces, Europe -- is somewhat beside the point in view of the subsequent telephonic contact established between the Secretary of Defense and the President, in Washington, with Rear Admiral Lawrence R. Geis, USN, the Commander of Carrier Task Force 60.1 who flew his flag on USS AMERICA (CV-66). Within range to succor LIBERTY, Admiral Geis had authorized AMERICA's Captain, Don Engen, to launch fighter aircraft that could, by their mere presence, have without further bloodshed ended any mistaken-identity claim by the attackers. Ordered by the President to recall the fighter aircraft that had been launched to aid the LIBERTY in response to her distress call, Admiral Geis had no alternative to compliance with that direct order from the Commander-in-Chief. That