Standard Form 88
(Rev. June 1956)
Bureau of the Budget
Circular A-32 (Rev.)

2608

# REPORT OF MEDICAL EXAMINATION

88–105

| | | |
|---|---|---|
| 1. LAST NAME—FIRST NAME—MIDDLE NAME<br>SIX, HArold Eugene | 2. GRADE AND COMPONENT OR POSITION<br>E6 USN | 3. IDENTIFICATION NO.<br>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 |
| 4. HOME ADDRESS (Number, street or RFD, city or town, zone and State)<br>552 Laura Apt C.<br>LaPuente, California | 5. PURPOSE OF EXAMINATION<br>Initial<br>Flight Physical | 6. DATE OF EXAMINATION<br>21 Oct 71 |
| 7. SEX: Male \| 8. RACE: Caucasian \| 9. TOTAL YEARS GOVERNMENT SERVICE — MILITARY: 7 CIVILIAN: 0 | 10. AGENCY<br>DN | 11. ORGANIZATION UNIT<br>Flt Supt Det, 96337 |
| 12. DATE OF BIRTH (25)<br>27 April 1946 \| 13. PLACE OF BIRTH: Torrington, Wyoming | 14. NAME, RELATIONSHIP, AND ADDRESS OF NEXT OF KIN<br>Lucy G. Six (wife)<br>U.S. NAVCOMMSTA Philippines PO Box 4;<br>FPO San Francisco, Calif. 96656 | |
| 15. EXAMINING FACILITY OR EXAMINER, AND ADDRESS<br>366TH USAF DISPENSARY, APO SF 96337 | 16. OTHER INFORMATION<br>— | |
| 17. RATING OR SPECIALTY<br>Non-Crew member | TIME IN THIS CAPACITY (Total)<br>— | LAST SIX MONTHS<br>— |

## CLINICAL EVALUATION

| NOR-MAL | (Check each item in appropriate column; enter "NE" if not evaluated.) | ABNOR-MAL |
|---|---|---|
| | 18. HEAD, FACE, NECK, AND SCALP | |
| | 19. NOSE | |
| | 20. SINUSES | |
| | 21. MOUTH AND THROAT | X |
| / | 22. EARS—GENERAL (Int. & ext. canals) (Auditory acuity under items 70 and 71) | |
| V | 23. DRUMS (Perforation) | |
| | 24. EYES—GENERAL (Visual acuity and refraction under items 59, 60 and 67) | |
| | 25. OPHTHALMOSCOPIC | |
| | 26. PUPILS (Equality and reaction) | |
| | 27. OCULAR MOTILITY (Associated parallel movements, nystagmus) | |
| | 28. LUNGS AND CHEST (Include breasts) | |
| | 29. HEART (Thrust, size, rhythm, sounds) | |
| | 30. VASCULAR SYSTEM (Varicosities, etc.) | |
| | 31. ABDOMEN AND VISCERA (Include hernia) | |
| | 32. ANUS AND RECTUM (Hemorrhoids, fistulae) (Prostate, if indicated) | |
| | 33. ENDOCRINE SYSTEM | |
| | 34. G-U SYSTEM | |
| | 35. UPPER EXTREMITIES (Strength, range of motion) | |
| | 36. FEET | |
| | 37. LOWER EXTREMITIES (Except feet) (Strength, range of motion) | X |
| | 38. SPINE, OTHER MUSCULOSKELETAL | |
| | 39. IDENTIFYING BODY MARKS, SCARS, TATTOOS | X |
| | 40. SKIN, LYMPHATICS | |
| | 41. NEUROLOGIC (Equilibrium tests under item 72) | |
| | 42. PSYCHIATRIC (Specify any personality deviation) | |
| | 43. PELVIC (Females only) (Check how done) ☐ VAGINAL ☐ RECTAL | |

NOTES. (Describe every abnormality in detail. Enter pertinent item number before each comment. Continue in item 73 and use additional sheets if necessary.)

21. TE

23. VSNB

37. 1½" circular scar right shin. WHNS

39. 2" scar, 2nd finger, rt hand. WHNS
2, 3/4" scar right thumb. WHNS.

(Continue in item 73)

44. DENTAL (Place appropriate symbols above or below number of upper and lower teeth, respectively.)
O—Restorable teeth
/—Nonrestorable teeth
X—Missing teeth
XXX—Replaced by dentures
(6 X 8)—Fixed bridge, brackets to include abutments

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | X | X | X | X | | | | | | X | X | X | X | X | X | X | |
| RIGHT | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | LEFT |
| | 32 | 31 | 30 | 29 | 28 | 27 | 26 | 25 | 24 | 23 | 22 | 21 | 20 | 19 | 18 | 17 | |
| | X | | X | X | | | | | | | | | | X | X | X | |

REMARKS AND ADDITIONAL DENTAL DEFECTS AND DISEASES
xam Type - 3
ass - 2
..ol [redacted]
e Dental Health Record
Initials [illegible]

LABORATORY FINDINGS

| | | |
|---|---|---|
| 45. URINALYSIS: A. SPECIFIC GRAVITY 1.016 | | 46. CHEST X-RAY (Place, date, film number and result) 366TH USAF DISPENSARY, APO SF 96337 |
| B. ALBUMIN | D. MICROSCOPIC neg | 71-4611 21 Oct 71 [illegible] |
| C. SUGAR neg | neg | |
| 47. SEROLOGY (Specify test used and result)<br>VDRL - neg | 48. EKG<br>WNL | 49. BLOOD TYPE AND RH FACTOR<br>O pos | 50. OTHER TESTS<br>AR 889 1971 [illegible] Hemat 47 |

## MEASUREMENTS AND OTHER FINDINGS

| 51. HEIGHT | 52. WEIGHT | 53. COLOR HAIR | 54. COLOR EYES | 55. BUILD: | 56. TEMPERATURE |
|---|---|---|---|---|---|
| 73 | 145 | Brown | Brown | ☐ SLENDER ☒ MEDIUM ☐ HEAVY ☐ OBESE | — |

57. BLOOD PRESSURE (*Arm at heart level*)

| A. SITTING | B. RECUMBENT | C. STANDING (5 min.) |
|---|---|---|
| SYS. 130 DIAS. 70 | SYS. X DIAS. X | SYS. 134 DIAS. 72 |

58. PULSE (*Arm at heart level*)

| A. SITTING | B. AFTER EXERCISE | C. 2 MIN. AFTER | D. RECUMBENT | E. AFTER STANDING 3 MIN. |
|---|---|---|---|---|
| 72 | — | / | / | 80 |

59. DISTANT VISION — RIGHT 20/ 100 CORR. TO 20/ 20; LEFT 20/ 200 CORR. TO 20/ 20

60. Manifest REFRACTION — BY -1.75 S. +0.50 CX 180; BY -1.75 S. +0.50 CX 180

61. NEAR VISION — 20/20 CORR. TO — BY —; 20/20 CORR. TO BY

62. HETEROPHORIA (*Specify distance*) VTA-ND

ES° 2 EX° 0 R. H. 0 L. H. 0 PRISM DIV. — PRISM CONV. CT Omit PC — PD —

63. ACCOMMODATION — RIGHT — LEFT —

64. COLOR VISION (*Test used and result*) VTS-CV Pass

65. DEPTH PERCEPTION (*Test used and score*) — UNCORRECTED — CORRECTED —

66. FIELD OF VISION —

67. NIGHT VISION (*Test used and score*) 2 LS/4

68. RED LENS TEST —

69. INTRAOCULAR TENSION — TBA

70. HEARING — RIGHT WV /15 SV /15; LEFT WV /15 SV /15

71. Maico AUDIOMETER 150 64

| | 250 256 | 500 512 | 1000 1024 | 2000 2048 | 3000 2896 | 4000 4096 | 6000 6144 | 8000 8192 |
|---|---|---|---|---|---|---|---|---|
| RIGHT | X | 15 | 10 | 10 | 15 | 20 | 15 | X |
| LEFT | X | 15 | 10 | 10 | 40 | 30 | 30 | X |

72. PSYCHOLOGICAL AND PSYCHOMOTOR (*Tests used and score*) ABMA; SAT

73. NOTES (*Continued*) AND SIGNIFICANT OR INTERVAL HISTORY

See attached

(*Use additional sheets if necessary*)

74. SUMMARY OF DEFECTS AND DIAGNOSES (*List diagnoses with item numbers*)

59. Def VA - one corrected 20/20

75. RECOMMENDATIONS—FURTHER SPECIALIST EXAMINATIONS INDICATED (*Specify*)

Glasses to be worn when performing AC duties

76. A. PHYSICAL PROFILE

| P | U | L | H | E | S |
|---|---|---|---|---|---|
| 1 | 1 | 1 | 1 | 1 | 1 |

77. EXAMINEE (*Check*)

A. ☒ IS QUALIFIED FOR FC III

B. ☐ IS NOT QUALIFIED FOR

B. PHYSICAL CATEGORY

| A | B | C | E |
|---|---|---|---|
| X | | | |

78. IF NOT QUALIFIED, LIST DISQUALIFYING DEFECTS BY ITEM NUMBER —

79. TYPED OR PRINTED NAME OF PHYSICIAN — Richard J Emerson Capt USAF MC FMO — SIGNATURE [signature]

80. TYPED OR PRINTED NAME OF PHYSICIAN — SIGNATURE

81. TYPED OR PRINTED NAME OF DENTIST ~~OR PHYSICIAN (Indicate which)~~ J.C. Clower, LICC; — SIGNATURE J C Clower

82. TYPED OR PRINTED NAME OF REVIEWING OFFICER OR APPROVING AUTHORITY — SIGNATURE — NUMBER OF ATTACHED SHEETS

Standard Form 89
Bureau of the Budget
89-106
BOB Approval No. 80-R158

# REPORT OF MEDICAL HISTORY

THIS INFORMATION IS FOR OFFICIAL USE ONLY AND WILL NOT BE RELEASED TO UNAUTHORIZED PERSONS

| | | |
|---|---|---|
| 1. LAST NAME—FIRST NAME—MIDDLE NAME<br>Six Harold Eugene | 2. GRADE AND COMPONENT OR POSITION<br>E-6 USN | 3. IDENTIFICATION NO.<br>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 |
| 4. HOME ADDRESS (Number, street or RFD, city or town, zone and State)<br>552 Laurel Apartment C<br>La Puente, California | 5. PURPOSE OF EXAMINATION<br>Flight Physical | 6. DATE OF EXAMINATION<br>21 October 1971 |
| 7. SEX: Male · 8. RACE: Caucasian · 9. TOTAL YEARS GOVERNMENT SERVICE: MILITARY 7 CIVILIAN 0 | 10. AGENCY<br>NAVY | 11. ORGANIZATION UNIT<br>Fleet support Detachment 96337 |
| 12. DATE OF BIRTH (25)<br>27 April 1946 · 13. PLACE OF BIRTH<br>Torrington Wyoming | 14. NAME, RELATIONSHIP, AND ADDRESS OF NEXT OF KIN<br>Mrs. Lucy G. Six (wife)<br>~~U.S. Naval Communications~~ Station Philippines<br>PO Box 490<br>FPO San Francisco, California 96656 | |
| 15. EXAMINING FACILITY OR EXAMINER, AND ADDRESS | 16. OTHER INFORMATION | |

17. STATEMENT OF EXAMINEE'S PRESENT HEALTH IN OWN WORDS (*Follow by description of past history, if complaint exists*)

Good

18. FAMILY HISTORY

| RELATION | AGE | STATE OF HEALTH | IF DEAD, CAUSE OF DEATH | AGE AT DEATH |
|---|---|---|---|---|
| FATHER | | | | |
| MOTHER | | | | |
| SPOUSE | | | | |
| BROTHERS AND SISTERS | | | | |
| CHILDREN | | | | |

19. HAS ANY BLOOD RELATION (*Parent, brother, sister, other*) OR HUSBAND OR WIFE

| YES | NO | (*Check each item*) | RELATION(S) |
|---|---|---|---|
| | ✓ | HAD TUBERCULOSIS | |
| | | ~~HAD SYPHILIS~~ | |
| | | HAD DIABETES | |
| | | HAD CANCER | |
| | | HAD KIDNEY TROUBLE | |
| | | HAD HEART TROUBLE | |
| | | HAD STOMACH TROUBLE | |
| | | HAD RHEUMATISM (*Arthritis*) | |
| | | HAD ASTHMA, HAY FEVER, HIVES | |
| | | HAD EPILEPSY (*Fits*) | |
| | | COMMITTED SUICIDE | |
| | | BEEN INSANE | |

20. HAVE YOU EVER HAD OR HAVE YOU NOW (*Place check at left of each item*)

| YES | NO | (*Check each item*) | YES | NO | (*Check each item*) | YES | NO | (*Check each item*) | YES | NO | (*Check each item*) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | ✓ | SCARLET FEVER, ERYSIPELAS | | ✓ | GOITER | | ✓ | TUMOR, GROWTH, CYST, CANCER | | ✓ | "TRICK" OR LOCKED KNEE |
| | — | DIPTHERIA | | ✓ | TUBERCULOSIS | | ✓ | RUPTURE/HERNIA | | ✓ | FOOT TROUBLE |
| ✓ | | RHEUMATIC FEVER | | ✓ | SOAKING SWEATS (*Night sweats*) | | ✓ | APPENDICITIS | | ✓ | NEURITIS |
| | ✓ | SWOLLEN OR PAINFUL JOINTS | | ✓ | ASTHMA | | ✓ | PILES OR RECTAL DISEASE | | ✓ | PARALYSIS (*Inc. infantile*) |
| ✓ | | MUMPS | | ✓ | SHORTNESS OF BREATH | | ✓ | FREQUENT OR PAINFUL URINATION | | ✓ | EPILEPSY OR FITS |
| | ✓ | COLOR BLINDNESS | | ✓ | PAIN OR PRESSURE IN CHEST | | ✓ | KIDNEY STONE OR BLOOD IN URINE | | ✓ | CAR, TRAIN, SEA, OR AIR SICKNESS |
| | ✓ | FREQUENT OR SEVERE HEADACHE | | ✓ | CHRONIC COUGH | | ✓ | SUGAR OR ALBUMIN IN URINE | | ✓ | FREQUENT TROUBLE SLEEPING |
| | ✓ | DIZZINESS OR FAINTING SPELLS | | ✓ | PALPITATION OR POUNDING HEART | | ✓ | BOILS | | ✓ | FREQUENT OR TERRIFYING NIGHTMARES |
| | ✓ | EYE TROUBLE | | ✓ | HIGH OR LOW BLOOD PRESSURE | ✓ | | VD—SYPHILIS, GONORRHEA, ETC. | | ✓ | DEPRESSION OR EXCESSIVE WORRY |
| | ✓ | EAR, NOSE OR THROAT TROUBLE | | ✓ | CRAMPS IN YOUR LEGS | | ✓ | RECENT GAIN OR LOSS OF WEIGHT | | ✓ | LOSS OF MEMORY OR AMNESIA |
| | ✓ | RUNNING EARS | | ✓ | FREQUENT INDIGESTION | | ✓ | ARTHRITIS OR RHEUMATISM | | ✓ | BED WETTING |
| | ✓ | HEARING LOSS | | ✓ | STOMACH, LIVER OR INTESTINAL TROUBLE | | ✓ | BONE, JOINT, OR OTHER DEFORMITY | | ✓ | NERVOUS TROUBLE OF ANY SORT |
| | ✓ | CHRONIC OR FREQUENT COLDS | | ✓ | GALL BLADDER TROUBLE OR GALL STONES | | ✓ | LAMENESS | | | ~~ANY DRUG OR NARCOTIC HABIT~~ |
| | ✓ | SEVERE TOOTH OR GUM TROUBLE | | ✓ | JAUNDICE | | ✓ | LOSS OF ARM, LEG, FINGER, OR TOE | | | ~~EXCESSIVE DRINKING HABIT~~ |
| ✓ | | SINUSITIS | | ✓ | ANY REACTION TO SERUM, DRUG OR MEDICINE | | ✓ | PAINFUL OR "TRICK" SHOULDER OR ELBOW | | | ~~HOMOSEXUAL TENDENCIES~~ |
| | ✓ | HAY FEVER | | ✓ | HISTORY OF BROKEN BONES | | ✓ | BACK TROUBLE OF ANY KIND | | | PERIODS OF UNCONSCIOUSNESS |
| | ✓ | HISTORY OF HEAD INJURY | | | | | | | | | |
| | ✓ | SKIN DISEASES | | | | | | | | | |

21. HAVE YOU EVER (*Check each item*)

| YES | NO | (*Check each item*) | YES | NO | (*Check each item*) |
|---|---|---|---|---|---|
| ✓ | | WORN GLASSES—CONTACT LENS | | ✓ | ATTEMPTED SUICIDE |
| | ✓ | WORN AN ARTIFICIAL EYE | | ✓ | BEEN A SLEEP WALKER |
| | ✓ | WORN HEARING AIDS | | ✓ | LIVED WITH ANYONE WHO HAD TUBERCULOSIS |
| | ✓ | STUTTERED OR STAMMERED | | ✓ | COUGHED UP BLOOD |
| | ✓ | [illegible] | | ✓ | BLED EXCESSIVELY AFTER INJURY OR TOOTH EXTRACTION |
| | | [illegible] | | | WHAT IS THE LONGEST PERIOD YOU HELD ANY OF THESE JOBS? |

22. FEMALES ONLY: A. HAVE YOU EVER—

| YES | NO | |
|---|---|---|
| | | BEEN PREGNANT |
| | | HAD A VAGINAL DISCHARGE |
| | | BEEN TREATED FOR A FEMALE DISORDER |
| | | HAD PAINFUL MENSTRUATION |
| | | HAD IRREGULAR MENSTRUATION |

B. COMPLETE THE FOLLOWING:

AGE AT ONSET OF MENSTRUATION
INTERVAL BETWEEN PERIODS
DURATION OF PERIODS
DATE OF LAST PERIOD
QUANTITY: ☐ NORMAL ☐ EXCESSIVE ☐ SCANTY

25. WHAT IS YOUR USUAL OCCUPATION? US Navy

26. ARE YOU (*Check one*) ☑ RIGHT HANDED ☐ LEFT HANDED

| YES | NO | CHECK EACH ITEM YES OR NO. EVERY ITEM CHECKED "YES" MUST BE FULLY EXPLAINED IN BLANK SPACE ON RIGHT | |
|---|---|---|---|
| | X | 27. HAVE YOU BEEN REFUSED EMPLOYMENT OR BEEN UNABLE TO HOLD A JOB BECAUSE OF: A. SENSITIVITY TO CHEMICALS, DUST, SUNLIGHT, ETC. | |
| | X | B. INABILITY TO PERFORM CERTAIN MOTIONS | |
| | X | C. INABILITY TO ASSUME CERTAIN POSITIONS | |
| | X | D. OTHER MEDICAL REASONS *(If yes, give reasons)* | |
| | | 28. HAVE YOU EVER WORKED WITH RADIOACTIVE SUBSTANCE? | |
| | X | 29. DID YOU HAVE DIFFICULTY WITH SCHOOL STUDIES OR TEACHERS? *(If yes, give details)* | |
| | X | 30. HAVE YOU EVER BEEN DENIED LIFE INSURANCE? *(If yes, state reason and give details)* | |
| X | | 31. HAVE YOU HAD, OR HAVE YOU BEEN ADVISED TO HAVE, ANY OPERATIONS? *(If yes, describe and give age at which occurred)* | Tonsilectomy 8<br>~~[illegible]~~ wound to lower (R) leg and Finger of right hand 21 |
| | X | 32. HAVE YOU EVER BEEN A PATIENT *(committed or voluntary)* IN A MENTAL HOSPITAL OR SANITORIUM? *(If yes, specify when, where, why, and name of doctor, and complete address of hospital or clinic.)* | |
| | X | 33. HAVE YOU EVER HAD ANY ILLNESS OR INJURY OTHER THAN THOSE ALREADY NOTED? *(If yes, specify when, where, and give details)* | |
| ~~X~~ | X | 34. HAVE YOU CONSULTED OR BEEN TREATED BY CLINICS, PHYSICIANS, HEALERS, OR OTHER PRACTITIONERS WITHIN THE PAST 5 YEARS? *(If yes, give complete address of doctor, hospital, clinic, and details)* | ~~May 2 1963 TMR~~ |
| | | 35. HAVE YOU TREATED YOURSELF FOR ILLNESSES OTHER THAN MINOR COLDS? *(If yes, which illnesses)* | |
| X | | 36. HAVE YOU EVER BEEN REJECTED FOR MILITARY SERVICE BECAUSE OF PHYSICAL, MENTAL, OR OTHER REASONS? *(If yes, give date and reason for rejection)* | May 2 1963 TMR 1year Immaturity |
| | X | 37. HAVE YOU EVER BEEN DISCHARGED FROM MILITARY SERVICE BECAUSE OF PHYSICAL, MENTAL, OR OTHER REASONS? *(If yes, give date, reason, and type of discharge: whether honorable, other than honorable, for unfitness or unsuitability)* | |
| | X | 38. HAVE YOU EVER RECEIVED, IS THERE PENDING, OR HAVE YOU APPLIED FOR PENSION OR COMPENSATION FOR EXISTING DISABILITY? *(If yes, specify what kind, granted by whom, and what amount, when, why.)* | |

~~WARNING: A FALSE OR DISHONEST ANSWER TO ANY OF THE QUESTIONS ON THIS FORM MAY BE PUNISHED BY FINE OR IMPRISONMENT (18 U.S.C. 1001)~~

I CERTIFY THAT I HAVE REVIEWED THE FOREGOING INFORMATION SUPPLIED BY ME AND THAT IT IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE.
I AUTHORIZE ANY OF THE DOCTORS, HOSPITALS, OR CLINICS MENTIONED ABOVE TO FURNISH THE GOVERNMENT A COMPLETE TRANSCRIPT OF MY MEDICAL RECORD FOR PURPOSES OF PROCESSING MY APPLICATION FOR THIS EMPLOYMENT OR SERVICE.

| TYPED OR PRINTED NAME OF EXAMINEE | SIGNATURE |
|---|---|
| Harold Eugene Six | Harold E. Six |

39. PHYSICIAN'S SUMMARY AND ELABORATION OF ALL PERTINENT DATA *(Physician shall comment on all positive answers in items 20 thru 38)*

AR 892

| TYPED OR PRINTED NAME OF PHYSICIAN OR EXAMINER | DATE | SIGNATURE | NUMBER OF ATTACHED SHEETS |
|---|---|---|---|
| | | | |

☆ U. S. GO[illegible]MENT PRINTING OFFICE: 1970—382-665

CLINICAL RECORD | ELECTROCARDIOGRAPHIC RECORD

PREVIOUS ECG ☐ YES ☒ NO

CLINICAL IMPRESSION: Initial Flying Class III

MEDICATION

☐ EMERGENCY ☒ ROUTINE ☐ BEDSIDE ☒ AMBULANT

| AGE | SEX | RACE | HEIGHT | WEIGHT | B. P. | SIGNATURE OF WARD PHYSICIAN | DATE |
|---|---|---|---|---|---|---|---|
| 25 | M | Cau | 73 | 145 | 130/70 | [signature] Emerson | 21 Oct 71 |

RHYTHM

AXIS DEVIATION (QRS)

RATES AURIC. 60 VENT. 60

INTERVALS PR .16 QRS .08 QT .34

P WAVES

QRS COMPLEXES

RS—T SEGMENT

T WAVES

UNIPOLAR EXTREMITY LEADS (*Specify*)

WNL

PRECORDIAL LEADS (*Specify*)

WNL

SUMMARY, SERIAL CHANGES, AND IMPLICATIONS:

ECG WNL - ~~[illegible]~~

~~[illegible]~~

(*Continue on reverse*)

| NO. ECG | SIGNATURE OF PHYSICIAN | PATIENT'S IDENTIFICATION NO. | DATE |
|---|---|---|---|
| | [signature] Emerson | | |

PATIENT'S IDENTIFICATION (*For typed or written entries give: Name—last, first, middle; grade; date; hospital or medical facility*)

REGISTER NO. | WARD NO.

SIX, HAROLD E

EG, 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

**ELECTROCARDIOGRAPHIC RECORD**
(Attach Tracings to SF-507)

Standard Form 520
Revised April 1968
General Services Administration & Interagency Comm. on Medical Records
FPMR 101-11-809-3
520-105

GPO : 1969 O - 330-901

Standard Form 88

88-105

# REPORT OF MEDICAL EXAMINATION

| | | |
|---|---|---|
| 1. LAST NAME—FIRST NAME—MIDDLE NAME: Six Harold Eugene | 2. GRADE AND COMPONENT OR POSITION: CTR1 | 3. IDENTIFICATION NO.: 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 |
| 4. HOME ADDRESS (Number, street or RFD, city or town, zone and State): 5 Paradise Valley Carson, Calif 90745 | 5. PURPOSE OF EXAMINATION: Discharge | 6. DATE OF EXAMINATION: 6 Feb 73 |
| 7. SEX: Male | 8. RACE: Cauc | 9. TOTAL YEARS GOVERNMENT SERVICE — MILITARY: 8 yrs 10 mon — CIVILIAN: |
| 10. AGENCY: | 11. ORGANIZATION UNIT: NAV STA TI SF CALIF | |
| 12. DATE OF BIRTH: 12 Apr 1946 | 13. PLACE OF BIRTH: Torrington, Wyoming | 14. NAME, RELATIONSHIP, AND ADDRESS OF NEXT OF KIN: Mrs. Lucy G. Six wife — Same as #4 |
| 15. EXAMINING FACILITY OR EXAMINER, AND ADDRESS: DISPENSARY, U. S. NAVSTA, TI, SF, CALIF. | | 16. OTHER INFORMATION: RELIGION: Prot |
| 17. RATING OR SPECIALTY: | TIME IN THIS CAPACITY (Total): | LAST SIX MONTHS: |

## CLINICAL EVALUATION

| NORMAL | (Check each item in appropriate column, enter "NE" if not evaluated.) | ABNORMAL |
|---|---|---|
| ✓ | 18. HEAD, FACE, NECK AND SCALP | |
| ✓ | 19. NOSE | |
| ✓ | 20. SINUSES | |
| ✓ | 21. MOUTH AND THROAT | |
| ✓ | 22. EARS—GENERAL (Int. & ext. canals. Auditory acuity under items 70 and 71) | |
| ✓ | 23. DRUMS (Perforation) | |
| ✓ | 24. EYES—GENERAL (Visual acuity and refraction under items 59, 60 and 67) | |
| ✓ | 25. OPHTHALMOSCOPIC | |
| ✓ | 26. PUPILS (Equality and reaction) | |
| ✓ | 27. OCULAR MOTILITY (Associated parallel movements, nystagmus) | |
| ✓ | 28. LUNGS AND CHEST (Include breasts) | |
| ✓ | 29. HEART (Thrust, size, rhythm, sounds) | |
| ✓ | 30. VASCULAR SYSTEM (Varicosities, etc.) | |
| ✓ | 31. ABDOMEN AND VISCERA (Include hernia) | |
| ✓ | 32. ANUS AND RECTUM (Hemorrhoids, fistulae) (Prostate, if indicated) | |
| ✓ | 33. ENDOCRINE SYSTEM | |
| ✓ | 34. G-U SYSTEM | |
| | 35. UPPER EXTREMITIES (Strength, range of motion) | X |
| ✓ | 36. FEET | |
| ✓ | 37. LOWER EXTREMITIES (Except feet) (Strength, range of motion) | |
| ✓ | 38. SPINE, OTHER MUSCULOSKELETAL | |
| | 39. IDENTIFYING BODY MARKS, SCARS, TATTOOS | X |
| | 40. SKIN, LYMPHATICS | X |
| ✓ | 41. NEUROLOGIC (Equilibrium tests under item 72) | |
| ✓ | 42. PSYCHIATRIC (Specify any personality deviation) | |
| | 43. PELVIC (Females only) (Check how done) ☐ VAGINAL ☐ RECTAL | |

NOTES (Describe every abnormality in detail. Enter pertinent item number before each comment. Continue in item 73 and use additional sheets if necessary.)

520

35. R middle digit has ↓ ROM 2° to wound.

40 Mild acne.

39. 1 1½" circular scar Right shin
2 2" L. Scar 2nd finger right hand
3 ¾" L. Scar Right Thumb
4 T.T. American flag & Eagle right forearm

(Continue in item 73)

44. DENTAL (Place appropriate symbols above or below number of upper and lower teeth, respectively.)

o—Restorable teeth; /—Nonrestorable teeth; X—Missing teeth; XXX—Replaced by dentures; (6 X 8)—Fixed bridge, brackets to include abutments

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RIGHT | X1 | X2 | 3 | X4 | X5 | 6 | 7 | 8 | 9 | X10 | X11 | X12 | X13 | X14 | X15 | 16 | LEFT |
| | X32 | 31 | X30 | X29 | 28 | 27 | 26 | 25 | 24 | 23 | 22 | 21 | 20 | X19 | X18 | 17 | |

REMARKS AND ADDITIONAL DENTAL DEFECTS AND DISEASES: Oral T-3 C-1

## LABORATORY FINDINGS

8 FEB 1973

| | | |
|---|---|---|
| 45. URINALYSIS: A. SPECIFIC GRAVITY | | 46. CHEST X-RAY (Place, date, film number and result): DISPENSARY, U.S. NAVSTA, TI SF, CALIF. FILM # 1583 |
| B. ALBUMIN: Neg | D. MICROSCOPIC | |
| C. SUGAR: | | |
| 47. SEROLOGY (Specify test used and result) | 48. EKG | 49. BLOOD TYPE AND RH FACTOR | 50. OTHER TESTS |

Form 88 (10-68)

| HEIGHT | WEIGHT | COLOR HAIR | COLOR EYES | BUILD: ☒ SLENDER ☐ MEDIUM ☐ HEAVY ☐ OBESE | TEMPERATURE |
|---|---|---|---|---|---|
| 72 | 155 | Brown | Brown | | N |

51. BLOOD PRESSURE (Arm at heart level)

| A. SITTING | B. RECUMBENT | C. STANDING (3 min.) |
|---|---|---|
| SYS. 118 DIAS. 76 | SYS. DIAS. | SYS. DIAS. |

52. PULSE (Arm at heart level)

| A. SITTING | B. AFTER EXERCISE | C. 2 MIN. AFTER | D. RECUMBENT | E. AFTER STANDING 3 MIN. |
|---|---|---|---|---|
| 72 | | | | |

59. DISTANT VISION
RIGHT 20/ 20/20 CORR. TO 20/ 20
LEFT 20/ 20/20 CORR. TO 20/ 20

60. REFRACTION
BY S. CX
BY Lens S. CX

61. NEAR VISION
CORR. TO BY
CORR. TO BY

62. HETEROPHORIA (Specify distance)
ES° EX° R. H. L. H. PRISM DIV. PRISM CONV. CT PC PD

63. ACCOMMODATION
RIGHT LEFT

64. COLOR VISION (Test used and result)
AOC (REV) 1940 PIP 14/14

65. DEPTH PERCEPTION (Test used and score)
UNCORRECTED
CORRECTED

66. FIELD OF VISION

67. NIGHT VISION (Test used and score)

68. RED LENS TEST

69. INTRAOCULAR TENSION

70. HEARING
RIGHT WV 15 /15 SV 15 /15
LEFT WV 15 /15 SV /15

71. AUDIOMETER

| | 250 256 | 500 512 | 1000 1024 | 2000 2048 | 3000 2896 | 4000 4096 | 6000 6144 | 8000 8192 |
|---|---|---|---|---|---|---|---|---|
| RIGHT | | | | | | | | |
| LEFT | | | | | | | | |

72. PSYCHOLOGICAL AND PSYCHOMOTOR (Tests used and score)

73. NOTES (Continued) AND SIGNIFICANT OR INTERVAL HISTORY

"I CERTIFY THAT I HAVE BEEN INFORMED AND UNDERSTAND THE PROVISIONS OF BUMED INSTRUCTION 6120.6"

SIGNATURE Harold C Six

(Use additional sheets if necessary)

74. SUMMARY OF DEFECTS AND DIAGNOSES (List diagnoses with item numbers)

40
35
39.

75. RECOMMENDATIONS—FURTHER SPECIALIST EXAMINATIONS INDICATED (Specify)

76. A. PHYSICAL PROFILE

| P | U | L | H | E | S |
|---|---|---|---|---|---|
| | | | | | |

77. EXAMINEE (Check)
A. ☒ IS QUALIFIED FOR
B. ☐ IS NOT QUALIFIED FOR
IS/~~IS NOT~~ QUALIFIED FOR ACTIVE DUTY AT SEA AND/OR ON FOREIGN SHORE AND FOR:

B. PHYSICAL CATEGORY

| A | B | C | E |
|---|---|---|---|
| | | | |

78. IF NOT QUALIFIED, LIST DISQUALIFYING DEFECTS BY ITEM NUMBER

79. TYPED OR PRINTED NAME OF PHYSICIAN E. B. YELLIG, Lt MC USNR — SIGNATURE E B Yellig

80. TYPED OR PRINTED NAME OF PHYSICIAN — SIGNATURE

81. TYPED OR PRINTED NAME OF DENTIST OR PHYSICIAN (Indicate which) J. J. FINE, Lt DC USNR — SIGNATURE J. J. Fine

82. TYPED OR PRINTED NAME OF REVIEWING OFFICER OR APPROVING AUTHORITY — SIGNATURE — NUMBER OF ATTACHED SHEETS

# STATEMENT OF REAR ADMIRAL MERLIN STARING

In June of 1967 I was assigned as the senior Navy legal officer in London at the headquarters of Admiral John S. McCain, Jr., who was then the Commander-in-Chief, U. S. Naval Forces, Europe. In that capacity, Admiral McCain was in command of our naval forces in the Mediterranean.

The U. S. Navy Court of Inquiry into the 8 June attack on the USS LIBERTY was convened at our London headquarters at the direction of Admiral McCain. A Navy Court of Inquiry is a formal fact-finding body convened to investigate an incident involving, for example, substantial loss of life, or possible significant international or other legal consequences. It is an administrative, not a judicial, body, and its report is purely advisory.

Rear Admiral Isaac Kidd was appointed by Admiral McCain to be the president of the Court, with Captains Bernard Lauff and Bert Atkinson as the other members. Captain Ward Boston, a Navy legal officer, was assigned as counsel to the Court.

Admiral Kidd and the two members of his Court, with their legal officer, Ward Boston, immediately traveled to the Mediterranean where they boarded the LIBERTY at sea and commenced collecting evidence for their investigation.

The clerical production of the written transcript of the proceedings and the report of the Court of Inquiry containing its stated conclusion that the attack was accidental was largely accomplished first at Malta, where the heavily damaged LIBERTY was initially docked, and then at our London headquarters, under the direction and supervision of Admiral Kidd and Captain Boston, in the days during and immediately following their on-scene investigation.

As Force Legal Officer for Admiral McCain, it would normally have been my duty to review the record of the investigation by the Court of Inquiry and to prepare a recommended action on that record for Admiral McCain's consideration and decision, leading ultimately to his official endorsement and transmission of the record to the Department of the Navy in Washington. Consistent with that anticipated procedure, Captain Boston appeared in my office in midafternoon of the day that he and Admiral Kidd arrived in London from Malta, handed me the record of some 600 pages, and said that Admiral McCain had asked him to bring it to me for my review.

I immediately swept all other work aside and began a comprehensive review of that file, working steadily at it from the afternoon until about 3:00 AM. At that point I took a brief break for sleep, then resumed my review at about 6:00 AM the following morning. I was still so engaged when Captain Boston again appeared in my office at about 10:00 AM and asked how I was doing, and when I thought I would complete my review. I told him that I was at that point only about 1/3 of

the way through the record and that I was having serious problems, so far, in finding evidence in the record to support some of the Court's conclusions or findings of fact. One of the items for which I had so far been unable to find supporting evidence in the record was the Court's very first conclusion that "available evidence combines to indicate the attack on LIBERTY on 8 June was, in fact, a case of mistaken identity." I also told Captain Boston that I could not yet estimate a time for the completion of my review, but that I was working full time on it and would continue to do so.

Captain Boston thereupon left my office, then reappeared about 20 minutes later and said that Admiral McCain had sent him up to get the Court's record from me and bring it to him in his office. I accordingly turned the record back over to Captain Boston, and he left my office with it. I was never, either at that point or later, asked for any of my comments or conclusions based upon the work that I had done to that point. Later that same day I learned that Admiral Kidd had departed London en route back to the United States, presumably carrying the Court's record with him for delivery to Navy Department authorities. At that point I had no knowledge whether Admiral McCain had placed his official endorsement on the record, or what it might have said, or who if anyone might have participated in its preparation.

In the course of my career as a Navy lawyer, I have been called upon to review and to take or to recommend action on hundreds of investigations of various degrees of magnitude and importance. This was the only instance, during my entire career, in which a record of such an investigation was withdrawn from me before I had been given an opportunity to complete my review and to communicate my advice and recommendations to the convening authority.

My personal connection with or participation in the Navy's investigative proceedings that followed the attack on the USS LIBERTY was thus both brief and incomplete. In recent times I have seen in the media comments purporting to support or to justify the validity of the conclusions stated by the Navy Court of Inquiry on the ground that those conclusions by the Court were later approved by Admiral McCain, the convening authority who had ordered the Court. Although my contact with the matter was thus extremely brief, I do know and can firmly testify to one thing -- that the proceedings and the conclusions of the Navy Court of Inquiry were never subjected to a competent, a considered, and a complete legal review before the Convening Authority endorsed the record forward for consideration by officials at the highest levels of the Navy and of the United States Government. Implicit in that conclusion is the fact that no other reviewing authority, in London or elsewhere, could possibly have reviewed and considered that record of over 600 pages, and have rendered sound opinions or recommendations to Admiral McCain, in the brief period between the withdrawal of the record from me and its dispatch to the United States with Admiral Kidd that same day.

Merlin H. Staring (signature)

Merlin H. Staring

Rear Admiral, Judge Advocate General's Corps

United States Navy, (Retired)

Date: 31 May 2005

# DECLARATION OF WARD BOSTON, JR., CAPTAIN, JAGC, USN (RET.)

I, WARD BOSTON, JR. DO DECLARE THAT THE FOLLOWING STATEMENT IS TRUE AND COMPLETE:

1. FOR MORE THAN 30 YEARS, I HAVE REMAINED SILENT ON THE TOPIC OF USS *LIBERTY*. I AM A MILITARY MAN AND WHEN ORDERS COME IN FROM THE SECRETARY OF DEFENSE AND PRESIDENT OF THE UNITED STATES, I FOLLOW THEM.

2. HOWEVER, RECENT ATTEMPTS TO REWRITE HISTORY COMPEL ME TO SHARE THE TRUTH.

3. IN JUNE OF 1967, WHILE SERVING AS A CAPTAIN IN THE Judge Advocate General Corps, Department of the Navy, I WAS ASSIGNED AS SENIOR LEGAL COUNSEL FOR THE NAVY'S COURT OF INQUIRY INTO THE BRUTAL ATTACK ON USS *LIBERTY*, WHICH HAD OCCURRED ON JUNE 8TH.

4. THE LATE ADMIRAL ISAAC C. KIDD, PRESIDENT OF THE COURT, AND I WERE GIVEN ONLY ONE WEEK TO GATHER EVIDENCE FOR THE NAVY'S OFFICIAL INVESTIGATION INTO THE ATTACK, DESPITE THE FACT THAT WE BOTH HAD ESTIMATED THAT A PROPER COURT OF INQUIRY INTO AN ATTACK OF THIS MAGNITUDE WOULD TAKE AT LEAST SIX MONTHS TO CONDUCT.

5. ADMIRAL JOHN S. MCCAIN, JR., THEN COMMANDER-IN-CHIEF, NAVAL FORCES EUROPE (CINCUSNAVEUR), AT HIS HEADQUARTERS IN LONDON, HAD CHARGED ADMIRAL KIDD (IN A LETTER DATED JUNE 10, 1967) TO

> "INQUIRE INTO ALL THE PERTINENT FACTS AND CIRCUMSTANCES LEADING TO AND CONNECTED WITH THE ARMED ATTACK; DAMAGE RESULTING THEREFROM; AND DEATHS OF AND INJURIES TO NAVAL PERSONNEL."

6. DESPITE THE SHORT AMOUNT OF TIME WE WERE GIVEN, WE GATHERED A VAST AMOUNT OF EVIDENCE, INCLUDING HOURS OF HEARTBREAKING TESTIMONY FROM THE YOUNG SURVIVORS.

7. THE EVIDENCE WAS CLEAR. BOTH ADMIRAL KIDD AND I BELIEVED WITH CERTAINTY THAT THIS ATTACK, WHICH KILLED 34 AMERICAN SAILORS AND INJURED 172 OTHERS, WAS A DELIBERATE EFFORT TO SINK AN AMERICAN SHIP AND MURDER ITS ENTIRE CREW. EACH EVENING, AFTER HEARING TESTIMONY ALL DAY, WE OFTEN SPOKE OUR PRIVATE THOUGHTS CONCERNING WHAT WE HAD SEEN AND HEARD. I RECALL ADMIRAL KIDD REPEATEDLY REFERRING TO THE ISRAELI FORCES RESPONSIBLE FOR THE ATTACK AS "MURDEROUS BASTARDS." IT WAS OUR SHARED BELIEF, BASED ON THE DOCUMENTARY EVIDENCE AND TESTIMONY WE RE-

CEIVED FIRST HAND, THAT THE ISRAELI ATTACK WAS PLANNED AND DELIBERATE, AND COULD NOT POSSIBLY HAVE BEEN AN ACCIDENT.

8. I AM CERTAIN THAT THE ISRAELI PILOTS THAT UNDERTOOK THE ATTACK, AS WELL AS THEIR SUPERIORS, WHO HAD ORDERED THE ATTACK, WERE WELL AWARE THAT THE SHIP WAS AMERICAN.

9. I SAW THE FLAG, WHICH HAD VISIBLY IDENTIFIED THE SHIP AS AMERICAN, RIDDLED WITH BULLET HOLES, AND HEARD TESTIMONY THAT MADE IT CLEAR THAT THE ISRAELIS INTENDED THERE BE NO SUF

10. NOT ONLY DID THE ISRAELIS ATTACK THE SHIP WITH NAPALM, GUNFIRE, AND MISSILES, ISRA PEDO BOATS MACHINE-GUNNED THREE LIFEBOATS THAT HAD BEEN LAUNCHED IN AN ATTEMPT BY TI TO SAVE THE MOST SERIOUSLY WOUNDED – A WAR CRIME.

11. ADMIRAL KIDD AND I BOTH FELT IT NECESSARY TO TRAVEL TO ISRAEL TO INTERVIEW THE ISR. WHO TOOK PART IN THE ATTACK. ADMIRAL KIDD TELEPHONED ADMIRAL MCCAIN TO DISCUSS MA RANGEMENTS. ADMIRAL KIDD LATER TOLD ME THAT ADMIRAL MCCAIN WAS ADAMANT THAT WE WERE NOT TO TRAVEL TO ISRAEL OR CONTACT THE ISRAELIS CONCERNING THIS MATTER.

12. REGRETTABLY, WE DID NOT RECEIVE INTO EVIDENCE AND THE COURT DID NOT CONSIDER ANY OF THE MORE THAN SIXTY WITNESS DECLARATIONS FROM MEN WHO HAD BEEN HOSPITALIZED AND WERE UNABLE TO TESTIFY IN PERSON.

13. I AM OUTRAGED AT THE EFFORTS OF THE APOLOGISTS FOR ISRAEL IN THIS COUNTRY TO CLAIM THAT THIS ATTACK WAS A CASE OF "MISTAKEN IDENTITY."

14. IN PARTICULAR, THE RECENT PUBLICATION OF JAY CRISTOL'S BOOK, *THE LIBERTY INCIDENT*, TWISTS THE FACTS AND MISREPRESENTS THE VIEWS OF THOSE OF US WHO INVESTIGATED THE ATTACK.

15. IT IS CRISTOL'S INSIDIOUS ATTEMPT TO WHITEWASH THE FACTS THAT HAS PUSHED ME TO SPEAK OUT.

16. I KNOW FROM PERSONAL CONVERSATIONS I HAD WITH ADMIRAL KIDD THAT PRESIDENT LYNDON JOHNSON AND SECRETARY OF DEFENSE ROBERT MCNAMARA ORDERED HIM TO CONCLUDE THAT THE ATTACK WAS A CASE OF "MISTAKEN IDENTITY" DESPITE OVERWHELMING EVIDENCE TO THE CONTRARY.

17. ADMIRAL KIDD TOLD ME, AFTER RETURNING FROM WASHINGTON, D.C. THAT HE HAD BEEN ORDERED TO SIT DOWN WITH TWO CIVILIANS FROM EITHER THE WHITE HOUSE OR THE DEFENSE DEPARTMENT, AND REWRITE PORTIONS OF THE COURT'S FINDINGS.

THAT LITERALLY OR IF WAS HIS WAY OF EXPRESSING HIS DISGUST FOR CRISTOL'S HIGHLY PARTISAN, PRO-ISRAELI APPROACH TO QUESTIONS INVOLVING *USS LIBERTY*.

24. AT NO TIME DID I EVER HEAR ADMIRAL KIDD SPEAK OF CRISTOL OTHER THAN IN HIGHLY DISPARAGING TERMS. I FIND CRISTOL'S CLAIMS OF A "CLOSE FRIENDSHIP" WITH ADMIRAL KIDD TO BE UTTERLY INCREDIBLE. I ALSO FIND IT IMPOSSIBLE TO BELIEVE THE STATEMENTS HE ATTRIBUTES TO ADMIRAL KIDD, CONCERNING THE ATTACK ON USS *LIBERTY*.

25. SEVERAL YEARS LATER, I RECEIVED A LETTER FROM CRISTOL THAT CONTAINED WHAT HE PURPORTED TO BE HIS NOTES OF OUR PRIOR CONVERSATION. THESE "NOTES" WERE GROSSLY INCORRECT AND BORE NO RESEMBLANCE IN REALITY TO THAT DISCUSSION. I FIND IT HARD TO BELIEVE THAT THESE "NOTES" WERE THE PRODUCT OF A MISTAKE, RATHER THAN AN ATTEMPT TO DECEIVE. I INFORMED CRISTOL THAT I DISAGREED WITH HIS RECOLLECTION OF OUR CONVERSATION AND THAT HE WAS WRONG. CRISTOL MADE SEVERAL ATTEMPTS TO ARRANGE FOR THE TWO OF US TO MEET IN PERSON AND TALK BUT I ALWAYS FOUND WAYS TO AVOID DOING THIS. I DID NOT WISH TO MEET WITH CRISTOL AS WE HAD NOTHING IN COMMON AND I DID NOT TRUST HIM.

26. CONTRARY TO THE MISINFORMATION PRESENTED BY CRISTOL AND OTHERS, IT IS IMPORTANT FOR THE AMERICAN PEOPLE TO KNOW THAT IT IS CLEAR THAT ISRAEL IS RESPONSIBLE FOR DELIBERATELY ATTACKING AN AMERICAN SHIP AND MURDERING AMERICAN SAILORS, WHOSE BEREAVED SHIPMATES HAVE LIVED WITH THIS EGREGIOUS CONCLUSION FOR MANY YEARS.

DATED: JANUARY 8, 2004

AT CORONADO, CALIFORNIA.

Ward Boston Jr

WARD BOSTON, JR., CAPTAIN, JAGC, USN (RET.)

SENIOR COUNSEL TO THE USS LIBERTY COURT OF INQUIRY

National Naval Medical Center
Adult Behavioral Healthcare Clinic
Bethesda, MD 20889

April 29, 2004

TO: Chairman, Board for Correction of Naval Records
From: John Stetson, MAJ, USAF, MC

Subject: Comments and Recommendations in the case of former GySgt BRYCE F. LOCKWOOD, USMC, 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

Reference:
1. BCNR File
2. USMC Service Record
3. VA records
4. Comments and Recommendations in the case of former GySgt BRYCE F. LOCKWOOD, USMC, 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, undated, Matthew Carroll, LCDR, MC, USNR
5. Applicants Motion to Reopen for Newly Discovered Evidence and Motion for Reconsideration, 16 Nov 2001, William Kenney, Esq.
6. Psychiatric Report: Bryce Lockwood, 28 August 2001, Frank Ochberg, MD

1. Gunnery Sergeant Lockwood has requested that the Board reconsider his request for Correction of his record to show that at the time of his discharge he suffered from Post Traumatic Stress Disorder (PTSD). The Board denied GySgt Lockwood's initial application on 05 October 2000.

2. Subsequent to his initial application, GySgt Lockwood has obtained an additional psychiatric evaluation by Frank Ochberg, M.D. and additional VA medical records. In light of this new evidence, the subject wishes to rebut the Board's decision and, in specific, the findings of LCDR Carroll.

3. GySgt Lockwood served in the USMC from 1959 until 1972. During this period of service, he was present on the USS Liberty when it was attacked on 08 June 1967. The subject desires to have his record reflect that as a result of this attack, he developed Post Traumatic Stress Disorder and that he was medically retired from the USMC by reason of having Post Traumatic Stress Disorder.

4. OPINION: After reviewing GySgt Lockwood's record, the findings of John M. Smothers, Ph.D., the affidavit provided by Mrs. Lois Lockwood, the opinion of LCDR Carroll, MD, and the findings of Frank M. Ochberg, MD, it is my medical opinion that GySgt Bryce F. Lockwood has Post Traumatic Stress Disorder (PTSD), chronic, stemming from his participation in the attack on the USS Liberty. This disorder was incurred in the line of duty.

MAY 12 2004

**AR 901**

National Naval Medical Center
Adult Behavioral Healthcare Clinic
Bethesda, MD 20889

a. GySgt Lockwood meets the DSM-IV-TR criteria for PTSD as described below:

i. Criteria A: Traumatic Event. GySgt's involvement in the attack upon the Liberty and subsequent combat experiences in Vietnam have been well documented and fully meet the criteria for a life-threatening experience. Furthermore, GySgt appears to have had a dissociative reaction during the attack upon the USS Liberty. Such a reaction is a significant risk factor for developing PTSD and is a diagnostic criteria for Acute Stress Disorder, a precursor to PTSD. These symptoms fulfill Criteria A.

ii. Criteria B: Re-experiencing the Trauma. Several of the above mentioned references clearly document that GySgt Lockwood has experienced recurrent distressing thoughts of the events aboard the USS Liberty. These thoughts appear to be in excess of normal recollection and do fulfill Criteria B. In addition, both GySgt Lockwood and his wife attest to his having recurrent nightmares of the attack upon the Liberty. These nightmares may have started as early as 1972. This symptom also fulfills Criteria B. Moreover, Dr. Ochberg documents that GySgt Lockwood has had flashbacks of the attack as early as 1967. Flashbacks are a classic hallmark of PTSD, but are not required for the diagnosis of PTSD. This symptom also fulfills Criteria B.

iii. Criteria C: Avoidance of stimuli associated with the traumatic event. LCDR Carroll's comments in his advisory opinion in re Criteria C are duly noted, however, they do not exclude a diagnosis of PTSD. GySgt Lockwood appears to have avoided unexpected exposure to evocative stimuli, he has had difficulty recalling the events of the attack, he has displayed social isolation, estrangement from his wife, and has displayed a restricted range of affect. These symptoms appear to have started before or by 1972. These symptoms fulfill Criteria C. Moreover, it is my medical opinion that GySgt Lockwood increased use of alcohol represents an additional symptom of avoidance. PTSD has a high alcohol abuse co-morbidity rate.

National Naval Medical Center
Adult Behavioral Healthcare Clinic
Bethesda, MD 20889

iv. Criteria D: Increased arousal. Mrs. Lockwood's affidavit seems to clearly indicate a dramatic change in her husband's sleep pattern that is indicative of hyper-arousal. She also notes an increased irritability. He has documented anxiety symptoms from 1972. GySgt Lockwood notes difficulty concentrating. In addition he is noted by Dr. Ochberg to have an exaggerated startle response since 1967. These symptoms more than fulfill Criteria D.

v. Criteria E: Symptoms last more than 30 days. The record suggests that GySgt Lockwood's symptoms began in 1967 and persisted through 2001.

vi. Criteria F: Symptoms cause significant distress or impairment. The record clearly documents that GySgt has had a difficult transition to civilian life with occupational impairment, poor judgment, and marital difficulties. While it is not as clear to me that the difficulties are directly resultant from GySgt Lockwood's symptoms, I believe this evidence of social and occupational impairment fulfills Criteria F.

b. In his advisory opinion, LCDR Carroll implies that it is inconsistent with the diagnosis of PTSD for GySgt Lockwood to discuss the attack on the USS Liberty with his peers. While this may have some superficial validity when compared to DSM-IV criteria C, it does not negate the diagnosis of PTSD. One of the natural therapeutic modalities for PTSD is for survivors of the same or similar traumatic events to share their experiences and reactions. One of the objectives of Group Therapy for PTSD is to encourage such interchange. LCDR Carroll's point is accurate in specific, but not in context. In my medical opinion, GySgt Lockwood's efforts for validation and recognition do not invalidate the diagnosis of PTSD.

c. LCDR Carroll also notes that GySgt Lockwood did not seek psychiatric help for his symptoms. It is my opinion that those individuals suffering from PTSD more frequently do not seek medical attention than is otherwise the case, especially early in the onset of the disorder. The insidious nature of PTSD is such that those with the condition typically do not seek help. This is consistent with DSM-IV Criteria C: avoidance of stimuli. In addition, the diagnosis of PTSD (1980) had not been established at the time GySgt Lockwood developed his symptoms (1967). There was, and still is, a strong stigma in the military, and especially the Marine Corp,

National Naval Medical Center
Adult Behavioral Healthcare Clinic
Bethesda, MD 20889

against mental illness of any sort. This stigma raises an additional barrier to those individuals who might otherwise seek medical attention. In establishing a diagnosis, it is neither significant nor helpful that GySgt Lockwood did not seek psychiatric care in the early phase of his illness, as this is consistent with the presentation of PTSD.

d. My opinion is based on my review of the aforementioned references. I did not have the benefit of interviewing GySgt Lockwood myself. Nevertheless, his record, medical evaluations, and psychological evaluation appear to be consistent and to provide compelling data for the diagnosis of PTSD, chronic.

5. In summary, I find that the preponderance of data is indicative that GySgt BRYCE F. LOCKWOOD developed chronic Post Traumatic Stress Disorder as a result of his combat experiences while serving in the USMC on active duty. This condition is associated with occupational and social impairment. He is likely to require lifetime treatment by mental health professionals. I cannot make treatment recommendations based on the information I have available at this time. I recommend the Board of Correction of Naval Records amend GySgt Lockwood's record per his request.

JOHN B. STETSON, MD
MAJ, USAF, MC

FRANCES I. STEWART, MD
CAPT, MC, USN