# Harold E. Six, Sr. v. United States

Docket No. 04- 1727c

(Judge Emily C. Hewitt)

Plaintiff's Memorandum in Support of

Plaintiff's Motion for Judgment on the Administrative Record

William J. Kenney
DC Bar No. 99267

%HART/ HTC
600 Pennsylvania Avenue, SE
Suite 105
Washington, DC 20003
Tel: 202-547-5129
Fax: 202-547-8311

Attorney for the plaintiff
Harold E. Six, Sr.

July 30, 2007

## Table of Contents

Introduction ……………………………………………………………………………………..1

Nature of the Case ........................................................................................................ 7

2 PRELIMINARY ISSUES ............................................................................................ 8

a. JURISDICTION ........................................................................................................ 8

b. JUSTICIABLILITY ..................................................................................................... 8

3 STATEMENT OF CASE ............................................................................................. 9

4 SUMMARY OF ARGUMENT ...................................................................................... 21

5 ARGUMENT ............................................................................................................ 22

A. PRESUMPTION OF REGULARITY REBUTTED ......................................................... 22

B Six's Rights of Administrative Due Process Violated .................................................. 24

C Board Denial Arbitrary, Capricious, Ignores Substantial Evidence of Record ................ 25

D Record Establishes Six's PTSD at 1973 Discharge ..................................................... 27

Conclusion ................................................................................................................ 45

# Table of Authorities

**CONSTITUTIONAL PROVISIONS**

Fifth Amendment......................................................................................................24

Cases

Acevedo v. U.S., F. Appx. , 2007, W.L. 445004 (Fed. Cir. 2007)) ..........................24

Chayra v. U.S, 23 Cl. Ct. 172, 178 (1991), ..................................................................22

Bailey v. West, 160 F. 3d 1369 (Fed. Cir. 1998 .............................................................9

Bannum, Inc. v. U.S., 404 F. 3d 1346, 1356 (Fed Cir. 2005); .........................................24

*Chambers v. United States,* 417 F.3d 1218 (Fed. Cir. 2005)........................................8,9

Colon v. U.S. 71 Fed Cl. 473,484 (2006), .....................................................................24

*Fisher v. United States, 402* F. 3d 1167, 1174-1175 (Fed. Cir. 2005) ..............................8

*Friedman v. United States*, 310 F. 2d 381, 389 (Ct. Cl. 1962.)....................................8,9

Harper v. United States , 310 F2d. 404 (Ct. Cl. 1962).....................................................9

Heisig v. U.S., 719 F2d 1153, 1156 (Fed, Cir. 1983) .....................................................24

<u>Motor Vehicle Mfrs.</u> Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co, 463 U.S. 29,43 (1983) ..........29

Pomeroy v. U.S., 39 Fed. Cl. 213, 215-216 (1997.........................................................24

Porter v. U.S., 163 F. 3d 1304, 1312 (Fed. Cir. 1998)...................................................24

Proper v. United States, 154 F. Supp. 317 (Ct. Cl. 1957)................................................9

Randolf v. U.S., 31 Fed. Cl. 787, 789-790 (1994). .......................................................24

*Real v. U.S, 906 F2d 1557,1560 (Fed.cir. 1990)* ....................9

Roth v. U.S., 378 f.3D 1371(Fed. Cir. 2007) ....................20-21

Saunders v. U.S. , 219 Ct. Cl. 285, 302, 542 F. 2d 41979)....................21

Service c. Dulles, 354 U.S. 363 (1957) ....................23

Six v. U.S. 71 Fed. Cl. 671(2006)....................18,19

Skinner v. U.S., 219 Ct. Cl. 322, 594 F. 2d 829 (1978))....................24

*VanCleave* v *United States*,, docket 03- 1765C, filed June 24,2005....................26,29, 30

Wronke v. Marsh, 783 F. 2d 1569, 1576 (Fed. Cir. 1986 ....................24

Yagjian v. Marsh, 571F. Supp. 698, 701 (D N.H. 1998) ....................29

Young v. U.S., 535 U.S. 43 (2006)....................9

Statutes

Administrative Procedures Act (5 U.S.C. 706 (2000)....................20,23

10 U.S.C. 1201 (2000)....................8,11,,21,22,26,45,46

(10 U.S.C. 1552 (2000)....................21

Military Pay Act, 37 U.S.C. 204 (2000) ....................8

Tucker Act, 28 U.S.C. 1401(2000)....................8

Other Authorities

Am. J. Psychiatry. 2001, Aug:158 (8) 1184-90....................35

*Combat Duty in Iraq and Afghanistan, Mental Health Problems and Barriers to Care,* NEJM, 357:13-21(2004)....41

DSM III ....................19,28

DSM IV ....................16,.35

ICD F 60.)……………………………………………………………………………………………………………………………………19,22

Posttraumatic Stress Disorder in the National Comorbidity Survey,

Arch. Gen. Psychiatry 1995; 52-1048-1060 …………………………………………………………………………………… ……..38

PTSD, Alcoholism, and Drug Abuse, Journal Watch-Psychiatry, May 1, 1996 (501)……………………………… ………38

*Trauma and the Vietnam War Generation: Report of Findings from the National Vietnam Veterans……………………….38*

Rules

RFCF 52.1 (b)……………………………………………………………………………………………………………………………………….5

**REGULATIONS**

32 C.F.R. 723 ……………………………………………………………………………………………………………………………… .20,21,24

BUMED Inst. 5300 series.) ...............................................................................................................29

SECNAV Inst. 5300 series …………………………………………………………………………………………………………………….14

The ICD document .........................................................................................................................20

VA Rating Manual ...........................................................................................................................33i

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ************************* | ) | |
| **Harold E. Six, Sr.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Docket No. 04-1727C** |
| | ) | |
| **v** | ) | **(Judge Hewitt)** |
| | ) | |
| **The United States,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ************************* | | |

PLAINTIFF'S MEMORANDUM IN SUPPORT OF

MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Pursuant to the Court's Order and under RFCF 52.1 (b), plaintiff here moves for Judgment on the Administrative Record in reliance on the attached Plaintiff's Statement of Facts in Support of Plaintiff's Motion for Judgment on the Administrative Record, and, on his Memorandum In Support of Motion for Judgment on the Administrative Record.

Plaintiff respectfully submits that the Administrative Record establishes by clear,

relevant, material, cogent and credible evidence on which reasonable minds could not differ that he was 70% disabled by post traumatic stress disorder incurred in and aggravated by his service at the time of his discharge in 1973, and, that the board's decision denying him correction of his navy record to establish his 10 U.S.C. 1201 disability retirement rights is arbitrary, capricious and contrary to the record evidence.

## Nature of the Case

1. Plaintiff, Harold E. Six, Sr., here complains defendant wrongfully and arbitrarily and capriciously discharged then Petty Officer First Class Six, in or about February, 1973, although he was then more than seventy (70% ) percent disabled by his PTSD and other, disabling, undiagnosed illnesses. Defendant's duty was to provide Six competent care and treatment, and thereafter transfer him to the medically retired list. The correction board's decision denying correction of his records was likewise arbitrary, capricious and contrary to the evidence of record. Defendant failed to perform its duties in Six's case in continuance of its conspiracy to conceal its knowingly false report of the 8 June 1967 attack by Israel on the U.S.S. Liberty (AGTR 5). This conspiracy wrongfully and capriciously injures not only the plaintiff, but all of the heroic crew of the U.S.S. Liberty (living and dead) and their families. It is a horrible blight on the history of the U.S. Navy and the United States. The time is long past to begin correcting this egregious wrong.

# 2 PRELIMINARY ISSUES

## ***a. JURISDICTION***

Plaintiff submits that the Board for Correction of Naval Records ("BCNR") on 25 August 2003, 23 July 2004, and, 26 March 2007 arbitrarily and capriciously, and prejudicially violated the law, in denying Six's correction application seeking his military retirement pay entitlement under 10 U.S.C. 1201 a (2000). 10 U.S.C. 1201 is ''a money mandating statute" within the jurisdiction of this court under the Tucker Act, 28 U.S.C. 1401(2000). *Fisher v. United States, 402* F. 3d 1167, 1174-1175 (Fed. Cir. 2005) Six's complaint, filed December 2, 2004, is well within the applicable limitations requirements. *Chambers v. United States*, 417 F.3d 1218 ( 2005) . *Friedman v. United States*, 310 F. 2d 381, 389 (Ct. Cl. 1962.)

## ***b. JUSTICIABLILITY***

Plaintiff asserts he was unfit for duty at the time of his February, 1973 discharge and should then have been medically retired, with pay pursuant to 10 U.S.C. 1201. He does not seek restoration to duty, nor does he assert any claim under the Military Pay Act, 37 U.S.C. 204 (2000.) The precedent of this court and its predecessor, the Court of Claims, clearly establish the right "of a discharged service member to judicial review on the merits of eligibility for disability retirement pay." *Fisher, supra*. The issue of a former service member's physical fitness for

discharge is clearly subject to judicial review on the merits where the issue is the former member's resultant entitlement to disability retired pay. This is especially true where, as here, the Correction Board's action of August, 2003, was the first Board to consider plaintiff's claim, *Chambers, supra, Friedman, supra;* plaintiff had no notice of his disability or his potential right to disability retirement pay, *Harper v. United States, 310 F.2d 405 (Ct. Cl. 1962), Proper v. United States, 154 F. Supp. 317 (Ct. Cl. 1957),* the diagnosis for his disabilities were not established until 1980, years after his discharge, and, defendant made no effort to inform plaintiff of his disability or his resultant rights. *Real v. U.S, 906 F2d 1557,1560 (Fed.cir. 1990),* Further, defendant's misconduct in issuing silencing orders to conceal the falsity of it's Report of Court of Inquiry precluded plaintiff from pursuing his rights prior to his initial application to the correction board. *Bailey v, West 160 F. 3d. 1369 (Fed. Cir. 1998); Young v. U.S., 535 U.S. 43 (2006).*

## 3 STATEMENT OF CASE

1. As specifically documented in Plaintiff's statement of facts in support of this motion, the administrative record establishes that on 8 June 1967 units of Israel's air and naval forces attacked the U.S.S. Liberty in international waters, without warning, with the purpose and intent of sinking the ship and killing the entire crew, well knowing the Liberty was a U.S. Naval vessel. (AR 12-13,21,27,28,192-202,206,246-251,351,358,388-89, 378-385, 896-897, 898-900, 820-

838, 817-819, 814-816)

2. The administrative record further establishes that defendant convened a Court of Naval Inquiry ostensibly to establish and report the true facts of the attack.(AR 358, 896, 898 ) Sadly, under pressure from DOD and the Johnson White House, defendant published a false report of the attack, (AR 898-900 ) tarnishing the heroic efforts of the Liberty crew, both the dead and the survivors. This false report exacerbated Six' emerging PTSD, and, defendant's silencing orders to conceal that the Report is false, obstructed Six's ability to obtain competent diagnosis and treatment and of his disorder, and prevented his prior pursuit of his disability retirement rights.. Defendant's abject refusal to correct the false report has subjected the surviving crew members, and the families of their dead crewmates, to allegations that they are lying "(not credible", "not a credible historian") when now reporting the true events and circumstances of that attack and the falsity of defendant's report. This has relegated many, indeed most, of the surviving crew to difficult, frequently dysfunctional lives as they have struggled with PTSD induced by the trauma and terror of the attack itself. Their is greatly exacerbated by the rage they sense from having been abandoned by their government during the attack, dishonored by the government in the false report, and attacked by both the government's and Israel's attempts to defend that false report, ( AR 378, 3855-388, 407, 820-838 ), while constrained from responding because of the silencing orders.

3. Defendant issued orders prohibiting the survivors from discussing events of the attack with anyone except as that attack is described in defendant's false report and its accompanying DOD press release.(AR 192-198, 199-204, 205-208, 209-210, 214-224,360.) Unable to explain their rage and anger without discussing the false report and the true facts of that attack, these orders left Six, and many of his fellow survivors, unable to obtain competent care and treatment for what is now recognized as PTSD, and unable to understand or pursue their 10 U.S.C. 1201 disability retirement entitlement. The board's decision demonstrates that even today, more than 40 years after the attack, defendant still publically labels the crew as liars when the crew survivors report the truth of the attack, and, defendant's orders silencing them from revealing the Report is a lie.(AR 150-161.)

4. The Report falsely declared as fact, Israel's claim the attack was a case of good faith mistaken identity, short lived and ended as soon as Israel recognized this was a U.S. Navy ship. (AR 410-414.) The members of the Inquiry Court and the supervising U.S. government officials directing the false report well knew that Israel well knew the ship was the U.S.S. Liberty, that Israel knew the operating schedule, location, and, mission of the ship, knew that it was lightly armed, knew its design characteristics, and, knew and specifically targeted the specific locations

of the specialized communications gathering equipment on the ship.[1] The Court clearly knew the attack lasted more than ninety minutes (longer than the infamous December 7,1941 Japanese attack on Pearl Harbor), and knew the that the attack was not an event of "friendly fire" as inferred by the board and claimed by Israel, but rather, was a carefully planned, carefully coordinated among different command structures in the Israeli Defense Forces, skillfully executed attack, intended to sink the ship and kill the entire crew. And yet, the Court rejected and excised testimony of the crew establishing these facts, (AR 401) issued silencing orders prohibiting such discussion (AR898-900) and adopted Israel's untruthful explanation contrary to the overwhelming facts of its record.(AR 413)

5. It is from that background Six's application for correction arises, seeking to establish his 10 U.S.C. 1201 disability rights and benefits, based on the traumatic psychiatric injuries he sustained during that attack, and his subsequent inability to seek proper care and treatment for his disorder because of the silencing orders.

---

[1] From the Pollard case, we now know the extent and success of Israel's espionage activities in the US, especially targeted to US Navy communications.

6. Then petty officer 3rd class Six was stationed in the communications compartment aboard the Liberty throughout the Israeli attack.(AR 12-21, 112, 123-24, 206-207, 245-247, 820-838.) The torpedo struck directly into Six's work station and exploded, killing his non-rated men on both sides of him, as well 21 other NAVSECCGRU shipmates in that compartment. Six was the last living survivor rescued from that compartment. He suffered a concussion in the blast, and was trapped, unconscious beneath debris from the explosion. Then Sgt. Lockwood USMC, making his next to last check for survivors in the flooded compartment, discovered Six was still alive, freed him from the debris and carried him up the ladder to safety.[2] Lockwood, Benkert, Jones, and Capt. Kiepfer all testify to the living hell Six was entrapped in. (AR28, 245-258, 248-250, 820-838, 826) And yet, Six's ordeal was not over, when Lockwood got him to the hatch atop of the escape ladder, he found the hatch was dogged closed. In trying to get the hatch open, Lockwood dropped the semi conscious Six back into the flooded compartment! When he finally got the crew to open the hatch, Lockwood went back down into the flooded compartment, locate Six, and carried him back up the ladder to safety.(Id.) The board, in denying Six suffered from PTSD, cites an article concluding that the diagnosis requires exposure to "stressors … outside

[2] Lockwood's Silver Star award documents this fact. The board claims there are no entries in the medical record, That is true, but these facts are well documented throughout the administrative record..

the range of normal human experience" (AR 320) Apparently the board views Six's experience aboard the Liberty as an event within the range of normal human experience.

7. The administrative record well documents Six's abnormal conduct following the Liberty attack. A recognized drunk at San Diego; (AR12-14, 17,21, 34, 35,m 112-117, 120, 121, 125, 448 ) his promotion is vacated and suspended for a year,[3] (AR456, 466) drunken brawls at the EM club in the Philippines, (AR565-566, 575-576 ) as well as spousal and family abuse, (id, and AR 44-48, 550-551, 578-579 ) loss of control of finances, (AR 546-583 ) fighting with fellow sailors and their wives, (AR 575-578), as well as numerous brawls with other enlisted personnel. (AR598.)

8. Although then existing Navy Regulations directed that personnel evidencing alcohol and substance abuse be counseled, directed for evaluation and offered the opportunity to participate in the Navy's Substance Abuse Rehab program (See SECNAV Inst 5300 series, AR 145 ), Six's command gave him solely a pro-forma warning addressed solely to his responsibilities to pay his just debts, (AR 457,626) and, dispatched him for TAD to Vietnam.(AR 521 ) On his return, without counseling or advice, Six's security clearance was revoked, his NAVSECGRU

[3] While not explained in Six's record, one familiar with Navy discipline would recognize this action, when coupled with record entries of the discipline action for "dirty uniform", as a short hand for a serious drinking problem.

assignment and attendant special pay was terminated, and, he was transferred from the Philippines to NAV STASANFRANCISCO for discharge processing.(AR 541, 545-46, 550-550)

9. The Philippines command did request he be evaluated for alcoholism, but provided the medics no details explaining that request, and made no records available to the medics to allow them to understand the nature and extent of his alcoholism, nor did it identify his special traumatic experiences aboard the Liberty.(AR 547) The evaluating doctor, while complaining of the lack of records needed for a "clearer" understanding, opined their was insufficient basis to determine Six suffered from alcoholism.(AR 541, 677-678) This was not acceptable to the reviewing authorities at BUPERS. BUPERS ordered that Six undergo a new psychiatric evaluation. This new evaluation was not conducted, and, in defiance of the BUPERS directive, Six was discharged on February 6, 1973. (AR426-427, 541)

10. As Six testifies, and confirmed by his children, records of the Los Angeles Police Department, and his current wife, his post service life has been profoundly troubled by his untreated PTSD, evidencing very sever social and industrial adaptability problems, and, a continuing pattern of sleeplessness, flashbacks, nightmares and uncontrolled rage and anger.(AR 122,216-215,234-237, 238-241, 256-258, 810-813) His ability to access the psychiatric care he so desperately needed has been obstructed by the common course of the avoidance of stimuli characteristic of the disorder,(AR 901, et seq., Stetson Comments in the Lockwood case), grossly compounded by the constraints of the silencing order.

11. Prior to and immediately following Six's discharge, his symptoms of PTSD with attendant alcoholism became catastrophically worse.. His children attest to the poverty stricken, sad and depressed circumstances of his post service life: he was "moody"; "he withdrew from us"; he presented wide mood swings; he would go off in uncontrolled rage and anger; he physically and verbally abused his wife and children; once discharged he rarely went except to get beer; he could not hold a steady job.( AR 15,16,17,27,28,44-48, 100-108 )

12. On January 9, 2003, relying on a VA determination he suffered from service incurred PTSD, supported by his and his children's statements, Six applied for correction of his naval records to establish his 10 USC 1201 disability retirement entitlement. The board denied the application on 25 August 2003 in a decision that articulated no reason other than "insufficient" evidence of error in the records.

13. On July 15, 2004, Six filed for reconsideration by the board, (AR 79, et seq.) adding a detailed psychiatric evaluation from Dr. Yuval Estrov, a well respected Southern California psychiatrist, (AR100-110) and a supplemental affidavit from Six. In his supplemental affidavit Six discussed the events of the attack and his rescue by Lockwood; his frustration and anger at the false report, the personal delivery of the silencing order to him while he was hospitalized, the effect the false report and the silencing order had on him, acknowledged the

truth of his children's statements, and, discussed the circumstances of the processing of his discharge, and, his post service life.[4]

14. Dr. Estrov reported he had reviewed Six's application and his available naval and medical records, plus the statements from Six's children, and conducted an in person evaluation of Six. Dr. Estrov carefully reviewed the criteria for establishing PTSD diagnosis, and carefully identified each fact he relied on in confirming Six suffered from service incurred PTSD, and, determined Six was 70% disabled from PTSD at the time of his discharge in 1973.(Id., at 109) Dr. Estrov identified that Six fulfilled criterion A of DSM IV for the diagnosis of PTSD, experiencing a traumatic event (threat of death or serious injury) in June, 1967; that Six" now and did fulfill criterion B for PTSD in winter of 1967, discussing Six describing daily and intrusive recollections of the event, which began in 1967 in the hospital, that he describes nightly nightmares of the events, gets only 3 hours sleep a night on average, and experiences flashbacks of the attack that were most prominent in 1968, that if is not careful in the shower and water gets over his head, 'I'm back in the hole" and begins to feel as though he is drowning, with shortness of breath and a paralyzing fear he is about to die., and experiences intense psychological

[4] When I interviewed the children, by phone, in preparation of those statements, I insisted Six leave his home during the interviews of his oldest step daughter, and his son. And, the son was not present during either daughter's interviews, and, I did not provide Six copies of those statements until after I filed them with the board.

responses at events that remind him of the attack. Dr. Estrov further reported that Six fulfills now and fulfilled criterion C ( avoidance of stimuli) in 1968, noting Six reports avoiding thoughts and conversations regarding the Liberty, he maintains distant relationships with the veterans of the Liberty and uses alcohol during infrequent meetings with them to allow him to converse with them: that the beginning in 1967, he avoids going to the beach or having water touch his head in any way; that starting in 1967 he is unable to recall the names of the 2 victims of the Liberty attack, despite being reminded of the names several times; he reports guilt that they died and he survived and “wish[es] it was me instead of them; that he has “prominent’ detachment from others and reports that starting in 1967 he has been unable to be close to loved ones, feeling that emotional intimacy will only lead to grief<”You get close and then they’re gone”, causing his inability to tell family members that he loved them and his inability to hug his children, “I didn’t love anybody because of ’wanting to die;” and, starting in 1967 he had feelings as though he were in some way ”already dead”. Dr. Estrov further found that Six fulfills now and did in 1968, criterion D for PTSD (Increased arousal.) He reports Six has had nightly insomnia since 1967, he has decreased concentration, is hyper vigilant ”I’m always on guard” and has an increased starle response and ducks when he hears a loud noises.(AR100-110)

15. On 23 July 2004 the board again refused to correct Six’s records. On December 2, 2004, Six filed his claim in his court and together with substantial additional documentation, which this Court treated as a motion to supplement Six’s record. (Six v. U.S. 71 Fed. Cl. 671(2006). This

Court, in its June 30, 2006 opinion denying defendant's motion to dismiss, remanded the record to the board with instructions to admit the supplemental documentation into the record[5] and, to review its decision in the light thereof, and, specifically directed the board to evaluate whether the Silencing Orders impeded Six from seeking timely diagnosis and care for his PTSD, directing the board to consider the case in light of the supplementing evidence, and, in that broader evidentiary context determine whether plaintiff suffered from PTSD., (Six, supra Slip, p.5) and, whether the silencing order impeded Six from seeking timely diagnosis and treatment for his disorder.(Six, supra, slip at p. 16.)

16. On March 24, 2007, the board again denied Six's application.(AR 150 et seq.) Its decision is mean spirited and is contradicted by the evidence of record, including the documents the board cites to support its decision.

17. The board dismissed Dr. Estrov's evaluation on the grounds he relied on Six's self reported symptoms, on the erroneous grounds that Dr.Estrov had "glossed over" or failed to consider many aspects of Six's personal history, on the erroneous grounds Dr. Estrov had failed to consider the messages of July 10, 1972, which messages were not then available to counsel or the doctor, but in fact confirm the material regarding Six's conduct discussed by the Doctor, and, on the ground that Dr. Estrov's analysis of Dr. Cain's report is misleading" in his criticism

5 The Court excluded one unsigned, statement from an unidentified shipmate at San Diego.

of Dr. Cain's diagnosis of Immature Personality, declaring such a diagnosis was in fact within the permissible diagnostic terminology under DSM III. The ICD document the board relies in fact confirms Dr. Estrov's statement that the diagnosis was inappropriate in Six's case.(AR 152-157)

18. The board denies the existence of a silencing order, citing the Presidential Unit Citation award. That document confirms the extent the administration went to avoid identifying Israel; it makes no mention of Israel as the attacking force, and merely describes the attack as taking place in the "Eastern Mediterranean".

19. The board then dismisses Dr. Kiepfer statements on the irrelevant ground he is an member of the USS Liberty Alliance, and, that he had not discussed the silencing orders in prior statements in made in Six's VA applications. It then challenges his credibility (AR159) for having given a statement that he treated Six for facial injuries when there is no supporting entry in Six's medical record, although the USS America entries document treating Six for arm, hand, and leg wounds when Six's care was transferred from the Liberty to the America and subsequent medical entries document Six being treated for facial pain throughout the remainder of his service..

20. The board's dismissal of Capt. Boston's statement borders on the absurd. Without explanation, the board states his statement is "self contradictory. It then dismisses his testimony

because it alleges he is biased against those he considers "apologists" for Israel, including Mr. Cristol, whose article is added to the record by the board.

21. The board dismisses RADM Staring's affidavit as not addressing the silencing order. It was offered to establish the irregularities in the review of the Report. It is noted that documents other documents from RADM Staring added by the board in fact do address the silencing of the crew.

22. Six here submits that the board's decision is arbitrary and capricious, contrary to and unsupported by the facts of record, and, that this Court should grant him judgment on the administrative record, granting him his 10 USC 1201 disability retirement entitlement.

## 4 <u>SUMMARY OF ARGUMENT</u>

23. In disregard of the orders of this Court , and, its duties under the authorizing statute, (10 U.S.C. 1552 (2000) ) and its governing regulation, ( 32 C.F.R. 723) defendant has denied plaintiff his right to a full and fair hearing on his application for correction. In violation of plaintiff's rights under the Administrative Procedures Act, (5 USC 706 (2000)), without notice to plaintiff or opportunity to comment on or rebut, the board relied on extra record material of questionable materiality, relevance, and competence in denying his application. The board's decision makes a mockery of this Court's Remand orders (Six, supra) and is arbitrary and capricious, in disregard of the facts of record, and, must be set aside. (Roth v. U.S., 378 F. 3d

1371 (Fed. Cir. 2007 ) The administrative record clearly establishes that at the time of Six's discharge in February, 1973, Six was then disabled from PTSD , and should have been transferred to the Disability Retired List under 10 USC 1201 (2000) with a rating of 70%. The board's invoking the presumption of regularity of actions by government officials in this case, whether referring to its own conduct or those of the officials processing Six's discharge in 1972 and 1973 is unwarranted. Given the board's refusal to conduct a full, fair and unbiased review of Six's application, this Court must grant plaintiff summary judgment on the administrative record and direct his assignment to the retired list, with the attendant retired pay entitlements.

# 5 ARGUMENT

## A. PRESUMPTION OF REGULARITY REBUTTED

24. Plaintiff acknowledges that government officials, including military officials and the correction board officials enjoy a rebuttal presumption that "administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." (Chayra v. U.S, 23 Cl. Ct. 172, 178 (1991), quoting Sanders v. U.S., 219 Ct. Cl. 285, 302, 594 F.2d 804, 813 (1979) The record totally rebuts that presumption, whether examined from the view of Six's processing by his NAVCOMSTAPHILLIPINES command, his processing by the NAVSTASANFRANCISCO separation command, or, by the correction board itself. At every

critical step responsibilities were ignored: evidence ignored, regulations ignored, professional standards ignored, instructions of higher commands ignored, and, most sadly, Six's progressive deterioration not merely ignored, but taken advantage of to meet the pressing personnel shortages then facing the service.

25. Starting with NAVCOMSTA's failure to provide Six and his family with care and counseling when it became evident he had lost control of his personal and family finances; (AR 448, 456, 466, 546-583) its failure to act on the November, 1971 incident at the EM club evidencing he was suffering from sever rage, engaged in spousal and family abuse, and uncontrolled alcoholism; (AR 44-48, 575-576, 550-557,575-578) through the incidents in May, 1972 prompting the command to terminate his NAVSECGRU status and request his transfer for separation ( AR 541, 545-546, 550-555 ). Clearly that command failed in its duties under then governing Navy instructions regarding counseling and treatment of personnel evidencing symptoms of alcohol and substance abuse. (AR145) It seems evident the November events were ignored to meet the command's personnel needs to TAD personnel to Vietnam.

26. Next, there is the psychiatric evaluation of Dr. Cain, establishing a diagnosis of Immature Personality Disorder, although that diagnosis is clearly inappropriate in Six's case under the applicable professional diagnostic standards since Six had a history of sever brain trauma. (AR 308-315, at 308; ICD F 60.) The fact this diagnosis was not warranted by Six's history of brain trauma apparently was recognized by BUPERS, but its order to conduct a new, competent

psychiatric evaluation was ignored (AR 543 ) and Six was discharged on February 6, 1973, without being presented to either a Medical Evaluation Board or a Physical Evaluation Board. (AR 426, 541) Finally, we have the actions of the correction board, ignoring its duty to correct records evidencing error causing injury to the applicant, (AR 150, et seq.) and, ignoring the specific orders of this Court in its Remand Order and its Order deny reconsideration.(Six, supra.) The presumptions of regularity should not constrain the Court's review on this record.

## B Six's Rights of Administrative Due Process Violated

27. The Correction Board considered and relied on numerous documents not contained in Six's Naval Records, without notice to Six or according him an opportunity to comment on or rebut the information in those documents, (AR 150-151 ) all in violation of Six's rights to administrative due process under the Fifth Amendment and under the Administrative Procedures Act (5 U.S.C. 706 (2000), thus denying him the "full and fair hearing" he is entitled to under the regulations. (32 C.F.R.723) We acknowledge that the board is not subject to the rules of evidence, and is authorized to consider a wide variety of material. Procedurally, however, the board must accord Six a full and fair hearing, including notice to Six of the data being considered by the board and an opportunity to comment on or rebut that material. (Service v. Dulles, 354 U.S. 363). The board's procedure denying him that right violated Six's rights to administrative due process and denied him a full and fair hearing.

## C Board Denial Arbitrary, Capricious, Ignores Substantial Evidence of Record

28. In acting on a motion for judgment on the administrative record, the standard of review is whether given all disputed and undisputed facts, the moving party has met its burden of proof based on the evidence of record. (Bannum, Inc. v. U.S., 404 F. 3d 1346, 1356 (Fed Cir. 2005); Acevedo v. U.S., F. 3d , (Fed. Cir. 2007) In correction board cases, the standard is whether the decision is arbitrary, capricious, unsupported by substantial evidence, or, contrary to law.(Porter v. U.S., 163 F. 3d 1304, 1312 (Fed. Cir. 1998); Skinner v. U.S., 219 Ct. Cl. 322, 594 F. 2d 829 (1978)). The results of board proceedings on remand are subject to court review. (Pomeroy v. U.S., 39 Fed. Cl. 213, 215-216 (1997); Randolf v. U.S., 31 Fed. Cl. 787, 789-790 (1994). The Court is required to make findings from the record as if it were conducting a trial on the record. (Bannum, supra, 404 F. 3d 1355-57) The Court's role is limited and cannot substitute its judgment for the military when reasonable minds could reach differing conclusions.(Heisig v. U.S., 719 F2d 1153, 1156 (Fed, Cir. 1983)) Plaintiff has burden of establishing by cogent and clearly convincing evidence that the board's decision is not supported by substantial evidence . (Colon v. U.S. 71 Fed Cl. 473,484 (2006), citing Wronke v. Marsh, 783 F. 2d 1569, 1576 (Fed. Cir. 1986), aff'd. sub nomine, Acevedo v. U.S., F. Appx. , 2007, W.L. 445004 (Fed. Cir. 2007))

29. Plaintiff has clearly met this high burden of proof on this record. By clear, cogent, credible, relevant, convincing evidence Six has established that he was suffering from disabling PTSD at the time of his discharge in 1973, and, that the board decisions denying him correction so as to establish his entitlement to 10 USC 1201 disability retirement benefits was arbitrary, capricious, and contrary to the facts of record and applicable law. The board's decision on remand ignores the remand orders of this Court. It is dismissive, mean spirited and petty, demonstrating that the board has lost all sense of objectivity and fairness in this case (and in all cases involving the Liberty survivors.) In its decision, the board ignores the clearly established facts that the military officials processing Six's transfer and discharge acted in bad faith and in disregard of governing statutes and regulations at every material stage in the events leading to Six's discharge. The record is clear Six was disabled from the brain trauma suffered in the Liberty attack. Had he been provided competent medical diagnosis and treatment in the years following 1967, instead of ignoring the signs of his deterioration, it is probable that the disabling affect of that trauma could have been avoided, or minimized. Even as late as 1971, he might have responded to competent care. Had he been properly processed in 1972 and 1973, he would have been transferred to the disability retired list with his pay and benefits under 10 U.S.C. 1201. It is now this court's responsibility to grant his judgment on this administrative record and provide him those benefits.

## D Record Establishes Six's PTSD at 1973 Discharge

30.. The statements of Dr. Estrov and Dr. Kiepfer clearly establish that Six suffered from and was disabled by PTSD and was so disabled at the time of his discharge.(AR 100-110, and 820-838) Each carefully identify the facts they relied on in reaching this diagnosis. The board dismisses Dr. Estrov's diagnosis because it was based on Six's own descriptions of his symptoms that the board had previously held unreliable. As Judge Hodges observed in Van Cleave v. U.S., ( Fed. Cl. , docket 03-1765C, filed May 19, 2006) this concept of rejecting the individual's description of his symptoms is contrary to all medical standards in the field of psychiatry. Further, Dr. Estrov carefully documented the facts he personally observed in his in person interview of Six in 2004 in evaluating the credibility of Six's report of his symptoms. He carefully identified the data he relied on in reaching his diagnosis and conclusions.(AR 106-107) Perhaps most telling in that data was the statements of Six's children regarding Six's conduct and demeanor from 1968, through 1973, and, thereafter,. (AR 111-118) subsequently verified in this record by the extra record documents the board itself introduced.

31. The board did not conduct a fair and objective evaluation of this evidence. It ignored these statements from Six's children and attacked the Doctor's diagnosis for his alleged failure to discuss certain 1971 and 1972 documents from Six's Command, well knowing those documents were not in the copy of Six's Navy Records provided counsel, and thus not available to the

doctor for his consideration.( AR 154) This is strange, because the documents the board relies on in rejecting Dr. Estrov's testimony in fact fully support Six's statement (AR 111-118) and those of his children (AR 44-48) as they relate to his conduct in the Philippines, his sever alcoholism, his loss of control of his personal and family finances, his family and spousal abuse, and, his fighting with other service members. These document the fact the Command well knew these tragic events were taking place and provided him no counseling or assistance. (See: AR 445-457) The board suggests Dr. Estrov should have given more consideration to Six's performance evaluations, particularly those shortly following the Liberty attack. The pertinent reports show a clear and progressive deterioration. The board's discussion of whether the Command was required to justify the sub standard ratings is simply irrelevant to Dr. Estrov's diagnosis. (AR 154-155)

32. The board states Dr. Estrov's critique of Dr. Cain's diagnosis is "misleading", when he states the diagnosis of immature personality disorder was not an accepted DSM diagnosis. It relates that in 1972/1973, when the "clinician judged that a specific…disorder not included in the DSM was appropriate" the diagnostic criteria of the International Classification of Diseases (ICD) should be assigned, and, assigning a diagnosis of immature personality disorder under ICD -10 code F60.8 was appropriate. (AR 155) The board fails to discuss that under ICD 10-code F60, assigning such a diagnosis is inappropriate for an individual, like Six, with a history of "disease, damage, or other insult to the brain or … other psychiatric disorder". (AR 308)

33. We acknowledge Six did not reveal his alcoholism to Dr. Cain or other attending medical personnel. As Dr. Stetson's comments in the Lockwood case, and both Dr.. Estrov and Dr. Kiepfer establish in this record, this is consistent with the diagnostic criterion for PTSD, avoidance of stimuli. What is troubling is that defendant itself concealed Six's troubled history from the medics. Had the command heeded Dr. Cain's request for more information, provided him a copy of Six's records, or otherwise provided him information as to the circumstances prompting Six's referral for psychiatric evaluation, it seems obvious a different diagnosis would have been established. Indeed, it is clear that the command failed to comply with governing Navy Regulations in responding to the November 1971 EM club incident (See SECNAV Inst 5300 series, and implementing regulations of OPNAV and BUPERS regarding care and treatment of alcohol and substance abusers) and concealed Six's alcohol abuse from the medics in assigning him flight status in Vietnam. (See: BUMED Inst. 5300 series.) Those regulations required such personnel be restricted from access to classified information and prohibited from duty in flight status. At best, defendant was complicit in concealing this information from Dr. Cain. A fair inference can be made this information was withheld from the medics to preclude Six from gaining access to the Alcohol and Substance Abuse Rehab program.[6] The board's

---

[6] This was a controversial program within the Navy at that time; ardently supported by some, aggressively opposed by others.

dismissal of Dr. Estrov's evaluation was an evident effort to avoid a fair and objective review of his diagnosis. Indeed, in referencing its decisions in the other BCNR cases, docket no. 07638-05, (AR 275- 287) and in BCNR docket No. 09117-04, (AR 289- 307)[7] the board seems almost to brag of its refusal to objectively consider the claims of Liberty survivors.

34. The Board's responsibilities is well stated by Judge Horn in *VanCleave* v *United States*,, docket 03- 1765C, filed June 24,2005. Judge Horn there noted:

> " Correction boards must examine relevant data and articulate satisfactory explanations for their decisions. Yagjian v. Marsh, 571 F. Supp. 698,701 (D.N..H. 1983) (Citing Motor Vehicle Mfrs. Ass'n of the United States, Inc. v State Farm Mut. Auto ins. Co.,463 U.S. 29, 43 (1983) This includes making rational connections between the facts found and the choices made. A court may find a correction board's decision arbitrary and capricious if the board entirely fails to consider an important aspect of a problem, offers an explanation for

7 The Court is informed that in the Lockwood case, BCNR docket 09117-04/09330-04, the board concealed BUMED's favorable comments and recommendations on the applicant's psychiatric evaluation in that case, (see AR 901-904) initially closing that record and sending it to storage without informing counsel or the applicant of the document or according counsel notice of its existence.

> its decision that runs counter to the evidence before the board, or is so implausible that it could not be ascribed to a difference in view or the product of board expertise. (Additional underscoring supplied.)

*Van Cleve II, supra,* Fed. Cl. at .

35. Here, while claiming to have considered the "application, together with all material submitted in support thereof," [A.R. 6 ] and. its representation on remand that "After careful and conscientious consideration of the entire record", (AR 153) the board wholly ignored and failed to considered the statements of Six's son and Six's step children. These documents attest to and substantiate Six's testimony of the severely disabling effects of Six's severe PTSD, including his severe alcoholism, and its affect on his performance of duty as well as his family life. [ A.R.12-19, 21, -26, ]. Further, the board failed to examine into or consider Six's claim that his alcoholism was related to the affects of his PTSD, failing even to seek advise of Naval Medical authorities as to the medical reasonableness of his claims. The Executive Director then wholly ignored Dr.Estrov's Report[8], establishing the high incidence of alcohol abuse and PTSD;

[8] Dr Estrov's Report, inter alia, was responsive to the board's decision that Six's claim that he was disabled from his PTSD at the time of his discharge, and, that his alcohol abuse was caused or exacerbated by his PTSD were unsubstantiated.

confirming Six suffers from PTSD, and confirming that Six was disabled by PTSD while in service and at the time of his discharge in 1973. (AR 100-107) Such actions by the board are arbitrary, capricious and materially prejudiced the plaintiff.

36. We invite the court's special attention to the board's failure to consider Dr. Estrov's testimony, or to seek advice of the Navy's Medical authorities[9] in rejecting Six's claims of

[9]Such referrals are customary in these cases. It is of significance to note that the date of the Executive Director's denial of Six's Motion to Reopen was closely aligned in time to issuance of an advisory Comments and Recommendations by the Adult Behavioral Healthcare Clinic, National Naval Medical Center, reversing an earlier advisory Comment and Recommendation in the Lockwood case (Six's shipmate and rescuer), also claiming disability retirement entitlement for PTSD arising from the Liberty incident. Counsel represents that applicant as well. In that proceeding, on April 29, 2004, BUMED advised the board that "After reviewing ....''s record .... the affidavit of Mrs ..., and the findings of Frank M Ochberg, MD, it is my medical opinion that ........has Post Traumatic Stress Disorder (PTSD), chronic, stemming from his participation in the attack on the USS Liberty. This disorder was incurred in the line of duty." (See AR 901, et seq.) BUMED;'s comment continued, "LCDR Carroll also notes that ... did not seek psychiatric help for his symptoms. ... The insidious nature of PTSD is such that those

PTSD and that his alcohol abuse was in fact a symptom of his PTSD. Perhaps the bopard was itself "avoiding stimuli."

37. Dr. Estrov's Report confirmed Six's diagnosis of PTSD, established Six has been suffering from PTSD from 1968 to date, was disabled by the disorder at the time of his discharge

---

with the condition typically do not seek help. This is consistent with DSM-IV Criteria C: avoidance of stimuli. .... In establishing a diagnosis, it is neither significant, nor helpful that ... did not seek psychiatric care in the early phase of his illness, as this is consistent with the presentation of PTSD. ... I recommend the board ... amend ...'s record per his request." It is worthy of note that although the board received that document on May 1, 2004, it was not forwarded to the applicant's counsel until November, 2004, following counsel's written demand for same. A fair inference can be drawn that the 23 July 2004 action of the Executive Director in rejecting Six's motion to reopen was improperly motivated by a materially prejudicial intent to avoid the board's responsibility to carefully weigh and evaluate the evidence presented, and, preclude a similar Comment and Recommendation from Navy Medical Authorities in Six's case. Indeed, a fair inference can be made that the failure to forward that document to counsel for comment as required in the Navy's correction board regulations was motivated to conceal that document from counsel until the Motion to Reopen in this case was filed.

in February, 1973, and was then rateable at 70% under the VA Rating Manual.[ A.R. 100-110] Dr. Estrov's evaluation was reviewed by and confirmed by Dr. Kiepfer. (AR 820-838) based on Dr. Kipefer's personal knowledge of Six's trauma during the Liberty attack, his personal knowledge of some of the other stressors from the silencing order and the false report Six was struggling with, and Dr. Kiepfer's study of the DOD/VA studies of PTSD in combat veterans.

38. Six asserts he was discharged "for cause;" that while the stated cause was his failure to control his financial affairs, the real reason was that his abject alcoholism rendered him unfit for duty handling classified materials, that his inability to control his dysfunctional family life was interfering with his ability to perform his NAVSECGRU's duties, and, that his spousal and family abuse was an embarrassing disruption in the family housing area. This is entirely confirmed by the additional documents the board included in his Navy records. (AR 553- 601) Those documents clearly report his Command's having revoked his security clearance, clearly show his transfer from the NAVSECGRU, clearly report his dysfunctional family circumstance, and clearly declare his alcoholism, his spousal and family abuse, and, his loss of control of his personal and family finances. Counsel is himself a Retired Navy JAG Reserve officer who served 5 years at BUPERS involved in the processing of Reserve Officer status changes and discharge, and has frequently served as either a member or as counsel to such proceedings. It is quite unusual to see an individual's security clearances revoked and his being referred for discharge on the occasion of the command's first record entry of an official

warning regarding his responsibility to pay his just debts. Especially where, as here, the record shows that all his outstanding debts had been paid before he was being processed for discharge. Thus, a heavy inference exists that the true reason for his discharge was, as Six asserts, his alcoholism and family abuse. Six asserts that the Navy violated multiple applicable regulations in revoking his security clearance and transferring him from his NAVSECGRU unit; that he was never informed of his right to contest that action and never informed of his right to consult legal counsel either with respect to the revocation of his security clearance or his discharge. Further, he was never informed of his right to apply to participate in the Navy's Alcohol Treatment Program, and, that participation in that program might save his Navy and his NAVSECGRU career.

39. in his July 15, 2004 Motion to Reopen and for Reconsideration, Six addressed in detail the Silencing Order, the Navy's false Report of the Court of Inquiry on the Israeli attack on the Liberty, and, the psychiatric impact the Silencing Order and the false report has had on him, his ;performance of duty, his service career, his family life, his children, and, throughout the remainder of his life. [A.R. 82-99, 111-117, 119-128]

40. Dr. Estrov reported: "PTSD is commonly associated with other psychiatric conditions. In combat related cases of PTSD, ..., co-morbidity is often the rule. ... the prevalence of an alcohol dependence diagnosis in combat related PTSD has been estimated as high as 75%," citing: *Am. J. Psychiatry*. 2001, Aug:158 (8) 1184-90. Dr Estrov concluded: "The time course of

psychiatric diagnoses: PTSD in 1968 and alcohol dependence in 1969 leads me to conclude that PTSD symptoms were more probably than not etiological in the subsequent development of alcohol dependence."[A.R. 108]

41. Dr. Estrov also addressed Six's 1972 mental health evaluation noting the examiner's conclusion that he needed to review other records, not then available to him, before a definitive diagnosis could be established. It is to be noted that thereafter, a superior medical officer entered a diagnosis not contained in the governing DSM IV. [Id]

42. A fair inference can be made that the first evaluator was troubled by Six's affect and demeanor. As Dr. Estrov notes, there was no notation of Six's affect[10] in the report of evaluation. It also can be fairly inferred that the evaluator was troubled by omissions of psychiatric significance in Six's available medical records. For example, in his Report of Medical History Six prepared in February, 1971, Six struck out and did not answer several questions relating to his mental health status. In the 1972 Report of Medical History, Six denied any such concerns. Six was in fact in both 1971 and, 1972, severely disabled by his PTSD and related mental health disorders. And yet, to discuss those problems would violate the Silencing Order, since he would have to discuss the true facts of the attack, and the fact defendant's report of the attack was intentionally false. The Psychiatric team evaluating Six in 1972, ignorant of the Silencing Order,

[10]Report of a person's "affect" is a fundamental to a competent psychiatric evaluation.

and, having failed to inquire as to service events that might put Six at risk for psychiatric disorders, misconstrued Six's lack of cooperation in the mental health evaluation and erroneously concluded he was evidencing "immature" conduct. Presumably this "immaturity" was his perceived lack of responsible appreciation of his then situation, his blaming his then wife for those circumstances, and, his failure to accept personal responsibility for his financial circumstances. In truth Six was constrained by the Silencing Order. By his lack of cooperation he was trying to comply with that order. In fact, in 1971, Six was evidencing clear symptoms of PTSD: anger, severe loss of focus and control due to flashbacks, nightmares, and, inability to sleep, survivors guilt death wish, alcoholism, uncontrollable rage, and, avoidance of stimuli, compounded by his fear of violation of the Silencing Order. At the times of his 1972 exams, these PTSD symptoms continued to haunt him. His " avoidance of stimuli", compounded by the Silencing Order, and, the lack of professionally diligent inquiry by the personnel and medical staff processing his discharge, and the complicit failure of his NAVCOMSTAPHILIPPINE command to inform NAVSTASANFRANCISCO of the circumstances of Six's transfer, left these doctors to speculate. They erred.[11]

---

[11] Counsel's past experience in dealing with similar situations notes that such transfers, coupled with directives for psychiatric evaluation, frequently reflect the fact the individual is being processed for alleged homosexual behavior. The Navy regulations required a psychiatric evaluation in processing the accused for administrative discharge. It is common in such circumstances that the individual stands silent. The 'diagnosis" of "immature personality" seems to be the diagnosis of choice of military clinicians in such circumstances. For the medics it eliminates the need for an MEB or PEB; for the administrative command it clears the deck for discharge orders.

43. Rather than perform its duty, the board rejected as "unsubstantiated," Six's claim his abuse of alcohol "was related to the effects of undiagnosed and untreated posttraumatic stress disorder". [A.R. 7 ] The board wholly ignored the affidavits of Six's step children and the statement of his son, affirming Six's overt symptoms of paranoia, severe alcoholism, suicidal thoughts, survivor's guilt, sever withdrawn moodiness, loss of personal control of his affairs, and, uncontrollable rage, dating back to 1968,[ A.R. 44-45, 46-47] Each of these are symptoms of PTSD. Contrary to the board's determination these symptoms are clearly documented and substantiated in the record, including Six's military and medical records.

44. It is now well documented that alcoholism is so prevalent among those suffering from combat related PTSD that it is considered a symptom of the disorder. See, for example: Reports of the Military Operational Medicine Research Program, U.S. Army Medical Research and Material Command, Ft. Detrick, MD; Reports of the Department of Psychiatry and Behavioral Sciences, Walter Reed Army Institute of Research; Reports of the Center for Disease Control Vietnam Experience Studies, and, Reports of the Joint DOD and VA PTSD Studies.

45. Given Six's status as a Liberty Survivor, it is difficult to defend the failure of the medical personnel, the personnel specialists, and his military superiors evaluating and processing Six in 1972 and 1973 for their lack of professionally diligent inquiry and their failure to diagnose and treat his PTSD at that time. Six's NAVSECGRU superiors and colleagues may have misguidedly felt they were being protective in failing to document Six's deteriorating mental health condition

in deference to him as a Liberty survivor and his two tours in Vietnam. There is no justification for the board's actions in 2003, 2004. Indeed, the Board's actions evidence a fundamental bias against veterans suffering from the dual effect of PTSD and alcohol abuse. This is inexcusable and indefensible. The correlation between PTSD and alcohol abuse among combat vets was well know and well documented among psychiatrists and those with expertise in military personnel matters by 2003. See, for example, the reports and studies underlying the medical journal articles relied on by Dr. Kiepfer in his statement : *PTSD, Alcoholism, and Drug Abuse*, Journal Watch Psychiatry, May 1, 1996; 1996 (501):5-5; *Posttraumatic Stress Disorder in the National Comorbidity Survey*, Arch. Gen. Psychiatry 1995; 52-1048-1060; *Trauma and the Vietnam War Generation: Report of Findings from the National Vietnam Veterans Readjustment Study*, New York: Brenner/Mazel, 1990; *Preliminary Findings from Perceptions of Wellness and Readiness Assessment*, Mil. Med. 1999, 164, 174-181.

46. The board rejects Six's claims he was blocked from disclosing his PTSD by defendant's Silencing Order. [ A.R. 95, 113, 115, and 159,160,161] The board consistently mis-represent's the limits the silencing order imposed, construing any mention of the attack as a violation of the orders While this is literally true of the order delivered to Six, the order did not block discussion of the obvious; it prohibited discussion of the attack except as described in the non classified version of the Report of the Court of Inquiry, and its accompanying DOD press release.(AR 209-210.) The record shows they were prohibited from discussions of " military intentions, our own

or the intentions of others;" (AR 349) interviews were permitted only if the individual signed a statement they understood and would comply with the limitations. ( AR 354). The COMNAVEUR Command prohibited all interviews of the crew "at this time." (AR 358) Finally, COMNAVEUR ordered that "crew members are limited to responses set forth in" the DOD press release restating the false conclusions of the Report. (AR 361)

47. Six could not discuss his anger and rage, and his flashbacks and nightmares, his survivor's guilt death wish, and how they affected his family and daily life without discussing the fact the Report was a deliberate lie, that the attack was a planned attack on a known US Navy ship, with the intent to sink the ship and kill the crew; that the Navy had refused to come to the Liberty's defense, and the Report was a deliberate lie, a continuing betrayal by the government of the honor of his shipmates, alive and dead, and, of his honor. And, his medical entries rel;ating to the attack make no mention of his having been trapped, unconscious in the flooded compartment; merely that he received wounds to his arm, hand and leg.

48. The board rejects Six's claim on the grounds he did not raise the issue in his initial application papers. It references another docket involving a Liberty survivor notes the applicant in that docket did not raise the issue before the board, but had raised it in his application for VA benefits; cites another docket, again noting the silencing order was not mentioned in that petitioner's initial application; and, states LCDR Ennes did not mention the silencing order in his

book.[12] These observations by the board lack objectivity, ignore the testimony of numerous other Liberty survivors regarding the silencing order,[13] and are wholly irrelevant to the issue of whether such orders were issued. They are clearly documented in this record by documents introduced by the board itself. The board thereby ignored the issue of whether the orders impeded Six's ability to gain timely diagnosis and treatment of his PTSD disorder. Dr. Kiepfer testified they did, as did Mr. Six, Mr. Ennes, Mr. Tourney, and, Mr. Lockwood. (AR 192-198, AT 193-195, 199-204, at 202-204; 295; and 254-58) In ignoring this material evidence, the board ignored a well and long recognized phenomena of PTSD and other mental health disorders, in general, and, among combat veterans, in particular. Defendants own studies, discussed by Dr. Kiepfer, establish that of military personnel suffering from PTSD, less than 40% sought professional help for their difficulties. *Combat Duty in Iraq and Afghanistan, Mental Health Problems , and Barriers to Care*, NEJM, 357:13-21(2004), citing, inter alia: *Arch. Gen. Psychiatry*, 1993; 50:85-91; and, 1994; 51:8-19; and, *JAMA* 2003; 298:3095-3105. (AR 860-880)

---

[12] Commander Ennes' entire book was a protest of the horrible lies and betrayal of the US government in its abandonment of the Liberty crew, during and after the attack. Any discussion with LCDR Ennes leaves no doubt that his book was a conscious, indeed conscientious, ignoring of that order.

[13] See: Jones 9AR 84-816), (Benkert (AR 817-819), Tourney ( AR )and the statements of MCPO White and at AR in the Lockwood proceeding, Fed Cls docket , referenced by the board (AR 156 )

49. These studies reflect only those circumstances where the individual's perception of stigma associated with mental health diagnosis and treatment, such as fear of perceived failure, perceptions of weakness, and, loss of respect from family, peers or by the leadership, are the constraining factor. Here, in addition to these PTSD characteristic constraints, Six was proscribed from reporting his symptoms in fear of violation of the Silencing Order. To explain his symptoms, Six would necessarily have had to discuss his experiences in the attack on the Liberty; the planned willful nature of the attack, its intent to sink the ship and kill the crew and, the publication of the false report to conceal these facts.. Doing so violated the Silencing Order. Nowhere has the board address this critically material issue. As Dr. Kiepfer states in his supplemental declaration, that order clearly restrained Six from seeking the timely medical care and treatment he so desperately needed. ( See: Plaintiff's Exhibit 1)

50. The Board's assertion that Dr. Estrov "glossed over, failed to consider, and/or ignored many significant aspects of your personal history" (AR 153) is contradicted by any fair reading of his Psychiatric Report, (AR 100-110) and, an unwarranted, unsupported attack on his professionalism. Any fair and objective reading of the report establishes that Dr. Estrov specifically addressed these so called "aspects" of Six's personal life. (AR 104) It is evident he considered these issues, but concluded the sever mental trauma Six experienced in the Liberty attack was the critical factor in Six's psychiatric symptoms. The board seeks to defend the diagnosis of immature personality, while ignoring the horrific reality of the concussion , loss of

consciousness, and multiple mental traumas Six suffered in the attack. Candidly, counsel wonders what role the board deems it is serving. Ignoring the Six's terrifying experiences aboard the Liberty, the board instead seeks to suggest his childhood poverty, and being raised by a single mom explains his PTSD symptoms. (AR 153) That is a despicable, shameless twisting of reality that is simply injudicious and unprofessional. The role of the board should not be that of a junkyard dog, mounting a personal attack on any who dare enter its province. The board's duty is to conduct a full and fair hearing. It has totally failed in that duty in this case.

51. As noted above, Dr. Estrov's diagnosis is confirmed by Dr. Kiepfer based on Dr. Kiepfer's review of the then available record data, (which did not then include the NAVCOMSTAPHILIPPINE documents regarding Six's conduct at that command) and, as the Liberty's medical officer during the attack, his personal knowledge of the horrific trauma Six suffered in the Liberty attack. Based on these facts and his professional training as a medical doctor, reinforced by his study and review of current medical journals dealing with the effects of traumatic, battle stress, Dr. Kiepfer confirmed Six suffered from and was disabled by PTSD at the time of his discharge. With a snide reference to Dr. Kiepfer's membership in the USS Liberty Alliance the board then dismisses Dr. Kiepfer's careful evaluation of Six's disabilities by an irrelevant comment that Dr. Kiepfer had not mentioned the silencing order in two earlier statements he filed on Six's behalf in VA proceedings. The board further stated Dr. Kiepfer's credibility is subject to "serious concern" because, in one of those statements, it notes he had

stated he had personally treated Six for multiple mini-fragment facial injuries, whereas Six's medical record does not document Six suffered mini-fragment facial injuries in the attack. It is angering to see such pettiness seized as a basis to attack Capt. Kiepfer's credibility.[14] The Record establishes that then Lt. Kiepfer was the only doctor aboard; and, he, and two corpsman, all themselves wounded, struggled to provide and supervise the care of the 33 U.S Navy personnel and one civilian killed and the more than 172 Navy and civilian personnel wounded in that attack.(AR 399) As he has testified, "I have been told that some question the fact these men were in fact injured because of the lack of detailed entries in their medical entries in their medical records at and following the attack. I guess these geniuses have no experience in trying to provide care to hundreds of severely injured personnel, all at the same time. …" (AR 827)

52. It is shocking that the board seizes on such an irrelevant issue to avoid its duty to carefully evaluate the relevant evidence before it. Had the board reviewed the record it would have noted that Six's medical record contains multiple post attack entries of Six's complaint of sever facial pain, the diagnosed as "Sinusitis", (AR 719, 720, 724, 725, 746, 747, ) plus, his treatment surgery to correct malformation of his mandible. (726-730) It is noted the mandible

[14] What is angering is the board engages in this character assassination, while ignoring Six's request for a personal hearing.

surgery did not alleviate his facial pain. Again, the board substitutes character assassination for responsible, fair examination of the data.

Plaintiff respectfully submits that the Administrative Record establishes by clear, relevant, material, cogent and credible evidence on which reasonable minds could not differ that he was 70% disabled by post traumatic stress disorder incurred in and aggravated by his service at the time of his discharge in 1973, and, that the board's decision denying him correction of his navy record to establish his 10 U.S.C. 1201 disability retirement rights is arbitrary, capricious and contrary to the record evidence.

## Conclusion

Plaintiff respectfully submits that the Administrative Record establishes by clear, relevant, material, cogent and credible evidence on which reasonable minds could not differ that he was 70% disabled by post traumatic stress disorder incurred in and aggravated by his service at the time of his discharge in 1973, and, that the board's decision denying him correction of his navy record to establish his 10 U.S.C. 1201 disability retirement rights is arbitrary, capricious and contrary to the record evidence.

The correction board failed to consider and evaluate critical material evidence

establishing Six's right to military disability retirement pay pursuant to 10 USC 1201.. Plaintiff Six is entitled to judgment on the administrative record and grant of his entitlements under 10U.S.C. 1201.

Respectfully submitted,

/S/ William J. Kenney

William J. Kenney, Esq.
D.C. Bar No. 99267

% HART
600 Pennsylvania Avenue, S.E., Suite 105
Washington, D.C. 20003
Tel: 202-547-5129
Fax: 202-547-8311

9915 Empire Woods Court
Charlotte, NC 28277
TEL/FAX: 704-341-4781

Attorney for the Plaintiff
Harold E. Six, Sr.
Former CTR-1, USN

Dated: July 30, 2007

**CERTIFICATE OF SERVICE**

I certify that on this 30th day of July, 2007, I filed the foregoing Plaintiff's Motion For Judgment on the Administrative Record, together with Plaintiff's Statement of Facts in Support of Motion for Judgment, and, Plaintiff's Memorandum in Support of Motion for Judgment via the Court's electronic filing system, it being understood that copies thereof are automatically served on defendant's counsel via that system.

/s/ William J. Kenney