**IN THE**

**United States Court of Federal Claims**

| | | |
|---|---|---|
| ************************* | ) | |
| **Harold E. Six, Sr.** | ) | |
| | ) | |
| **Plaintiff**, | ) | **Docket No. 04-1727C** |
| | ) | |
| **v** | ) | **(Judge Hewitt)** |
| | ) | |
| **The United States,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ************************* | | |

PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Plaintiff submits that the administrative record herein establishes the following facts relied in support of Plaintiff's Motion for Judgment on the Administrative Record:

1) Mr. Six enlisted in the Navy on 29 April, 1964.

2) In June, 1967, he was assigned duties as a member of the Naval Security Group aboard the U.S.S. Liberty (AGAR-5). A.R. 12

3) On June 8, 1967, the Liberty was steaming in international waters in the Mediterranean Sea, off the coast of the Gaza strip. Israeli and United Arab forces were actively engaged in warfare in the Gaza Strip and elsewhere. The Liberty, a Navy "Communications Spy Ship," was respecting the 12 mile internationally recognized territorial waters line. She was designed and equipped to 'eaves drop" on communications in its assigned area. A.R. 12, 13, 122-124, 104, 206, 367-368.

4) On information and belief, the U.S.S. Liberty was then in fact under the operational control of the National Security Agency, which Agency had several of its personnel assigned to the

ship. A.R. 123-124, 367-368

5) The ongoing warfare between Israel and the United Arab Republics was a matter of grave concern to the governments of both the United States and the Soviet Union, each of whom had treaty obligations with the opposing combatants. AR 348,349.

6) On information and belief, of particular concern to both the US and the Soviets on

7) June 7 and 8, 1967 was the belief that Israel had then developed nuclear weapons and would use those weapons if a threatened attack by the Iraqi Armored Corps was mounted against Israeli forces, which would trigger opposing treaty obligations of both the U.S. and the Soviets. C.4.

8) On information and belief, the true role of the Liberty was to monitor Israeli communications to insure that Israel did not launch such an attack, and United Arab force communications to insure that Soviet personnel were not actively engaged in the combat in support of United Arab activities. AR 194, 206.

9) On June 8, 1967, Six was on duty in the ship's communication spaces in a compartment below the water line. His duty station was also his battle station. A.R. 12, 21, .27-28, 122-124, 246-250.

10) Without warning, the Liberty came under attack by units of the Israeli Air Force and the Israeli Navy. Despite the fact elements of the Israeli Air Force had been monitoring the actions of the Liberty for 3 days as it approached the waters off the Gaza, despite the fact the Liberty was clearly identified as a U.S. Naval vessel on the situation maps in the Israeli High Command Headquarters, despite the fact it was flying the US Ensign, and, the fact its design presented a unique configuration clearly identifying the ship as a U.S. Naval Vessel, over the course of the next few hours, the Israeli's repeatedly strafed the ship. Ultimately, the ship

was attacked by Israeli torpedo boats and suffered a hit by an Israeli torpedo directly in the starboard side, into the Communication spaces. A.R12-13, 21, 27, 28, 199-202, 206, 246-251.

11) While the fighter plane attacks were occurring, Six and his fellow NAVSECGRU members manned the communication spaces. When the torpedo attack commenced they were ordered to prepare to destroy the code books and classified materials and equipment in the space. A.R. 12, 21, 112, 123-124, 206-207, 247 .

12) The torpedo hit directly into the communication spaces killing some 23 of Six's shipmates and watch mates, including the two non rated sailors on both sides of Six in the crowded Comm. space. These men were under Six's supervision. A.R. 12-13, 21, 27, 28, 123-124, 247-248.

13) Six was knocked unconscious, and, trapped under a fallen file cabinet as the room began flooding. Although he was not then aware of it, his leg had been badly cut by shrapnel from the explosion. A.R. 12-13, 21,24, 28,29, 30, 31, 100-101,112,123-124, 199, 246-252. [1]

14) Then SGT Lockwood, USMC, rescued several members of the crew from the flooded communications compartment. He returned to the flooded space and found Six, unconscious, trapped by the filing cabinet and other debris, with the flood water just about at Six's mouth. Lockwood pulled Six free from the debris, bringing Six out of his coma, and dragged him up a ladder to the upper deck, only to find that someone had dogged the hatch closed while Lockwood was down in the flooded compartment. In Lockwood's efforts to open the hatch,

[1] In the factually related Lockwood case, Fed Claims docket 06-cv-00543 (MBH), Master Chief Petty Officer White also attest to this fact.

he dropped Six back into the flooded compartment. A.R. 13, 24, 101, 112, 124, 248, 250[2]

15) Ultimately someone heard Lockwood's screams and undogged the hatch. Lockwood then went back down the ladder, found Six again and dragged him up to safety. A.R. 13, 21, 100,101,112,125, 248-250.

16) Six was ordered to report to sickbay. Although Six had suffered a cerebral concussion, and anoxic unconsciousness, plus multiple mini fragment facial, arm and wrist injuries, the ship's triage system determined that, other than shock and daze, they observed no injuries that warranted his treatment in advance of other shipmates more seriously injured by the strafing and explosions. Six's recollection is that he returned to the deck and attempted to help those awaiting care. At one point an officer criticized him for having a bloody uniform and ordered him to get into a clean uniform. In attempting to change his uniform, Six first discovered that he had a significant gash in his leg and was bleeding profusely. A.R. 13, 21, 24, 27, 28,29,30,31, 100-101, 124, 248-250.

17) His shipmates who took control of Six when he was passed out of the hatch to safety have a different recollection. They declare Six was in sever shock and was "out of it" such that one attendant sought out SGT Lockwood to determine if perhaps there were injuries they had not yet identified. AR 84, 192, 811, 814-816, 817-819.

18) Shockingly, no U.S. forces responded to the mayday messages of the Liberty. Throughout the attack the Israeli forces "jammed" the Liberty's communications. A.R. 123, 202-203, 206-207, 351, 358 Navy units that began to respond were ordered to stand down by Washington authorities. AR 247, 351, 358.

19) Some 20 hours later, the Navy ultimately responded to the Liberty's attack by dispatching

[2] Others, including LCDR Ennes, and MCPO White testify to this fact in the Lockwood case, 1;06-cv-543 MBH.

two Destroyers to send medical teams to assist, and, the USS America , to treat the wounded. Six was transferred to the America and, ultimately to U.S. Naval Hospital, San Diego for treatment of the injuries to his leg, face, and, hand. C. 7, A.R. 29, 30.31, 346.

20) While hospitalized under treatment for his wounds at USNH San Diego, Six was visited by an as yet unidentified Navy Lieutenant Commander. The Commander reminded Six of his special security oaths as a member of the NAVSECGRU and cautioned Six that he was not to discuss any aspect of the events aboard the Liberty with anyone without written authorization from the C.O. of the Liberty, and then, only in the presence of either the C.O. or himself. Six was warned he could be subject to Court Martial for breach of National Security if he violated that order. Six has since learned that all members of the Liberty crew were issued similar orders. Many who were shipped from the Liberty for treatment describe this same Lieutenant Commander as visiting them at the various hospitals where they were being treated, issuing the same " silencing order." AR 95, 96, 97, 112, 113, 116, 124-125, 192-195, 197-198, 200-201, 207, 811.816-819. [3]

21) While under treatment at USNH San Diego, Six began experiencing nightmares and flashbacks. In these nightmares and flashbacks, Six is terrorized with memories of the horrific blast of the torpedo smashing through the ship's side into his compartment, then the explosion of the torpedo, and the Communications compartment exploding into fire. He first senses the roar of the explosion; then the rush of water flooding the space and pushing everything before it. He smells the dust and smoke of the explosion, sees the blood and body

[3] The fact of these Silencing Orders is further confirmed by the Liberty's Plan of the Day for June 30, 1967, cautioning the crew they were not permitted to discuss the events aboard the Liberty except as is describe in the DOD Press Release issued that day. AR 209-210. These silencing orders are further confirmed in the Certified Record in the form oof messages from various DOD and Navy Commands, AR 348, 349, 350, 351, 352, 353, 354, 358-359, 360.

parts of his shipmates as they were blown apart by the explosion, and, he hears his own screams as well as the terrified screams of his dying shipmates. Fearful of violating the Commander's order, not wanting to jeopardize his career ambitions, Six did not disclose these attacks to his medical attendants, since he could not do so without discussing the events on the Liberty. A.R.13 - 18, 21-25, 27, 28, 57, 84-88, 100-110, 111-117, 122, 125, 241-225, 234-236, 249-258.

22) Since these nightmares and flashbacks began, Six has had ever increasing difficulty concentrating, controlling his anger, and, maintaining a focused life. For awhile, the respect that was initially given to him as a Liberty Survivor carried him through. However, when the Navy issued the report of its Court of Inquiry, that respect quickly disappeared, greatly exacerbating his paranoia and loss of self esteem. A.R.13 -15, 18, 21-22, 34- 35, 100-102, 111-113, 238-244, 249-258.

23) While under treatment at USNH San Diego, Six began drinking more heavily. Alcohol seemed to help control the nightmares and flashbacks. C. 9; .A.R.12, 14,17, 21, 34-35, 103, 112-117, 120-12, 125.

24) While stationed in San Diego, Six and his friend Lucy and her children began living together. Following finalization of her divorce they married. Harold did not adopt Lucy's children, but, from the beginning of their relationship, has treated them as his own children. A.R. 14, A.R.44-48.

25) Starting in or about September, 1967, in addition to his nightmares and flashbacks, Six began experiencing episodes of indistinct pain affecting the right side of his face, under his eye, into the cheek, and, running under the ear into his neck. This pain continues to the present day. The pain is sever, "like a hot poker", and lasts as little as a few minutes up to as much as 8

hours. These attacks extend for as little as 3 days running to as long as 2 or 3 months. First diagnosed as "Sinusitis", then attributed to dental malocclusion, it is now established that these are caused by the damage to his facial nerves resulting from the shrapnel wounds to his face suffered in the Liberty attack. Six's pain is also caused by or contributed to by his PTSD. A.R.13, 24, 27, 32- 38, 55, 58, 316.

26) The Liberty survivors initially were greeted as brave hero's by their fellow sailors and Marines. Then the Navy's Court of Inquiry published its false report. That report is but another page in defendant's abominable conduct throughout the sad history of the Liberty Affair. A.R. 13,-14, 22,23, 112, 113; RADM Staring, JAGC, USN, Retired, (AR 896-897, and, 388-389, 378-385) and, CAPT. Wade Boston, JAGC, USN, Retired (AR 898-900), CAPT. Kiepfer (AR 822-823,828-829) Benkert, AR 817-819, and, Jones, AR 814-816.

27) The Court members and staff were shamefully pressured by the White House and the Department of Defense to create a report that adopted the position of the Israeli government that the attack was a case of mistaken identity, and quickly ended when the ship was recognized as a U.S. Naval vessel. AR 378-385, 388-389, 896-897, 898-900.[4]

28) The Court's Report was so legally deficient that the Senior Legal Advisor to COMNAVEUR, refused to endorse the report. 896-897.

29) To insure that the true facts of the attack were not disclosed, the Navy brought the severely crippled ship back to Malta and isolated the crew, confining them to an inaccessible military camp on the island to keep the crew from talking to the press covering the Court's proceedings. A.R. 113, 124-125.

[4] The fact this was a false report and that the Israeli's well knew this was the Liberty, knew its schedule and mission, that the attack was carefully planned and skillfully executed with the intent to sink the ship and kill the crew has been stated by ADM. Moorer, the succeeding CNO following the attack, then SecState Rusk, Presidential Advisor Clark Clifford, several former CIA Directors, to identify but a few.

30) The President of the Court issued orders to the crew prohibiting them from talking to anyone, including, in particular, the press, regarding the events aboard the Liberty, threatening them with Court Martial if the order was violated. A.R113, 124-125, 218, 392-393, 399-407, 384, 814-816, 817-818-819, 898-900.

31) The Court of Inquiry's legal advisor has recently publically acknowledged that he and the greatly pressured by White House and Pentagon authorities to reach those conclusions. Boston Declaration, AR 898-900.

32) It is fair to infer that the pressure asserted on the Court of Inquiry was prompted by the desire of the Johnson administration to avoid a public outcry and public demand for retaliation against Israel if the true facts of the attack were revealed; a result that would greatly exacerbate the geopolitical situation of the Middle East. C. 11, AR 378-380

33) Following the attack , the Israeli government launched an aggressive campaign to support its assertion the attack was an accident, a case of mistaken identity that was terminated as soon as the ship was identified as a U.S. Naval vessel. A.R. 16-17, 365,366-371, 373-377, 898-900.

34) This public relations attack by Israel greatly aggravated the Crew. They know Israel is lying, and they are prohibited from responding. One aspect of the Israeli claims particularly enraged and insulted the Liberty crew. Israel claimed the attackers thought the Liberty was an Egyptian Horse Carrier vessel. It was particularly angering that the Report did not dispute this claim. In fact the Liberty had obvious, significantly different hull and superstructure characteristics from the Egyptian vessel, making the claim both insulting and patently false. Id.; A.R. 22-24.

35) At the same time, pro-Israeli groups in the U.S. mounted a campaign to support the position

of the Israeli government. One aspect of that Campaign claimed the Liberty crew was exaggerating the facts of the attack either for personal gain, or, to further the interests of Anti-Israel groups, or, from basic, personal anti-Semitism. Id.

36) These accusations incensed Six and the rest of the Liberty Survivors. Six was particularly enraged that the Report of the Court of Inquiry endorsed the Israeli claims and ignored the facts the crew readily provided. Mr. Six viewed the Report as an outrageous lie, and, that in accepting the Israeli explanation, the Navy and our Government necessarily labeled the Liberty crew as liars, grossly exaggerating the events for self serving purposes. A.R. 16-17, 22-24.112, 245-260, 251-252, 810-813, 823-824.

37) Six felt the Report was destroying the respect he and other Liberty Survivors had received when they first returned to the States. Burdened with this and with the intimidating silencing order he had received, Six began to become paranoid, lost his sense of self esteem, and, the frequency of his memories, daydreams and flashbacks of the attack, and his being trapped in the flooded compartment became intensified. His drinking increased. He was recognized as a troubled drunk at the Naval Communications Station, San Diego. A.R. 13-18.

38) From late 1967, through his transfer for discharge in July, 1972, Six was assigned duties at USN Radio Station, San Diego, then assigned to NSA, Ft.Meade, for cryptographic training and duty; and, then transferred to the Philippines. While at NAVCOMMSTAPHILLIPINES, Six volunteered for and served two tours of temporary additional duty with NAVSECGRU units in Vietnam. In July, 1972, he was transferred to NAVSTA,SanFrancisco, for processing and discharged in February, 1973. A.R.64, 65, 72,73.119,120, 121.

39) Six's Enlisted Performance Record (NAVPERS 601-9) shows that his Navy superiors were well aware that something was changing Six's performance standards:

a. In his performance ratings dated 16 May 1968 his grade for professional performance is reduced from the prior period of 3.6 to 3.2; his grade for military behavior is also reduce to 3.2; his grade for leadership and supervisory ability is reduced from 3.6 to 3.0; military appearance from 3.4 to 2.8, and, adaptability from 3.8 to 3.2.

b. Although he was recommended for advancement to CT1 on 26 May 1969, his ratings for 16 May 1969 in leadership and adaptability were only 3.2, and, his recommended advancement to CT1 was withdrawn on 18 June 1969. His grades on 16 August 1969, incident to his transfer to Ft. Meade were only 3.2 for professional performance, 3.6 for behavior, and all other grades were 3.4. This is hardly a warm send off evaluation given a respected performer en route to a new duty station.

c. Finally, his grades are reduced on 1 June, 1972 to 3.2 for professional performance, 3.0 for behavior, and, for leadership, and, 3.2 for adaptability. On 7 July 1972 his grades for behavior and military appearance are further reduced to 2.0 and 3.4, respectively.

A.R. 64, 70.

40) Throughout this period, Six struggled, without success, to control both the pain of his damaged facial nerves, and his progressively deteriorating symptoms of what is now diagnosed as Post Traumatic Stress Disorder. The Navy's sole response was to suspend his promotion to CT1 from 18 May, 1969 to 01 June 1970; caution him as to consequences of

dishonorable failure to pay just debts in May, 1972[5] ; and, thereafter to vacate his security clearances in or about May, 1972, transfer him to NAVSTA SAN FRANCISCO IN July, 1972, and, process him for discharge, while providing him no care or assistance. AR 64, 67, 73, 114, 127-28, 535,536.537, 538, 539-563, 565-566, 569 .[6]

41) As Dr. Yuval Estrov, Six's consulting psychiatrist reports:

> "Mr. Six describes daily intrusive and distressing recollections of the event. These ....began in 1967 in the hospital...
>
> Mr. Six describes nightly nightmares of the events....." I dream of being down in the compartment. All I see is bodies with no faces." He reports waking up from sleep in cold sweat and reports not desiring to return to sleep......
>
> Mr. Six experiences flashbacks of the attack on the Liberty. These were most prominent in 1968 with daily reliving of the traumatic event
>
> ********
>
> Mr Six is unable to recall the names of two victims of the Liberty attack. He has been reminded of the names several times but remains unable to recall the names. He reports guilt that they died and he survives: "I wish it was me instead of them."......This symptom has been on going since 1967.
>
> Mr. Six describes prominent detachment from others. He reports that starting in 1967 he was unable to be close to love ones. He reports that emotional intimacy will only lead to grief. "You get close and then they're gone." He reports that this has led to his inability to tell family members that he loved them and his inability to hug his children: 'I don't love anybody because it causes pain."
>
> Mr. Six reports a significant feeling of foreshortened future. Starting in 1967 Mr Six had been feeling as though he were in some ways "already dead." He reports volunteering for two tours of duty in Vietnam because of "wanting to die."
>
> ********
>
> Mr. Six reports nightly insomnia since 1967.
>
> Mr. Six reports significant irritability "I'm mad all the time," and angry outbursts particularly when symptoms are at a significant ascent "I get short with my wife." This symptom was present in 1968.
>
> **********

[5] It is to be noted that the Command withheld action while they dispatched Six to his TAD in Vietnam. It then appears the command suggested his wife was running around in his absence. The record is devoid of any effort of informing Six of his right to honorably discharge his debts by recourse to Bankruptcy, any effort to evaluate his qualifications for bankruptcy relief, other than to inform him he could see a lawyer if he wished. The notice did not suggest what help consulting an lawyer might provide. There is no record he was informed of his right to appeal the revocation of his security clearance, or inform him of any rights he had in the circumstance.

[6] It should be noted that one of these documents relating to the Command's request for his separation were contained in the copy of the record defendant provided counsel when he requested copies on first becoming involved in this application

> In addition to the above mentioned PTSD Mr. Six has had significant symptoms of alcohol dependence and depression.
>
> Alcohol Dependence Mr. Six ... had been drinking on the weekends when in port with neither social nor occupational consequences until the attack on the Liberty. The months that followed the attack were accompanied by increasing alcohol consumption. By 1969 Mr. Six's alcohol consumption had escalated to full dependency.
>
> ***********
>
> Co-Morbidity PTSD is commonly associated with other psychiatric conditions In combat related cases of PTSD, co-morbidity, far from an exception, is often the rule. Specifically, the prevalence of an alcohol dependence diagnosis in combat related PTSD has been estimated as high as 75% ( with civilian PTSD alcohol co-morbidity estimated at 20% - 40% . (Citing : Jacobsen LK, Southwick SM, Kosten TR. Substance use disorders in patients with posttraumatic stress disorder: a review of the literature. Am J Psychiatry; 158 (8): 1184-90.) ... . The time course of psychiatric diagnoses: PTSD in 1968 and alcohol dependence in 1969 leads me to conclude that PTSD symptoms were more probably than not etiological in the subsequent development of alcohol dependence.
>
> ********
>
> Based on the VA Rating Manual, 38 CFR, Ch.1, Part 4 (7-1-85 Edition), sections 4.125, et seq., evidence cited, and evaluation conducted above, I conclude that at the time of his discharge from the navy in February, 1973 Mr. Six was suffering from PTSD and alcohol dependence. These conditions were more likely than not the cause of severe impairment in both employment and interpersonal relationships at the time of his discharge. Mr. Six's disability rating was 70% under criterion established at section 4.132 of the Rating Manual, applying the standards for Psychoneurotic disorders, 9400,et seq.."

A.R. , 100- 110.

42) This clinical diagnosis is fully supported by the facts of Mr. Six's military and personal life, as evidenced by inferences to be drawn from his Enlisted Performance Record, as further established in affidavits presented by Mr. Six, three of his children, and, his current wife. A.R.13- 19, 21-25, 44-45, 46-48, 64,67,70,73; 111-118, and, 119-128, 806-809, 810-813, Kiepfer, AR 820- 838, at 826, 827-830, 831, and 838,and by records defendant includes in the Record, without notice to plaintiff or opportunity for comment. A.R. 446-447, 448, 449, 541, 546, 547, 550-551, 565, 566, 575,

577,578,579,580, 598, 601,

43) In his affidavit, Mr. Six relates:

> "All these stressors gradually destroyed my self confidence and self respect. I began drinking even more heavily. My family life was in turmoil. ....I developed an uncontrollable rage like anger directed at my wife. My drinking was draining the family's finances,but I blamed her, and her alone, for my inability to control our family finances. The more paranoid I became, the more uncontrolled my rage became. The more enraged I became, the more I drank.
> Obviously, this affected my job performance. In time, we became targets of bill collectors. In time, the bill collectors began writing my command. This added to my anger and my drinking. The Command first informed me of the Navy's policy of financial responsibility. They cautioned me it would affect my security clearances. This too became an excuse for anger and drinking."
> A.R. 14-15, 22-26, 34-35, 38,39, 44-45, 46-48, 49, 67; 100-108, 111-18, 119-128.

44) Six's child and step children relate their memories of Harold's actions . They testify to the terrible pain and damage the Navy has inflicted on both Six and his family by its failure to provide Six the proper medical care and treatment he was entitled to and they were responsible for providing:

a. Six's stepdaughter, Tammy Six Rievley, born, 1965, a citizen and resident of Fontana, California attests to her memory of her stepfather, Six, from the period of her family's life at San Diego, then Ft. Meade, MD., then Naval Communications Station, Philippines , through his discharge, and the five years following his discharge:

> "..in 1968 ... He was a proud sailor and showed great love to my sister and me. ... He always treated us as his own children. My memory is that initially we enjoyed a happy family life. Gradually that began to change.
>
> *****
>
> I do remember , even in Maryland , developing a sense that there were times when it was best to keep my mother, my sister and brother, and me, out of Harold's way. Even in Maryland , there were times when, in retrospect, Harold used to go into a shell. He would become moody, angry and loud if we tried to get his attention. We learned to stay clear when those dark periods came over him. When we moved to the Philippines, things got progressively worse. Forts [sic], Mom and Dad were drinking heavily. Harold's periods of withdrawal seemed

more frequent and he began to be physically and verbally abusive to my mother and me. I recall his coming home one afternoon. He had obviously been drinking. I can't remember what set him off. However, he began screaming at me and then he hit me across the face.
I was shocked, not merely because he hurt me physically, which he had. I was shocked because he had changed into such an angry, violent person. ... Of course, when he calmed down, he became very apologetic and loving. Nevertheless, my fear remained. It still burns in my mind.
Late in our first year in the Philippines, Harold was sent to Vietnam. ... By this time Mom and Dad's drinking had gotten even worse. And, they were always arguing. Harold seemed withdrawn and angry all the time.
When he returned from Vietnam, it was great to have him back. ...

******

Sadly, the drinking, the anger, the brooding, the fights between Mom and Dad all got worse. There were time I would have to shield my brother and sister from all the turmoil. There were times the neighbors would call the SP's. That scared and embarrassed me. It meant all my friends and there [sic] parents knew what was going on in our home.
Then one day in 1972, Harold came home angrier than ever. He announced "they' were sending us all back to the States - to San Francisco. The fights between Mom and Dad got even worse. ...
Shortly after we arrived in San Francisco, I learned what "everything " was. Dad had been thrown out of the Navy. He had no job and we had no place to live.
We moved to Los Angeles. We were living in a dump. Mom and Dad drank, were drunk, and, fought all the time. I realize now, that Harold hardly ever left home for that first year, except to go out and get beer. I recognize now, that he was deeply depressed. He was a very sad person.

*******

Sadly, Harold again started drinking. Thinking back, it always seemed he would first begin to withdraw from everybody. He would turn us away, accuse us each of all sorts of things. He then became gruff and sarcastic. Next, the arguments and fights with Mom would begin. Then, he would start drinking. When he drank, he became increasingly angry and argumentative.
To Harold's credit, he kept us kids with him and together. However, it was a sad, poor, depressing, embarrassing life. Harold was drunk most of the time and in a deep, dark, angry depression. "
AR46-47.

b. Her younger sister, Harold's stepdaughter, Cindy Six Valles, born in 1967, a resident of Parker, CO attests to her memories of Harold's actions and her life during these years:

"I present this affidavit to submit facts concerning ... Harold Six, during the period of our family's life following the family's transfer from the Philippines,

Harold's discharge from the Navy and the 5 or so years immediately following that discharge.

******

My earliest memories of Harold are not happy ones. He always treated us as his own children. My memory is a life full of drinking, arguments, and, turmoil. That turmoil had a profound effect on our family and me.

I was about 5 years old when we transferred from the Philippines..... We moved to Los Angeles.....Mom and Dad drank, were drunk and fought, all the time. I realize now, that Harold hardly ever left the home for that first year, except to go out and get beer. I recognize now, that he was deeply depressed. He was a very sad person.

I was only 5 years old, just starting school.......You could never tell what was going on in our house, or what would set Harold off on one of his frequent tantrums.

After about a year, Harold finally went out and got a job. .....

*******

Quickly, Harold got drinking again. In about 6 months, he was fired. We had to move again. Later that year, Harold took a course in truck driving. ... He then got a job driving a truck. ....

******

Within a few months, Harold began drinking again. .... Harold was back to hanging around the house, drinking. We, of course, had to move again. In addition, Mom and Dad's fighting got worse and worse. When he wasn't drinking, Harold lay around the home brooding and angry. Drunk or sober, he would argue and fight with Mom. He became increasingly abusive to all of us, even to Junior.

After several months, Harold got another job. ...... Sadly, Harold again started drinking. Thinking back, it always seemed he would first begin to withdraw from everybody. He would turn away from us, accuse each of us of all sorts of things. He then became gruff and sarcastic. Next, the arguments and fights with Mom would begin. Then he would start drinking. When he drank, he became increasingly angry and argumentative.

*******

I can remember another time when Harold scared me badly by his wild temper. When he got mad, he seemed to lose all control and go crazy. We all knew Junior was his favorite, and, Tammy had a way of getting Harold to do things for her the rest of us could not do. One afternoon, Harold did something to set Harold Sr. off. Harold began beating little Harold with a belt or brush. He was in a wild rage. I do not think I ever got over that. If he would treat little Harold that way, I made certain to keep as much distance from him as I could after that."

*******

AR 44-45

c. Six's own son, Harold Six, Jr. made the following statements to counsel before disappearing without signing the statement[7]:

" *****

I was born in 1968. ....

---

[7] Harold, Jr., informed counsel that he is a drug addict, then under treatment. Harold, Sr. has informed counsel that "Junior" is presently living somewhere around Virginia Beach, Virginia.

I am presently under the care of a psychologist to help me sort out and deal with the psychological trauma I have experienced as a result of having spent my youth in the dysfunctional family resulting from my father's impaired condition. Candidly, I have severely conflicting emotions toward my father: anger at how his conduct deprived me and my sisters of a normal childhood and continues to interfere with our ability to enjoy a normal life.....

It is embarrassing and troubling for me to recall our early family life while Dad was in the Navy, and, the several years following his discharge from the Navy. My memory of that era was that it was one continuous drunken brawl. Both my mother and my father drank all the time and fought constantly.... usually with each other. Truthfully, my oldest sister, Tammy, only a few years older than me, is the person who cared for me, fed me, got me to bed, got me up and dressed in the morning; not my parents.

I recall one time on the Naval Base in the Philippines, when the Shore Patrol escorted my mother home. She had been drinking with Dad and they went to the Base Exchange. As usual, they got fighting. Dad started beating Mom up pretty badly. The Shore Patrol was called. Dad was taken to the Brig. Mom and we kids were escorted home. That was pretty much the way things were in our family. When he was home, they were drinking. When they were drinking, they were fighting. When they were fighting, they made so much noise usually one of the neighbors would call the Shore Patrol to calm things down.

*******

When he was drinking, Dad would get mean and angry, seemingly over nothing. We kids learned early on when these attacks came on him to get out of the way. He seemed almost to explode and would strike out at anyone crossing his path, with anything available. I recall his beating me with a buggy whip......

When Dad got drunk, he would rage at everything and everybody, but particularly my mother. .... he'd scream at we kids; we weren't doing what we were told quickly enough, we were disobedient, or, whatever. And, he would rage at the Navy, the World, and, himself. One theme that was constant in his drunken raving was the thought that "I never should have survived the Liberty. Why was I the on565-566,575-576, 577,578,579,80ly member of my team to live? I never should have survived Vietnam. " I remember when I was 13-15 years old, he told me he felt guilty that he had been the only survivor of his duty team on the Liberty. He said he went to Vietnam because he expected to be killed there, and he was angry that he hadn't been killed."

********

A.R. 44-45, 46-48; Statement of Harold E. Six, Jr.

45) These affidavits establish that throughout Six's tour at NAVCOMSTAPHILIPINES, and prior to that duty, Six was rapidly and publically deteriorating; that he was

undergoing a dramatic and observable change in personality; and, these changes were catastrophically affecting his duty performance, his family life, and, his social life. The documents and those referenced by the Board clearly establish his Command was aware of this because of the involvement of the Shore Patrol and the Command itself. AR 446,447,448, 457, 541,542,543,546,550-551.

46) The Navy provided Counsel copies of what was represented to be Six's Naval and Medical records. Those records contained no records of Six's treatment at USNH San Diego; contained but a single NAVPERS 793, Report of Enlisted Performance Evaluation, a report for the period ending 16 Jan 1967, prepared incident to Six's advancement to CT3; contained no documents relating to revocation of Six's security clearance; and, contained limited documents relating to his transfer to San Francisco and discharge processing. For example, in BCNR's action denying Six's July 15, 2004, Motion to Reopen for Newly Discovered Evidence and Motion For Reconsideration, the Board relied in part on a Mental Health Evaluation conducted on Six on August 8, 1972. The copy of Six's Medical and Naval Records provided counsel did not contain a copy of the August 8, 1972 Mental Health Evaluation. That document is not included in the Administrative Record filed herein. C. 22-23.

47) In October, 1971, incident to his assignment to his second TAD to Vietnam, Six

i) underwent a flight physical since his duties were to man telecommunications equipment in aircraft monitoring battle operations in the field, and coordinating communications between the field units and their Commands. As required, he completed a Standard Form 89, Report of Medical History. In that report Six denied ever experiencing: frequent or severe headache, dizziness or fainting spells, history of

head injury, palpitation or pounding heart, neuritis, frequent trouble sleeping, depression or excessive worry, bed wetting, nervous trouble of any sort. He declined to answer questions relating to whether he had or ever had: any drug or narcotic habit, excessive drinking, homosexual tendencies, or, periods of unconsciousness. He acknowledged having experienced wounds to his lower left leg, and finger of right hand, but denied ever having any other illness. He then struck out that portion of the form acknowledging his awareness of criminal penalties arising from false or fraudulent answers to any question on the form, but signed the certification that the "foregoing information ... is true and correct to the best of my knowledge."

47) The Navy well knew that Six was then heavily abusing alcohol and was alcohol dependent; and, had defendant performed its duties, would have known that Six experienced multiple illnesses, had been rendered unconscious in the Liberty attack, was then experiencing frequent trouble sleeping, and, had a pre-service history of bed wetting; that Six was then undergoing a dramatic change in personality; that Six harbored a "death wish" resulting from his "survivor's guilt", that Six had become an alcoholic , drinking to drown out the flashbacks and nightmares , and was having sever trouble sleeping, all attributable to his trauma aboard the Liberty, that he was losing control of his family's finances; that Six had become a violent abuser of his wife and children, given to violent outbursts of uncontrollable rage, with a paranoid suspicion of his wife and children; that Six's uncontrollable rages of anger were not confined to his family, that, in fact he was engaging in fights outside the home with other service members and their wives; and, that Six's family, work, and, social life was in crisis deterioration because of his condition. A.R. 30,34-35, 38,39,47,49, 53-54, 64, 67, 70, 73; AR 446-448,

457, 541-546, 550-551; Kiepfer, AR 820-838, 830-832.

48) Six's medical and personnel records contained documentation that this entry was inaccurate and more than sufficient information to suggest Six was then experiencing severely disabling symptoms of post-traumatic stress disorder directly caused by the injuries, brain trauma, and, psychiatric trauma suffered in the Liberty attack. These traumas were exacerbated by the Navy's failure to provide Six proper treatment for this disorder, and the effects of the government's misrepresentation of the true facts of that attack. Id., A.R. 13, 14, 15, 16-18, 21-25, 27, 28, 53-54; A.R. 100-108; Kiepfer Declaration; AR 536-539, 541, 545-548, 550-551, 565-566, 575-580.

49) XLViii The record shows that officials at BUPERS were concerned with the failure of the processing commands to competently process Six's separation. It is fair to infer that BUERS, having copies of Six's records and noting his experiences aboard the Liberty, recognized the high probability that Six was suffering disabling psychiatric illness because of those experiences, and recognized the deficiencies in LCDR Cain's diagnosis of August, 1972. First, BUPERS directed that files on Six be forwarded to BUPERS for review. AR 542. This is not unusual in such cases. However, BUPERS on review, then directed NAVSTA SANFRANCISCO, by message of 14 January 1973, that Six undergo a complete psychiatric evaluation prior to separation. AR 536. The message is dated 1972, but references a 1973 message, and, Six was not at NAVSTASANFRANCISCO in 1972. There is no record BUPERS directive was complied with.

50) On November 19, 1971, Six, in a drunken rage lost all control while engaged in a fight with his wife at the EM club. He then attacked a fellow CT's wife, hitting her and

breaking her leg, followed by a fight with the CT himself. (AR 574-575, 577,578,579, 580) The record shows that Six then had an altercation with the Marine Security detail dispatched to control the events at the EM club, and, then continued his rage in the emergency room at the hospital where the woman was being treated. Still the command took no action against Six until he returned from scheduled TAD in Vietnam. This might be excused as simply letting off a little steam prior to the Vietnam assignment were it not for the fact the command was at that time also dealing with Six on indebtedness matters. AR 568, 570, 571, 572, 573,574, 582, 583, 584,585, 586, 587, 588, 589,590, 591, 597. It

51) is to be noted the command makes no specific mention of this incident in revoking his security clearance, terminating his assignment to the NAVSECGRU, and, requesting his transfer from the Philippines. It is further noted that this information, indeed any and all information pertinent to Six's conduct, was withheld from Dr. Cain when he was tasked to conduct Six's psychiatric evaluation in August, 1972.

52) Six was then experiencing frequent flashbacks and nightmares of his being trapped in the Liberty attack; was then frequently experiencing night sweats on awaking from his nightmares; was experiencing debilitating inability to sleep; was then suffering from "survivors guilt, " harbored a death wish, fulfillment of which is what prompted his volunteering for the tours in Vietnam; and, was then experiencing debilitating pain from his untreated, damaged facial nerves. Six did not disclose these symptoms to his military superiors or the medics because he believed to do so would violate the silencing order issued to him and other Liberty crew members, would jeopardize his Navy career, and thwart his death wish. A. R. 13,14,21,22, 24,27,28; 100-108, 111-118, 119-126; Kiepfer , AR 820-838, Benkert, Jones Declarations. Estrov, AR 100-110, 101-102.

53) In revoking his top security clearances, the Command failed to inform Six of his rights to appeal the revocation of his security clearances, and, the Command's declaration rendering him unfit for overseas duty assignments. It did not provide him with any legal advice concerning his rights in the circumstances; and, it did not then refer him for medical diagnosis or assistance, or, counseling of any nature. A.R. 114, 121.

54) While expressing diligent concern for the interests of Six's creditors, at no time did the Navy provide him any precautionary guidance or counseling concerning the probable consequences of the concussion and trauma he had experienced aboard the Liberty. At no time did the Navy provide him any counseling or guidance as to how to deal with his alcohol dependency and alcoholism. At no time did the Navy attempt to intervene or provide counseling regarding the tragic dysfunctional family circumstances that had developed in Six's family life. A. R. 16, 18, 446-447, 448, 457, 541-546,550-551.

55) The Navy well knows that personnel subjected to extreme battle stress such as Six endured in the Liberty attack were likely to experience significant physical, and psychiatric disorders if left untreated. It well knew that the pattern of deterioration Six evidenced was characteristic of such disorders; that individuals suffering from stress related and other psychiatric disorders commonly also experienced substance abuse disorders. Kiepfer Declaration, AR 820-838, 824-828, and its enclosures, AR 839-888, 859, 869-880, 860-863; Estrov, AR100=-110; A.R.15,16,17,

56) Six was discharged from the Navy on February 6, 1973 without ever being

57) informed of his rights to appeal the revocation of his security clearances, and, his discharge processing; and, without ever being informed of his right to care for his disabling symptoms of post traumatic stress disorder and attendant alcoholism. AR

114-115, 810-813.

58) Immediately following Six's discharge, his symptoms of post traumatic stress disorder

59) with attendant alcoholism became progressively worse. His children attest to the poverty stricken, sad and depressed circumstances of his post service life. He was "moody", "he withdrew from us." He presented wide swings in mood, he would go off in an uncontrollable rage and anger. He physically and verbally abused his wife and his children. He rarely left the house except to go get beer. Trained in sophisticated communications equipment and cryptology, he worked sporadically as a jail guard, a truck driver, security at a convenience store; all tasks well below his abilities. And, even then, he could not hold a steady job. C.31; A.R. 15, 16,17, 27, 28, 44-45, 46-48, 100-108, 113-116, 810-813, 806-808.

60) On January 9, 2003, Six, through his counsel, submitted his December 20, 2002 Application For Correction of Military Records to the Board For Correction of Naval Records, seeking correction of his records to show that he was transferred to the Disability Retired List effective Feb. 06, 1973, by reason of Post Traumatic Stress Disorder. AR 2, 20.

61) DOD sponsored research testified to and utilized by Dr. Kiepfer in preparing his statement, and other research in the field of psychiatry, establishes that alcohol abuse and dependency is so common among combat related PTSD that it is considered a symptom of the disorder. Kiepfer Declaration and its enclosures. AR 820-838,824-826, 833-836; 839-888, see, in particular, 859, 860, 869-880, 872, 873, 874, 875; see also: Estrov, AR 100-110.

62) DOD sponsored research and other research in the field of psychiatry establish that it is

characteristic of combat related PTSD sufferers to deny their symptoms and not to report those symptoms. This phenomena is considered caused by the avoidance of stimuli characteristic of the disorder. Kiepfer Declaration and its enclosures, AR 820-838, 828, 859, 860; Hoge, 869-880, 878; see aso: Stetson Comments, AR 901, et seq.

63) It is now well documented that alcoholism is so prevalent among those suffering from combat related PTSD that it is considered a symptom of the disorder. See, for example: Reports of the Military Operational Medicine Research Program, U.S. Army Medical Research and Material Command, Ft. Detrick, MD; Reports of the Department of Psychiatry and Behavioral Sciences, Walter Reed Army Institute of Research; Reports of the Center for Disease Control Vietnam Experience Studies, and, Reports of the Joint DOD and VA. AR 860-863, 869-880,872. See also: Estrov, AR 100-110, 108.

64) The medical personnel processing Six in 1972 and 1973 might be excused for their lack of professionally diligent inquiry and their failure to diagnose and treat his PTSD at that time. The diagnosis itself was not established until 1980. Further, Six's NAVSECGRU superiors and colleagues may have felt they were being protective in withholding documentation of Six's deteriorating mental health condition from the medics in deference to him as a Liberty survivor and his two tours in Vietnam. If so, this was a tragic error.

65) This does not justify the board's actions. The correlation between PTSD and alcohol abuse among combat vets was well know and well documented among psychiatrists and those with expertise in military personnel matters by 2003. See: *PTSD, Alcoholism, and Drug Abuse,* Journal Watch Psychiatry, May 1, 1996; 1996 (501):5-5; *Posttraumatic Stress Disorder in the National Comorbidity Survey*, Arch. Gen. Psychiatry 1995; 52-

1048-1060; *Trauma and the Vietnam War Generation: Report of Findings from the National Vietnam Veterans Readjustment Study*, New York: Brenner/Mazel, 1990; *Preliminary Findings from Perceptions of Wellness and Readiness Assessment*, Mil. Med. 1999, 164, 174-181. AR839-888, Estrov,AR 100-110, Kiepfer, 820-838, 826, 827.

66) Notwithstanding this Court's order on remand, the board and its executive director wholly ignored Six's claims he was blocked from disclosing his PTSD by defendant's Silencing Order, and failed to articulate the reasons for ignoring this material evidence. In ignoring this material evidence, the board ignored a well and long recognized phenomena of PTSD and other mental health disorders, in general, and, among combat veterans, in particular. AR 151-164.

67) Defendant's own studies establish that of military personnel suffering from PTSD, less than 40% sought professional help for their difficulties. Kiepfer Declaration, and its enclosures, *Combat Duty in Iraq and Afghanistan, Mental Health Problems , and Barriers to Care,* NEJM, 357:13-21(2004), citing, inter alia: *Arch. Gen. Psychiatry*, 1993; 50:85-91; and, 1994; 51:8-19; and, *JAMA* 2003; 298:3095-3105.AR 869-880

68) LXIII These studies reflect only those circumstances where the individual's perception of stigma associated with mental health diagnosis and treatment, such as fear of perceived failure, perceptions of weakness, and, loss of respect from family, peers or by the leadership, are the constraining factor. Here, in addition to these PTSD characteristic constraints, Six understood himself to be proscribed from reporting his symptoms in fear of violation of the Silencing Order. To explain his symptoms, Six would necessarily have had to discuss his experiences in the attack on the Liberty, beyond the false statements of the Report and the DOD press release, including discussing the fact that the Navy's

report of the attack was a deliberate lie, the fact that the Israeli's obviously knew both the schedule, mission and the design of the ship; that the attack was in fact a carefully planned, skillfully executed, prolonged, coordinated attack by Israeli air and naval forces, with the purpose and intent to sink the ship and kill the crew. Doing so would clearly violate the Silencing Order. (AR 360, 209-210) In disregard of the Court's remand order, the board did not address this critically material issue. AR 151-164.

69) In issuing such orders to members of the Naval Security Activities Group, the Navy well knew that any such orders would be literally construed and fully complied with. Kiepfer, AR .

70) In its 25 August 2003 action denying Six's application, the board stated it found the evidence "insufficient", and that it could not find any evidence in "the available records" that Six suffered from the "hall mark symptoms " of posttraumatic stress disorder during the period from 1967 to 1973, citing medical reports of 21 October 1971, and, psychiatric evaluations of 4 August 1972, and, 6 February 1973. It dismissed the VA finding of PTSD on 21 July 1999 as "not considered probative". AR 6-8.

71) On 23 July 2004, the board denied Six's petition for reconsideration stating that the supplemental evidence tendered" was not considered_material." Dr. Estrov"s opinion was dismissed "because he based his opinion [on]… his acceptance of your representations concerning the symptoms … you allegedly began to experience in 1967", citing its prior rejection of these representations. AR 10

72) In its 26 March 2007 action on remand, the board again denied the application stating that the "documentary material considered … consisted of your

application together with all materials submitted in support thereof.[8i] The board stated it considered "evidence from cases filed under docket numbers 9117-04 and 7638-05." It also declared it considered "Acute and Delayed Posttraumatic Stress Disorder: A History and Some Issues", American Journal of Psychiatry, Vol. 161, pp1321-1323, August 2004; "Adverse Outcomes Associated With Personality Disorders Not Otherwise Specified in a Community Sample", American Journal of Psychiatry, Vol. 162, pp 1926-1932, October 2005; "Stressed Out Vets", The Weekly Standard, 21-28 August 2006; " The Liberty Incident, Gag Order Debunked", "by retired District Court Judge A. Jay Cristal,[9] and, a statement by Bryce Lockwood dated 8 November 1995, "correspondence provided by Rear Admiral Staring", and, "The Assault On the Liberty; The True Story of the Israeli Attack On An American Intelligence Ship," James M. Ennes, Jr. 1979 AR 152-153.

73) The board then made additional findings. It found Dr. Estrov's findings and opinion "do not demonstrate that you suffered from [PTSD] at any time during the 1967-1973 period." It stated Dr. Estrov " glossed over, failed to consider, and/or ignored many significant aspects of Six's personal history" that might have caused or contributed to the development of these problems." It cited "particularly" that Six was raised by a single mother in economically deprived circumstances … saw his father twice during his childhood … did not receive adequate medical or dental care as a child … suffered from rheumatic fever… had a correctable defect of your mandible … which may have been disfiguring … and at least 10 of his teeth were extracted during his first few weeks of service … he dropped out of high school in the 10th grade… had no significant pre-

[8] These documents were added to the record without notice to plaintiff, or any opportunity to comment or rebut.

service employment … began alcohol at age 15… was rejected for enlistment in 1963 because of immaturity and bed wetting … admitted to drinking to intoxication prior to 1968 marriage … contracted gonorrhea on 2 occasions prior to 8 June 1967 … ,and, at the time of his marriage in 1968, his then wife was 5 months pregnant. The Board further cited that Dr. Estrov did not discuss an electronic message dated 10 July 1972 reporting on Six's indebtedness, active participation in disreputable incidents at the EM club , excessive drinking , mutual spousal physical abuse, harassment of Marine security, and alleged adultery of spouse.[10] AR 154

**74)** The board next asserts Dr. Estrov's discussion of the diagnostic impression recorded by Dr. Cain's[11] is "misleading." It asserts that the diagnosis of Immature Personality is listed in "International Classification of Disease", a World Health Publication, and was included in DSM II, the American Psychiatric Association diagnostic manual in effect in 1972. The board fails to note that the diagnosis was dropped in DSM III because its use had been abused, particularly in military diagnosis of individuals suffering from PTSD and other psychiatric disorders. Further, the board fails to note that the ICD publication explicitly supports Dr. Estrov's criticism of the Dr. Cain diagnosis. The ICD specifically notes that the diagnosis of Immature Personality is inappropriate where ( as is the fact in Six's case) the subject presents a history of trauma or brain injury. See: AR 308-315, at 308 At F 60, the ICD states: " Personality Disorder. There are sever disturbance in the personality and behavioral tendencies of the individual;

---

[10] Dr. Estrov did not discuss this message because it was not included in the copy of Six's Navy Record defendant provided counsel, hence was not available to Dr. Estrov. Further, it does not appear to be included in copies of Six's service records provided the VA. Dr. Estrov did specifically consider similar events reported by Six and his children, including spousal abuse, excessive drinking, incidents at the EM club, Six's fighting with other service members, his indebtedness problems, and, his then wife, Lucy's suspected adultery.

[11] The Court will note the degree of care exercised by the board in its "review" of the application and supporting documents. The " Dr. Cole" referenced in the 26 March 2007 letter is in fact Dr. Cain.

*not directly resulting from brain disease, damage, or other insult to the brain."*(Italics added)

75) The board wholly ignores Dr. Cain's plea for an opportunity to review Six's records "to assist in getting a clearer picture." AR 677-78. It is further to be noted Dr. Cain's report of the evaluation refers to "only one incident" in November 1971 when "he was intoxicated". AR 677 This is in sharp contrast to his command's messages. There are the incidents of 4 July 1972. (AR 565-566) The Command refers to multiple incidents of alcohol abuse, spousal abuse, etc. And, the Doctor seemingly made no inquiry into the November 1971 EM club incident. (AR 575-580) Dr. Cain made no inquiry as to whether Six had a history of brain trauma, brain disease, or brain injury. Given the entries in Six's medical records regarding his injuries from the Liberty incident, this is simply not professionally defensible.

76) The board 2007 further found the reports of the "Silencing Order" "are not credible", noting that it had rejected such claims in 2 other cases; docket numbers 8610-98 and 9117-04 , ( these are the Lockwood case, also represented by this counsel) and, in docket number 7638-05, and further declared that it did not consider Lockwood "to be a credible historian".[12]

77) The board identifies its authority as an article by Cristol wher he claims to have "debunked" the claims of the Liberty survivors, and adopts Cristol's method of creating a "straw man" issue in its evaluation of the Silencing Order. The survivors do not deny their ability to acknowledge that the Liberty was attacked by Israeli forces, or that the ship was badly damaged, with great loss of life and hundreds of injured crew members.

[12] We are left to speculate as to what portion of the records in those dockets in fact the board actually considered.

The documents relied on by the board establish that issue was in the public news before the Navy could put a lid on it. Rather, what the silencing orders prohibit is any discussion of the fact that it is obvious that the Israeli's well knew the Liberty's mission, operating schedule, and, its highly classified design, including the location of the ship's special communications equipment; [13] the fact that the attack was a carefully planned, coordinated action of both the Israeli Air Force and Israeli Naval units; the fact that the purpose and intent of the attack was to sink the ship and kill the crew; that the Navy deliberately falsified the key aspects of the Report of the Court of Inquiry as regards these key issues of the attack . AR 348 – 360, AR 209-210, AR378-419 A careful review of the articles relied on by Cristol (AR 346,-349, 357, 362 – 363) show the crew carefully respected those orders until LCDR Ennes published his book laying out the true facts of the attack, after his retirement from active duty.[14]

78) The other documents relied on by the board also carefully skirt the issues barred by the Orders. The Board cites the Presidential Unit Citation. ( AR 157) The citation (AR 164) does not mention Israel's involvement, nor does it state the purpose of the attack.

79) The record makes clear the silencing orders were issued, prohibiting any discussion of the attack, other than as described in the DOD Press Release. First, USCINCEUR message of 0311259 Z May 1967 expressly prohibits "all those likely to be contacted" from discussions or speculation about military intentions, "our own intentions or the intentions of others." AR 349 Then CINCUSNAVEUR message Z 081517Z Jun 67 cautions that "all news releases on Liberty Affair" will be made, repeat, will be made at Washington level." AR 350 Next, COMSIX

[13] We now know from the Pollard case of the extent the Israeli espionage operations had penetrated the Navy's security systems.

[14] Even as aggressive a reporter as Drew Pearson failed to penetrate the veil of secrecy imposed on the crew!

message CTF 60 DTG090546Z Jun67 authorized interviews of "Evacuees" only if they signed statements they have read, understand and will comply with provisions of "Ref B & C". AR 354 Next, there is CINCUSNAVEUR 0120950 Z Jun 67 declaring that neither the CO or other members of the Liberty crew will be available for interviews "at this time." AR 358 Finally, while CNO authorized interviews of crew members, AR 359, CINCNAVEUR "clarified " this by message 030140Z Jun 67ordering "crew members are limited to responses set forth in press release discussed in Ref B (SECDEF 9078 DTG 282051Z Jun 67)[15]. "Any substantive queries concerning the attack or any other phase of the Liberty incident must be referred to OASD (PA." Given these orders to flag officers, it is surely credible that these were relayed to the crew and the "evacuees" as "don't tell anyone, not even your mother."

80) Captain Boston acknowledges the publishing of the intentionally false report of the facts and circumstances of that attack, and, of the Silencing Order directing him, and all others involved under penalty of courts martial: "Never to speak of it and that everyone involved never speak of it again.[16]" The board rejects this assertion as "not considered credible." AR 159 But, as Dr. Kiepfer declares, anyone who understood the NAVSECGRU members would have recognized the orders would be taken seriously and literally. AR 828, 835.

81) The Board dismisses Captain Boston's statement is dismissed, as "self contradictory,(without further explanation) and "colored' by his 'obvious contempt' toward those whom he considers to be "apologists" for Israel, such as Judge Cristol.[17]

[15] Of course, we now know that CINCNAVEUR was directly involved in falsification of the Report , thus this silencing order, while it facially contradicts his superior, CNO's orders, is fully understandable. A matter of self protection.

[17] We acknowledge the board is not subject to "rules of evidence". 32 CFR 725.5 Still the governing Regulation declares the Chair is responsible for ensuring "a full and fair hearing'. Id. Further, the board is directed to consider the case on the basis of all material before it, including all "pertinent records." How Cristol's

AR 159 Captain Boston states clearly his basis for his distrust of Cristol, asserting Cristol presented what was represented to be "notes" of prior discussions with the Captain that " were grossly incorrect and bore no resemblance to that discussion,"

and, that Boston did not believe to be "the product of mistake, rather than an attempt to deceive." AR 898-900.

82) RADM Staring's statement is dismissed as not addressing the silencing order. AR 159 That statement establishes the predicate of that order, establishing the Report of the Court of Inquiry was not processed in conformance with normal standards oof review for such proceedings. AR 896-897. The board's failure to meaningfully discuss that statement, raises basic questions of the fairness of the board's review.

83) The Certified Administrative Record contains other statements of RADM Staring which it asserts it "carefully reviewed", wherein he does address the silencing order and the damage inflicted on the crew as a consequence of those orders. In his joint letter of July 22, 2006, with RADM Hill, Staring and Hill refer to "a hasty, insincere, apologetic and totally inadequate Court of Inquiry … browbeating the affected sailors with threats that silenced them for years, leaving many haunted by indelible memories that affect them and their lives to this day…" AR 384 In their letter of July 27, 2005 to SECNAV they relate "some of the Liberty crewmen who did not have an opportunity to testify before the Court attempted to respond … or add their … factual observations … but were stopped and expressly forbidden by the Court to testify further in those areas." AR 402 And, again, the Admirals relate "there is still available … a very substantial volume of live and fully competent testimony to the events of June 8, 1967. Those survivors, once they ultimately overcome the fear of threats and consequences that had

"document" qualifies as a pertinent record is not revealed. How the use of this document , without notice to plaintiff or opportunity for rebuttal does not comport with the duty of conducting a "full and fair hearing."

been drilled into them by the 1967 Court of Inquiry, have now for years sought to be heard… " AR 404-405.

84) The board's evaluation of Dr. Kiepfer's statements are similarly directed to a pre-ordained conclusion rather than an examination dictated by the board's governing "full and fair hearing" standard. Focusing on statements he submitted for Six in VA proceedings, the board challenges his testimony in this proceeding relating to the silencing order because he did not address the silencing order in those statements. [18]The board then states these statements "raise serious concern about his credibility as a witness" because they refer to "alleged shrapnel wounds to your[Six's] face and that he had "personally treated [Six]… for multiple mini fragment facial injuries" noting there are no entries in Six' medical records concerning mini fragment facial injuries. The board is correct regarding the absence of health record entries. Its comments are a scurrilous attack on Captain Kiepfer and ignore the reality of medical care treatment aboard the Liberty during and following the attack. Dr. Kiepfer states, medical record entries for minor consequences of the explosion were simply not a priority. AR 827

85) Had the board conducted the full and fair hearing required by its governing regulation, including a fair review of Six's records, the board would have noted adequate record documentation of Six' post Liberty attack complaints of facial injury and pain , See: AR 684, 685, 686, 689. The record shows repeated in service treatment for what was diagnosed as "Sinusitis." AR 720, 724, 725. The record also establishes extensive dental surgery to correct facial pain. AR 726, 741-785.

[18] Counsel was not involved in thise proceedings. It is counsel's understanding Six was there represented by the DVA or VFW staff. They apparently did not raise the issue in those proceedings. It is probable Six did not discuss those orders in fear of violating the orders themselves.

86) The board used this ridiculous assessment to justify its failure to consider and evaluate the substance of Dr. Kiepfer's eye witness testimony on the issue of the

i silencing order, A.R 823, 828-829, and, on Six's injuries aboard the Liberty; AR 824-825, and, his testimony as an expert witness on Six's PTSD AR 8825-838, and, on the professionally incompetent or inappropriate manner Six was medically evaluated and administratively processed (AR 828,-838) incident to his discharge processing. The board totally ignores and fails, perhaps more accurately, in the face of this Court's remand order and its order denying reconsideration, refuses to evaluate this critical testimony.

87) The board acknowledges that in reaching its decision it relied on selected articles from The Weekly Standard (AR342-339) and the American Journal of Psychiatry. The Weekly Standard is not a recognized professional medical journal where the articles published are subject to peer review.

88) Dr. Andreason's article in The American Journal of Psychiatry in fact reinforces Dr. Kiepfer's testimony (AR 826) that the lack of established PTSD diagnosis in 1973 was no justification for the Navy's failure to diagnose, treat, and rate Six's obvious PTSD symptoms at the time of his discharge. The Andreason article (AR 318-332) discusses the fact of somewhat comparable diagnoses existing back to at least Word War I ("Shell Shock"), and World War II ("Gross Stress Reaction") (AR318). It discusses the evolution of DSM III, and the efforts of the DSM III Task Force (including Dr. Andreason) to establish a diagnostic description appropriate for battle trauma induced psychiatric symptoms, and how the Task Force ultimately arrived at the PTSD terminology. Dr. Andreason seems concerned that over time some in the profession have " reinterpreted " the criteria "to include less severe stressors." She relates the DSMIII intended the "stressor be outside the range of normal human experience". AR 320.

Surely, the stressors Six experienced aboard the Liberty were beyond "normal human experience." This article merely confirms the professional validity of Dr. Estrov and Dr. Kiepfer in Six's case.

89) The second article, Adverse Outcomes Associated With Personality Disorder Not Otherwise Specified in a Community Sample, concludes that individuals meeting the diagnostic criteria of Personality Disorder, Not Otherwise Specified present a measurably greater risk of educational difficulties, interpersonal difficulties and aggression. (AR329) As noted above, there is a fundamental problem in seeking to apply this information to the Six case. *Dr. Cain failed to comply with the governing medical standards in establishing his diagnosis of Immature Personality. By the governing medical criteria cited by the board,, the ICD, the diagnosis is not appropriate where the individual presents a history of trauma, brain injury or brain disease.* The article does confirm a causative relationship between the mental health disorders and the co-morbid incidents of alcohol and substance abuse. Thus, reinforcing Dr. Estrov's and Dr. Kiepfer's testimonies.

90) The board relied on The Weekly Standard of August 20-28, 2006 article "Stressed Out Vets" over the by-line of Sally Strasser. (AR 340-342) Dr. Strasser opines that PTSD is treatable and that the VA is not adequately distinguishing between those who can be helped with short term care, and those "who are seeking a free ride ", (AR 340) She acknowledges the prevalence of alcohol abuse, erratic employment and domestic abuse among PTSD vets, but questions if traumatic exposure was the "real cause." (AR 340)

91) The board seems to view this report as a credible rebuttal to the DOD studies referenced by Dr. Kiepfer, challenging the DOD sponsored research reported by Dr. Hoge and his colleagues. It is to be noted, that Dr. Satel has no studies supporting the inference of her statements that most are

in it for the free ride. This article simply is not relevant or material to the facts of this case, and lacks any substance to counter the careful research conducted by Dr. Hoge and his colleagues, and relied on in part by Dr. Kiepfer. Again, entered in the record without notice to plaintiff or opportunity to rebut, its use defeats the "full and fair" standard that governs board deliberations.

Respectfully submitted

/s/ William J. Kenney, Esq.

William J. Kenney
DC BAR No. 99267
Attorney for the plaintiff,
Harold E. Six, Sr.

%HART/HTC
600 Pennsylvania Avenue, SE, Suite 105
Washington, DC 20003
Tel: 202-547-5129
Fax: 202-547-8311

I certify that on this 9th day of July, 2007, I filed the foregoing Plaintiff's Motion for Judgment on the Administrative Record, together with Plaintiff's Statement of Facts in Support of Motion , and, Plaintiff's Memorandum in Support of Motion for Judgment via the Court's electronic filing system, it being understood that copies thereof are automatically served on defendant's counsel via that system.

/s/William J. Kenney

---

[i] It is unclear what material the board actually considered at any stage, but particularly on remand. It contemptuously omitted from the certified Administrative Record filed by defendant, the materials this Court directed it to consider, and, in tendering its "Supplement to the Administrative Record" defendant provides no certification that these documents constitute a true and accurate copy of the administrative file of the board in this case.