IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HAROLD E. SIX, Sr. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1727C |
| v. | ) | (Judge Emily Hewitt) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff's Reply In Opposition To Defendant's Second Motion For Judgment Upon the Administrative Record

William J. Kenney, Esq.
DC Bar No. 99267

Counsel for Plaintiff Harold E. Six, Sr.
%HART/HTC
600 Pennsylvania Avenue, SE, Suite 105
Washington, DC 20003
Tel: 202-547-5129
Fax: 202-547-8311

August 24, 2007

TABLE OF AUTHORITIES

Bannum, Inc. v. U.S. , 406 F.3d 1346, 1355-57 (Fed. Cir. 2005) …………………………. 13

Van Cleve v. U.S. , 66 Fed. Cl 133, 136 (2005) …………………………………………… 13

Yagjian v. Marsh, 571 F. Supp. 698, 702 ………………………………………………….. 13

Van Alllen v. U.S. , 70 Fed. Cl. 57, 62-63 (2006) …………………………………………….. 13

Chambers v. U.S. 417 F. 3d 1218, 1224 (Fed. Cir. 2005) ………………………………….. 13

Wistowski v. U.S. Fed. Cl docket 04-300c filed Jan. 12, 2006 …………………………. 14

Motor Vehicles Mfrs Assn. 463 U.S. AT 43 ……………………………………………..14

Roth v. US.S 378 f.Ed 1371, 1381 (Fed. Cir. 2004) ……………………………………14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HAROLD E. SIX, Sr. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1727C |
| v. | ) | (Judge Emily Hewitt) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff's Reply In Opposition To Defendant's Second Motion For Judgment Upon the Administrative Record

Plaintiff here replies in opposition to defendant's second motion for judgment upon the administrative record. Plaintiff has addressed and rebutted the legally relevant issues raised therein in plaintiff's cross motion for judgment on the administrative record. In this reply we strive to highlight and emphasize the obvious errors of the Board's opinion and the gross injustice created by its refusal to correct plaintiff's record and confirm his entitlement to 10 U.S.C. 1201 disability retirement.

*Evidenced introduced by defendant clearly establishes that Navy officials issued silencing orders to the crew of the U.S.S. Liberty.* Notwithstanding these facts, the Board rejects as "non credible" the testimony of Six, the senior legal officer of the Court of Inquiry, the Liberty's ship doctor, one of the Liberty's division officers, and, the statements of Six's Liberty shipmates regarding those orders and how those orders impeded the crews' access to necessary medical care and treatment for their emerging symptoms of PTSD resulting from the terror and trauma of Israel's assault on the Liberty, and the Navy's false report of that assault promulgated by defendant.

We well recognize that this Court is limited to the record before the Board. Six relies on the record before the board . We submit that in his record before the Board, Six has established

clearly, by overwhelming and substantial, uncontradicted, unrebutted evidence that he was disabled and unfit for duty by reason of PTSD at the time of his discharge from the Navy in 1973; that the Navy issued silencing orders to him to conceal its false report, and, that order compounded the natural barriers to care characteristic of PTSD, to precluded Six from disclosing his illness to his military health care providers. We further submit that Six's self destructive conduct was symptomatic of his PTSD and were so evident that his Navy superiors acted in disregard of applicable regulations in failing to provide him the necessary evaluation and care of those symptoms, and, that the health care providers involved in his discharge processing were either negligent, incompetent, or, pressured by Navy officials to disregard and, or, curtail their inquiry into the cause of his self destructive conduct.

It was the duty of the Board to correct these errors in his record. All of these errors were within the jurisdiction of the Board, but the Board has refused to do so. The Board's opinion on remand suggest that the Board misconstrues the limited role of the Court on review as granting the Board an unreviewable license to abuse the applicant and his supporting witnesses and unreviewable authority to declare fantasy as fact, fiction as history, and injustice as justice. It is sad to see a Board so essential to the efficient administration of the daily operations of the military abandon its duty to provide an impartial review of actions by the military to protect the service member from injustices that arise in the peculiar circumstances of military operations and the response to those situations.

In its Second Motion, defendant seeks to divert the Court's attention from the true issues of the case. Defendant asserts "Mr. Six's statement to the Court that he raised the silencing order in his first application were admittedly false." Mr. Six never made such a representation to the Court. First, it is the Board that asserted; "Contrary to what you led … (the Court) ... to believe,

you did not raise the issue of an alleged silencing order in your initial application" [AR 152] Plaintiff's Complaint did not make any such assertion. Plaintiff's complaint informed the Court "2 Facts Six's evidence before BCNR established the following facts: x. While hospitalized …. Six was visited by an as yet unidentified Navy Lieutenant Commander. … The Commander reminded Six of his special security oath … and cautioned Six he was not to discuss any aspect of the events aboard the Liberty with anyone … Six was warned he could be subject to courts martial …. If he violated that order…." [Complaint, 2, x, at page 8]

At no time have Mr. Six, or his counsel, represented to this Court that the 'Silencing Order", per se, was addressed in Six's initial application. That application repeatedly referred to the "stressors" Six was experiencing following the release of the Report of the Court of Military Inquiry.[AR 14, 16, 17, 18, 22, 23, 24] We informed the Court in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment that " he had addressed the Silencing Order in detail" in his July 15, 2004 Motion to Reopen and Reconsider.[Pl Memo in Opposition, July 12, 2006, at Para 15, p. 10; See also: AR 90,95-97,98] Counsel has addressed the circumstances of Counsel's initial handling of the fact of the Silencing Order in counsel's October 17, 2006 letter to BCNR. [AR 178-182, at 179-180] Mr. Six also addressed the silencing order in his affidavit of Nov. 2, 2006. [AR 214-225, at 217-222, see, in particular, Para 11, 12 and 23, AR 218-219]

The existence of the Silencing Order and its effects on the Liberty crew is further attested to by CAPT. Kiepfer, [AR192-198] LCDR Ennes [AR199-204], CTC Benkert, [AR 817-819], Mr. Lockwood [AR 245-258 at 251-257], Mr. Tourney, [AR 205-208], Mr. Jones, [AR 814-816]

and, MCPO White.,[1] the Liberty's Plan of the Day, June30, 1967, [AR209-210] and, of course, CAPT. Boston.[ AR 898-900] The Board dismisses their testimony as "not credible'. It appears that any evidence that destroys the Board's pre-conceived positions is "not credible." In dismissing the testimony of these men as "not credible", the Board necessarily accuses these men, as well as the undersigned counsel, of knowing participation in a scheme to defraud the U.S. Government by submitting knowingly false statements in support of a claim against the government. We respectfully invite the Court's attention that most, if not all of these men, including counsel, are retired members of the Navy, in receipt of retired pay, or, in the case of some, in receipt of benefits from the VA and the Social Security Administration. It is simply irrational to suggest that any one of us, would, individually or collectively, participate in such a scheme, and jeopardize our benefit entitlements. The Board has clearly abused its discretion in rejecting the credibility of these witnesses. The stated reason for attacking their credibility are insubstantial; mere pretenses to avoid the Board's duty to correct the record when an error giving rise to an injustice is established. At a minimum, the Board had a duty to make diligent inquiry into the facts reported. This it has aggressively refused to do. The Board's action is clearly arbitrary and capricious and must be set aside.

Defendant speculates "it is not reasonable that a survivor would violate the order by discussing allegedly prohibited matters with his peers but not his health care providers."[Def. Memo, p. 9] Such speculation ignores the reality that these men served with fellow NAVSECGRU members, each of whom shared the special security clearances and special security consciousness characteristic of that group. See, for example: the special travel orders issued Six. [AR 529]

[1] The Board notes, on remand, it relied on its action in other dockets involving Liberty crew members. The Lockwood case is pending before Judge Horn in Docket No.04-543c MBH . That docket contains declarations presented to the board from MCPO White, Docket 06-543c MBH, AR362, also testifying to the silencing orders.

The Board seeks to bolster its denial of the silencing order by reference to another Liberty crew survivor's case that had been before the board in the past. We have no knowledge of the facts or evidence presented in that proceeding and, had no notice of the Board's reliance thereon. There is nothing contained in the Board's discussion of that case that seems relevant to the issues here other than the fact the applicant was a Liberty survivor and his attorney raised the issue of silencing orders in a pending judicial proceeding. Nor is there any indication that the applicant acted in disregard of the silencing orders by exposing the knowingly false report of the Court of Inquiry.

The Board's assertion, [AR 157] repeated by defendant, [Def. Memo. P. 11] that "Mr. Six admitted that his record had not been sanitized" is a bit disingenuous. We stated, and we restate that the records had been "sterilized", [AR 89] and that Six's records were almost totally silent as to Six's real service history. [AR 95] The sole reference to his Liberty experience was the notations of the injuries to his leg and hand, the fact he had been transferred to the USS America on June 8 or 9, 1967, and thereafter medevaced to US Naval Hospital, San Diego. Persons reviewing that record would have no knowledge of how the injury was incurred or what else took place that day. [AR 89-90] Six's Purple Heart award merely identified the fact he was wounded in enemy action. Even the Presidential unit citation, issued on 6 May, 1969, some 2 years after the assault refers solely to an attack "by foreign jet fighters and motor torpedo boats".[AR 633] Nowhere in the medical and service record is there any recitation of facts concerning the attack on the Liberty, his having suffered a concussion with loss of consciousness incident to the attack, or the extreme trauma he underwent during the attack. The Navy made certain of that. And yet, his initiation into "Davey Jone's Locker" is carefully recorded in his records. [AR 503] As a consequence, Six did not receive the quality of care he needed and was entitled to.

Instead of providing the care and treatment Six and his fellow Liberty survivors needed and deserved, they were labeled as liars; and the Board's opinion essentially continues to slander and assassinate the characters of these brave men. Mr. Six's supplemental affidavit of July 14, 2004, and the declarations of his supporting witnesses establish the facts behind this statement in his Motion to Reopen. "….the fact our government endorsed the Israeli lie that this was a brief attack, mistaken identity, terminated as soon as they recognized our status as a U.S. Navy vessel, resulted in we, the survivors being labeled as, essentially, liars and anti-Semites … It was more a situation of watching in frustrated silence while the government spread these lies … . Adding to that sense of frustration was the fact our government undertook an operation to silence the Liberty crew. Indeed, … there is nothing in those records other than the recordation I served on the Liberty … (and) was transferred for treatment and recuperation. No one reviewing that record would have any notice of the horrific, terrifying events we on the Liberty experienced that day. No one would have knowledge of my personal experience of being knocked unconscious in the flooded compartment, etc. … This was not by accident. It was part and parcel of the Navy's intent to conceal the true facts that occurred aboard the Liberty. Not only was my record 'sterilized', care was taken to insure that information did not get out." [AR 112-113]

Defendant's assertion of any admission that this record had not been "sanitized" [Def. Memo, p11] is a game of words. At no point in this proceeding, whether before the Board, or this Court, has plaintiff made any such "admission." If defendant construes this to assert that information was removed from Six's record, Six (and counsel) have no information whether such occurred or did not occur. What Six does contend, and any fair reading of his record establishes, is that record entries were not made of facts pertinent to his experiences aboard the Liberty, including, in particular, omission of the fact that he was knocked unconscious by the torpedo

exploding into his below the waterline compartment, that his non rated men on both sides of him were killed in that explosion that he was trapped beneath debris from the explosion as the compartment was flooding from the hole in the hull, that as he was being rescued from the flooded compartment, he was dropped back into the flooded compartment because the escape hatch had been sealed, and, that he was dazed and semi-conscious when he was finally passed through the hatch to safety. None of these critical facts are found in his health or service records. "Sanitized" or "sterilized"? Critical information normally recorded in such circumstances was not recorded in his service record. There is strong evidence this was the result of the silencing orders. [See Dr. Kiepfer's testimony to his personal receipt of such orders. [AR194] Candidly, whether that data was deliberately omitted from the records, or was a consequence of the utter confusion following the attack is irrelevant. This critical data was not in Six's record and its absence contributed to erroneous diagnosis and a failure to provide competent, timely, care and treatment. The Board wholly fails to address this critical issue.

Defendant reminds the Court it is not a "super correction board," citing *Heisig v. U.S.*, 719 F. 2d 1153 (Fed.Cir. 1983). We do not contend otherwise. The issue here is whether the Board's conclusion is supported by substantial, competent, relevant evidence. Does the Board's repeated rejection of plaintiff's evidence as "not credible," and its reliance on documents it inserted in the record without analysis of the reliability or relevance of said documents, and, without notice to plaintiff or opportunity for comment thereon, constitute the substantial evidence needed to rebut plaintiff's evidence. On this record it clearly does not.

Dr. Kiepfer testified: "The record is clear that the Command (NAVCOMSTA Philippines) in fact knew that Six was becoming dysfunctional and in severe stress. …These were clear symptoms of a young man seriously disabled and in grave crisis by his PTSD … and

that he was no longer capable of performing his duties. … As a Naval Officer it is outrageous that a command would have a senior rated member of the command, responsible for handling highly classified, extra sensitive security documents and information, evidencing such a degradation of personal conduct and not intervene.[AR 831] Again, the Board simply ignores this evidence.

The Board dismisses as "not credible" plaintiff's affidavit testimony, and the declarations of his supporting witnesses, regarding the issuance of the silencing orders. Wholly aside from plaintiff's evidence, the documents entered into the record by the Board itself clearly establish that such orders were in fact issued. Did these orders impede Six's ability to obtain the care and treatment he needed? First, given the total lack of control his conduct demonstrated in the Philippines, the Navy itself had both the power and the duty to place him under treatment. This it failed to do. Here Six, Dr. Kiepfer, LCDR Ennes, Mr. Lockwood, Mr. Tourney each testify to how those orders interfered with the survivors' ability to get the mental health care they needed. [AR 113, 828-29, 192-195, 199-204, 205-208,245 -258]

Dr. Kiepfer states "It is my professional opinion as a matter of medical certainty that the silencing order impeded the ability of the survivors to seek professional help for their evolving symptoms of mental health disorders, including, especially, symptoms of Post Traumatic Stress Disorder." [ AR ] Citing studies by the Walter Reed Army Institute of Research, Dr. Kiepfer concludes: "This research reinforces my confidence that the Silencing Order interfered with Mr. Six's ability to obtain the care he needed for his evolving symptoms of PTSD. … the order exaggerated the constraints of this so-called 'natural' reluctance to acknowledge symptoms of mental health disorders."[AR 156] The Court will note that the Board dismisses CAPT Kiepfer's testimony asserting he made no reference to the silencing orders in prior statements

submitted to the VA. The Board fails to establish that existence of the silencing order was iny sense an issue in those VA proceedings.

The Board infers Dr. Kiepfer's testimony lacks credibility because of his testimony in a VA proceeding involving Mr. Six, wherein Dr. Kiepfer supported Six's claim for a damaged facial nerve arising from the Liberty assault.. We presume the Board's opinion is attempting to assert these were prior inconsistent statements. There is nothing to support that assumption. To the contrary, Six's record shows Six receiving treatment aboard the Liberty for what was then diagnosed as "sinusitis." [AR 698, 701, 718, 719, 729,724,725 ] There is nothing inconsistent with Dr. Kiepfer's statement to the VA. Indeed, had the Board genuinely questioned either Dr. Kiepfer's or Dr. Estrov's testimony, it could, and should have followed its normal procedures and referred the record and those statements to the Navy's Surgeon General for review and advice. The BUMED advisory opinion in Lockwood shows why that avenue was not utilized. BUMED there advised the Board that a PTSD victim's failure to disclose his symptoms was in fact itself a characteristic symptom of the disorder, avoidance of stimuli. [AR 901-904]

Defendant argues "it is not reasonable that a survivor would violate the order by discussing allegedly prohibited matters with his peers but not with his health care providers." [Def. Memo. P. 3, 11, 16] Of course, individuals suffering from PTSD are suffering from a mental health disorder that disrupts the brain's rational functioning. "Reasonable" or "rational" behavior is not often the norm in such circumstances, as is demonstrated by Six's conduct in the Philippines and his post service years. As Dr. Hoge's research establishes [AR839-843, 844-846, 847-858, 869-880, 881-884], and as Dr. Kiepfer testifies, referring to the medical care provided the Liberty crew, " Our medical system worked well in diagnosing and treating their

physical injuries. Where we failed was in the diagnosis and treatment of psychiatric and psychological injuries."[AR 193]

Defendant's argument ignores the evidence of record. CAPT Kiepfer, [AR 194, and, 820-838] LCDR Ennes [AR 199-204 ], Mr. Tourney. [AR 207-208] Mr. Six [AR 218], and, Mr. Lockwood [AR 252-254] each address this phenomena. After reviewing Dr. Hoge's reports on the Hoge team research, and an NEMJ article by Rachel Yehuda, PhD on the barriers to treating PTSD victims,[2] Dr. Kiepfer addresses the key aspect of this in the context of the Liberty survivors and the combined impact of the false report and the silencing orders: " … those lies claimed the attack was brief, inferring it was an insignificant event. Thus, individuals experiencing PTSD symptoms were denied the opportunity to disclose the event; their symptoms could not be understood for what they were without such disclosure and the individual ore3sents, in military circumstances, as a malingerer." [AR 196-197]

LCDR Ennes relates how the silencing order was delivered to him by a Navy Captain while he was hospitalized at U.S. Naval Hospital, Portsmouth, VA. He relates; "…this officer … cautioned me that I was not to discuss the events aboard the U.S.S. Liberty with anyone … not even your wife. …I was warned … I could face disciplinary action, including courts martial. I responded, in effect, that as a member of the Naval Security Group Activity, I did not need such an order. I well understood my duties in handling National Security information. His response was to the effect, this was recognized, but these orders came from the top and were very serious…..I have been asked if I interpreted this order as prohibiting me from discussing aspects of the attack with health care providers. I certainly did. Why else would the Navy feel it necessary to convey that order to me in the hospital, and why have a superior officer convey the

[2] There is hoard of supporting medical journal articles on this aspect of PTSD. It is a common phenomena encountered in treating many mental health disorders. Dr. Kiepfer selected the NEMJ articles because of both the NEMJ reputation for scholarly work, and the rigor of peer review of articles accepted for publication in that journal.

order and threat to me personally." [AR 200-201] After discussing the special training NAVSECGRU members receive in handling and complying with highly sensitive, highly classified national security matters, Commander Ennes continues:"Thus, where a special order of secrecy is issued, members take it to heart. When that order is reinforced with threats of courts martial, it is scrupulously complied with. You don't ask questions, you don't seek clarification; when in doubt, you comply."[AR203] Commander Ennes then discusses the orders impact on those survivors who continued to serve in his division in Germany after the Liberty assault.. Reviewing the effects those men were experiencing, he states: "Normally, in those days, if one of your crew was having recurrent nightmares and difficulty sleeping and it was affecting his job performance, you would most likely suggest he go talk to the chaplain or a doctor. The one thing I well understood, as did they, this they could not do. There is no way you could discuss your symptoms without going into the true facts of the attack and the conspiracy to cover it up. That clearly was prohibited by the silencing order."[AR 203-204]

Mr. Tourney relates a like impact." There was, and is, no way I can describe the symptoms … without discussing the attack itself. … I've been told we were free to discuss the fact the ship was attacked. That may have been the intent. But it sure wasn't the way it was conveyed. I doubt I had ever met any Admiral prior to RADM. Kidd's visit to us in sick bay. I readily acknowledge when he told me I couldn't discuss this with anyone, I took it to heart. He didn't offer any exceptions, and I didn't dare ask any questions. He meant to intimidate us, and he surely intimidated me."[AR 208]

Mr. Six testifies to the same effect.[AR 218] "I took that order at its fullest threat. I understood it to prohibit me from discussing anything about my experiences aboard the Liberty

with anyone, at any time. … That obviously meant the doctors and nurses, why else convey it to me in the hospital." [AR 218]

The issue here is whether the Board's findings are supported by substantial evidence. The Board dismisses plaintiff's evidence as "not credible" on the issue of the silencing order, the issue of the false report, and, the issue of whether Six was disabled from PTSD at the time of his discharge. The Board dismisses eyewitness testimony of defendant's own agents, and, in CAPT Boston's case, against his own interests. The Board dismisses the testimony of both Dr. Estrov and Dr. Kiepfer, and ignores the carefully researched peer reviewed reports of defendant's own agents at the Walter Reed Army Research Institute, in favor of a newspaper article! It defends and adopts the historic diagnosis of "immature personality," ignoring the fact that the medical diagnostic manual it relies on clearly establishes that diagnosis is inappropriate in cases such as Six's where a history of head trauma and brain injury is present.

The first hand, eyewitness accounts of the ship's crew, including the ship's doctor and one of its division officers, as to the true facts of the assault on the ship, and the confession of the Court's senior legal advisor as to the falsity of the Court's report, is rejected in favor of an unpublished article by Judge Cristol, a retired bankruptcy court judge. [3] In contrast, RADM (then Captain) Staring testifies to his search of the record of the proceedings of the Court of Inquiry as COMNAVEUR (the convening authority) Staff Judge Advocate, and his report to Captain Boston that he could find no records support for the Report's conclusion the attack was a case of mistaken identity.[AR 896-897] Captain Boston, in a statement against interest, in his declaration acknowledges the report was willfully false and that he and RADM Kidd in fact

[3] Judge Cristol's injection of himself into the history of the Liberty assault is both peculiar and untested or examined. The energy he has expended in defending Israel's claims the attack was brief, and a case of mistaken identity raises genuine questions as to his motivation and independence of judgment. To dismiss CAPT Boston's credibility because of some alleged conflict with Cristol highlight's that the Board's review of the evidence in this proceeding is singularly lacking in judicial temperament.

determined the attack was a carefully planned deliberate attack, but manipulated the Report to reach conclusions dictated by SECDEF McNamara and then President Johnson.[AR 898-900,898-899]

It is fair to say that the Board's 28 March 2007 decision on remand at best pays passing compliance with this Court's orders on remand. Indeed, it took a studied effort to have defendant add the material the Court directed be reviewed to the administrative record, and, no certification that such had been considered is included in the record. Defendant argues that the fact documents are not specifically addressed in a decision does not mean they were not considered. We agree. But, as here, when the decision demonstrates they in fact could not have been considered, a different conclusion arises.

The Board, on remand, wholly ignored the substance of this Court's remand orders..For example, the Board totally ignores, does not address in any way the medical hournal articles incorporated in Dr. Kiepfer's declaration. It dismisses Dr. Estrov's Report on factually inaccurate grounds. While this Court's role is limited, it should not be blind to the lack of substantial evidence to support the Board's findings, nor should it beblind to the substantial evidence supporting Six's application.

Pursuant to *Rule 52.1 of the Court's Rules, [RCFC 52.1*] the Court is required to make factual findings ./… from the record as if it were conducting a trial on the record." *Acevedo v. U.S.; Bannum, Inc. v. U.S., 409 F. 3d 1346,1355-57(Fed. Cir. 2005)* Correction Boards are obligated to examine relevant data and articulate a satisfactory explanation for their decisions. *Van Cleve v. U.S., 66 Fed. Cl. 133, 136 (2005); Yagjian v. Marsh, 571 F. Supp. 698,702; Van Allen v. U.S., 70 Fed. Cl. 57, 62--63 (2006); Chambers v. U.S. 417 F. 3d 1218, 1224 (Fed. Cir. 2005).* "Although courts should be responsible and seek not to interfere in military matters

beyond their competence, it, nonetheless, is a court's duty to identify and review errors…." *Wistowski v. U.S.*, Fed. Cl , docket 04-300c, filed January 12, 2006, slip, p.8.

As defendant asserts, the court does not serve as a "super correction board." When substantial evidence supports the board's action and its action is reasonable in light of all evidence presented, it should not disturb the result,. The board must examine relevant material and articulate its decision. This requires rational connections between facts found and choices made. Its decision may be found to be arbitrary and capricious if it fails to consider an important aspect of a problem, offers an explanation that runs counter to evidence before the board, or, "is so implausible that it could not be a difference in view or the product of agency expertise." *Van Cleve, supra, slip. P. 7* quoting Motor Vehicle Mfrs Assn, 463 U.S. at 43. When a correction board fails to correct an injustice clearly presented in the record, it is acting in violation of its mandate. *Roth v. U.S., 378 f. 3D 1371, 1381 (Fed. Cir. 2004).*

As in Van Cleve, supra, the rulings of Six's correction board did not resolve the inconsistent findings as directed by the remand orders. Its decision on remand is simply contrary to the substantial evidence of record. Here, as in Van Cleve, the primary, essential facts the board used for denying Six's application was that neither he, his doctors, his shipmates, RADM. Staring, Captain Boston, or the reports of the DOD sponsored research on the characteristic symptoms of battle induced PTSD could be believed. As in Van Cleve, the Board's reasons range from the petty to the absurd.. Such suggest bad faith by the board. *Van Cleve, supra at slip p. 8, footnote 6.*

Israel's attack had the purpose and intent to sink the Liberty and kill all the crew. [Boston, AR 898] The brave crew of the Liberty frustrated that effort, only to be labeled as liars and torpedoed by their own Navy officials, their Secretary of Defense and their own President.

We fervently hope some genuine security interest of the U.S. justified that treachery in 1967. Whatever justification may have existed in 1967, there can be no justification for using this conspiracy to cover up the true facts of the attack as a premise to deny its victims suffer from the wholly predictable consequences of exposure to such terror. The evidence of record here clearly establishes Mr. Six was disabled from PTSD at the time of his discharge and the court should now mandate correction of his records to establish his entitlement to 10 USC 1201 disability retirement benefits.

Respectfully submitted

/S/ William J. Kenney
William J. Kenney, Esq.
DC Bar No. 99267

Counsel for Plaintiff Harold E. Six, Sr.
%HART/HTC
600 Pennsylvania Avenue, SE, Suite 105
Washington, DC 20003
Tel: 202-547-5129
Fax: 202-547-8311