# In the United States Court of Federal Claims

No. 04-1727 C

(E-Filed: December 18, 2007)

| | | |
|---|---|---|
| HAROLD E. SIX, SR., Plaintiff, v. THE UNITED STATES, Defendant. | ) | Military Pay; Motion for Judgment on the Administrative Record; Substantial Evidence Rule; Request for Correction of Military Records; Post-Traumatic Stress Disorder |

William J. Kenney, Washington, DC, for plaintiff.

Leslie Cayer Ohta, with whom were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.

OPINION

HEWITT, Judge

This case is before the court after remand to the Board for Correction of Naval Records (BCNR or Board) following this court's review of a prior decision of the BCNR in Six v. United States (Six), 71 Fed. Cl. 671 (2006). The remand focused on the possible existence of an alleged "silencing order" that could have affected the information in medical records contemporaneous with plaintiff's military service. Id. at 686-87.

Plaintiff Harold E. Six, Sr. is a survivor of a torpedo attack on the U.S.S. Liberty (the Liberty), an event that occurred off the coast of Gaza during the Six-Day War between Israel and Arab forces in June 1967. Six, 71 Fed. Cl. at 671 (citation omitted).

The Court of Inquiry of the United States Navy investigated the attack and "determined that the attack was a case of mistaken identity that ended once the ship was recognized to be a U.S. naval vessel." Id. at 673. However, plaintiff argues "that the facts contained in the decision were false and that defendant purposely engaged in a cover-up operation." Id.

> [Plaintiff] seeks correction of his naval records to reflect disability retirement on the basis of post-traumatic stress disorder (PTSD) and the back pay, allowances, and benefits that would flow therefrom. Plaintiff contends that, at the time of his discharge on February 6, 1973, he was suffering from PTSD and entitled to a 70% disability rating on the basis of symptoms caused by or aggravated by PTSD, and that the Navy should have transferred plaintiff to the Temporary Disability Retired List on February 6, 1973 in lieu of discharge and thereafter conferred on him permanent disability retirement status."

Id. at 671-72 (internal citations omitted).[1]

Before the court are the dispositive motions of the parties based on the Administrative Record after remand (AR): Defendant's Second Motion for Judgment Upon the Administrative Record (defendant's Motion or Def.'s Mot.); Defendant's Statement of Facts (defendant's Facts or Def.'s Facts); Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment on the Administrative Record (plaintiff's Memorandum or Pl.'s Mem.); Plaintiff's Statement of Facts in Support of Plaintiff's Motion for Judgment on the Administrative Record (plaintiff's Facts or Pl.'s Facts); Defendant's Opposition to Plaintiff's Motion for Judgment on the Administrative Record (defendant's Response or Def.'s Resp.); Plaintiff's Reply in Opposition to Defendant's Second Motion for Judgment Upon the Administrative Record (plaintiff's reply or Pl.'s Reply); Plaintiff's Response to Defendant's Opposition to Plaintiff's Motion for Judgment on the Administrative Record (plaintiff's Response or Pl.'s Resp.); and Defendant's Reply to Plaintiff's Opposition to Defendant's Second Motion for Judgment Upon the Administrative Record (defendant's Reply or Def's Reply).

Defendant moves for judgment upon the AR that "the decision of the [BCNR] that plaintiff . . . failed to demonstrate that he was entitled to the correction of his military records to reflect a disability discharge was [not] arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." Def.'s Mot. 1; see also id. at 20. Plaintiff moves for judgment upon the administrative record that "the

---

[1]The background facts are set out in Six v. United States (Six), 71 Fed. Cl. 671, 672-78 (2006).

[BCNR's] decision denying him correction of his navy record to establish his 10 U.S.C. [§] 1201 disability retirement rights [was] arbitrary, capricious and contrary to the record evidence." Pl.'s Mem. 7.

## I. Background

### A. Review and Reconsideration by the BCNR

"[T]he Department of Veterans Affairs (VA) awarded plaintiff disability benefits for post-traumatic stress disorder (PTSD) with a ten percent disability rating" on July 21, 1999. Six, 71 Fed. Cl. at 675. Plaintiff filed an application with the BCNR for the correction of his naval records to reflect disability retirement due to PTSD on December 20, 2002. Id. (citation omitted); see also AR 20-78. Plaintiff provided:

> [A] letter from Dr. Richard F. Kiepfer, dated August 20, 1997, stating that PTSD could contribute to plaintiff's physical pain, AR at 27; a letter from the same doctor dated February 15, 1996, stating, "I understand that Mr. Six has suffered 'Post Traumatic' neurological syndrome," id. at 28; plaintiff's 1967-1973 medical records, which did not indicate that plaintiff was suffering from any symptoms of PTSD, see id. at 29-43, 49-54; . . . medical records dated September 5, 2002 and October 11, 2002, id. at 55-59, stating that "P[atien]t has PTSD" . . . ; affidavits from his stepdaughters describing plaintiff's drinking and marital problems and concluding that those problems were the result of his experience aboard [the Liberty]. . . . [; and] his own affidavit describing his experience aboard [the Liberty], the alleged cover-up, and his subsequent nightmares, flashbacks, and physical pain. . . .

Six, 71 Fed. Cl. at 675 (alteration in original). Plaintiff's medical records included a psychiatric evaluation performed on August 4, 1972 by Lieutenant Commander (LCDR) Cain. AR 53-54. The evaluation stated that plaintiff had an "[i]mmature personality" and "does not give sufficient history of alcohol abuse to indicate that he requires further medical psychiatric management." Id. at 54. In particular, plaintiff's December 20, 2002 application made no mention of a "silencing order" that prohibited plaintiff from discussing the attack on the Liberty. See id. at 20-78.

In a letter dated August 25, 2003, the BCNR denied plaintiff's application for correction of his naval records pursuant to section 1552 of title 10 of the United States Code. Id. at 6-8. According to the letter, a "three-member panel of the [BCNR] sitting in executive session, considered [plaintiff's] application on 21 August 2003." Id. at 6. The letter stated:

> Documentary material considered by the Board consisted of [plaintiff's] application, together with all material submitted in support thereof, [his] naval record and applicable statutes, regulations and policies.
>
> After careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice.

Id. "The Board noted that[,] despite the traumatic events [plaintiff] experienced in 1967, [plaintiff] continued to perform [his] duties in a satisfactory manner for several years thereafter, and [was] promoted to CT2 in 1967, and to CT1 in 1973." Id. The Board found no "indication in the available records" that plaintiff "suffered from the hallmark symptoms of posttraumatic stress disorder during the period from 1967 to 1973." Id. The Board noted that, on October 21, 1971, plaintiff denied having a history of psychological complaints; on August 4, 1972, plaintiff was given a diagnosis of immature personality disorder after a psychiatric evaluation; on August 8, 1972, another psychiatrist stated that plaintiff had "'no detectable psychiatric difficulties;'" and, on February 6, 1973, plaintiff's psychiatric state was classified as normal. Id. at 6-7. According to the Board, "[t]he majority of [plaintiff's] complaints apparently related to [plaintiff's] wife's behavior and the perceived unfairness of [plaintiff's] life situation." Id. at 7. The Board did not find probative the fact that the VA had, in its July 21, 1999 decision, granted plaintiff a ten percent rating for posttraumatic stress disorder because "the military departments assign disability ratings only in those cases where a service member has been found unfit for duty by reason of physical disability, whereas the VA rates all conditions it classifies as 'service connected,' without regard to the issue of fitness for military duty." Id. The Board informed plaintiff that he was "entitled to have the Board reconsider its decision upon submission of new and material evidence or other matter not previously considered by the Board." Id. at 7-8. The Board also stated that "a presumption of regularity attaches to all official records" and that "the burden is on the applicant to demonstrate the existence of probable material error or injustice." Id. at 8.

Plaintiff filed a motion for reconsideration of the BCNR's decision on July 15, 2004, Six, 71 Fed. Cl. at 676; AR 79-150, and submitted a brief in support of his request, AR 82-99. The request included plaintiff's supplemental affidavit, id. at 111-18, Dr. Yuval Estrov's Psychiatric Report dated April 29, 2004, id. at 100-10, various medical records, id. at 82; see id. at 29-43, 49-60, and a copy of plaintiff's answers to questions from counsel in preparation of his application, id. at 119-126. It was in this motion for reconsideration that plaintiff raised for the first time the issue of an alleged "silencing order." Id. at 95, 113. Plaintiff alleged that "[a]n officer was dispatched to each survivor to warn the crew members that they were not to discuss the attack with anyone, without permission of either the [Commanding Officer] of the Liberty, or that officer." Id. at 113. Plaintiff's motion for reconsideration argued that "the fact Six was issued orders by

competent superiors prohibiting him from answering those questions [on the Reports of Medical History prepared incident to his examination] accurately must be considered in evaluating [his medical] histories." Id. at 91; see also id. at 95-97. Plaintiff argued "that the BCNR 'fail[ed] to address the chilling effect of the Navy's silencing order,' which would explain an absence of symptoms of PTSD in the contemporaneous medical record." Six, 71 Fed. Cl. at 676 (quoting AR 95) (alteration in original); see AR 113. In his April 29, 2004 Psychiatric Report, Dr. Estrov opined that, on February 6, 1973, plaintiff was suffering from PTSD and had a seventy percent disability rating. Id. at 109.

In a letter dated July 23, 2004, the Executive Director of the BCNR denied plaintiff's request for reconsideration. Id. at 10-11. "The regulations require the submission of evidence that is both new and material in support of a motion for reconsideration." Six, 71 Fed. Cl. at 676 (citing 32 C.F.R. § 723.9 (2005)). Because the Executive Director found that Dr. Estrov based his opinion on his acceptance of plaintiff's representations of the symptoms of PTSD he began experiencing in 1967, which were rejected by the Board on August 21, 2003, the Board did not consider Dr. Estrov's April 29, 2004 Psychiatric Report to be new material evidence. AR 10. The Executive Director found nothing "that would warrant a change in the Board's rejection of [plaintiff's] contentions." Id. Plaintiff's allegations regarding the effect of the silencing order were not addressed by the Executive Director. Six, 71 Fed. Cl. at 676; see AR 10.

B. Initial Consideration By the United States Court of Federal Claims

Plaintiff filed a complaint in the United States Court of Federal Claims on December 2, 2004. Complaint (Compl.) 1. Plaintiff argued "that the BCNR and Executive Director abused their discretion in failing to consider plaintiff's claim that he was prevented from disclosing his PTSD by defendant's silencing order and for 'fail[ing] to articulate the reasons for ignoring this material evidence.'" Six, 71 Fed. Cl. at 685 (alteration in original and citation omitted). Defendant filed the Administrative Record and its Motion for Summary Judgment, or, in the Alternative, for Judgment Upon the Administrative Record on May 3, 2005. Six, 71 Fed. Cl. at 676-77. Defendant argued it was "entitled to summary judgment because plaintiff's claim is barred by the doctrine of laches." Id. Defendant argued, in the alternative, that it was "entitled to judgment on the administrative record because the BCNR 'was not arbitrary or capricious and did not prejudicially violate the law when it found that the record before it did not show that [plaintiff] suffered from PTSD as a result of his military service [at the time of his discharge].'" Id. at 677 (alterations in original and citation omitted). Defendant moved "to supplement the administrative record on October 3, 2005 with records before the Executive Director on reconsideration of plaintiff's application." Id. (citation omitted). The court granted defendant's motion. Id.

On January 19, 2006, plaintiff filed his Memorandum in Opposition to Defendant's Motion for Summary Judgment, or, in the Alternative for Judgment Upon the Administrative Record, his Proposed Counter Statement of Facts and supplemental declarations and proposed exhibits. Id. The supplemental declarations and exhibits, however, had not been previously submitted to the BCNR and had therefore not been considered in the BCNR's determinations. Id. On February 7, 2006, at the direction of the court, plaintiff filed a statement describing the admissibility of each document. Id. Among the documents that plaintiff proposed to introduce were declarations of Admiral Staring, Captain Boston, and Dr. Kiepfer. Id. at 682-83. Captain Boston had assisted in the preparation of the report of the Court of Inquiry, and Admiral Staring had participated in the review of the record of the investigation by the Court of Inquiry. Id. at 682. Plaintiff proposed to use these declarations "to prove that the report was false and that the methods which defendant used to promulgate the report were irregular." Id. at 682-83 ("The Staring Statement and the Boston Declaration state that, based on their investigation and review, the evidence yielded the opposite result from that published."). Dr. Keipfer was the doctor on the Liberty during the attack; plaintiff offered his declaration "for the purpose of diagnosing plaintiff with PTSD" and "to prove the existence of the silencing order and the falsity of the Report of the Court of Inquiry." Id. at 683. The court admitted the declarations that were signed by identifiable declarants and the exhibits into evidence, but denied plaintiff's request to supplement the administrative record with an unsigned declaration of an unidentified declarant. Id. at 682-84. The court issued an order on April 3, 2006, "directing defendant to file records upon which the BCNR explicitly stated that it relied in denying plaintiff's application for correction of records but which were not included in the Administrative Record or Supplement filed by defendant," specifically, the October 1971 medical examination, the August 8, 1972 psychiatric consultation, and the February 6, 1973 clinical evaluation. Id. at 677. Defendant filed copies of the October 1971 medical examination and the February 1973 clinical evaluation on May 19, 2006, but was unable to provide a copy of the August 8, 1972 psychiatric consultation. Id. at 678. This court issued its opinion on June 30, 2006. Id. at 671.

This court noted that "[a] judgment of a board for a correction of military records will only be overturned if the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." Id. at 679 (citing Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983)). The court also noted that "[u]nder the substantial evidence rule, however, 'all of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion.'" Id. (citing Heisig, 719 F.2d at 1157). "Where the Board did not consider or address evidence before it that may have had the effect of changing the result, the court may remand for consideration of that evidence." Id. at 679-80 (citations omitted). This court denied defendant's motion for summary judgment on the ground of laches "[b]ecause there is a statute of limitations applicable to plaintiff's claim and

because plaintiff filed within the time period prescribed by that statute." Id. at 681. Additionally, "[d]efendant cannot establish on summary judgment that 'plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time he knew or reasonably should have known of his claim against the defendant.'" Id. at 682 (citations omitted).

This court also denied defendant's motion for judgment upon the administrative record and remanded plaintiff's claim to the BCNR because "the BCNR cannot be said on this record to have considered all the evidence." Id. at 686 ("[B]ecause the existence of the silencing order could explain the lack of contemporaneous medical evidence on the record which could form the basis for a diagnosis of PTSD and therefore casts doubt on the accuracy of the contemporaneous medical record, the question of the existence of the alleged silencing order is directly relevant to the question of whether plaintiff had disabling PTSD at the time of his discharge."). The court specifically directed the BCNR "to consider plaintiff's claim in light of the alleged silencing order." Id. The case was stayed pending the remand. Id. at 687.

Defendant submitted a motion for clarification on July 18, 2006 regarding the nature of the silencing order and the scope of materials to be considered by the BCNR on remand. Reconsideration Opinion of November 9, 2006 (Reconsideration Opinion), 1-2. The court deemed the motion for clarification to be a motion for reconsideration and issued its Reconsideration Opinion on November 9, 2006. Id. at 1. In its Reconsideration Opinion, the court stated:

> The initial purpose of the remand is to permit the agency to consider whether a silencing order exists. If the agency finds, as the agency very well could, that a silencing order existed, the agency would then examine whether such a silencing order could be the reason that Mr. Six failed "to demonstrate that he suffered from PTSD," even though he in fact was suffering from PTSD.

Id. at 5 (internal citation omitted). Furthermore:

> The Opinion does not comment on whether plaintiff did or did not have a duty to "question the authority of the officer to issue [the alleged] order," nor does it comment on whether defendant is able to and/or has a duty to identify such an officer. The court wishes to permit the BCNR the opportunity to examine the completed record. This court therefore orders that the BCNR consider the case in light of the supplementary evidence and the allegations of a silencing order and, in that broader evidentiary context, determine whether plaintiff suffered from PTSD.

Id. (alteration in original and internal citations omitted).

C. Reconsideration by the BCNR on Remand

Plaintiff's application was again considered on March 15, 2007 by a "three-member panel of the [BCNR], sitting in executive session." AR 151. In a letter to plaintiff dated March 26, 2007, the BCNR again denied plaintiff's application. Id. at 151-61. The Board considered such documentary material as plaintiff's "application, together with all material submitted in support thereof, [his] naval record and applicable statutes, regulations and policies." Id. at 151. The Board also considered evidence from cases pertaining to two former members of the crew of the Liberty and the following:

> "Acute and Delayed Posttraumatic Stress Disorders: A History and Some Issues", American Journal of Psychiatry, volume 161, pp. 1321-1323, August 2004; "Adverse Outcomes Associated With Personality Disorder Not Otherwise Specified in a Community Sample", American Journal of Psychiatry, volume 162, pp. 1926-1932, October 2005; "Stressed Out Vets", The Weekly Standard, 21/28 August 2006; "The Liberty Incident, Gag Orders Debunked", [sic] by retired Federal District Court Judge A. Jay Cristol with referenced documents, available on-line at http://thelibertyincident.com/gag-orders-debunked.html,; [sic] a statement by Bryce Lockwood dated 8 November 1995; correspondence provided by Rear Admiral Merlin Staring, Judge Advocate General's Corps, US Navy, Retired, in his capacity as an official of the USS Liberty Alliance, an advocacy group which wants the United States government to reopen the investigation of the Liberty attack, with the apparent goal of establishing that military forces of the State of Israel intentionally attacked the Liberty pursuant to the orders of officials of the government of Israel; and "The Assault on the Liberty: The True Story of the Israeli Attack on an American Intelligence Ship", James M. Ennes, Jr., 1979.

Id. at 151-52. The Board noted that it was "unable to obtain an updated copy of [Mr. Six's] VA claims folder from the VA, despite multiple requests for those records." Id. at 152.

The Board found that plaintiff did not raise the issue of the silencing order in his initial application and therefore "evidence concerning that issue is not 'new evidence or other matter' as those terms are defined in [Secretary of the Navy Instruction] 5420.193." Id. The Board also determined that "the medical evidence and affidavits [plaintiff] submitted in support of [his] request for further consideration of [his] application are not new, because such evidence was reasonably available . . . when [he] submitted [his] initial

application." Id. Therefore, these pieces of evidence did "not provide a basis for reconsidering [plaintiff's] request for corrective action." Id.

Nevertheless, the Board considered specifically the issues to which the court directed the Board in its remand, although in its view it was not required to do so under Secretary of the Navy Instruction 5420.193.[2] Id. at 153-61. The Board stated:

> After careful and conscientious consideration of the entire record[,] the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice in [plaintiff's] naval record. Specifically, the panel of the Board that considered [plaintiff's] case was not persuaded [he was] issued the silencing order described in [his] application, that [he] suffered from [PTSD] while serving on active duty in the Navy, or that [he was] unfit to reasonably perform the duties of [his] office, grade, rank or rating by reason of physical disability prior to [his] separation from the Navy.

Id. at 153.

The Board made a determination that the reports of a "silencing order" were not credible. Id. at 155. The Board reviewed the denial of applications made by two other survivors of the Liberty attack, id. at 156-157, and plaintiff's Navy service and health records containing multiple references to the Liberty attack, id. at 157-58. The Board then made an adverse credibility determination with respect to plaintiff. Id. at 157-61. The Board also considered the statements made by Captain Boston, Admiral Staring, Captain Kiepfer, and LCDR Ennes and determined that they either did not relate to the silencing order or lacked credibility. Id. at 159-60. Additionally, "[t]he panel did not accept [plaintiff's] contention to the effect that [plaintiff] suffered from untreated [PTSD] that caused [him] to develop a death wish, which in turn led [him] to volunteer for two tours of duty in Vietnam." Id. at 160. The Board observed that plaintiff's tours of duty were not lengthy and that "there is no indication in available records that [plaintiff]

---

[2]Secretary of the Navy Instruction 5420.193, codified at section 723 of title 32 of the Code of Federal Regulations, establishes procedures of the Board for Correction of Naval Records (BCNR or Board). 32 C.F.R. § 723.1 (2006); see also Dep't of the Navy, Office of the Sec'y, Instruction 5420.193 (November 19, 1997), available at http://www.hq.navy.mil/bcnr/bcnr.htm. The Board, citing Secretary of the Navy Instruction 5420.193, stated: "[A]fter final adjudication, further consideration will be granted only upon presentation by the applicant of new and material evidence or other matter not previously considered by the Board." Administrative Record on remand (AR) 152. "New evidence is defined as evidence not previously considered by the Board and not reasonably available to the applicant at the time of the previous application." 32 C.F.R. § 723.9 (2006).

participated directly in offensive combat operations or that [plaintiff] came under enemy fire." Id. at 161. The Board noted that plaintiff "received highly complementary [sic] performance reports during each of those periods, when [he was] apart from [his] spouse." Id.

The Board further determined that "Dr. Estrov's findings and opinion do not demonstrate that [plaintiff] suffered from [PTSD] at any time during the 1967-1973 period." Id. at 153. In making this determination, the Board rejected the possibility that "most or all of the problems [plaintiff] encountered during [his] service in the Navy are related to the effects of undiagnosed and untreated [PTSD]." Id. Instead, the Board found that "Dr. Estrov glossed over, failed to consider, and/or ignored many significant aspects of [plaintiff's] personal history that might have caused or contributed to the development of those problems." Id. at 153-54 (discussing, among many things, the fact that plaintiff was raised by a single mother, lacked adequate medical or dental care, dropped out of high school, began drinking at age fifteen, was rejected for enlistment in 1963 because of immaturity, and became financially responsible for a wife and three children at the age of 22). Furthermore, the Board noted that Dr. Estrov failed to discuss an electronic message filed in plaintiff's Navy service record dated July 10, 1972. Id. at 154. In part, the message states:

> "Documented problems and reputation of petty officer Six and his spouse include $2661.32 indebtedness, active participation in disreputable incidents at EM club at San Miguel, excessive drinking, mutual physical abuse, harassment of marine sentry and alleged adultry [sic] of spouse . . . potential for success is dependant upon assignment which does not ensure proximity to spouse. His service reputation is good and reflects application to assignment only when physically separated from spouse. . . Mrs. Six's promiscuous reputation is well know[n] and is having a deleterious effect upon the morale of married neighbors and bachelor enlisted alike. Her behavior and her husband's reactions cannot be tolerated in the small isolated community environment at San Miguel."

Id. (all capitals in original). The Board also found that Dr. Estrov failed to note that plaintiff's performance of duty, as measured by his Enlistment Performance Record, was slightly better after the attack on the Liberty than before. Id. Finally, the Board determined Dr. Estrov's discussion of the diagnostic impression recorded by Dr. Cain[3] to be misleading "because immature personality disorder is a recognized mental disorder," the discussion "did not comment on the fact that [plaintiff] lied to Dr. [Cain] about [his]

---

[3]The letter from the BCNR mistakenly refers to Dr. Cain as Dr. Cole. See AR 155. This court understands Dr. Cain to have been the psychiatrist who performed the psychiatric evaluation of plaintiff on August 4, 1972. See id. at 53-54.

use of alcohol," and Dr. Estrov erroneously stated that Dr. [Cain] did not comment on plaintiff's affect. Id. at 155 ("Dr. [Cain] wrote that [plaintiff's] affect was 'happy'[4].").

Plaintiff now seeks review of the BCNR's denial of his application for correction of his naval records to establish his disability entitlement pursuant to section 1201 of title 10 of the United States Code. Pl.'s Mem. 21. Plaintiff "submits that the [B]oard's decision is arbitrary and capricious, contrary to and unsupported by the facts of the record, and, that this Court should grant him judgment on the [AR], granting him his 10 U[.]S[.]C[.] [§] 1201 disability retirement entitlement." Id.

II. Discussion

A. Standard of Review

The Court of Federal Claims "will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983); Roth v. United States, 378 F.3d 1371, 1381 (Fed. Cir. 2004); Haselrig v. United States, 333 F.3d 1354, 1355 (Fed. Cir. 2003). "[M]ilitary administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs. Hence, a soldier who has sought relief from a correction board is bound by its decision unless he can demonstrate by 'cogent and clearly convincing evidence that the correction board acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence.'" Dodson v. United States, 988 F.2d 1199, 1204-05 (Fed. Cir. 1993) (citations omitted). "Plaintiff, however, has the heavy burden of rebutting the 'presumption that administrators of the military, like other public officials, discharge their duties correctly, lawfully, and in good faith.' The plaintiff must do more than 'merely allege or prove that an [Officer Effectiveness Report] seems inaccurate, incomplete, or subjective in some sense.' The plaintiff must establish through '"cogent and clearly convincing evidence"' that the Board's decision was arbitrary and capricious, unsupported by substantial evidence or contrary to law for this court to overturn the [Air Force Board of Correction of Military Record's] decision." Harris v. United States, 14 Cl. Ct. 84, 90 (1987) (citations omitted). "[R]esponsibility for determining who is fit or unfit to serve in the armed services is not a judicial province," Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983), and the [predecessor to the Court of Federal Claims] "does not sit as a super correction board," Harris, 14 Cl. Ct. at 89 (citation omitted) ("This court will not substitute its judgment for that of the correction board's,

[4]According to the AR, Dr. Cain wrote that plaintiff's affect was "pleasant." AR 54.

especially when the correction board is determining the suitability of an individual to be a military officer.").

The court "'may not reweigh the evidence but must only ascertain whether the administration's decision was based on substantial evidence.'" Chambers, 417 F.3d at 1222-23 (quoting Chambers v. United States, No. 03-1767-C, slip op. at 2 (Fed. Cl. July 12, 2004)); Heisig, 719 F.2d at 1157. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Where reasonable minds might reach differing conclusions, the fact that this court would have reached a different conclusion than the one the agency reached is not sufficient for this court to overturn the administrative action." Harris, 14 Cl. Ct. at 90 (citations omitted). "A court may find a correction board's decision arbitrary and capricious if the board entirely fails to consider an important aspect of a problem, offers an explanation for its decision that runs counter to the evidence before the board, or is so implausible that it could not be ascribed to a difference in view or the product of board expertise." Van Cleave v. United States, 66 Fed. Cl. 133, 136 (2005) (citation omitted).

B. Whether the Board's Decision that Plaintiff Was Not Disabled From PTSD at the Time of His Discharge Was Arbitrary, Capricious, Contrary to Law, or Unsupported by Substantial Evidence

Plaintiff argues that "the [B]oard's decision denying him correction of his navy record to establish his 10 U.S.C. [§] 1201 disability retirement rights is arbitrary, capricious and contrary to the record evidence." Pl.'s Mem. 7. According to plaintiff, the Board did not properly consider the silencing orders issued by defendant "prohibiting the survivors from discussing events of the attack." Id. at 11. Plaintiff argues that the AR establishes that the "false" report of the Court of Inquiry "exacerbated Six'[s] emerging PTSD, and, defendant's silencing orders to conceal that the Report is false, obstructed Six's ability to obtain competent diagnosis and treatment . . . of his disorder, and prevented his prior pursuit of his disability retirement rights." Id. at 10. Defendant argues that "the BCNR's finding that Mr. Six's assertion that he had been issued a silencing order was not credible is supported by substantial evidence." Def.'s Mot. 5.

The parties also discuss the possible impact of the alleged silencing order. Plaintiff argues:

> [He] could not discuss his anger and rage, and his flashbacks and nightmares, his survivor's guilt death wish, and how they affected his family and daily life without discussing the fact the Report was a deliberate lie, that the attack was a planned attack on a known US Navy ship, with the intent to sink the ship and kill the crew; that the Navy had refused to come to the Liberty's defense, and the Report was a deliberate lie, a continuing

> betrayal by the government of the honor of his shipmates, alive and dead, and, of his honor.

Pl.'s Mem. 40. Furthermore, plaintiff notes that his medical records regarding the attack "make no mention of his having been trapped, unconscious in the flooded compartment; merely that he received wounds to his arm, hand and leg." Id. Plaintiff argues that the statements of Dr. Estrov and Dr. Kiepfer establish that plaintiff suffered from PTSD and was disabled at the time of his discharge. Id. at 27. Defendant argues that "[b]ecause Mr. Six failed to demonstrate through credible evidence that he was ordered not to discuss the Liberty attack, he necessarily failed to establish that the reason he did not report his alleged PTSD symptoms to his health care providers was because of the alleged silencing order." Def.'s Mot. at 6. Defendant also argues that "the finding of the BCNR that Mr. Six failed to demonstrate that he suffered from PTSD while serving in the Navy, or that he was unfit to serve at the time of his discharge, is supported by substantial evidence." Id. The purpose of the remand to the BCNR, however, was "to permit the agency to consider whether a silencing order exists." Reconsideration Opinion 5. Only if the Board found that a silencing order existed would it "then examine whether such a silencing order could be the reason that Mr. Six failed to 'demonstrate that he suffered from PTSD,' even though he in fact was suffering from PTSD." Id. (internal citation omitted); see also Six, 71 Fed. Cl. at 686-87. The core of this Opinion, then, concerns the Board's consideration of whether a silencing order exists or not.

Certain minor factual errors contained in the Board's letter of March 26, 2007 denying plaintiff's application, see supra notes 3 and 4, could make it appear as though the Board did not give plaintiff's application the attention it deserved. Nonetheless, this court reviews decisions of the BCNR with a high degree of deference and "will not disturb the decision of the [Board] unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." Chambers, 417 F.3d at 1227. Because the BCNR considered the substantive aspects of plaintiff's application, and because the BCNR's explanations are supported by substantial evidence contained in the AR, the decision of the BCNR was not "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." See id.

1. Plaintiff's Allegations Concerning the Alleged Silencing Orders Are Not Credible

As directed by the Court of Federal Claims, Six, 71 Fed. Cl. at 686, the Board reconsidered the question of the possible existence of the alleged silencing order, AR 151-61, and found that the reports relating to the alleged silencing order were not credible, id. at 155.

The AR contains no contemporaneous documentary evidence explicitly referring to a "silencing order." See AR passim. The only contemporaneous documents that suggest a possible limitation on plaintiff's ability to discuss the attack on the Liberty and the events arising therefrom, are a Plan of the Day of the Liberty dated June 30, 1967, id. at 209-10, and internal messages from and between the Department of Defense (DoD) and various Navy commands, id. at 348-61. The Plan of the Day includes three items. AR 209-10. The first item discusses a letter addressed to the officers and crew of the Liberty from the wife of one of the men killed in the attack on the Liberty. Id. at 209. The second item states that "[t]he ship expects to return to Norfolk about 01 August 1967." Id. at 210. Only the last item of the Plan of the Day discusses communications between ship members and others concerning the attack on the Liberty. Id. This last item states:

> The Secretary of Defense has released to the press portions of the unclassified information obtained by the Court of Inquiry. Ships members are authorized to discuss with others only what is contained in the news release and no more. In other words can say no more than exactly what the news release says. To avoid any possibilities of disclosing classified information it is highly recommended that all hands refrain from discussing the incident with others, particularly news media representatives. The release has not yet been received but will be promulgated to all hands when received. Any discussions with news media representatives are to be reported to the Executive Officer right away giving the name of the individual you talked with, who he worked for and what information given to him.

Id.

The messages in the AR from and between DoD and various Naval commands discuss media coverage of the Liberty and emphasize the "importance of not . . . commenting on any aspect of crisis without full coordination with DoD Public Affairs." Id. at 348. The correspondence indicates that interviews could be conducted provided the Liberty "evacuee [sic] signs a statement that he has read, understood and will comply with provisions of Refs B & C." Id. at 354. There is no explanation, however, as to what "Refs B & C" are or as to what they contain. The AR contains a newspaper report of an interview of Kenneth Ecker, a member of the Liberty crew, conducted aboard the USS America shortly after the attack on the Liberty. Id. at 357. According to military correspondence from June 1967, Seaman Ecker "was briefed IAW Ref A & B[,] [and] [c]leared by the medical officer who signed a statement agreeing to the interview. [An] America Public Affairs officer monitored the interview." Id. at 356. In the interview, Seaman Ecker describes the attack and his injuries. Id. at 357. Correspondence between the Navy commands also stated that any unclassified findings of the Court of Inquiry

would likely be made available to the public and that members of the crew could be interviewed on unclassified matters after the Court of Inquiry concluded its investigation. Id. at 358, 359. A message from the Commander in Chief, U.S. Naval Forces, Europe to the Liberty, dated June 1967, stated:

> Commanding officer and any member of Liberty crew who so desires are authorized to respond to queries and give interviews at Malta at time convenient to commanding officer. Narrative and testimony refered [sic] to in Ref B are only portions of Court of Inquiry that have been declassified. Normal security procedures are otherwise applicable. Crew members are limited to responses set forth in press release discussed Ref. B. Any substantive queries concerning attack or any other phase of Liberty incident must be referred to OASD(PA) for resolution, as directed para Two Ref B.

Id. at 360. Neither party, however, directly addressed the Plan of the Day or the messages in briefing. Plaintiff refers to the documents in a string cite in briefing, Pl.'s Mem. 11, and in a footnote in plaintiff's statement of facts, Pl.'s Facts 5 n.3, while defendant does not address them at all, see Def.'s Mot. passim; Def.'s Facts passim; Def.'s Resp. passim; Def.'s Reply passim.

Regardless of the lack of discussion of the Plan of the Day and other references to limitations on the ability of crew members of the Liberty to communicate freely about the attack, the documents are unhelpful to plaintiff for three reasons. First, plaintiff never claims that he saw the Plan of the Day, even though it appears to be the only document that reflects the internal correspondence within the military command discussing media coverage of the attack on the Liberty and it is presumably a document that plaintiff could have been aware of.[5] Second, neither party explains the authority of a Plan of the Day.

---

[5] United States v. Chandler, a case from the United States Court of Military Appeals, discusses the authority of a Plan of the Day and the issue of whether a person should be charged with knowledge of its contents. 23 U.S.C.M.A. 193 (1974). In Chandler, a member of the Navy assigned to the U.S.S. John F. Kennedy was charged with "negligently missing, . . . the scheduled movement of the vessel." Id. at 193. The scheduled movement of the vessel was published in the Plan of the Day. Id. at 195. The defense argued that "publication of the vessel's movement in the plan of the day, as implied in the record entry, did not 'indicate that . . . [the accused] had knowledge or had reasonable cause to know' of the scheduled movement." Id. at 193-94 (omissions and alterations in original). The Court of Military Appeals found that "[a] plan of the day can be competent evidence of a scheduled movement of a vessel[,] . . . [h]owever, publication alone does not import knowledge of the content by the accused." Id. at 195. Because there was no evidence that the plan of the day was publicly announced in the Chandler defendant's presence, and there was no evidence of a requirement for him to ascertain its contents, the Chandler defendant could not be charged with actual knowledge or notice of the date of movement of the vessel. Id. There is no evidence in the case now before this court that

The Plan states that "all information appearing in the Plan of the Day constitutes an official order in accordance with USS Liberty Regulation 4236." AR 209. This statement, however, does not inform the court of the strength or enforceable nature of the order. Furthermore, while the court is not aware of the scope of the press release, the AR supports the inference (given Seaman Ecker's interview referenced in the AR) that the press release was likely broad enough to permit a description of the incident and the injuries that resulted. See id. at 357. Third, the restrictions the Plan of the Day could potentially have placed on plaintiff's communications differ greatly from the restrictions of the alleged silencing order. See id. at 210. Even considered along with the correspondence contained in pages 348-361 of the AR, the Plan of the Day reflected limitations on communications with the press, but does not support the contours of the alleged silencing order; in particular, the Plan of the Day does not support the allegation that an officer approached individual crew members to threaten them with courts martial if they should speak about the incident. Communications with the press were clearly a concern at the time, but no action taken as a result of this concern appears to rise to the level of plaintiff's allegations. Indeed, the inclusion of guidance in the Plan of the Day suggests a level of informality that is inconsistent with the terms of the alleged silencing order.

With no documentary evidence to support plaintiff's allegations, the existence of the silencing order turns on plaintiff's credibility and the credibility of any supporting testimony. The Board found that plaintiff did not raise the issue of the silencing order in his initial application, id. at 152, and questioned plaintiff's credibility based on that omission, id. at 158-61. The Board determined that plaintiff had a history of making false reports and of misleading officials. See id. at 158-61. As an example, the Board found that, in a physical examination on October 21, 1971, plaintiff "falsely reported that [he] did not have a history of bed wetting, and denied a history of frequent or terrifying nightmares, depression or excessive worry, loss of memory or amnesia, and nervous trouble of any sort." Id. at 158. Plaintiff argued that he crossed out questions on the form that pertained to a drug or narcotic habit, excessive drinking, and "homosexual tendencies" to ensure that he did not violate the silencing order. Id. at 158; Pl.'s Mem. 36. However, the Board found that "[i]t appears that [plaintiff was] instructed to do so because answers to those questions were no longer required, and the questions were removed from later editions of the form that superseded the form [plaintiff] completed on 21 October 1971." AR 158. The Board also stated:

---

plaintiff ever saw the Plan of the Day or that it was publicly announced. Furthermore, Six was transferred to the U.S.S. America and then to a U.S. Naval Hospical in San Diego for treatment, Pl.'s Facts 5, and was not aboard the Liberty when the Plan of the Day was issued. Therefore, absent a statement by plaintiff, it is uncertain whether plaintiff, as a result of the Plan of the Day, was even aware of any restrictions on his communications with the press, let alone with his doctors or other healthcare professionals.

> [Plaintiff] apparently misled officials of the Los Angeles Police Department (LAPD) in [his] application for employment as a jail guard, as it is unlikely that [he] would have been hired had [he] disclosed [his] history of alcohol related problems, or [his] continuing financial and marital difficulties. Records [he] obtained from the State of California Department of Corrections at the request of the staff of the Board suggest that when [he] applied for employment as a prison guard, [he] was not truthful about the circumstances of [his] discharge from employment with LAPD.

Id. The BCNR apparently perceived plaintiff as a person of uncertain credibility with a habit of stating facts in a self-serving manner consistent with his immediate interests.[6]

The Board noted that it has also determined that two other survivors of the Liberty attack, who had previously submitted applications similar to plaintiff's application, were not credible. Id. at 155-56. One of those petitioners, like plaintiff, did not mention the alleged silencing order in his initial application and instead "admitted that he had discussed the Liberty incident with a number of his fellow Marines." Id. at 156. The Board denied his initial application. Id. When that petitioner made a second application in which he "raised the issue of the silencing order," the Board denied the second application because it "did not consider him to be a credible historian." Id. The second petitioner did not mention the alleged silencing order in his initial application to the BCNR or in his May 1990 psychiatric evaluation conducted pursuant to his application to the VA "for service connection for [PTSD]." Id. at 156-57. The VA granted this second petitioner a disability rating for PTSD effective January 1990. Id. at 157. "In 1994 he applied for an increased rating for [PTSD], and [he] raised the issue of the silencing order during psychological evaluations that he underwent on 6 June and 25 July 1994. The panel of the Board that considered his application did not find him to be a reliable historian . . . and denied his application." Id. In making this determination, the Board pointed to a letter in his file, dated August 21, 1968, from an attorney to VA officials, stating that the attorney "represented the former Liberty crewmember in connection with his claim against the State of Israel." Id. The Board noted that a claim against the State of Israel "would appear to violate the alleged silencing order." Id.

---

[6]Plaintiff argues that "the [B]oard wholly ignored and failed to consider the statements of Six's son and Six's stepchildren." Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment on the Administrative Record (plaintiff's Memorandum or Pl.'s Mem.) 31. However, in the absence of a determination by the BCNR that plaintiff himself is credible, materials that provide only a reflection of plaintiff's statements are of no assistance, and the court does not fault the Board for failing to consider them. The statements of Six's children and stepchildren, based on Six's statements to them, do not support a finding that a silencing order was issued.

As with the two other survivors whose claims of a silencing order the Board had also denied, the Board noted the fact that "[t]here are multiple references to the Liberty attack in [plaintiff's] record." Id. These references include:

> a message dated 9 June 1967 entitled Status Report USS Liberty Casualties, and a Presidential Unit Citation which contains details of the attack on the Liberty. [Plaintiff's] health record also contains a copy of a letter to [his] commanding officer dated 29 January 1969, in which the Chief Bureau of Medicine and Surgery, requested, on behalf of the Judge Advocate General, that information be provided regarding the treatment of the injuries [plaintiff] sustained in the Liberty attack, presumably for inclusion in a claim for damages to be submitted to the State of Israel.

Id. at 157-58 (citations omitted). Defendant argues:

> This evidence provides strong support for the BCNR's determination for three reasons. First, it casts doubt upon Mr. Six's overall credibility. Second, it undercuts the truth of Mr. Six's assertion that his medical records do not reflect the symptoms of PTSD that he experiences before and after his discharge from the Navy because he was afraid to relate such symptoms to his health care providers. Third, if a survivor of the Liberty attack faced court martial for disobeying the silencing order, as alleged by Mr. Six, it is not reasonable he would violate the order by discussing allegedly prohibited matters with his health care providers.

Def.'s Mot. 11.

The Board also considered statements, declarations and affidavits submitted by plaintiff "in support of [his] contentions concerning the silencing order" and found that they "are not probative of the existence of material error or injustice in [plaintiff's] Navy record." AR 159.

The declarations of Captain Boston and Admiral Staring, discussed the falsity of the Report of the Court of Inquiry. Id. at 896-900; see supra Part I.B. The Board determined that the statement of Captain Boston that he was told never to speak of the attack on the Liberty "is self-contradictory . . . and does not address the consequences of discussing the attack." AR 159. ("Captain Boston's statement is colored by his obvious contempt toward those whom he considers to be 'apologists' for Israel."). The Board determined that Admiral Staring's statement did not address the silencing order. Id.

Captain Kiepfer's declaration discussed the falsity of the Report of the Court of Inquiry, id. at 822, 193, the alleged silencing orders, id. at 823, 193, and the effect the

alleged silencing orders had on the ability of survivors of the attack on the Liberty to access medical care, id. at 193 ("It is my professional opinion as a matter of medical certainty that the Silencing Orders definitely impeded the ability of the survivors to seek professional help for their evolving symptoms of mental health disorders, including, especially, symptoms of [PTSD]."). According to the Board, Captain Kiepfer's statement concerning the silencing order was not considered to be credible because "he did not mention the silencing order in two earlier statements he submitted [on plaintiff's] behalf, dated 15 February 1996 and 20 August 1997." Id. at 160; see id. at 316-17. The Board also noted that Dr. Kiepfer's statement that he had treated plaintiff for "multiple mini-fragment facial injuries," while there are no entries concerning "mini-fragment facial injuries" in plaintiff's Naval health record, was not credible. Id. at 160. Plaintiff argues that this discrepancy is due to Dr. Kiepfer's inability, as the only doctor on board, to keep completely accurate records while trying to care for hundreds of injured people at once. Pl.'s Mem. 44. The court finds plaintiff's argument about the lack of mention of the facial injuries a potentially persuasive one. However, plaintiff has no explanation, persuasive or otherwise, for Dr. Kiepfer's earlier omission to mention the alleged "silencing orders" when he has "medical certainty" about their effect. Finally, plaintiff argues that "Dr. Kiepfer confirmed Six suffered from and was disabled by PTSD at the time of his discharge." Id. at 43. In his statement of February 15, 1996, Dr. Kiepfer stated: "I understand that Mr. Six has suffered 'Post Traumatic' neurologic syndrome." AR at 316. According to the Board:

> It is . . . significant that in the 15 February 1996 statement, [Dr. Kiepfer] claimed that he understood that [plaintiff] suffered from "Post Traumatic" neurologi[c] syndrome. [Plaintiff] maintain[s], however, that [he] learned from [Dr. Kiepfer] that [he] suffered from that condition.

Id. at 160. The Board did not find, in Dr. Kiepfer's statement that he "underst[oo]d" that plaintiff suffered from PTSD, id. at 316, support for plaintiff's assertion that Dr. Kiepfer had diagnosed plaintiff as suffering from PTSD. Dr. Kiepfer's statement is at best ambiguous on the point and the Board's view of Dr. Kiepfer's statement is not unreasonable.

The declaration of LCDR Ennes discusses the falsity of the Report of the Court of Inquiry, id. at 199, the alleged silencing orders, id. at 200-204, and the problems that resulted from the alleged silencing orders, id. at 203-04. The Board determined that LCDR Ennes's declaration was not credible because he did not make similar claims in his book about the attack on the Liberty. Id. at 160 ("He devoted a chapter of that book to the alleged cover-up of the incident, but he did not use the term 'silencing order', or mention the alleged visits from an unidentified officer who conveyed the silencing order, and threatened sanctions for violating its terms.").

The Board also determined that "the silencing order, as [plaintiff has] related it, was not absolute since [plaintiff] could have requested an exception to the order from the officer who gave [him] the order or from the former commander of the Liberty," id. at 161, apparently viewing plaintiff as having failed to take appropriate steps if such an order existed.

Given that plaintiff failed to raise the issue of the silencing order in his initial application, given the evidence before the Board of plaintiff's prior untruthful statements, given that two other applicants also failed to raise the silencing order in their initial applications and that one of those two applicants admitted to discussing the incident with his fellow Marines and that the second asserted a claim against the State of Israel, - both actions that appear to violate the alleged silencing order - given that plaintiff's record contains multiple references to the Liberty attack, and given the Board's adverse credibility determinations with respect to the various statements, declarations and affidavits submitted by others on plaintiff's behalf, the BCNR's finding that plaintiff's allegations concerning the alleged silencing order are not credible is supported by substantial evidence.

A finding by the Board that a silencing order did not exist requires the conclusion that plaintiff's further allegation that he did not report his symptoms of PTSD because of the silencing order is not supported by substantial evidence. And, in the absence of a silencing order explaining the lack of evidence of PTSD in the record, the Board's finding that plaintiff failed to demonstrate that he suffered from PTSD at the time of his discharge is also supported by substantial evidence. For completeness, the balance of this Opinion examines the Board's findings with respect to plaintiff's explanation for not reporting his alleged symptoms of PTSD and whether plaintiff did in fact suffer from PTSD at the time of his discharge.

2. Plaintiff's Assertion That He Did Not Report His Alleged Symptoms of PTSD Because of the Silencing Order Is Not Credible

In the absence of a silencing order, plaintiff's assertion that he did not report his symptoms of PTSD because of the silencing order cannot be supported. In addition, the Board found "several entries in [plaintiff's] Navy service and health records which would have been considered violations of the silencing order had [plaintiff] actually received such an order." Id. at 158. These entries included a letter written by plaintiff via his commanding officer, dated May 26, 1970, to the Chief of Naval Personnel, requesting that plaintiff receive the Combat Action Ribbon and discussing the attack on the Liberty and the fact that plaintiff received wounds from torpedo shrapnel. Id. A Report of Medical History, completed on October 21, 1971, also "disclosed a history of wounds to [plaintiff's] lower right leg and a finger of [plaintiff's] right hand." Id. Finally, prior to surgery on plaintiff's mandible in 1972, plaintiff disclosed to a surgeon that he "had

undergone a surgical procedure for the repair of lacerations 'following shrapnel injury', and that [he] had sustained 'Shrapnel injury (1967) R middle finger, R elbow and R lower leg.'" Id. at 159 (citations omitted). The Board concluded:

> Given [plaintiff's] disclosures concerning the attack on the Liberty, [his] participation in combat action, and [his] wounds, as well as the multiple entries in [plaintiff's] record concerning the attack, [plaintiff's] contention to the effect that . . . [he] did not report alleged symptoms such as insomnia, nightmares, and depression or excessive worry because [he] feared [he] might violate the silencing order, is not considered credible.

Id. Plaintiff argues that by "construing any mention of the attack as a violation of the [silencing] orders," the BCNR "consistently [misrepresents] the limits the silencing order imposed." Pl.'s Mem. 39. According to plaintiff, "the order did not block discussion of the obvious; it prohibited discussion of the attack except as described in the non[-]classified versions of the Report of the Court of Inquiry, and its accompanying DoD press release." Id. (citing AR 209-10). Plaintiff, however, fails to make clear exactly what discussions would be prohibited and what discussions would be permitted. That a silencing order prevented plaintiff from disclosing his symptoms of PTSD is unlikely considering seaman Ecker's interview, discussed above in Part II.B.1, and plaintiff's history of telling pieces of the story of the attack of the Liberty that would appear to violate the alleged silencing order, AR 158. Given the Board's finding that a silencing order did not exist and given the numerous disclosures made by plaintiff and other survivors of the attack on the Liberty, the BCNR's determination that the alleged silencing order was not the cause of plaintiff's failure to report his alleged symptoms of PTSD is supported by substantial evidence.

3. Plaintiff Failed to Demonstrate That He Suffered From PTSD at the Time of His Discharge

This court's Reconsideration Opinion "order[ed] that the BCNR consider the case in light of the supplementary evidence and the allegations of a silencing order and, in that broader evidentiary context, determine whether plaintiff suffered from PTSD." Reconsideration Opinion at 5. The Board determined that plaintiff's allegations regarding the existence of a silencing order were not credible. AR 153; see supra Part II.B.1. The Board then considered the supplemental evidence contained in the Administrative Record to determine whether plaintiff suffered from PTSD at the time of his discharge. AR 153-61.

The Board considered, but was not persuaded by, Dr. Estrov's evaluation of plaintiff. AR 153-55. Plaintiff argues that the "[B]oard did not conduct a fair and objective evaluation of [Dr. Estrov's evaluation]. Pl.'s Mem. 27. The Board found that

Dr. Estrov's findings did not substantiate the belief that "most or all of the problems [plaintiff] encountered during [his] service in the Navy are related to the effects of undiagnosed and untreated [PTSD]." AR 153. In particular, the Board found that Dr. Estrov ignored "significant aspects of [plaintiff's] personal history that might have caused or contributed to the development of those problems." Id. Plaintiff was "raised by a single mother in economically deprived circumstances[,] . . . [only] saw [his] father twice during [his] childhood, . . . did not receive adequate medical or dental care as a child, . . . dropped out of high school in the 10th grade, . . . had no significant employment until [he] entered the Navy in 1964[,] . . . began drinking alcoholic beverages at age 15, and [was] rejected for enlistment in 1963 because of immaturity and a history of bedwetting that continued beyond [his] 16th birthday." Id. Furthermore, plaintiff "contracted gonorrhea on at least two occasions while overseas prior to 8 June 1967," which the Board presumed "resulted from contact with prostitutes while [plaintiff's] judgment may have been impaired by alcohol." Id. Additionally, at the time plaintiff married his wife on July 5, 1968, he was twenty-two years old and financially responsible for his pregnant wife and her two children from a previous marriage. Id. at 153-54.

Plaintiff argues, however, that "Dr. Estrov specifically addressed these so called 'aspects' of Six's personal life" and "considered these issues, but concluded the sever[e] mental trauma Six experienced in the Liberty attack was the critical factor in Six's psychiatric symptoms." Pl.'s Mem. 42. Plaintiff also argues that the Board "ignored Dr. Estrov's Report, establishing the high incidence of alcohol abuse and PTSD." Id. at 31 (footnote omitted). Plaintiff urges the court to focus on "the [B]oard's failure to consider Dr. Estrov's testimony, or to seek advice of the Navy's Medical authorities." Id. at 32 (footnote omitted). However, the Board also found that Dr. Estrov failed to discuss an electronic message that was of particular significance "concerning the loss of [plaintiff's] security clearance and [his] ultimate discharge." AR 154. The message discussed plaintiff's indebtedness, excessive drinking, disreputable behavior and mutual physical abuse between plaintiff and his wife. Id. It also mentioned his wife's adultery and that plaintiff's reputation was good "when physically separated from [his] spouse." Id.

Finally, the Board found Dr. Estrov's discussion of Dr. Cain's evaluation to be misleading "because immature personality disorder is a recognized mental disorder." Id. at 155. Plaintiff argues, however, that Dr. Cain's diagnosis was inappropriate because plaintiff has a history of severe brain trauma. Pl.'s Mem. 23, 28. The Board noted that "Dr. Estrov did not comment on the fact that [plaintiff] lied to Dr. [Cain] about [his] use of alcohol." AR 155. Plaintiff acknowledges that he did not disclose his alcoholism to Dr. Cain, but argues that defendant concealed plaintiff's alcohol abuse as well. Pl.'s Mem. 29. Plaintiff argues that "this information was withheld from the medics to preclude Six from gaining access to the Alcohol and Substance Abuse Rehab program."

Id. (footnote omitted). Plaintiff, however, offers no evidence to support this argument.[7] See Pl.'s Mem. passim. Plaintiff also argues that the 1972 evaluations, "having failed to inquire as to service events that might put Six at risk for psychiatric disorders, misconstrued Six's lack of cooperation in the mental health evaluation and erroneously concluded he was evidencing 'immature' conduct." Id. at 37. Plaintiff alleges that in actuality, plaintiff was simply constrained by the silencing order and the symptoms of PTSD. Id. According to plaintiff, "of military personnel suffering from PTSD, less than 40% sought professional help for their difficulties." Id. at 41 (citations omitted). Yet, as discussed in Part II.B.2 above, plaintiff's records contain numerous disclosures of the attack on the Liberty and plaintiff's injuries. See supra Part II.B.2. Given its findings of inconsistencies and lacunae in Dr. Estrov's evaluation, it was not arbitrary or capricious for the Board to decline to rely on Dr. Estrov's evaluation of plaintiff.

Furthermore, contrary to plaintiff's assertions, Pl.'s Mem. 28; Pl.'s Facts 9-10, the Board did not find that plaintiff's Enlisted Performance Record supported a finding of PTSD, AR 154. The Board noted that plaintiff's performance "was slightly better after the attack on Liberty than before the attack." Id. Plaintiff's performance record fluctuated but remained high up until the time of his discharge, with the exception of a drop in plaintiff's military behavior rating to 2.0 in July of 1972. Id. at 64.[8] Following a

[7] Plaintiff's briefing is replete with speculative inferences drawn by plaintiff's counsel and repeated references to counsel's past experiences in the military. Examples of plaintiff's counsel's inferences include: "A fair inference can be made this information was withheld from the medics to preclude Six from gaining access to the Alcohol and Substance Abuse Rehab program," Pl.'s Mem. 29 (footnote omitted); "A fair inference can be drawn that the 23 July 2004 action of the Executive Director . . . was improperly motivated by a materially prejudicially intent to avoid the [B]oard's responsibility," id. at 32 n.9; "a fair inference can be made that the failure to forward that document . . . was motivated to conceal," id.; "a heavy inference exists that the true reason for his discharge was . . . ," id. at 35; "[a] fair inference can be made that the first evaluator was troubled by Six's affect and demeanor," id. at 36; and "[i]t also can be fairly inferred that the evaluator was troubled by omissions of psychiatric significance in Six's available medical records," id. Examples of references to plaintiff's counsel's past experiences include: "While not explained in Six's record, one familiar with Navy discipline would recognize this action," id. at 14 n.3; "Counsel is himself a Retired Navy JAG Reserve officer . . . . It is quite unusual to see an individual's security clearances revoked . . . [,]" id. at 34; and "Counsel's past experience in dealing with similar situations notes . . . ," id. at 37 n.11. The foregoing and similar statements are not part of the AR, do not constitute evidence, and are not helpful to the court in the resolution of this case.

[8] According to the Board, the Enlisted Performance Evaluations "had a possible numerical range . . . from 4.0 to 2.2, in increments of .2." AR 154. "Only those ratings that were below 2.6 were per se adverse/unsatisfactory and required additional written comments to justify the ratings." Id. at 155.

low point of 2.8 in May of 1968, plaintiff's military appearance rating increased and remained at a 3.4 or higher. Id. Nor did the Board accept plaintiff's contention that he developed a "death wish" as a result of his untreated PTSD. Id. at 160. Plaintiff alleges that he volunteered for two tours of duty in Vietnam because he wanted to die. Compl. 15. The Board found, however, that "the periods of duty were not lengthy, and there is no indication in available records that [plaintiff] participated directly in offensive combat operations or that [plaintiff] came under enemy fire." AR 161. In addition, plaintiff "received highly complementary [sic] performance reports during each of those periods, when [he was] apart from [his] spouse." Id.[9]

The AR does not require the court to conclude that the decision of the BCNR was arbitrary, capricious, contrary to law, or unsupported by substantial evidence. The court agrees with defendant that, given the Board's credibility determinations of those claiming to diagnose plaintiff with PTSD, plaintiff's Enlistment Performance Record, and plaintiff's failure to report any PTSD symptoms, "[t]he BCNR's finding that Mr. Six failed to demonstrate that he suffered from PTSD while serving in the Navy, or that he was unfit to serve, at the time of his discharge is supported by substantial evidence." Def.'s Mot. 16.

## II. Conclusion

For the foregoing reasons, the court GRANTS defendant's motion for judgment on the AR and DENIES plaintiff's motion for judgment on the AR. The Clerk of the Court is directed to enter JUDGMENT for defendant. No costs.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge

[9]Plaintiff argues that "the [B]oard wholly ignored and failed to consider the statements of Six's son and Six's stepchildren." Pl.'s Mem. 31; see supra note 6. The court does not believe that the BCNR was required to credit childhood memories as probative evidence of plaintiff's medical condition several decades in the past, especially when the distant memories of various individuals are now expressed in nearly identical language. Compare AR 44-45, with AR 46-47.